# **EXHIBIT 1**

**ICSID**

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**
1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE +1 (202) 458 1534 | FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# CERTIFICATE

### AIR CANADA

### v.

### BOLIVARIAN REPUBLIC OF VENEZUELA

### (ICSID CASE NO. ARB(AF)/17/1)

I hereby certify that the attached document is a true copy of the Tribunal's Award dated September 13, 2021.

Meg Kinnear
Secretary-General

Washington, D.C., September 13, 2021



**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

**Air Canada**

**v.**

**Bolivarian Republic of Venezuela**

**(ICSID Case No. ARB(AF)/17/1)**

---

**AWARD**

---

***Members of the Tribunal***
Prof. Pierre Tercier, President of the Tribunal
Dr. Charles Poncet, Arbitrator
Ms. Deva Villanúa, Arbitrator

***Secretary of the Tribunal***
Mr. Marco Tulio Montañés-Rumayor

***Assistant to the Tribunal***
Ms. Maria Athanasiou

13 September 2021

## REPRESENTATION OF THE PARTIES

*Representing Air Canada*

Mr. Kenneth R. Fleuriet
Mr. Marc-Olivier Langlois
King & Spalding
12, Cours Albert Ier
Paris 75008
France

and

Mr. Reginald Smith
Ms. Eldy Quintanilla Roche
Mr. Fernando Rodríguez-Cortina
King & Spalding
1100 Louisiana Street, suite 4000
Houston, Texas 77002
United States of America

*Representing the Bolivarian Republic of Venezuela*

Mr. Reinaldo Enrique Muñoz Pedroza
Procurador General de la República (E)
Mr. Henry Rodríguez Facchinetti
Gerente General de Litigio
Procuraduría General de la República
Av. Los Ilustres, cruce con calle Francisco
Lazo Marti Urb. Santa Mónica
Caracas, 1040, Distrito Capital, Venezuela

and

Mr. Alfredo De Jesús S.
De Jesús & De Jesús, S.A.
Torre Luxor, Piso 3, Oficina 3B,
Urb. Las Mercedes,
Municipio Baruta del Estado Miranda,
Caracas, 1060
Venezuela
  and
Edificio Magna Corp, Piso 5, Oficina 507
Calle 51 Este y Manuel María Icaza
Bella Vista, Ciudad de Panamá
Panama

and

Dr. Alfredo De Jesús O.
Mr. Pierre Daureu
Ms. Eloisa Falcón López
Ms. Marie-Thérèse Hervella
Ms. Erika Fernández Lozada
Ms. Déborah Alessandrini
Alfredo De Jesús O. – Transnational
Arbitration & Litigation
20, rue Quentin Bauchart
Paris 75008
France

## TABLE OF CONTENTS

**TABLE OF ABBREVIATIONS** ................................................................. vii

**TABLE OF SUBMISSIONS AND TRIBUNAL DECISIONS** ................... xi

**A.    SUMMARY OF THE FACTS AND PROCEDURE** ................................ 1

**I.    The Parties and other concerned entities** ......................................... 1

**II.    Overview of the factual background** ................................................. 1
1.    Air Canada's presence in Venezuela until 1 July 2004 ................... 2
2.    The Venezuelan currency exchange regime ................................... 3
3.    The filing of the *Autorizacíon de Adquisición de Divisas* ............. 3
4.    The suspension of Air Canada's flights to Caracas ........................ 5

**III.    The arbitral proceedings** ................................................................. 8
1.    The commencement of the proceedings ......................................... 8
2.    The written procedure ................................................................... 8
3.    The Hearing .................................................................................. 17
4.    The steps following the Hearing ................................................... 20

**B.    LEGAL CONSIDERATIONS** ............................................................ 23

**I.    In general** ........................................................................................ 23
1.    The arbitration agreement ............................................................ 23
2.    The constitution of the Tribunal ................................................... 28
3.    The arbitral procedure .................................................................. 28
4.    The Parties' prayers for relief ...................................................... 29
      4.1  Claimant ............................................................................... 29
      4.2  Respondent ........................................................................... 30
5.    Roadmap ....................................................................................... 31

**II.    Applicable law** ................................................................................ 32

**III.    Jurisdiction and Admissibility** ....................................................... 34
1.    The issue ....................................................................................... 34
2.    Objection to jurisdiction based on the ATA ................................. 35
      2.1  The Parties' positions .......................................................... 35
           (i)    Respondent ................................................................. 35
           (ii)   Claimant ..................................................................... 38
      2.2  The Tribunal's analysis ........................................................ 39
           (i)    The issue .................................................................... 39
           (ii)   The lex specialis principle ......................................... 40
           (iii)  The ATA and the BIT ................................................. 44
                  a.    In general ........................................................... 44

|  | b. | The ATA | 44 |
|  | c. | The BIT | 46 |
|  | d. | The application of the *lex specialis* | 48 |
| (iv) | | Does the ATA supersede the BIT in the present case? | 50 |
| (v) | | Conclusion | 51 |
| 3. | | Objection to jurisdiction based on the waiver provision of the BIT | 51 |
| 3.1 | | The Parties' positions | 51 |
| (i) | | Respondent | 51 |
| (ii) | | Claimant | 52 |
| 3.2 | | The Tribunal's analysis | 53 |
| (i) | | The issue | 53 |
| (ii) | | Article XII(3)(b) of the BIT | 54 |
| (iii) | | Has Claimant complied with Article XII(3)(b)? | 57 |
| (iv) | | Conclusion | 58 |
| 4. | | Objection to jurisdiction based on the time-bar provision of the BIT | 58 |
| 4.1 | | The Parties' positions | 58 |
| (i) | | Respondent | 58 |
| (ii) | | Claimant | 59 |
| 4.2 | | The Tribunal's analysis | 60 |
| (i) | | The issue | 60 |
| (ii) | | The requirements of Article XII(3)(d) | 61 |
| (iii) | | Has Claimant complied with Article XII(3)(d) of the BIT? | 63 |
| (iv) | | Conclusion | 67 |
| 5. | | Objections to jurisdiction *ratione materiae* and *ratione personae* | 68 |
| 5.1 | | The Parties' positions | 68 |
| (i) | | Respondent | 68 |
|  | a. | *Ratione materiae* | 68 |
|  | b. | *Ratione personae* | 71 |
| (ii) | | Claimant | 71 |
|  | a. | In general | 71 |
|  | b. | Investment under Article I(f) of the BIT | 71 |
|  | c. | The *Salini* test | 73 |
|  | d. | Compliance with Venezuelan law | 73 |
| 5.2 | | The Tribunal's analysis | 75 |
| (i) | | In general | 75 |
| (ii) | | Ratione materiae | 75 |
|  | a. | The issue | 75 |
|  | b. | The definition | 75 |
|  | c. | The facts | 80 |
|  | d. | Conclusion | 83 |
| (iii) | | Ratione personae | 83 |
|  | a. | The issue | 83 |
|  | b. | The definition | 83 |
|  | c. | The facts | 84 |
|  | d. | Conclusion | 84 |
| (iv) | | Conclusion | 84 |

6.    Conclusion ................................................................................................... 84

**IV. Merits** .......................................................................................................... **84**
1.    The issue .................................................................................................. 84
2.    Article VIII of the BIT: Free Transfer of Funds ..................................... 85
   2.1   The Parties' positions .......................................................................... 85
      (i)    Claimant .................................................................................. 85
      (ii)   Respondent .............................................................................. 87
   2.2   The Tribunal's analysis ........................................................................ 91
      (i)    The issue .................................................................................. 91
      (ii)   Article VIII of the BIT ........................................................... 92
      (iii)  Did Respondent violate Article VIII of the BIT? ................... 98
         a.    The facts ........................................................................ 98
         b.    The assessment ............................................................ 108
      (iv)   Other considerations ............................................................ 116
      (v)    Conclusion ............................................................................ 116
3.    Article II of the BIT: Fair and Equitable Treatment ............................. 117
   3.1   The Parties' positions ........................................................................ 117
      (i)    Claimant ................................................................................ 117
      (ii)   Respondent ............................................................................ 120
   3.2   The Tribunal's analysis ...................................................................... 125
      (i)    The issue ................................................................................ 125
      (ii)   Article II(2) of the BIT ......................................................... 126
      (iii)  Did Respondent violate Article II(2) of the BIT? .................. 130
         a.    Facts ............................................................................. 131
         b.    Assessment .................................................................. 132
      (iv)   Conclusion ............................................................................ 137
4.    Article VII of the BIT: Expropriation ................................................... 137
   4.1   The Parties' positions ........................................................................ 137
      (i)    Claimant ................................................................................ 137
      (ii)   Respondent ............................................................................ 141
   4.2   The Tribunal's analysis ...................................................................... 145
      (i)    The issue ................................................................................ 145
      (ii)   Article VII of the BIT ........................................................... 145
      (iii)  Did Respondent violate Article VII of the BIT? .................... 149
         a.    Facts ............................................................................. 150
         b.    Assessment .................................................................. 150
      (iv)   Conclusion ............................................................................ 152
5.    Conclusion .............................................................................................. 152

**V. Damages** ..................................................................................................... **152**
1.    The issue ................................................................................................ 152
2.    Entitlement to and quantification of damages ....................................... 153
   2.1   The Parties' positions ........................................................................ 153
      (i)    Claimant ................................................................................ 153
      (ii)   Respondent ............................................................................ 156
   2.2   The Tribunal's analysis ...................................................................... 164

(i)    The issue ................................................................................................ 164
(ii)   Entitlement to damages ............................................................................ 164
a.    The law ................................................................................................. 164
b.    The assessment ..................................................................................... 166
(iii)  Quantification of damages ....................................................................... 168
2.3  Conclusion ................................................................................................. 178
3.    Interest ............................................................................................................ 178
3.1  The Parties' positions ................................................................................ 178
(i)    Claimant ................................................................................................. 178
(ii)   Respondent ............................................................................................. 180
3.2  The Tribunal's analysis .............................................................................. 184
3.3  Conclusion ................................................................................................. 187
4.    Conclusion ...................................................................................................... 187

**VI.  Arbitration costs** ............................................................................................ **188**
1.    The issue ......................................................................................................... 188
2.    The Parties' positions ..................................................................................... 188
2.1  Claimant ..................................................................................................... 188
2.2  Respondent ................................................................................................. 189
3.    The costs of the proceeding ............................................................................ 191
4.    The Tribunal's analysis ................................................................................... 191
5.    Conclusion ...................................................................................................... 192

**C.    AWARD** ........................................................................................................... **193**

# TABLE OF ABBREVIATIONS

| AAD request | Application for an Authorization for Foreign Currency Acquisition (*Solicitud de Autorización de Adquisición de Divisas*) |
|---|---|
| 15 AAD requests or 15 AADs or Controverted AADs or AADs in dispute | 15 AAD requests filed by Air Canada between September 2013 to January 2014 for ticket sales corresponding to October 2012 to December 2013 and for a total amount of approximately U.S.$ 50 million |
| Additional Facility Rules or AF Rules | Rules Governing the Additional Facility for the Administration of Proceedings by the Secretariat of the International Centre for Settlement of Investment Disputes, 2006 |
| AF Arbitration Rules | Arbitration (Additional Facility) Rules |
| ALAV | Venezuelan Airlines Association (*Asociación de Líneas Aéreas de Venezuela*) |
| ALD | Authorization to Liquidate Foreign Currency (*Autorización de Liquidación de Divisas*) |
| ATA | Air Transport Agreement between the Government of Canada and the Government of the Republic of Venezuela, signed in Caracas on 26 June 1990 |
| BASSA | Bassa Business, Aviation & Services, S.A. |
| BCV | Central Bank of Venezuela (*Banco Central de Venezuela*) |
| BIT or Canada-Venezuela BIT | Agreement between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and Protection of Investments, signed in Caracas on 1 July 1996 |
| CADIVI | Commission for the Administration of Foreign Currency (*Comisión de Administración de Divisas*) |

| CENCOEX | National Centre of Foreign Trade (*Centro Nacional de Comercio Exterior*) |
|---|---|
| Chicago Convention | Chicago Convention on International Civil Aviation, signed on 7 December 1944 |
| Civil Code | Venezuelan Civil Code, published in Extraordinary Official Gazette No. 2.990, dated 26 July 1982 |
| Claimant or Air Canada | Air Canada Inc. |
| Designated Airlines | Airlines designated under the ATA |
| DR-CAFTA | Dominican Republic–Central America Free Trade Agreement |
| Exchange Agreement No. 1 | Agreement entered into between the Ministry of Finance and the Central Bank on 5 February 2003 |
| Exchange Agreement No. 2 | Agreement entered into between the Ministry of Finance and the Central Bank on 9 February 2003 |
| Forex | Foreign exchange control |
| GSA | Passenger General Sales Agreement between Air Canada and Business Aviation & Services, S.A. BASSA |
| IATA | International Air Transport Association |
| ICJ | International Court of Justice |
| ICSID | International Centre for Settlement of Investment Disputes |
| ICSID Convention | Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 1965 |
| ILC | International Law Commission |

| ILC Articles | International Law Commission's Draft Articles on Responsibility of States for Internationally Wrongful Acts |
|---|---|
| INAC | National Institute for Civil Aviation / National Institute for Civil Aeronautics (*Instituto Nacional de Aviación Civil / Instituto Nacional de Aeronáutica Civil*) |
| IVSS | Venezuelan Institute for Social Security (*Instituto Venezolano de los Seguros Sociales*) |
| IVSS Certificates | Certificates of Good Standing issued by the IVSS |
| LOPA | Organic Law of Administrative Procedures (*Ley Orgánica de Procedimientos Administrativos*) |
| MFN | Most Favored Nation |
| MPPDP | Ministry of the Popular Power for the Office of the Presidency and Government Administration Oversight (*Ministerio del Poder Popular del Despacho de la Presidencia y Seguimiento de la Gestión de Gobierno*) |
| NAFTA | North America Free Trade Agreement |
| NAFTA Interpretation | NAFTA Notes of Interpretation of Certain Chapter 11 Provisions |
| Parties | Air Canada and the Republic |
| PDVSA | Petróleos de Venezuela, S.A. |
| *Providencia* No. 23 | *Providencia* No. 23 issued by CADIVI, published in Official Gazette No. 37.667, dated 8 April 2003 |
| *Providencia* No. 124 | *Providencia* No. 124 issued by CADIVI, published in Extraordinary Official Gazette No. 6.122, dated 23 January 2014 |
| RAV 108 | Venezuelan Aviation Regulation No. 108 (*Regulación Aeronáutica Venezolana*) |

| | |
|---|---|
| RUSAD | Users Registry of the Currency Administration System (*Registro de Usuarios del Sistema de Administración de Divisas*) |
| SICAD | Alternative System for the Acquisition of Currency (*Sistema Complementario de Administración de Divisas*) |
| SOTI | Sold Outside Ticked In |
| SOTI tickets | Tickets ticketed in the Republic but sold outside of the Republic |
| Suspension Notice | Air Canada's notice of suspension of its flights to Caracas dated 17 March 2014 |
| The Republic or Venezuela | The Bolivarian Republic of Venezuela |
| VCLT | Vienna Convention on the Law of the Treaties |
| VEF | Bolivar Fuerte |
| Toronto-Caracas-Toronto route | Non-stop route between Lester B. Pearson International Airport in Toronto, Canada, and *Aeropuerto Internacional de Maiquetía Simón Bolívar* in Caracas, Venezuela, began in 2004 |

# TABLE OF SUBMISSIONS AND TRIBUNAL DECISIONS

| Request for Arbitration | Request for Access to the Additional Facility and Request for Arbitration, dated 16 December 2016 |
|---|---|
| PO No. 1 | Procedural Order No. 1, dated 12 January 2018 |
| Memorial | Memorial on the Merits submitted by Air Canada, dated 22 March 2018 |
| Application for Bifurcation | Respondent's Application for Bifurcation, dated 15 June 2018 |
| Response to Application for Bifurcation | Response to Respondent's Application for Bifurcation, dated 28 June 2018 |
| PO No. 2 | Procedural Order No. 2, dated 10 July 2018 |
| Counter-Memorial | Counter-Memorial on Jurisdiction and Merits, dated 3 August 2018 |
| PO No. 3 | Procedural Order No. 3, dated 14 September 2018 |
| PO No. 4 | Procedural Order No. 4, dated 29 October 2018 |
| PO No. 5 | Procedural Order No. 5, dated 20 November 2018 |
| PO No. 6 | Procedural Order No. 6, dated 29 November 2018 |
| Reply | Reply Memorial on the Merits and Counter-Memorial on Jurisdiction submitted by Air Canada, dated 14 December 2018 |
| PO No. 7 | Procedural Order No. 7, dated 28 May 2019 |
| Rejoinder | Rejoinder on Jurisdiction and Merits submitted by the Bolivarian Republic of Venezuela, dated 25 October 2019 |
| PO No. 8 | Procedural Order No. 8, dated 24 February 2020 |

| PO No. 9 | Procedural Order No. 9, dated 3 April 2020 |
|---|---|
| PO No. 10 | Procedural Order No. 10, dated 7 July 2020 |
| R-PHB | Respondent's Post-Hearing Brief, dated 5 June 2020 |
| C-PHB | Claimant's Post-Hearing Brief, dated 5 June 2020 |
| Reply R-PHB | Respondent's Reply Post-Hearing Brief, dated 14 September 2020 |
| Reply C-PHB | Claimant's Reply Post-Hearing Brief, dated 14 September 2020 |
| C-Costs | Respondent's Submission on Costs, dated 8 January 2021 |
| R-Costs | Claimant's Submission on Costs, dated 8 January 2021 |

# A.    SUMMARY OF THE FACTS AND PROCEDURE

## I.    The Parties and other concerned entities

1.    <u>Claimant</u> is ***Air Canada Inc.***, a Canadian airline headquartered in Montreal, Canada ("Claimant" or "Air Canada").

2.    Air Canada has been a wholly private company since 1989 and is publicly traded on the Toronto Stock Exchange. It is one of the 20 largest airlines in the world, operating an average of 1,600 scheduled flights per day and flying directly to 222 airports around the world.[1]

3.    <u>Respondent</u> is the ***Bolivarian Republic of Venezuela*** ("Republic" or "Venezuela").

4.    ***Other entities concerned*** are the following:

    (a)    The *Commission for the Administration of Foreign Currency* or *Comisión de Administración de Divisas* ("CADIVI");

    (b)    The *National Institute for Civil Aviation*, later renamed *National Institute for Civil Aeronautics* ("INAC");

    (c)    The *Venezuelan Airlines Association* or *Asociación de Líneas Aéreas de Venezuela* ("ALAV");

    (d)    The *International Air Transport Association* ("IATA"); and

    (e)    *Banco Mercantil*, an exchange agency ("Banco Mercantil").

## II.    Overview of the factual background

5.    The following Section is a general summary of the facts of the dispute and does not purport to be exhaustive. To the extent that a more detailed statement of the essential facts is necessary, it is given in connection with the various claims and defenses.

---

[1] Memorial, para. 17.

1.    **Air Canada's presence in Venezuela until 1 July 2004**

6.    Air Canada began service in Venezuela <u>in the late 1970s.</u>[2] <u>It established a local subsidiary in the late 1980s with U.S.$ 50,000 in capital</u>.[3]

7.    <u>From 1989 to 2004</u>, Air Canada's operations in Venezuela consisted mainly of promoting Canada as a travel destination and marketing Air Canada flights between North American destinations.[4]

8.    <u>On 26 June 1990</u>, the Government of Canada and the Government of Venezuela entered into the ***Air Transport Agreement*** ("ATA"). The ATA granted Air Canada the right to operate international air services in Venezuela, including overflying Venezuelan territory, landing in Venezuela for non-traffic purposes, and landing in Venezuela for picking up and dropping off international passengers, cargo and mail when serving certain routes.[5]

9.    <u>In 2004</u>, to further expand its presence in Latin America by operating flights to and from the region, Air Canada decided to launch a non-stop service between Lester B. Pearson International Airport in Toronto, Canada, and *Aeropuerto Internacional de Maiquetía Simón Bolívar* in Caracas, Venezuela, i.e., the *Toronto-Caracas-Toronto route*.[6]

10.   <u>On 4 March 2004</u>, Air Canada applied to the INAC, for authorization under the ATA to operate scheduled air services between Toronto and Caracas as of 1 June 2004.[7]

11.   <u>On 22 May 2004</u>, Air Canada signed a renewable *General Sales Agreement* with a *Business, Aviation & Services S.A.* ("BASSA") – a Venezuelan company selling air transportation – by which it organized its operations within the Republic.[8]

12.   <u>On 25 June 2004</u>, INAC issued ***Providencia No. 60***, an administrative order that permitted Air Canada to operate as a commercial air carrier in Venezuela and to provide regular transportation services between Caracas and Toronto.[9]

13.   <u>On the same day</u>, Air Canada entered into a service contract with *GlobeGround Venezuela* – a Venezuelan company – for the ground handling of its aircraft at Maiquetía airport in Caracas.[10]

---

[2] Exh. C-7, Certificate issued by the Registry of Commerce domiciling Air Canada's Venezuela's branch, dated 25 June 2005 ("Certificate"); Memorial, para. 20.

[3] Exh. C-7 (Certificate); RfA, para. 10; Memorial, para. 20.

[4] RfA, para. 10; Memorial, para. 24.

[5] Exh. C-5, Air Transportation Agreement between the Government of Canada and the Government of Venezuela, dated 14 September 1990 ("ATA"), Art. XXI(2); RfA, para. 8; Memorial, paras 6 and 22.

[6] RfA, para. 1; Memorial, para. 24.

[7] Exh. R-5, Letter from Air Canada to INAC, dated 4 March 2004; Counter-Memorial, para. 29.

[8] Exh. R-2, Passenger General Sales Agency Agreement between Air Canada and BASSA for the period 2012-2014, dated 22 May 2012 ("Passenger General Sales Agency Agreement").

[9] Exh. C-8, INAC *Providencia Administrativa No. 60*, dated 2 May 2003; see also RfA, para. 12; Counter-Memorial, para. 33.

[10] Exh. R-6, Standard Ground Handling Agreement between Air Canada and GlobeGround Venezuela valid as from 15 June 2004, dated 30 April 2004; Counter-Memorial, para. 30; see also Memorial, para. 28.

14.  On 30 June 2004, INAC approved the operation of Air Canada.[11]

15.  On 1 July 2004, Air Canada began operating the Toronto-Caracas-Toronto route under *Providencia No. 60*, with three weekly flights, usually with a 120-seat Airbus 319.[12]

**2.  The Venezuelan currency exchange regime**

16.  On 5 February 2003, President Hugo Chávez created the ***Commission for the Administration of Foreign Currency*** or ***Comisión de Administración de Divisas*** ("CADIVI"), a government entity attached to the former Ministry of Finance (now the Ministry of Popular Power for Planning and Finance), to administer the legal exchange of currency in Venezuela.[13]

17.  On the same date, the Ministry of Finance and the Central Bank entered into ***Exchange Agreement No. 1***, pursuant to which: (i) the purchase and sale of foreign currency in Venezuela was centralized in the Central Bank; and (ii) the Central Bank and the Ministry of Finance would determine the applicable official exchange rate in connection with CADIVI requests.[14]

18.  On 9 February 2003, the Ministry of Finance and the Central Bank entered into ***Exchange Agreement No. 2***, which established the official exchange rates for the purchase and sale of U.S. dollars.[15]

19.  On 8 April 2003, CADIVI issued ***Providencia No. 23***, an administrative order that regulated the ***Authorizations for Currency Acquisition*** or ***Autorización de Adquisición de Divisas*** ("***AADs***") by foreign carriers in Venezuela which were processed at an exchange rate of 6.3 bolivars to 1 U.S. dollar.[16]

**3.  The filing of the *Autorizacíon de Adquisición de Divisas***

20.  As of July 2004, when the Toronto-Caracas-Toronto route began operating (see *supra* para. 15), Air Canada regularly submitted AAD applications to CADIVI, through Banco Mercantil, in order to exchange the bolivar proceeds generated from ticket sales in Venezuela to U.S. dollars and repatriate them.[17] Through November 2012, Air Canada

---

[11] Exh. C-106, Fax from INAC authorizing Air Canada Operations.
[12] RfA, para. 13; Memorial, para. 27; Counter-Memorial, para. 34.
[13] Exh. C-10, Decree No. 2,302, 5 February 2003 ("Decree No. 2,302"); RfA, para. 21; Memorial, para. 3.
[14] C-31 / RL- 52, Exchange Agreement No. 1, originally published in Official Gazette No. 37.625, dated 5 February 2003, reprinted in Official Gazette No. 37.653, dated 19 March 2003 ("Exchange Agreement No. 1"); Memorial, para. 35.
[15] Exh. C-94, Exchange Agreement No. 2, published in Official Gazette No. 37.875, dated 9 February 2004; Memorial, para. 325.
[16] Exh. C-9 / Exh. R-11, CADIVI *Providencia Administrativa No. 23*, published in Official Gazette No. 37.667, dated 8 April 2003 ("Providencia No. 23"); see also RfA, para. 22 and Counter-Memorial, para. 43.
[17] RfA, para. 24; Memorial, para. 40.

submitted 91 AAD requests totaling approximately U.S.$ 91 million, which were approved by CADIVI ("91 AAD requests").[18]

21. <u>From September 2013 through January 2014</u>, Air Canada submitted 15 additional AAD requests corresponding to the ticket sales of October 2012 to December 2013, totaling approximately U.S.$ 50 million ("15 AADs" or "15 AAD requests" or "Controverted AADs" or "Disputed AADs").[19] Specifically:

– <u>On 20 September 2013</u>, Air Canada submitted 10 AAD requests for ticket sales covering the period from October 2012 through July 2013.[20]

– <u>On 11 October 2013</u>, Air Canada submitted one AAD request for ticket sales for August 2013.[21]

– <u>On 29 October 2013</u>, Air Canada submitted one AAD request for ticket sales for September 2013.[22]

– <u>On 14 January 2014</u>, Air Canada submitted one AAD request for ticket sales for October 2013.[23]

– <u>On 15 January 2014</u>, Air Canada submitted one AAD request for ticket sales for November 2013.[24]

– <u>On 22 January 2014</u>, Air Canada submitted one AAD request for ticket sales for December 2013.[25]

– It is undisputed that all of the above AAD requests were not processed.

22. <u>Between November 2013 and March 2014</u>, the issue of the remittance of funds related to AAD requests by foreign airlines, including Air Canada, was the subject of discussions between INAC, IATA, ALAV, and the Venezuelan government.[26]

---

[18] Memorial, para. 47.

[19] Memorial, para. 5; Counter-Memorial, para. 63.

[20] Exh. C-75, Currency Acquisition Request No. 17319004, dated October 2012; Exh. C-76, Currency Acquisition Request No. 17319142, dated November 2012; Exh. C-77, Currency Acquisition Request No. 17319325, dated December 2012; Exh. C-78, Currency Acquisition Request No. 17319490, dated January 2013; Exh. C-79, Currency Acquisition Request No. 17319683, dated February 2013; Exh. C-80, Currency Acquisition Request No. 17319919, dated March 2013; Exh. C-82, Currency Acquisition Request No. 17320990, dated April 2013; Exh. C-82, Currency Acquisition Request No. 17321189, dated May 2013; Exh. C-83, Currency Acquisition Request No. 17321350, dated June 2013; Exh. C-84, Currency Acquisition Request No. 17321425, dated July 2013; Memorial, para. 58.

[21] Exh. C-85, Currency Acquisition Request No. 17415372, dated August 2013; RfA, para. 26; Memorial, para. 58.

[22] Exh. C-86, Currency Acquisition Request No. 17494025, dated September 2013; Memorial, para. 58.

[23] Exh. C-87, Currency Acquisition Request No. 17779096, dated October 2013; Memorial, para. 58.

[24] Exh. C-88, Currency Acquisition Request No. 17781897, dated November 2013; Memorial, para. 58.

[25] Exh. C-89, Currency Acquisition Request No. 17807874, dated December 2013; Memorial, para. 58.

[26] See, for example, RfA, para. 27, Memorial, para. 65 and Exh. C-39, ALVA Press Release, dated 7 March 2014.

23.    <u>On 22 January 2014</u>, CADIVI issued ***Providencia No. 124***, an administrative order that became effective on 24 January 2014. Pursuant to Providencia No. 124, Venezuela would thereafter process foreign airlines' AADs at a different exchange rate, i.e., approximately 11 bolivars for 1 U.S. dollar.[27]

**4.    The suspension of Air Canada's flights to Caracas**

24.    <u>On 23 January 2014</u>, Air Canada informed the public that its "*flights continue operating as normal*" but that "*the issuance of tickets* [has been] *temporarily suspended*".[28]

25.    <u>On 17 March 2014</u>, Air Canada informed INAC of its ***decision to suspend its flights to Caracas*** (the "Suspension Notice") from that date until further notice, due to the unrest and challenges of conducting business in Venezuela, including the possibility of repatriating its funds from Venezuela. It indicated that its office in Caracas would remain open to assist passengers with tickets out of Venezuela. Air Canada further stated that it would monitor the situation and reassess the reprogramming of its flights with a view to resuming operations on this route once the situation in Venezuela had stabilized.[29]

26.    <u>On 19 March 2014</u>, INAC acknowledged receipt of the Suspension Notice. It stated that relations between Air Canada and Venezuela were subject to the ATA which provided for a specific termination regime. INAC also stated that Air Canada's motivations for terminating the flights could be resolved through the dispute settlement mechanism of Article XVIII of the ATA. Finally, INAC reminded Air Canada that being air transport a public service, it was up to the State to decide when a private entity ceases to provide such a service. In particular, it stressed that foreign companies that comply with the Venezuelan legal framework will be protected and their investments encouraged, but those that choose to break the law will not benefit from exemptions or privileged treatment.[30]

27.    <u>On 26 March 2014,</u> Air Canada clarified to INAC that it had provided the Suspension Notice, but that as a private company, it could not terminate the ATA because it was an intergovernmental treaty.[31]

28.    <u>In late March 2014</u>, Venezuela announced that it would allow airlines to repatriate their revenues.[32]

---

[27] Memorial, para. 59.
[28] Exh. R-45, Printout if Air Canada Venezuela's Twitter webpage, dated 23 January 2014.
[29] Exh. C-49, Letter from Air Canada to the President of INAC, dated 17 March 2014; RfA, para. 29; Memorial, para. 67.
[30] Exh. C-45, Letter from INAC to Air Canada, dated 19 March 2014; Memorial, para. 75.
[31] Exh. C-46, Letter from Air Canada to INAC, dated 26 March 2014; Memorial, para. 75.
[32] Memorial, para. 78.

29.   On 28 April 2014, Air Canada wrote to the President of INAC requesting a meeting to clarify any misunderstandings regarding Air Canada's Suspension Notice (see *supra* para. 25), the future of its operations in Venezuela, and the repatriation of its funds.[33]

30.   On 28 May 2014, Air Canada wrote to the Venezuelan Vice President to clarify any misunderstandings further to the Suspension Notice (see *supra* para. 25). Air Canada explained that it had never been involved in domestic or foreign affairs and therefore had not publicly commented on the restriction to transfer its funds necessary to maintain operations. Air Canada emphasized that despite the suspension, it remained committed to its operations and investments in Venezuela and intended to resume its services once the situation was regularized. Finally, Air Canada confirmed its willingness to meet with government officials to resolve the issue and negotiate a plan for moving forward.[34]

31.   On 13 June 2014, IATA's Director General and CEO sent a letter to the President of Venezuela "*on behalf of the airline members of the* [IATA] *that operate flights to Venezuela*" stating the following:

> *Over the past weeks, foreign airlines flying to and from Venezuela have been in negotiations with the Minister of Transport, Mr. Hebert Garcia Plaza, regarding the blocked monies from airline ticket sales in Venezuela. IATA and the carriers recognize the efforts made by the government to find a solution to this long standing issue. While a few airlines have agreed to the terms, the majority of our members have chosen not to accept them. Particularly given the government's insistence that our members agree not to pursue other available legal remedies, the airlines have cited a number of serious concerns:*
>
> *1. Lack of guarantees regarding compliance with or enforceability of the proposed two-year payment plan.*
>
> *2. Proposed reductions in the amounts owed, unilaterally decided by CAA, appear to be based on inaccuracies and inconsistencies.*
>
> *3 No provision for remittances relating to sales executed during the first half of 2014.*
>
> *4. No details provided regarding the regulation of fare calculations and payment processes applicable as of July 1st under the SICAD II scheme.*
>
> *Furthermore, IATA is very alarmed that airlines have been asked to provide detailed and sensitive information on their inventories and fare structures for the Venezuelan market. Such requests are inconsistent with applicable bilateral air services agreements, raise concerns about competition law compliance, and run contrary to the airlines' expectation that they will be able to set prices based on prevailing market conditions.*

---

[33] Exh. C-91, Letter from Air Canada to the President of INAC, dated 28 April 2014; Memorial, para. 83.

[34] Exh. C-56, Letter from Air Canada to the Vice-President of Venezuela, dated 28 May 2014; Memorial, para. 84.

> *IATA's main objective on behalf of its 240 member airlines is the promotion of robust international air transport in the service of national economies everywhere. My sole purpose in writing this letter is to find a way to sustain the basis for viable air transportation to and from Venezuela in the interest of the Venezuelan people.*
>
> *As previously communicated, IATA stands by its offer to provide our expertise to assist the government in understanding airline pricing and distribution principles and finding a viable solution for our members.*[35]

32. <u>On 10 July 2014</u>, Air Canada wrote to the Minister for Popular Power, Air and Water Transport. It noted that it had contacted the Vice President but had not received a response (see *supra* para. 30). Air Canada also referred to agreements reached on 3 July 2014 between the Government and 14 airlines regarding their requests for currency exchange in connection with their operations in Venezuela. It described these agreements as encouraging and reaffirmed its intention to move Air Canada's operations forward in Venezuela. Air Canada reiterated that it was unable to maintain its operations without the repatriation of its funds and restated its willingness to meet and negotiate a mutually acceptable agreement.[36]

33. <u>On 3 October 2014,</u> Air Canada wrote to the Minister for Popular Power of Economic, Finance and Public Banks. It repeated what had already been written to the Vice President (see *supra* para. 30) and noted its willingness to meet and resolve the issue of fund repatriation. Air Canada also noted that while its proposal to negotiate remained the preferred option, it would continue to consider and examine all other options, including legal ones.[37]

34. <u>On 15 June 2016</u>, Air Canada provided Venezuela with a ***written notice of dispute*** pursuant to Article X(II) of the *Agreement between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and Protection of Investments* ("BIT" or "Canada-Venezuela BIT").[38]

---

[35] Exh. C-55, Letter from IATA to the President of Venezuela, dated 13 June 2014; Memorial, para. 87.

[36] Exh. C-57, Letter from Air Canada to the Minister of Popular Power, Air and Water Transport, dated 10 July 2014; Memorial, para. 85.

[37] Exh. C-58, Letter from Air Canada to the Minister of Popular Power of Economy, Finance and Public Banks, dated 3 October 2014; Memorial, para. 86.

[38] Exh. C-14, Notice Letter, dated 15 June 2015 ("Notice Letter"). See also Exh. C-1, the Agreement between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and Protection of Investments, dated 20 December 1992 ("BIT" or "Canada-Venezuela BIT").

### III.    The arbitral proceedings

## 1.    The commencement of the proceedings

35.  <u>On 16 December 2016</u>, Claimant filed with the International Centre for Settlement of Investment Disputes ("ICSID") a ***Request for Access to the Additional Facility and Notice of Arbitration***, together with Exhibits C-1 to C-18 ("Request for Arbitration").

36.  <u>On 13 January 2017</u>, the ICSID Secretary-General approved access to the Additional Facility pursuant to Article 4 of the *Rules Governing the Additional Facility for the Administration of Proceedings by the Secretariat of ICSID* ("AF Rules") and registered the Request for Arbitration pursuant to Articles 4 and 5 of the *Arbitration (Additional Facility) Rules* ("AF Arbitration Rules").

37.  <u>On 26 September 2017</u>, ICSID notified the Parties of the constitution of the Tribunal and the commencement of the proceedings pursuant to Article 13 of the AF Arbitration Rules. The Tribunal is composed of Prof. Pierre Tercier (Swiss), President, appointed by the Chairman of the Administrative Council in accordance with Article 10 of the AF Arbitration Rules; Mr. Charles Poncet (Swiss), appointed by Claimant; and Ms. Deva Villanúa (Spanish), appointed by Respondent.

38.  <u>On 14 December 2017</u>, further to the Parties' agreement to extend the 60-day deadline provided for in Article 21 of the AF Arbitration Rules, the Tribunal held a ***First Session*** with the Parties by telephone conference.

39.  <u>On 12 January 2018</u>, the Tribunal issued ***Procedural Order No. 1*** ("PO No. 1"). PO1 provided, *inter alia,* that the applicable AF Arbitration Rules would be those in force as of 10 April 2006; that the place of the arbitration proceeding would be Paris, France, and that the procedural languages would be English and Spanish.

40.  PO No. 1 also set out the *Procedural Calendar*. Pursuant to the Procedural Calendar, Respondent could file an Application for Bifurcation either before or with the filing of its Counter-Memorial.

## 2.    The written procedure

41.  <u>On 22 March 2018</u>, Claimant filed its ***Memorial on the Merits*** ("Memorial"), together with two witness statements, one expert report, factual exhibits C-19 to C-101 and legal authorities CL-1 to CL-76.

42.  <u>On 15 June 2018</u>, Respondent filed its ***Application for Bifurcation*** ("Application for Bifurcation"), together with legal authorities RL-1 to RL-48.

43.  <u>On 18 June 2018</u>, the Tribunal invited Claimant to reply to Respondent's Application for Bifurcation by 28 June 2018.

44.    On 28 June 2018, Claimant filed its **Response to Respondent's Application for Bifurcation** ("Response to Application for Bifurcation"), together with factual exhibit C-102 and legal authorities CL-77 to CL-92.

45.    On 10 July 2018, the Tribunal issued **Procedural Order No. 2** ("PO No. 2"), rejecting Respondent's Application for Bifurcation. It also deferred to a later stage of the proceedings its decision on the Parties' costs in connection with the Application for Bifurcation.

46.    On 3 August 2018, Respondent filed its **Counter-Memorial on Jurisdiction and Merits** ("Counter-Memorial"), together with two witness statements, one expert report, factual exhibits R-1 to R-46 and legal authorities RL-1 to RL-122.[39]

47.    On 10 August 2018, the Parties filed their **document production requests** in the form of Redfern Schedules.

48.    On 24 August 2018, the Parties filed their **objections to the other Party's document production requests** and produced documents the request of which they did not object.

49.    Also on 24 August 2018, the Tribunal confirmed that, as agreed by the Parties, the language of the arbitration shall be *only* English, as opposed to English *and* Spanish as was originally foreseen in PO No. 1.

50.    On 31 August 2018, the Parties filed their **replies to the objections to the other Party's document production requests**. With their replies, the Parties also set out their general remarks on the other Party's document production requests and objections.

51.    On 14 September 2018, the Tribunal issued **Procedural Order No. 3** ("PO No. 3") together with Annexes A and B, deciding on the document production requests. In PO No. 3, the Tribunal also directed the Parties as follows:

> 55. In relation to <u>Claimant's Redfern Schedule</u>:
>
> a.    **Respondent** *shall confirm or clarify Claimant's understanding in relation to <u>Claimant's Request No. 3</u>* **by 20 September 2018**. **Claimant** *shall reply, if needed,* **by 28 September 2018**. **The Tribunal** *shall decide, if necessary,* **by 5 October 2018** *(Claimant's Redfern Schedule, page 9, Request No. 3).*
>
> b.    **The Parties** *shall enter into a confidentiality agreement in relation to confidential documents responding to <u>Claimant's Requests Nos 6, 14, 16, 23, 24, 25 and 26</u>* **by 20 September 2018** *(Claimant's Redfern Schedule, page 13, Request No. 6; pages 36-38, Requests Nos 23 to 25).*
>
> […]

---

[39] Exhibits RL-1 to RL-42 are the same as those submitted with Respondent's Application for Bifurcation on 15 June 2018.

*56. In relation to <u>Respondent's Redfern Schedule</u>:*

    *a.    **Claimant** shall, in relation to <u>Respondent's Requests Nos 4 and 6</u>, submit a privilege log in relation to documents that may be protected by legal privilege in line with the principles of Article 9(2)(b) and 9(3) of the IBA Rules **<u>by 20 September 2018</u>**. **Respondent** shall provide its comments to such log **<u>by 28 September 2018</u>**. **The Tribunal** shall decide **<u>by 5 October 2018</u>** (Respondent's Redfern Schedule, page 12, Request No. 4 and page 16, Request No. 6).*

    *b.    **Claimant** shall provide a list describing documents responsive to <u>Respondent's Requests Nos 17, 18, 20, 21 and 22</u> that were already disclosed or shared with Respondent **<u>by 20 September 2018</u>**. **Respondent** shall reply, if needed, **<u>by 28 September 2018</u>**. **The Tribunal** shall decide, if necessary, **<u>by 5 October 2018</u>** (Respondent's Redfern Schedule, pages 33 to 35, Requests Nos 17 and 18; pages 37 to 39, Requests Nos 20 to 22).*

    *c.    **Claimant** shall respond to Respondent's explanations in relation to <u>Respondent's Requests Nos 36 and 37</u> **<u>by 20 September 2018</u>**. **Respondent** shall reply, if needed, **<u>by 28 September 2018</u>**. **The Tribunal** shall decide, if necessary, **<u>by 5 October 2018</u>** (Respondent's Redfern Schedule, pages 55 to 57, Requests Nos 36 and 37).*

    *[…]*

*57. For these reasons, the Tribunal orders the following:*

    *[…]*

    *4. The Parties shall take the necessary steps to comply with the Tribunal's directions set forth in paragraphs 55 and 56 above.*

52.    <u>On 19 and 20 September 2018</u>, the Parties requested leave to address the Tribunal's specific instructions under paragraphs 55 and 56 of PO No. 3 and to complete the production of documents. The Tribunal granted such leave <u>on 21 September 2018</u>.

53.    <u>On 4 October 2018</u>, the Parties made their respective submissions addressing the Tribunal's directions set out in paragraphs 55 and 56 of PO No. 3

54.    <u>On the same date</u>, the Parties informed the Tribunal that they continued to negotiate a confidentiality agreement ("Confidentiality Agreement") pursuant to paragraph 55 of PO No. 3. The Parties confirmed that they would either provide to the Tribunal an executed version or seek the latter's intervention if they could not reach an agreement.

55.    <u>On 11 October 2018</u>, the Parties informed the Tribunal that they had made progress in respect of the Confidentiality Agreement, but that they sought the Tribunal's intervention on two matters on which they were still in disagreement. In the same communication, they enclosed the draft Confidentiality Agreement and noted that they would provide the Tribunal with their positions on the disputed points.

56.  <u>On 12 October 2018</u>, Respondent submitted its further position concerning the Tribunal's directions of paragraph 56 of PO No. 3.

57.  <u>On 15 October 2018</u>, the Parties submitted their respective positions on the disputed points in the draft Confidentiality Agreement.

58.  <u>On 24 October 2018</u>, Claimant submitted its reply to Respondent's position of 12 October 2018. It argued, among other things, that Respondent's production of documents was deficient because it comprised of non-responsive, illegible, and duplicate documents. Claimant also argued that Respondent had not produced any documents issued or generated by its relevant government entities and that it had failed to produce any documents in response to Claimant's Requests Nos 1 and 2. Claimant therefore requested the Tribunal to order Respondent to comply with PO No. 3 and to produce all documents responsive to Claimant's requests.

59.  <u>On 29 October 2018</u>, the Tribunal issued ***Procedural Order No. 4*** ("PO No. 4"), deciding on document production, including matters relating to the execution of the Confidentiality Agreement. Specifically, it decided the following:

> *51.    For these reasons, the Tribunal orders the following:*
>
> *[…]*
>
> *2. Concerning the dispute resolution provision of the draft Confidentiality Agreement, the Tribunal invites the Parties to confer and agree on a text along Claimant's proposal.*
>
> *[…]*
>
> *9. Respondent shall respond to Claimant's objection on the alleged deficient production of documents by Respondent **by 5 November 2018**. The Tribunal will decide **by 12 November 2018**.*

60.  <u>On 4 November 2018</u>, Respondent informed the Tribunal that it had fully complied with the document production ordered in PO No. 3. It also confirmed that, to the extent it identified any document responsive to Claimant's requests which had not previously been produced during the pendency of the arbitration, it would produce such document. Moreover, it noted that it was conducting a detailed review and that it would be contacting counsel for Claimant directly with its particularized concerns.

61.  <u>On 7 November 2018</u>, the Tribunal took note of Respondent's letter of 4 November 2018 and the fact that Respondent would contact Claimant to address any concerns. The Tribunal stated that it would decide if the Parties were unable to resolve the pending disagreements.

62.  <u>On 12 November 2018</u>, Claimant requested the Tribunal to resolve its application of 24 October 2018, concerning the alleged deficiency of Respondent's document production.

It also informed the Tribunal that the Parties had failed to agree on the dispute resolution provision of the Confidentiality Agreement pursuant to PO No. 4. Thus, Claimant submitted its proposal in an Annex and requested the following:

> "*that the Tribunal invites Venezuela to enter into the Confidentiality Agreement in the form attached hereto as Annex 2 by no later than November 16, 2018 and to order Venezuela to produce responsive documents that same date to avoid any further delay. In the alternative, and should Venezuela refuse to enter into the Confidentiality Agreement, Air Canada respectfully asks that the Tribunal enters into a confidentiality order in the same or similar terms to the ones contained in the Confidentiality Agreement.*"

63. <u>On 13 and 14 November 2018</u>, the Tribunal invited the Parties to comment on the other Party's position concerning (i) the dispute resolution provision of the Confidentiality Agreement and (ii) the status of the Parties' cooperation (if any) concerning the alleged deficiency of Respondent's document production.

64. <u>On 16 November 2018</u>, Claimant informed the Tribunal that it did not understand Respondent to offer to correct its deficient production of documents: while Respondent acknowledged its obligation of ongoing production of documents, Claimant had not received any supplemental production or indication that it would produce further documents. Further, concerning Respondent's allegations on the supposed deficiencies in Claimant's production, Respondent had not contacted Claimant to raise any issues.

65. <u>Also on 16 November 2018</u>, Respondent noted that it had fully complied with the Tribunal's decisions in PO No. 3 and PO No. 4. Specifically, its proposed dispute resolution provision for the Confidentiality Agreement was in line with Claimant's proposal and satisfied the requirement of neutrality. By contrast, Claimant's proposal did not reflect the Parties' agreement on the draft Confidentiality Agreement as it was missing Respondent's proposed edits concerning the number of arbitrators, the languages of the arbitration and the languages of potential evidence. Moreover, while noting that it could not consent to creating jurisdiction for this Tribunal under the Confidentiality Agreement, Respondent submitted its own proposal in an Annex and requested the following:

> "*that the Arbitral Tribunal (i) deny Air Canada's request of 12 November 2018 and (ii) declare that the Republic's proposed terms, as reflected in the Confidentiality Agreement in the form attached hereto as <u>Annex 1</u> are reasonable and in accordance with the Arbitral Tribunal's directions set forth in P.O. No. 4.*"

Respondent also noted that it intended to contact Claimant concerning Respondent's concern on the latter's document production.

66.     On 20 November 2018, the Tribunal rendered ***Procedural Order No. 5*** ("PO No. 5"), deciding, among other things, the following:

>       *1. The Parties shall endeavour and enter into a Confidentiality Agreement in the terms proposed in para. 14 above, **by 23 November 2018**. Failing an agreement between the Parties, the Tribunal shall issue an order to this effect.*

In paragraph 14 of PO No. 5, the Tribunal stated the following:

>       *Accordingly, the Tribunal considers that, in line with its considerations of neutrality set out in PO No. 4, and in view of the Parties' positions, the appropriate dispute resolution provision of the Confidentiality Agreement should comprise the following elements:*

>       –       *During the pendency of the present proceedings, any dispute concerning the Confidentiality Agreement shall be resolved by the present Tribunal;*

>       –       *Following the end of the present proceedings, any dispute concerning the Confidentiality Agreement shall be resolved as follows:*

>       •       *Arbitration under the Rules of Arbitration of the International Chamber of Commerce;*

>       •       *Sole arbitrator;*

>       •       *French law;*

>       •       *English and Spanish language of the arbitration;*

>       •       *English and Spanish fluency of the sole arbitrator;*

>       •       *Documents in the arbitration may be submitted in their original language.*

67.     On 23 November 2018, Respondent informed the Tribunal that it was not in a position to enter into a Confidentiality Agreement in the terms proposed by PO No. 5 because this would confer jurisdiction to the Tribunal.

For Respondent, neither of the Tribunal's considerations in PO No. 5 took into account that the jurisdiction that would be created were to cover a potential liability claim against Air Canada for breach of contract under French law – clearly not a procedural matter. This was a distinct consent to the one allegedly given by the Republic under the BIT. The Republic would not be granting it freely were it to follow the Tribunal's order.

Further, the Tribunal's proposed procedural order was inadequate because it still left unanswered the question of the appropriate forum for the Republic's potential action for a breach of confidentiality, and its confidential information was without protection upon termination of the arbitration.

68.    On 29 November 2018, the Tribunal issued **Procedural Order No. 6** ("PO No. 6"), deciding on the confidentiality terms that would govern the production of documents, as set out in an Annex to said Order. It also ordered the Parties to:

> "*enter into enter into a Confidentiality Agreement **by 3 December 2018** concerning only the timeframe following the termination of the present arbitration. The Confidentiality Agreement shall comprise the agreed text of the draft Confidentiality Agreement, including the dispute resolution provision providing for an ICC arbitration.*"

69.    On 14 December 2018, Claimant filed its **Reply Memorial on the Merits and Counter Memorial on Jurisdiction** ("Reply Memorial"), together with two witness statements, one expert report, factual exhibits C-34, C-35, C-64, and C-103 to C-160, and legal authorities CL-6 (updated), CL-52 (updated), and CL-93 to CL-135.

70.    On 12 February 2019, Respondent requested the suspension of the Procedural Calendar, specifically, the filing of its Rejoinder by the due date. Respondent based its request on the political situation in Venezuela at the time and the possible travel disruptions of Respondent's expert to the country.

71.    On 15 February 2019, after being invited by the Tribunal to clarify its request, Respondent confirmed that it was requesting the stay of the entire proceeding.

72.    On 22 February 2019, Claimant commented on and objected to Respondent's request for a stay.

73.    On 26 February 2019, the Tribunal granted Respondent an extension of one month to file its Rejoinder but rejected its request for a suspension or stay of the proceeding.

74.    On 28 March 2019, ICSID transmitted to the Tribunal and the Parties (i) a letter from Mr. José Ignacio Hernández G., *Procurador Especial de la República Bolivariana de Venezuela*, to ICSID, dated 27 March 2019, and (ii) a letter from ICSID to Mr. Hernández, acknowledging receipt of his correspondence, dated 28 March 2019 (both in the Spanish language).

In his letter, Mr. Hernández noted that the judicial representation of the Republic, including in arbitration proceedings, was vested exclusively on him, as *Procurador Especial de la República*. Consequently, any notice or communication from ICSID to the Republic had to be addressed to him and not to any other individual claiming to act on behalf of the Republic. In addition, ICSID should not consider valid any instruction or communication submitted as of 5 February 2019 by any other person that claims to act on behalf of the Republic.

75.    <u>On 29 March 2019</u>, Respondent renewed its requested for a stay of the proceedings and reiterated the circumstances preventing it from adequately preparing its Rejoinder. It also enclosed a letter from its economic expert explaining how the U.S. sanctions on Venezuela were impacting his ability to provide expert services in this arbitration.

76.    <u>On 2 April 2019</u>, the Tribunal invited Claimant to confirm whether it objected to Respondent's request for a stay.

77.    <u>On 3 April 2019</u>, Claimant communicated its preliminary observations on (i) the letter of Mr. Hernández to ICSID, dated 27 March 2019, and (ii) Respondent's request for a stay, dated 29 March 2019.

    Claimant reiterated its objection to "*an indefinite stay or suspension of the arbitration*" but suggested nonetheless that the Tribunal should extend the date by which Respondent would file its Rejoinder by six months and that new Hearing dates be fixed for the first quarter of 2020. Claimant suggested this course of action for the following reasons: (a) it was no longer clear who was empowered to represent Venezuela in this arbitration and Venezuela should be ordered to clarify this issue immediately through further submissions from Mr. Hernández and the De Jesús law firm; (b) Claimant would be prejudiced if the Hearing is maintained in the face of further delays from Venezuela and procedural surprises and uncertainty; and (c) the proposed six-month extension of the deadline for filing the Rejoinder would give Venezuela ample time to submit a competent legal opinion and retain a replacement expert if necessary.

78.    <u>On the same date</u>, the Tribunal informed the Parties that the deadline for Respondent's Rejoinder had been now postponed and that it would communicate further instructions.

79.    <u>On 4 April 2019</u>, the Tribunal notified the Parties and Mr. Hernández its decision on (i) the suspension of the Procedural Calendar and (ii) the procedure to address the question of Respondent's representation. Specifically, the Tribunal decided:

    (a)    to extend the filing of the Rejoinder by six months, i.e., 4 October 2019, and postpone the Hearing until the first quarter of 2020, respectively. The suspension of the Procedural Calendar would be subject to the procedure on the question of Respondent's representation; and

    (b)    to address the question of Respondent's representation as a preliminary matter *via* the filing of two rounds of submissions and, if necessary, a hearing on the matter, following which it would render its decision.

80.    <u>On 5 April 2019</u>, ICSID communicated to the Tribunal and the Parties (i) a letter from Mr. Reinaldo Enrique Muñoz Pedroza, *Procurador General de la República*, to ICSID (in the Spanish language), dated 4 April 2019, and (ii) a letter from ICSID to Mr. Muñoz Pedroza, acknowledging receipt of his correspondence, dated 5 April 2019.

    Mr. Muñoz Pedroza, referred to the letter from Mr. Hernández to ICSID of 27 March 2019, and noted that arbitral tribunals did not have any authority or jurisdiction to question or decide on the functions or authority of the President or Attorney General. He

contested the authority relied on by Mr. Hernández to present himself as *Procurador Especial de la República*. He concluded that the representation of the Republic's interest before arbitral tribunals fell within the authority of the Republic's Attorney General.

Mr. Muñoz Pedroza announced that he would issue instructions to the attorneys representing the Republic to request the dismissal in *limine litis* of the incident raised by the letter from Mr. Hernández for lack of jurisdiction or competence.

81.    <u>On 8 April 2019</u>, ICSID informed the Tribunal and the Parties that it had requested from Mr. Hernández and Mr. Muñoz Pedroza the English translations of their letters of 27 March 2019 and 4 April 2019, respectively. ICSID communicated the English translation of Mr. Muñoz Pedroza's letter <u>on 10 April 2019</u> and of Mr. Hernández's letter (as well as of the *Estatuto que Rige la Transición a la Democracia para Restablecer la Vigencia de la Constitución de la República Bolivariana de Venezuela*, hereinafter the "*Estatuto*") <u>on 12 April 2019</u>.

82.    <u>On 12 April 2019</u>, following the Tribunal's instructions of 4 April 2019, the Parties communicated their agreed revisions to the Procedural Calendar.

83.    <u>On 16 April 2019</u>, the Tribunal informed the Parties and Mr. Hernández that its decision of 4 April 2019 concerning the next steps on the question of Respondent's representation was maintained.

84.    <u>On the same date</u>, the Tribunal amended the Procedural Calendar (on Jurisdiction and Merits), reflecting the Parties' agreements that the filing of the Rejoinder would be due by 4 October 2019 and that the Hearing would take place on one of the following dates: 2-5, 3-6 or 10-13 March 2020.

85.    <u>On 19 April 2019</u>, the Parties and Mr. Hernández filed their comments on the question of Respondent's representation in the form of letters and exhibits thereto.

86.    <u>On 23 April 2019</u>, the Tribunal reminded the Parties and Mr. Hernández of the deadline for the reply comments on the question of Respondent's representation and asked them whether a meeting *in persona* or *via* video conference would be requested.

87.    <u>On 29 April 2019</u>, the Parties and Mr. Hernández filed their reply comments on the question of Respondent's representation in the form of letters and exhibits thereto.

In reply to the Tribunal's instructions of 23 April 2019, Claimant noted that no hearing was necessary but that a telephone or video hearing might suffice if the Tribunal believed that a hearing would be useful. Respondent also confirmed that no hearing was necessary. Mr. Hernández did not express any request in relation thereto.

88.    <u>On 30 April 2019</u>, the Tribunal informed the Parties and Mr. Hernández that it had decided not to hold a hearing on the representation issue.

89.    <u>On 28 May 2019</u>, the Tribunal issued ***Procedural Order No. 7*** ("PO No. 7"), deciding that the proceedings would continue with the representatives of Respondent on record in this case.

90.    <u>On 12 September 2019</u>, Respondent requested a time-extension for the filing of its Rejoinder. Respondent referred to the issuance of *Executive Order 13884 "Blocking Property of the Government of Venezuela"* by the President of the United States of America on 5 August 2019 and noted that this measure impacted the Republic's ability to finalize its Rejoinder, in particular from obtaining the economic expert report that was to accompany its submission.

91.    <u>On 20 September 2019</u>, following an invitation from the Tribunal, Claimant commented on Respondent's further request for an extension of time to file its Rejoinder and urged the Tribunal to deny such request.

92.    <u>On 26 September 2019</u>, the Tribunal rejected Respondent's request for an extension to file its Rejoinder. It also decided that Respondent could file its expert reports at any time up to one month before the Hearing so that Respondent could take the necessary measures to tackle any difficulties it still faced. Moreover, the Tribunal decided that it would deal with any procedural difficulties that could arise from such filing at a later stage of the proceedings. Finally, the Tribunal noted that the Hearing would take place as agreed.

93.    <u>On 16 October 2019</u>, Respondent sought another extension to file its Rejoinder by 31 October 2019.

94.    <u>On 22 October 2019</u>, following an invitation from the Tribunal, Claimant objected to Respondent's request for an extension to file its Rejoinder.

95.    <u>On the same date</u>, the Tribunal granted Respondent an extension to file its Rejoinder by 25 October 2019.

96.    <u>On 25 October 2019</u>, Respondent filed its ***Rejoinder on Jurisdiction and Merits*** ("Rejoinder"), together with factual exhibits R-47 to R-91 and legal authorities RL-123 to RL-166.

**3.    The Hearing**

97.    <u>On 14 January 2020</u>, the Parties notified the fact witnesses and experts they intended to cross-examine during the Hearing.

98.    <u>On 21 January 2020</u>, the Tribunal requested that the Parties liaise and attempt to agree on a Hearing schedule.

99.    <u>On 29 January 2020</u>, the Parties filed jointly a ***Hearing Schedule***.

100.    <u>On 3 February 2020</u>, the Tribunal held a ***Pre-Hearing Conference Call*** with the Parties. During the Pre-Hearing Conference Call, the Parties confirmed their agreements on several items indicated in their joint Hearing Schedule. Respondent informed the Tribunal

and Claimant that Dr. Flores, Respondent's quantum expert, would not be available for examination during the Hearing due to the continuing effect of the U.S. sanctions. In this connection, the Parties presented their positions on the consequences of Dr. Flores's absence, including the admissibility of his expert report, the time allocation to each Party during the Hearing, and the sequestration of Mr. Rosen, Claimant's quantum expert. The Tribunal invited the Parties to indicate their respective positions in writing and that it would decide on this matter thereafter.

101.    On 4 February 2020, the Tribunal invited the Parties to discuss the questions of the admissibility of Dr. Flores' report, of the influence on the sequestration, and of the allocation of Hearing time.

102.    On 10 February 2020, Respondent sent a letter to the Tribunal, arguing that Dr. Flores's impossibility to participate in the Hearing affected, *inter alia*, the total time allocated to each Party at the Hearing: 60% for Respondent and 40% for Claimant, resulting in 7 hours allocated to Claimant and 10 hours to the Respondent with 2.5 hours reserved per Party for opening statements.

Respondent further argued that Dr. Flores was prevented from attending the Hearing due to unilateral and illegitimate U.S. sanctions and that the situation was beyond the control of Dr. Flores and the Republic. These "extraordinary circumstances" made his expert report of 3 August 2018 admissible.

Moreover, Dr. Flores's "legitimate impossibility" to participate in the Hearing generated an imbalance between the Parties that required an adjustment of the rule of sequestration. Mr. Rosen should not be authorized to attend the Hearing prior to giving evidence and would be sequestered until he testified.

103.    On 17 February 2020, Claimant sent a letter to the Tribunal setting out its position in relation to Dr. Flores's absence. Claimant argued that the Tribunal should not reward Respondent's failure to present its quantum expert at the Hearing by allocating additional time to it for cross-examination. The Tribunal should maintain the 50/50 time allocation agreed between the Parties.

Claimant further argued that Dr. Flores's expert report should be excluded or given no weight by the Tribunal. Specifically, Respondent had ample opportunity to support its case with an opinion from an expert who is not subject to such sanctions and could appear to defend his or her own report but had failed to do so.

In addition, Claimant's quantum expert should not be sequestered or prevented from attending any other portions of the Hearing before he testifies. Sequestering Claimant's expert would infringe on Claimant's rights of defense.

104.    On 21 February 2020, the Parties communicated their list of participants to the Hearing.

105.   <u>On 24 February 2020</u>, the Tribunal issued **Procedural Order No. 8** ("PO No. 8"), confirming the Parties' agreement on the organization of the Hearing and deciding on the Parties' disagreement in relation to Dr. Flores's absence from the Hearing as follows:

> […]

> *The Tribunal decides that the equal allocation of time as originally agreed between the Parties shall be maintained. The fact that a witness or an expert will not attend the Hearing should not affect this repartition.*

> *In any event, the time allocated will be applied with a good faith standard and will remain flexible generally and if technical delays and/or interruptions materially reduce a Party's allocated time.*

> […]

> *The Tribunal decides that, in light of the exceptional circumstances, the expert report of Dr. Flores is admissible. However, it also notes that Respondent could have avoided the present procedural incident had it chosen an expert unaffected by the US sanctions. Therefore, when deciding on the evidentiary weight accorded to Dr. Flores' report, the Tribunal will take into consideration that Dr. Flores will not ratify its content, nor will it be subject to Claimant's cross-examination.*

> […]

> *The Tribunal decides that, in order to avoid any imbalance between the Parties in their presentations and examinations, Mr. Rosen shall be sequestrated both during the opening statements and the witness examinations.*

106.   <u>On 2 March 2020</u>, Respondent sent a letter to the Tribunal, referring to the COVID-19 outbreak across the world and requesting that the Tribunal reconsider the manner in which Respondent's witnesses would be examined during the Hearing. Respondent suggested that the witnesses be examined *via* videoconference from Caracas and sought guidance from the Tribunal as to the procedural adjustments that could be required beyond the physical presence of such witnesses.

107.   <u>On 3 March 2020</u>, and after being invited by the President of the Tribunal to do so, Claimant noted that it would not oppose Respondent's request in relation to the manner of hearing its own witnesses. In connection with the remaining participants to the Hearing, Claimant noted that, subject to the Tribunal's views, it did not believe that any further procedural adjustments were necessary.

108.   <u>On the same date</u>, the Tribunal confirmed that Respondent's witnesses would testify *via* videoconference and noted that the Hearing Schedule was maintained.

109.   <u>On 6 and 7 March 2020</u>, the Tribunal and the Parties exchanged further correspondence on the possible impact of the COVID-19 outbreak on the Hearing.

110. <u>On 7 March 2020</u>, the Tribunal ultimately decided to maintain the Hearing but reserved the right to change its decision at any time in case circumstances required it to do so.

111. <u>Between 10 and 12 March 2020</u>, a ***Hearing*** was held at the World Bank premises in Paris, France.

   <u>On Day 1</u>, the Parties delivered their Opening Statements ("C-Opening" for Claimant and "R-Opening" for Respondent).

   <u>On Day 2</u>, the examinations of Claimant's witnesses, Mr. Alfredo Sebastián Babún Sabat and Mr. Alex Pittman, and Respondent's witnesses, Mr. Yhonatan Rafael Blanco and Ms. Anira Dinorys Padrón Barito took place. As it had been agreed, the examinations of Mr. Blanco and Ms. Padrón took place *via* videoconference.

   <u>On Day 3</u>, the examination of Claimant's expert, Mr. Howard Rosen, took place. Further, the Tribunal and the Parties discussed certain procedural matters, in particular, the next steps of the proceedings.

112. <u>On 16 March 2020</u>, the Tribunal sent a letter to the Parties, summarizing the decisions taken at the end of the Hearing in relation to the next steps of the proceedings.

113. <u>On 3 April 2020</u>, the Parties communicated their agreed corrections to the Hearing transcript ("Tr. [date];[reference]").

114. <u>On the same date</u>, the Tribunal issued ***Procedural Order No. 9*** ("PO No. 9"), deciding on the content of the Parties' Post-hearing Briefs, and providing a list of questions that the Parties should address in relation to jurisdiction, the merits and the quantum aspects of the case.

## 4.    The steps following the Hearing

115. <u>On 2 June 2020</u>, Claimant requested leave to submit three new legal authorities with its Post-Hearing Brief.

116. <u>On 4 June 2020</u>, following an invitation from the Tribunal, Respondent objected to Claimant's request of 2 June 2020.

117. <u>On the same date</u>, the Tribunal decided to admit Claimant's three additional legal authorities as follows:

   *1. In Procedural Order No. 9, the Tribunal noted that "[t]he Parties may not submit any new legal or factual exhibits (subject to Article 41(2)…)."*

   *2. Article 41(2) of the Arbitration (Additional Facility) Rules provide that "[t]he Tribunal may, if it deems it necessary at any stage of the proceeding, call upon the parties to produce documents, witnesses and experts".*

> *3. Claimant's request to file the three additional legal authorities for use in its Post-Hearing Brief is very belated. This is particularly so as Respondent's position on the lex specialis derogat a generali maxim has been pleaded in depth from the outset of the present case.*
>
> *4. Nevertheless, because of the connection with the Tribunal's question in Procedural Order No. 9, the Tribunal decides to admit the three additional legal authorities.*
>
> *5. To ensure equal treatment and no prejudice caused to Respondent, Respondent may, if it so requests, submit new legal authorities in response to Claimant's three additional legal authorities together with a short comment.*

118.    On 5 June 2020, the Parties filed, simultaneously, their respective **Post-Hearing Briefs** ("C-PHB" and "R-PHB"). Claimant's Post-Hearing Brief was accompanied by legal authorities CL-157 to CL-159 pursuant to the Tribunal's decision of 4 June 2020.

119.    On 17 June 2020, the Tribunal acknowledged receipt of the Parties' Post-Hearing Briefs and reminded them that, in case of need, either Party could make an application for a second round of Post-Hearing Briefs by 22 June 2020. The Tribunal also noted that it would pursue its deliberations and invited the Parties to liaise and agree on the format and procedure of the Statement of Costs.

120.    On 22 June 2020, Respondent requested the Tribunal (i) to exclude part of Claimant's Post-Hearing Brief from the record; and (ii) leave to comment on the remaining parts of Claimant's Post-Hearing Brief which was produced, according to Respondent, in breach of PO No. 9. In the alternative, were the Tribunal to deny its request, Respondent sought leave to comment on Claimant's Post-Hearing Brief by 11 September 2020 and to produce additional legal authorities in connection with the issue of *lex specialis* and Claimant's three new legal authorities.

121.    On 23 June 2020, Claimant confirmed that it would not request a second round of Post-Hearing Briefs. It nevertheless requested leave to respond to any submission from Respondent.

122.    On 24 June 2020, the Tribunal invited the Parties to comment, if they wished so, on the other Party's communications of 22 and 23 June 2020.

123.    On 1 July 2020, Claimant requested the Tribunal, to deny Respondent's requests of 22 June 2020 (see *supra* para. 120). Claimant also stated that "[i]*f the Tribunal were somehow minded to give Venezuela a further opportunity to argue its case beyond simply submitting new legal authorities in response to Air Canada's three additional authorities together with "a short comment," Air Canada would request a right to respond.*"

124.    On 2 July 2020, Respondent confirmed that, "*the Bolivarian Republic of Venezuela has no observation on Air Canada's decision not to answer the Republic's post-hearing submission.*"

125.    <u>On 8 July 2020</u>, the Tribunal issued ***Procedural Order No. 10*** ("PO No. 10"), deciding as follows:

      *1.*    *Paragraphs 100-153 of Claimant's Post-Hearing Brief are admissible.*

      *2.*    *Respondent shall have an opportunity to respond to paragraphs 100-153 of Claimant's Post-Hearing Brief as set out in the present Procedural Order (see para. 41).*

      *3.*    *Respondent shall have an opportunity to file a short comment with legal authorities as set out in the present Procedural Order (see para. 41). The possibility for a short reply from Claimant is reserved (see para. 30).*

      *4.*    *The Parties shall have an opportunity to file simultaneously Reply Post-Hearing Briefs by 11 September 2020 and in the manner explained in the present Procedural Order (see para. 41).*

126.    <u>On 11 September 2020</u>, the Parties filed, simultaneously, their respective ***Reply Post-Hearing Briefs*** ("Reply C-PHB" and "Reply R-PHB").

127.    <u>On 8 December 2020</u>, the Tribunal informed the Parties that it was deliberating and preparing the Award. It invited the Parties to liaise and agree, if possible, on the format, procedure and timing for their Submissions on Costs. The Parties agreed to file them by 8 January 2021.

128.    <u>On 8 January 2021</u>, the Parties filed their respective ***Submissions on Costs*** ("C-Costs" and "R-Costs").

129.    <u>On 12 August 2021</u>, the Tribunal declared the proceedings closed pursuant to Article 44 of the AF Arbitration Rules.

# B.    LEGAL CONSIDERATIONS

## I.    In general

### 1.    The arbitration agreement

130.    Claimant commenced the present arbitration against Respondent pursuant to the ***Agreement between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and Protection of Investments*** ("BIT" or "Canada-Venezuela BIT"), signed on 1 July 1996 and in force since 28 January 1998, and the AF Rules.[40]

131.    <u>Article XII of the BIT</u> provides as follows:

> *1. Any dispute between one Contracting Party and an investor of the other Contracting Party, relating to a claim by the investor that a measure taken or not taken by the former Contracting Party is in breach of this Agreement, and that the investor or an enterprise owned or controlled directly or indirectly by the investor has incurred loss or damage by reason of, or arising out of, that breach, shall to the extent possible, be settled amicably between them.*

> *2. If a dispute has not been settled amicably within a period of six months from the date on which it was initiated, it may be submitted by the investor to arbitration in accordance with paragraph (4). For the purposes of this paragraph; a dispute is considered to be initiated when the investor of one Contracting Party has delivered notice in writing to the other Contracting Party alleging that a measure taken or not taken by the latter Contracting Party is in breach of this Agreement, and that the investor or an enterprise owned or controlled directly or indirectly by the investor has incurred loss or damage by reason of, or arising out of, that breach.*

> *3. An investor may submit a dispute as referred to in paragraph (1) to arbitration in accordance with paragraph (4) only if:*

> *(a) the investor has consented in writing thereto;*

> *(b) the investor has waived its right to initiate or continue any other proceedings in relation to the measure that is alleged to be in breach of this Agreement before the courts or tribunals of the Contracting Party concerned or in a dispute settlement procedure of any kind;*

> *(c) if the matter involves taxation, the conditions specified in paragraph 14 of this Article have been fulfilled; and*

---

[40] Exh. C-1 (BIT).

*(d) not more than three years have elapsed from the date on which the investor first acquired, or should have first acquired, knowledge of the alleged breach and knowledge that the investor has incurred loss or damage.*

*The dispute may, by the investor concerned, be submitted to arbitration under:*

*(a) The International Centre for the Settlement of Investment Disputes (ICSID), established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States, opened for signature at Washington 18 March. 1965 (lCSID Convention), provided that both the disputing Contracting Party and the Contracting Party of the investor are parties to the ICSID Convention; or*

*(b) the Additional Facility Rules of ICSID, provided that either the disputing Contracting Party or the Contracting Party of the investor, but not both, is a party to the ICSID Convention; or*

*In case neither of the procedures mentioned above is available, the investor may submit the dispute to an international arbitrator or ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL).*

*5. Each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration in accordance with the provisions of this Article.*

*6. (a) The consent given under paragraph (5), together with either the consent given under paragraph (3), or the consents given under paragraph (12), shall satisfy the requirements for:*

*(i) written consent of the parties to a dispute for purposes of Chapter II (Jurisdiction of the Centre) of the ICSID Convention and for purposes of the Additional Facility Rules; and*

*(ii) an "agreement in Writing" for purposes of Article II of the United Nations Convention for the Recognition and Enforcement of Foreign Arbitral Awards, done at New York. June 10, 1958 ("New York Convention").*

*(b) The venue for any arbitration under this Article shall be such so as to ensure enforceability under the New York Convention, and claims submitted to arbitration shall be considered to arise out of a commercial relationship or transaction for the purposes of Article 1 of that Convention.*

*7. A tribunal established under this Article shall decide the issues in dispute in accordance with this Agreement and applicable rules of international law. **An interpretation of this Agreement to which both Contracting Parties have agreed shall be binding upon the tribunal.***

*A tribunal may order an interim measure of protection to preserve the rights of a disputing party, or to ensure that the tribunal's jurisdiction is made fully effective, including an order to preserve evidence in the possession or control of a disputing party or to protect the tribunal's jurisdiction. A tribunal may not order attachment or enjoin the application of the measure alleged to constitute a breach of this Agreement. For purposes of this paragraph. An order includes a recommendation.*

*A tribunal may award, separately or in combination, only:*

*(a) monetary damages and any applicable interest;*

*(b) restitution of property, in which case the award shall provide that the disputing Contracting Party may pay monetary damages and any applicable interest in lieu of restitution.*

*A tribunal may also award costs in accordance with the applicable arbitration rules.*

*Where an investor brings a claim under this Article regarding loss or damage suffered by an enterprise the investor directly or indirectly owns or controls any award shall be made to the affected enterprise.*

*10. An award of arbitration shall be final and binding. Each Contracting Party shall provide for the enforcement of an award in its territory.*

*11. Nothing in this Article shall deprive a Contracting Party of its right to seek compliance by the other Contracting Party with its obligations under this Agreement, including through use of the procedures set forth in Articles XIII and XIV.*

*12. (a) Where an investor brings a claim under this Article regarding loss or damage suffered by an enterprise the investor directly or indirectly owns or controls, the following provisions shall apply:*

*(i) both the investor and the enterprise shall be required to give the consent referred to in subparagraph (3)(a);*

*(ii) both the investor and the enterprise must give the waiver referred to in subparagraph (3)(b); and*

*(iii) the investor may not make a claim if more than three years have elapsed from the date on which the enterprise first acquired, or should have first acquired, knowledge of the alleged breach and knowledge that it has incurred loss or damage.*

*(b) Notwithstanding subparagraph 12(a), where a disputing Contracting Party has deprived a disputing investor of control of an enterprise, the following shall not be required of the enterprise:*

*(i) the consent referred to in subparagraph (3)(a); and*

*(ii) the waiver referred to in subparagraph (3)(b).*

*13. Where an investor submits a claim to arbitration and the disputing Contracting Party alleges as a defense that the measure in question is*

*(a) a reasonable measure for prudential reasons of the kind referred to in Article X, or*

*(b) a measure to limit or prevent transfers by a financial institution under paragraph 6 of Article VIII, the tribunal, at the request of such Contracting Party, shall request both Contracting Parties to submit a joint report in writing as to whether the defence is a valid one in that particular case. The Contracting Parties shall consult through their financial services authorities on the matter.*

*The tribunal may proceed to decide the matter if it does not receive, within 70 days of its referral, either*

*(a) the joint report requested, or written notification that the matter has been submitted to arbitration between the Contracting Parties under Article XIV.*

*If the joint report or, as the case may be, the decision of the arbitral tribunal under Article XIV finds that the defence is valid, the tribunal shall be bound by this finding.*

*Tribunals for disputes on prudential issues and other financial matters shall have the necessary expertise relevant to the specific financial service in dispute.*

*14. Subject to Article XI, a claim by an investor that:*

*(a) a taxation measure of a Contracting Party is in breach of an investment agreement between the central government authorities of that Contracting Party and the investor, or*

*(b) a taxation measure of a Contracting Party constitutes an expropriation under of Article VII, may be subjected to arbitration under this Article unless the Contracting Parties, through the competent taxation authorities designated by each, determine jointly, within six months of being notified of the claim by the investor, that the measure in question, as the case may be, is not in breach of the investment agreement or does not constitute an expropriation.*

(emphasis as in the original)

132. Respondent contests the jurisdiction of the Tribunal. It submits, in the first place, that the present dispute arises from the **Transport Agreement signed on 26 June 1990 between the Government of Canada and the Government of Venezuela** ("ATA") and not from the BIT. According to the ATA, disputes are to be resolved by State-to-State negotiations.

The relevant provision of the ATA, i.e., Article XVIII on "Settlement of Disputes", provides as follows:[41]

> *1. If any dispute arises between the Contracting Parties relating to the interpretation or application of this Agreement, the Contracting Parties shall endeavor to settle it by negotiations.*

> *2. Such negotiations shall commence as soon as practicable but in any event not later than forty-five (45) days from the date of receipt of the request for negotiations, unless otherwise agreed by the Contracting Parties.*

> *3. Failure to reach a satisfactory settlement within a further one hundred and eighty (180) days shall constitute grounds for the application of Article VII of this Agreement, unless otherwise agreed by the Contracting Parties.*

133.    Also, Article VII of the ATA, on "Revocation and Limitation of Authorization", provides as follows:

> *1. The aeronautical authorities of each Contracting Party shall have the right to withhold the authorizations referred to in Article V of this Agreement with respect to an airline designated by the other Contracting Party, to revoke or suspend such authorizations or impose conditions, temporarily or permanently:*

> *a) in the event of failure by such airline to qualify before the aeronautical authorities of that Contracting Party under the laws and regulations normally and reasonably applied by these authorities in conformity with the Convention;*

> *b) in the event of failure by such airline to comply with the las and regulations of that Contracting Party;*

> *c) in the event that they are not satisfied that substantial ownership and effective control of the airline are vested in the Contracting Party designating the airline or its nationals; and*

> *d) in case the airline otherwise fails to operate in accordance with the conditions prescribed under this Agreement.*

> *2. Unless immediate action is essential to prevent infringement of the las and regulations referred to above, the rights enumerated in paragraph 1 of this Article shall be exercised only after consultations with the aeronautical authorities of the other Contracting Party in conformity with Article XVI of this Agreement.*

---

[41] Exh. C-5 (ATA).

Respondent submits that, in the alternative, this Tribunal does not have jurisdiction as Claimant failed to meet the waiver and statutory period requirements of the BIT. In the further alternative, Respondent argues that Claimant failed to meet the requirements for the existence of an investor and an investment under the BIT. The Tribunal will discuss these objections further on (see *infra* paras 148 *et seq.*).

## 2.    The constitution of the Tribunal

134.    The Tribunal was validly constituted on 26 September 2017 (see *supra* para. 37). The Parties did not object to the appointment of the Members of the Tribunal.[42]

## 3.    The arbitral procedure

135.    The details of the arbitral procedure have been described above (see *supra* paras 1 to 129). The main steps can be summarized as follows:

–    On 12 January 2018, the Tribunal issued ***PO No. 1***, including the *Procedural Calendar* (see *supra* para. 39).

–    On 10 July 2018, the Tribunal issued ***PO No. 2***, denying ***Respondent's*** Application for Bifurcation (see *supra* para. 45) because the objections to jurisdiction were intertwined with the merits of the case, and even if it were otherwise, it would not be more efficient in terms of time and cost to deal with those objections separately.

–    On 13 September 2018, the Tribunal issued ***PO No. 3*** on the Parties' requests for production of documents (see *supra* para. 51).

–    On 29 October 2018, the Tribunal issued ***PO No. 4*** on matters relating to document production, including the execution of a Confidentiality Agreement (see *supra* para. 59).

–    On 20 November 2011, the Tribunal issued ***PO No. 5*** on further matters relating to the production of documents (see *supra* para. 66).

–    On 29 November 2018, the Tribunal issued ***PO No. 6*** on the confidentiality conditions that should apply to the production of documents (see *supra* para. 68).

–    On 28 May 2019, the Tribunal issued ***PO No. 7*** on the issue of Respondent's legal representation in this case (see *supra* para. 89).

In reaching that decision, the Tribunal had to determine "*whether it may continue the present proceedings with Respondent's interests being represented by Respondent's Counsel on record, who at least until 4 February 2019, were indisputably the valid representatives of Venezuela*". It held that the dispute between the Parties over the representation of Respondent concerned a political

---

[42] See PO1, para. 2.4.

and constitutional issue that was beyond the authority and jurisdiction of the Tribunal. Nonetheless, the Tribunal had the authority to decide whether or not it could proceed in the case with Respondent's representative on record. The Tribunal found that it could do so in order to preserve the integrity of the arbitration and the interests of all Parties.

–   On 24 February 2020, the Tribunal issued *PO No. 8* on the organization of the Hearing and Dr Flores' absence from that Hearing (see *supra* para. 105).

In particular, the Tribunal ruled that Dr Flores' expert report would remain admissible, but that in deciding the evidentiary weight to be accorded to it, it would take into account the fact that Dr Flores would not corroborate its content or be subject to cross-examination by Claimant. The Tribunal specifically noted that Respondent could have avoided the present procedural incident by choosing an expert who was not affected by the U.S. sanctions.

Further, the Tribunal ruled that the equal allocation of time originally agreed upon by the Parties would be upheld and applied in good faith and with flexibility.

In addition, it ruled that Claimant's quantum expert be sequestered to avoid an imbalance between the Parties in their presentations and examinations.

–   Between 10 and 12 March 2020, a *hearing* was held at the World Bank's premises in Paris (see *supra* para. 111).

–   On 3 April 2020, the Tribunal issued *PO No. 9* regarding the Post-Hearing Briefs, including questions posed by the Tribunal to the Parties (see *supra* para. 114).

–   On 7 July 2020, the Tribunal issued *PO No. 10* on certain issues relating to the Parties' Post-Hearing Briefs (see *supra* para. 125).

136.    The Parties expressly acknowledged that they had no objection to the manner in which the proceedings were conducted.[43]

## 4.    The Parties' prayers for relief

### 4.1    *Claimant*

137.    In its final submission, *Claimant* requests the Tribunal to grant the following relief:[44]

[Claim. 1]        *a declaration that the dispute is within the jurisdiction of the tribunal;*

---

[43] Tr. 12.03.20, 72:13-20.
[44] Reply C-PHB, para. 112. See also, Memorial, para. 202, Reply Memorial, para. 300 and C-PHB, para. 234.

[Claim. 2]       *a declaration that Venezuela has breached its obligations under the BIT and international law with respect to Air Canada's investments;*

[Claim. 3]       *an order that Venezuela pay compensation to Air Canada for all damages suffered, plus pre-award compound interest up to February 29, 2020, in the amount of US$ 213,140,023 or, alternatively, in the amount of US$ 72,118,369;*

[Claim. 4]       *an order that Venezuela additionally pay Air Canada pre-award compound interest calculated from March 1, 2020 until the date of the Tribunal's award using Venezuela's cost of borrowing or, alternatively, Air Canada's cost of debt;*

[Claim. 5]       *an order that Venezuela additionally pay all of Air Canada's costs of this proceeding, including (but not limited to) Air Canada's attorney's fees, experts, and all costs associated with the tribunal and the conduct of the proceeding;*

[Claim. 6]       *an order that Venezuela additionally pay Air Canada post-award compound interest calculated using Venezuela's cost of borrowing or, alternatively, Air Canada's cost of debt until the date of Venezuela's final satisfaction of the award; and*

[Claim. 7]       *any other relief the Tribunal deems fit and proper.*

## *4.2*    ***Respondent***

138.    Respondent's prayers for relief in its Counter-Memorial are more detailed than those in its Rejoinder, Post-Hearing Brief and Reply Post-Hearing Brief. Therefore, the Tribunal will refer to the relevant versions in its analysis if it deems it necessary.

139.    In its final submission, ***Respondent*** requests that the Tribunal:[45]

[Resp. 1]       *Declare that the dispute is not within the jurisdiction of the Arbitral Tribunal and is, in any event, not admissible;*[46]

---

[45] Reply R-PHB, para. 49. See also Counter-Memorial, para. 533, Rejoinder, para. 462 and R-PHB, para. 169.

[46] In its Counter-Memorial, Respondent requests the Tribunal to:

    a. *Declare that the dispute is not within the jurisdiction of the Arbitral Tribunal because the dispute is governed by and must be resolved as per the terms of the ATA;*
    b. *Declare that the dispute is not within the jurisdiction of the Arbitral Tribunal or is inadmissible because:*
    i. *Claimant has not complied with the waiver requirement of Article XII(3)(b) of the BIT, and/or*

[Resp. 2] *Dismiss Air Canada's claims of liability under Articles II, VII and VIII of the Agreement between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and Protection of Investments;*[47]

[Resp. 3] *Dismiss Air Canada's claim for compensation, as well as its claim for interest, or alternatively, reduce any amounts ordered as compensation on account of Air Canada's contributory fault, its unwise conduct or its improper actions;*[48]

[Resp. 4] *Order Air Canada to pay all costs incurred by the Republic in connection with this arbitration, including all of the Arbitral Tribunal's and ICSID's fees and expenses, and all legal fees and expenses incurred by the Republic (including but not limited to lawyer's fees and expenses);*

[Resp. 5] *Order Air Canada to pay interest as the Arbitral Tribunal may consider appropriate on the amounts owed to the Republic as from the date of the award on costs and complete payment; and*

[Resp. 6] *Order any additional measure it may deem appropriate.*

## 5. Roadmap

140. The Tribunal will proceed as follows:

 – *First*, it will set out the law applicable to the present dispute (<u>Section II</u>).

---

*ii. Claimant has referred the dispute to arbitration after the expiry of the three year statutory period of Article XII(3)(d) of the BIT.*
*c. Declare that the dispute is not within the jurisdiction of the Arbitral Tribunal because Claimant does not meet the ratione materiae and/or ratione personae requirements of Article I of the BIT.*

[47] In its Counter-Memorial, Respondent requests the Tribunal to:

 *d. Declare that the Bolivarian Republic of Venezuela has not violated either Article II, Article VII or Article VIII of the BIT.*

[48] In its Counter-Memorial, Respondent requests the Tribunal to:

 *e. Declare:*
 *i. That Claimant is not entitled to any compensation; or in the alternative*
 *ii. That Claimant has failed to quantify its damages; or in a further alternative*
 *iii. That Claimant's entitlement to any compensation shall be reduced by 75% due to Claimant's contributory fault; or by 50% due to Claimant's unwise conduct; or, at the very least by 25% due to its improper actions.*
 *f. Declare, if any damages are awarded to Air Canada, that Claimant is not entitled to any interest neither simple nor compound;*
 *g. Dismiss all of Claimant's claims;*

    &minus;   *Second*, it will rule on Respondent's jurisdictional and admissibility objections (<u>Section III</u>).

    &minus;   *Third*, to the extent that it finds it has jurisdiction over the present dispute, it will rule on Claimant's claims on the merits, i.e., the alleged violations of the BIT (<u>Section IV</u>).

    &minus;   *Fourth*, and to the extent it finds that Respondent breached the BIT, it will decide on issues relating to quantum (<u>Section V</u>).

    &minus;   *Firth*, and in any event, the Tribunal will decide on the issue of costs of the arbitration (<u>Section VI</u>).

141.    Having carefully considered all the arguments and evidence presented by the Parties in the course of these proceedings, the Tribunal does not consider it necessary to repeat all of them in the Award. The Tribunal will address in its reasoning only the decisive factors necessary to rule on the Parties' prayers for relief. When summarizing the Parties' positions, the Tribunal reproduces the positions as they were presented in the first two rounds of submissions on jurisdiction and the merits; reference is made to all other submissions (including Post-Hearing Briefs) to the extent necessary for the Tribunal's analysis.

## II.    Applicable law

142.    The Parties made certain arguments in the first round of their written submissions regarding the applicable law.[49] Although the issue appears to become relevant <u>if</u> and after the Tribunal determines that it has jurisdiction, the Tribunal considers that it is appropriate to address it beforehand because the applicable law may also become relevant to the Tribunal's assessment of its jurisdiction (see *infra* para. 146).

143.    The relevant provisions in relation to the applicable law in the present case are *Article 54(1) of the AF Arbitration Rules* and *Article XII(7) of the BIT*.

144.    <u>Article 54(1) of the AF Arbitration Rules</u> provides as follows:

> *The Tribunal shall apply the rules of law designated by the parties as applicable to the substance of the dispute. Failing such designation by the parties, the Tribunal shall apply (a) the law determined by the conflict of laws rules which it considers applicable and (b) such rules of international law as the Tribunal considers applicable.*

---

[49] Memorial, paras 103-105; Counter-Memorial, paras 256-265.

145.    Further, <u>Article XII(7) of the BIT</u> provides as follows:[50]

> *A tribunal established under this Article shall decide the issues in dispute in accordance with this Agreement and applicable rules of international law. **An interpretation of this Agreement to which both Contracting Parties have agreed shall be binding upon the tribunal**.* (emphasis as in original)[51]

146.    The Parties agree, and the Tribunal confirms, that in accordance with the foregoing provisions, the BIT itself and international law govern this dispute.[52] However, the Parties appear to differ as to the application of Venezuelan law by this Tribunal. Specifically:

–    ***Claimant*** points to the fact that the Vienna Convention on the Law of Treaties ("VCLT") provides that "*treaties are governed by international law*" and must be interpreted in light of "*any relevant rules of international law*". This makes international law supreme over domestic law in the area of state responsibility. This is also confirmed by the *International Law Commission's Draft Articles on Responsibility of States for Internationally Wrongful Acts* ("ILC Articles"). These rules, together with the BIT's governing law provision, which does not mention domestic law, confirm that Venezuelan law may not be used by the Tribunal to determine the outcome of this dispute.[53]

–    ***Respondent*** submits that that the Tribunal must indeed consider Venezuelan law when assessing Claimant's claims, Respondent's defenses and the conduct of both Parties, particularly with respect to civil aviation, labor law, exchange control, and administrative procedures, all matters governed by rules of Venezuelan law.[54] In the present case, the "territorial nexus" is undeniable, as the BIT requires that the investment be made "*in the territory of Venezuela*".[55] Moreover, Claimant was operating in an environment regulated by Venezuelan law, namely civil aviation. In conducting its business in the Republic, Claimant was also subject to Venezuelan labor regulations.[56] The same is true of Claimant's AAD requests, in the sense that they are also subject to Venezuelan law. Only by considering these provisions of Venezuelan law will the Tribunal be able to determine the proper scope and content of Claimant's alleged "right to U.S. dollars". This is consistent with the position taken by numerous arbitral tribunals.[57]

---

[50] Exh. C-1 (BIT).
[51] The interpretation is found in an Annex to the BIT, Exh. C-1.
[52] Memorial, paras 103-105; Counter-Memorial, paras 256-258.
[53] Memorial, para. 105.
[54] Counter-Memorial, para. 259.
[55] Counter-Memorial, para. 262.
[56] Counter-Memorial, para. 264.
[57] Counter-Memorial, para. 265.

147.    **The Tribunal** agrees with Respondent. Domestic law, in this case Venezuelan law, "*is likely* [to be] *relevant*" to the determination of the claims and defenses at hand.[58] This being said, the role of domestic law is not to be confused with that of the BIT and/or international law. In particular, it is not part of the regime governing the present dispute (see *supra* para. 146). Instead, it must be considered from a factual perspective in order to determine, where appropriate, the scope and extent of the rights and obligations of the Parties alleged to give rise to the existence of an "investment" for jurisdictional purposes, as well those alleged to give rise to the claims on the merits.[59]

### III.    Jurisdiction and Admissibility

### 1.    The issue

148.    The issue is whether this Tribunal has **jurisdiction** over the present dispute and whether the claims are admissible.

149.    **Respondent** requests that the Tribunal "[d]*eclare that the dispute is not within the jurisdiction of the Arbitral Tribunal and is, in any event, not admissible*" [Resp. 1] (see *supra* paras 138 and 139).[60] Specifically, that:

–    "*the dispute is not within the jurisdiction of the Arbitral Tribunal because the dispute is governed by and must be resolved as per the terms of the ATA*";

---

[58] See Counter-Memorial, para. 260 quoting Exh. RL-65, C. Schreuer, *Jurisdiction and Applicable Law in Investment Treaty Arbitration*, McGill Journal of Dispute Resolution / Revue de règlement des différends de McGill, Vo. 1: 1, 2014, pp. 17-18.

[59] See Exh. RL-68, *Alpha Projektholding GmbH v. Ukraine*, ICSID Case No. ARB/07/16, Award, dated 8 November 2010, para. 347 ("*When necessary to resolve factual questions, including the scope of Claimant's rights and interests in the JAAs, the Tribunal shall apply the domestic law of Ukraine*".); Exh. RL-69, *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/1, Decision on liability, dated 27 December 2010, para. 39 ("*The first question concerns the role of Argentina's domestic law in determining the content and the extent of Total's economic rights as they exist in Argentina's legal system. In this regard, the Tribunal believes that Argentine law has a broader role than that of just determining factual matters. The content and scope of the Total's economic rights […] must be determined by the Tribunal in light of Argentina's legal principles and provisions […] Thus, the Tribunal shall determine the precise content and extent of Total's economic rights under Argentina's legal system in respect of Total's claims under the BIT, wherever necessary in order to ascertain whether a breach of the BIT has occurred*".); Exh. RL-23, *Emmis International Holding B.V. et al. v. Hungary*, ICSID Case No. ARB/12/2, Award dated 16 April 2014, paras 149 and 162 ("*the existence and nature of any such rights must be determined in the first instance by reference to Hungarian law, before the Tribunal proceeds to decide whether any such rights can constitute investments capable of giving rise to a claim for expropriation for the purpose of its jurisdiction under the Treaties and ICSID Convention*" and "[i]*n order to determine whether an investor/claimant holds property or assets capable of constituting an investment it is necessary in the first place to refer to host State law*".).

[60] Reply R-PHB, para. 49. See also Counter-Memorial, para. 533, Rejoinder, para. 462 and R-PHB, para. 169.

–  "*the dispute is not within the jurisdiction of the Arbitral Tribunal or is inadmissible because: i. Claimant has not complied with the waiver requirement of Article XII(3)(b) of the BIT, and/or ii. Claimant has referred the dispute to arbitration after the expiry of the three year statutory period of Article XII(3)(d) of the BIT*";

–  "*the dispute is not within the jurisdiction of the Arbitral Tribunal because Claimant does not meet the ratione materiae and/or ratione personae requirements of Article I of the BIT*".[61]

150. **Claimant** requests that the Tribunal find that "*the dispute is within the jurisdiction of the tribunal*" [Claim. 1] (see *supra* para. 137).[62]

151. **The Tribunal** recalls that it is constituted in accordance with the BIT and the AF Rules. Its jurisdiction should therefore in principle be determined only by reference to the criteria set out in the BIT and the AF Rules.[63] In the present case, however, Respondent contests the appropriateness of the BIT *forum* for the present dispute and, more specifically, whether it is affected by the ATA *forum*. In these circumstances, the Tribunal must first assess whether the present dispute is appropriately brought before it before considering if necessary, whether the jurisdictional requirements are met.[64]

152. The Tribunal is therefore concerned with the following questions:

–  *First*, whether the ATA exclusively governs the present dispute (see *infra* Section 2).

–  *Second*, and if necessary, whether an arbitration agreement has been reached under the BIT (see *infra* Sections 3 and 4); and/or

–  *Third*, and if necessary, whether Air Canada qualifies as a protected investor that has made a protected investment within the meaning of the BIT (see *infra* Section 5).

## 2.  Objection to jurisdiction based on the ATA

### 2.1  The Parties' positions

### (i)  Respondent

153. Respondent submits that the ATA is the *lex specialis* applicable to this dispute to the exclusion of the BIT.[65]

---

[61] Counter-Memorial, para. 533.
[62] Reply C-PHB, para. 112. See also, Memorial, para. 202, Reply Memorial, para. 300 and C-PHB, para. 234.
[63] See Reply, para. 75.
[64] See Rejoinder, para. 21.
[65] Application for Bifurcation, Section I; Counter-Memorial, Section III.A; Rejoinder, Section I.A.

154.    According to Respondent, Claimant invokes the BIT when it needs to resort to arbitration, and the ATA when it needs to substantiate its claims.[66] As such, Claimant's case is nothing more than an ATA claim disguised as a BIT claim.[67] In fact, Claimant's alleged protected investment under the BIT has only one source: the ATA.[68] Further, each of Claimant's alleged claims point to the ATA.[69]

155.    Claimant is mistaken that (i) the BIT is the *lex specialis* applicable to the dispute and governs, as such, jurisdictional issues, and (ii) the rules contained in the ATA are "*applicable rules of international law*" in the meaning of Article XII(7) of the BIT and as such may supplement the BIT.[70]

156.    The *lex specialis* maxim seeks to resolve a situation where there is a conflict of norms, by ruling that the special norms should apply instead of the general ones.[71] In absence of any express exclusion of "*aviation industry investors*" from the scope of the BIT, the ATA and the BIT *prima facie* both provide protection to Claimant. However, they also provide for conflicting dispute settlement mechanisms.[72] While the ATA provides that disputes must exclusively be resolved through State-to-State negotiations, the BIT only offers an option for the investor to refer the dispute to arbitration.[73]

157.    Further, the ATA already regulated the operation of airlines such as Air Canada for six years prior to the signature of the BIT. Moreover, as evidenced by official statements of the Legal Bureau of Department of legal Affairs of Canada of 1990, both Canada and Venezuela were aware that more specific treaties prevail over the general ones such as the BIT.[74]

158.    Therefore, the Tribunal must apply the *lex specialis* maxim in order to first determine whether the ATA prevails over the BIT.[75] This determination requires the analysis of (i) the subject-matter of the studied norms and (ii) the number of actors whose behavior is regulated.[76] Respondent makes seven comparisons between the two instruments in this connection that confirm that the ATA has a more specific subject-matter than the BIT and that it specifically protects designated airlines, such as Claimant (i.e., in relation to the objective, scope, regulation of behavior of actors, subject-matter, reference to domestic

---

[66] Application for Bifurcation, para. 14.
[67] Application for Bifurcation, para. 11; Rejoinder, paras 14-15.
[68] Rejoinder, para. 16.
[69] Rejoinder, para. 17.
[70] Application for Bifurcation, paras 15-16.
[71] Application for Bifurcation, para. 19.
[72] Application for Bifurcation, para. 12; Rejoinder, paras 27, 30.
[73] Rejoinder, paras 49-50 quoting Exh. CL-107, V. Lowe, *Overlapping Jurisdiction in International Tribunals*, Australian Yearbook of International Law, 1999, vol. 20 ("Lowe").
[74] Rejoinder, para. 28 quoting Exh. RL-124, B. Mawhinney, *Canadian Practice in International Law at the Department of External Affairs in 1990/91*, 29 Can. Y.B. Int'l L., 1991, pp. 454-475 ("Mawhinney").
[75] Counter-Memorial, para. 111; Rejoinder, paras 20-25.
[76] Application for Bifurcation, para. 20; Counter-Memorial, paras 110-111.

law, MFN clause and national treatment clause).[77] In this connection, Respondent replies to Claimant's defense as follows:

- It is evident that the ATA and the BIT are international bilateral treaties entered into between the same parties, i.e., Venezuela and Canada.[78] Respondent does not agree with Claimant that in order for the *lex specialis* principle to apply, parties to the conflicting norms must be the same.[79]

- The subject matter of a treaty is defined by its general scope. It does not depend on the typology of the specific substantive provisions but on the situations regulated by such provisions. The ATA, which regulates the activity of and offers protection to "aviation industry investors", overlaps with the BIT that, in essence regulates and offers protection to investors in general, including, *prima facie*, those of the aviation industry.[80] In any event, the *lex specialis* applies even in the absence of a conflict between the subject matter of the ATA and the BIT.[81]

159.    Even if the Tribunal were to accept that for the principle to apply there must be some inconsistency between the ATA and the BIT, the MFN, national treatment, free transfer of funds, as well as the dispute resolution clauses of the ATA and the BIT are inconsistent with each other.[82]

160.    The relevant question is not whether specific provisions are similar but whether the ATA and the BIT are in conflict.[83] Article XVIII of the ATA covers all disputes arising out of the interpretation and application of that treaty, including any grievance that one of the beneficiaries of the ATA may have against either Venezuela or Canada. Air transportation carriers have always resorted to their home sovereigns to resolve disputes arising out of air transportation agreements.[84] Thus, the ATA cannot be deemed to be silent on the question of the resolution of disputes arising between the airlines designated thereunder and one of its member States. Instead, such disputes are to be resolved at the inter-State level through State-to-State negotiation.[85]

---

[77] Application for Bifurcation, paras 21-33; Counter-Memorial, paras 112-133.

[78] Rejoinder, para. 32.

[79] Rejoinder, paras 33-34.

[80] Application for Bifurcation, paras 19, 33; Rejoinder, paras 35-37.

[81] Rejoinder, para. 40 quoting Exh. RL-125, S. Zorzetto, *The Lex Specialis Principle and its Uses in Legal Argumentation. An Analytical Inquire*, Eunomía, Revista en Cultura de la Legalidad, No. 3, September 2012-February 2013, pp. 61-87.

[82] Application for Bifurcation, paras 31-32; Rejoinder, paras 41-42.

[83] Rejoinder, paras 43-44.

[84] Rejoinder, paras 45-46 quoting Exh. CL-98, A. B. Steinberg & Charles T. Kotuby Jr., *Bilateral Investment Treaties and International Air Transportation: A New Tool for Global Airlines to Redress Market Barriers*, 76 J. Air L. & Com. 457 (2011) ("Steinberg") and Exh. RL-126, T. C. Atherton & T.A. Atherton, *The Resolution of International Civil Aviation Disputes*, Journal of International Arbitration, Kluwer Law International, Vol. 9 Issue 2, 1992, pp. 105-122.

[85] Rejoinder, paras 47-48.

161.    In the present case, neither the BIT nor the ATA contain a rule resolving the conflict between the two treaties. This is where the *lex specialis* doctrine plays its role. Accepting Claimant's argument that just because nothing in the ATA prevents it from bringing claims before this Tribunal in relation to the rights and protection it has under the ATA would amount to (i) simply negating the *lex specialis* principle used by Claimant itself and (ii) permitting shopping by any interested party amongst conflicting treaties.[86]

162.    The Tribunal should therefore decline its jurisdiction in light of the more "special" procedure to which Venezuela and Canada agreed in the ATA.[87]

*(ii)*    *Claimant*

163.    Claimant submits that the ATA cannot and does not deprive the Tribunal of its jurisdiction under Article XII of the BIT.[88]

164.    *First*, the BIT is the *lex specialis* applicable to the dispute and governs therefore jurisdictional issues.[89] The Tribunal's jurisdiction is to be determined solely by reference to the criteria set forth in the BIT, which Claimant has satisfied.[90] Claimant has not asserted any claim under the ATA. Instead, it relies on the ATA primarily to provide factual context and background for its claims under the BIT. Article XII(7) of the BIT positively requires this Tribunal to "*decide issues in dispute in accordance with* [the BIT] *and applicable rules of international law*". These international rules necessarily include the ATA.[91]

165.    *Second*, if Canada and Venezuela had wanted to exclude investments by designated airlines under the previously signed ATA or aviation generally from the scope of the BIT's protections, including its investor-state dispute resolution provisions, then they could have done so, just as they expressly excluded investments in "cultural industries" from protection. Indeed, Canada and Venezuela were clearly mindful of the aviation sector when they entered into the BIT, because they specifically excluded third-party bilateral agreements relating to aviation from the scope of certain protections contained in Article II(3) and Article III(1) and (2) of the BIT.[92]

166.    *Third*, it is well-established that the principle *lex specialis* applies only where the parties and the subject-matter of conflicting norms are identical. Here neither the parties nor the subject-matter of treaties is identical. Claimant alleges breaches by Respondent of the investment protections contained in the BIT, including its provisions governing FET and expropriation. The ATA does not contain such investment protection provisions.[93] In addition, Article XII of the BIT covers disputes between different parties and concerning different subject-matters than Article XVII of the ATA. This is not an inter-State dispute

---

[86] Counter-Memorial, para. 132.
[87] Rejoinder, paras 51-52 quoting Exh. CL-107 (Lowe).
[88] Response to Application for Bifurcation, paras 14-19; Reply, para. 73.
[89] RfA, para. 35; Memorial, Section III. C and para. 104.
[90] Reply, para. 75.
[91] Response to Application for Bifurcation, para. 16.
[92] Rejoinder, para. 76.
[93] Rejoinder, para. 77.

between Venezuela and Canada relating to the interpretation or application of the ATA. Even though the ATA contains free transfer rights and obligations that are similar to those in the BIT, a dispute arising under the latter is different from a dispute concerning the interpretation and application of the former, most notably because the parties are different.[94] Moreover, there is no indication that Venezuela or Canada intended the ATA to limit or otherwise curtail a designated airline's legal rights to those found in the ATA, to the exclusion of any other rights it might have under domestic or international law.[95]

167.   *Fourth*, pursuant to the ILC Articles, for the *lex specialis* principle to apply there must be some actual inconsistency between the two provisions. Dispute settlement mechanisms are considered inherently cumulative in nature in the absence of a clear indication that they were intended to be exclusive. Thus, even if Claimant were a party to the ATA, it would not be precluded from bringing arbitration under the BIT, absent express language in either treaty to the contrary.[96]

## 2.2   The Tribunal's analysis

### (i)   The issue

168.   The *issue* is whether the present dispute is governed exclusively by the ATA so that it must be resolved in accordance with the dispute settlement provision contained therein (see *supra* paras 153, 162, 163, 164).

169.   *First,* the Tribunal notes that in its Post-Hearing and Reply Post-Hearing Briefs, Claimant developed in detail its defense to Respondent's jurisdictional objection under the ATA and in particular the *lex specialis* argument. Specifically, Claimant further developed its arguments[97] and sought to present new legal authorities on the issue,[98] which the Tribunal admitted into the record (see *supra* para. 117). Respondent indicated that it disagreed, arguing that Claimant had "*used its Post-Hearing Brief to present a fully new case* […] *and adduced new authorities of its choice*", that "*these limitations undoubtedly generate a procedural unfairness to the detriment of the Republic, in breach of the principle of equal treatment*" and that "[t]*he fact that the Republic was provided with an opportunity to respond to Air Canada's new case is not sufficient to cure this procedural unfairness*".[99]

---

[94] Reply, para. 78.
[95] Response to Application for Bifurcation, para. 17.
[96] Reply, para. 79 quoting Exh, RL-116, *International Law Commission, Draft Articles on Responsibility of States for Internationally Wrongful Acts, with commentaries*, Yearbook of the International Law Commission, United Nations, 53rd Session (2001) ("ILC Draft Articles Commentary"), Exh. CL-106, Seyed Ali Sadat-Akhavi, *Methods of Resolving Conflicts between Treaties (2003)* and Exh. CL-107 (Lowe).
[97] For example, invoking the *lex posterior derogate priori*, the intention of the Contracting States under the BIT, the relevant question of whether the treaties are part of the same "treaty regime", "*the presumption against normative conflict*". See C-PHB, paras 100-150; Reply C-PHB, paras 16-34.
[98] Exhibits CL-157 to CL-159.
[99] Reply R-PHB, paras 4-6. Respondent also objects to the relevance of Claimant's new legal authorities and argues that they should be dismissed by the Tribunal in its assessment. See Reply R-PHB, paras 45-48.

170.  The Tribunal considers that Claimant could indeed have developed such arguments at a much earlier stage in these proceedings. At the same time, it cannot overlook the fact that, following the Hearing, the Tribunal asked specific questions about jurisdiction and, in particular, about Respondent's objection under the ATA which may have guided Claimant's recent and more elaborate position.

171.  *Second,* the Tribunal considers that it has given both Parties an equal and sufficient opportunity on this point. In particular, it has also granted Respondent the right to address new and more detailed arguments and even to submit legal authorities with its Reply Post-Hearing Brief. Nonetheless, the Tribunal will address Respondent's jurisdictional objection under the ATA by reference to the Parties submissions up to the Hearing (including oral testimony). This does not mean that the Tribunal will not consider the Parties' Post-Hearing Briefs in this regard. Instead, to the extent that new avenues are developed or explored with respect to this objection, the Tribunal will consider them only if they are sufficiently presented by **both Parties** and to the extent necessary for the Tribunal to resolve this issue under the law applicable in this case.

172.  In any event, the main question to be answered by the Tribunal is Respondent's question whether the Tribunal lacks jurisdiction because the allegedly applicable *lex specialis* governing the dispute, the ATA, does not contain an arbitration agreement.[100] Therefore, the Tribunal will address this issue as follows:

–  *First*, it will set out the principle of *lex specialis* (Section (ii)).

–  *Second*, it will analyze whether the principle of *lex specialis* applies by examining the "competing" treaties, i.e., the ATA and the BIT (Section (iii)).

–  *Third*, it will examine whether the ATA supersedes the BIT in the present case, in the event that the *lex specialis* principle is applicable, or otherwise (Section (iv)).

–  *Finally*, it will conclude (Section (v)).

*(ii)*  *The lex specialis* principle

173.  The Parties dispute the relevance, applicability, and scope of the *lex specialis* maxim to the present dispute.[101]

174.  The Tribunal notes that, contrary to Respondent's submission, the Parties do not agree on the appropriateness of the *lex specialis* principle for determining the Tribunal's jurisdiction. Indeed, Claimant stated during the Hearing that the principle does not apply. The Parties also disagree on the requirements of the principle itself. Therefore, in order to determine whether the principle is relevant in this case, it is important for the Tribunal to understand the function and scope of the principle.

---

[100] Reply R-PHB, paras 9-10.
[101] Respondent (Counter-Memorial, para. 107; Rejoinder, paras 13-52; R-PHB, para. 10); Claimant (Memorial, para. 104; Reply, paras 73-80; C-PHB, paras 100-150).

175. According to the Report of the Study Group of the ILC on the "*Fragmentation of international law: Difficulties arising from the diversification and expansion of international law*" – an authority relied upon by Respondent[102] – the *lex specialis* maxim in international law functions as follows:

– As Respondent submits, the maxim, that "*suggests that if a matter is being regulated by a general standard as well as a more specific rule, then the latter should take precedence over the former*", is both a "*maxim of legal interpretation of a conflict and a technique for the resolution of normative conflicts*".[103]

– As such, the Report clarifies that "[t]*he relationship between the general standard and the specific rule may, however be conceived in two ways*": (i) *where the specific rule should read and understood within the confines or against the background of the general standard, typically as an elaboration, updating or a technical specification of the latter*";[104] (ii) "*where two legal provisions that are both valid and applicable, are in no express hierarchical relationship, and provide incompatible direction on how to deal with the same set of facts. In such a case, lex specialis appears as conflict-solution technique.*" In both cases, primacy falls on the "special" provision.[105]

– The Report adds, however, that "***the maxim does not admit of automatic application***". In this context, there are the following two sets of difficulties: "***First, it is often hard to distinguish what is "general" and what is "particular"*** *and paying attention to the substantive coverage of a provision or to the number of legal subjects to whom it is directed one may arrive at different conclusions. An example would be provided by a relationship between a territorially limited general regime and a universal treaty on some specific subject.* ***Second, the principle also has an unclear relationship to other maxims of interpretation or conflict-solution techniques*** *such as, for instance, the principle lex posterior derogate legi priori (later law overrides prior law) and may be offset by normative hierarchies or informal views about "relevance" or importance.*"[106] (emphasis added)

---

[102] In its Post-Hearing Brief, Claimant relies on a passage of the ILC Study Group's report, which the Tribunal does not quote above, and states that "*the ILC's Study Group concluded that principles like lex specialis only make sense to apply when, within the same treaty regime, two treaties might potentially conflict or overlap*" and develops the argument that "[t]*he BIT's regime is thus entirely different from that of the ATA*". See C-PHB, paras 117-121 quoting Exh. RL-1, M. Koskenniemi, *Fragmentation of International Law: Difficulties Arising from the Diversification and Expansion of International Law*, United Nations General Assembly, International Law Commission, Fifty Eighth Session, Geneva, para. 255 ("Koskenniemi"). Respondent objects to this reasoning. See Reply R-PHB, para. 25. The Tribunal refers to its considerations above on the approach it will take in relation to Claimant's allegedly new and elaborated arguments (see *supra* paras 166-168). In any event, the Tribunal approaches the relationship between the two "regimes", i.e., the ATA and the BIT, in a slightly different way below, when it generally analyzes the *lex specialis* and assesses the general subject-matter of each Treaty in that context (see *infra* paras 183-186).
[103] Exh. RL-1 (Koskenniemi), para. 56; Counter-Memorial, para. 108; Tr. Day 1, 126:16-18.
[104] Exh. RL-1 (Koskenniemi), para. 56.
[105] Exh. RL-1 (Koskenniemi), para. 57.
[106] Exh. RL-1 (Koskenniemi), para. 58.

- Indeed, "*lex specialis is usually discussed as one factor among others in treaty interpretation (articles 31-33 VCLT) or in dealing with the question of successive treaties (article 30 VCLT, especially in relation to the principle of lex posteriori)*".[107] It may operate "*(a) within a single instrument; (b) between two different instruments; (c) between a treaty and a non-treaty standard and (d) between two non-treaty standards*".[108] "*Inasmuch as "general law" does not have the status of jus cogens, treaties generally enjoy priority over custom and particular treaties over general treaties*".[109]

- Further, "[a] *rule is never "general" or "special" in the abstract but in relation to some other rule*" and "[a] **rule may be general or special in regard to its subject-matter (fact description) or in regard to the number of actors whose behavior is regulated by it**."[110] (emphasis added)

- With respect to specificity in relation to the "subject-matter", "*lex specialis can only apply where both the specific and general provisions concerned deal with the same substantive matter*". This is in line with Article 55 of the ILC Articles.[111] However, "*the criterion of the "same subject-matter" as a condition for applying a conflict rule is too unspecific to be useful*" and "[d]*ifferent situations may be characterized differently depending on what regulatory purpose one has in mind*".[112]

- In this regard, the Report refers to the ILC's explanation in its commentary on the drafting of Article 55 which states that "[f]*or the lex specialis principle to apply it is not enough that the same subject matter is dealt with by two provisions; there must be some actual inconsistency between them, or else a discernible intention that one provision is to exclude the other*".[113] (emphasis added)

176. The Tribunal can, therefore, infer the following from the foregoing in the context of the present case.

---

[107] Exh. RL-1 (Koskenniemi), para. 65.
[108] Exh. RL-1 (Koskenniemi), para. 68.
[109] Exh, RL-1 (Koskenniemi), para. 85.
[110] Exh, RL-1 (Koskenniemi), para. 112.
[111] Exh. RL-1 (Koskenniemi), para. 116. Article 55 ("*Lex specialis*") of the ILC Articles: "*These articles do not apply where and to the extent that the conditions for the existence of an internationally wrongful act or the content or implementation of the international responsibility of a State are governed by special rules of international law.*"
[112] Exh. RL-1 (Koskenniemi), para. 117.
[113] Exh. RL-1 (Koskenniemi), paras 88-89.

177.   *First*, the present case concerns two different and successive instruments, namely (i) the ATA, concluded between Canada and Venezuela in 1990,[114] and (ii) the BIT, signed between Canada and Venezuela in 1996 and in force since 1998.[115]

178.   *Second*, the *lex specialis* functions both as a rule of interpretation and as a conflict of laws rule. In the present case, Respondent refers to the primacy of the ATA and the *incompatibility* of the dispute settlement clauses of the ATA and the BIT: the clauses allegedly provide incompatible direction on how to deal with Claimant's claims. As such, if applicable, the *lex specialis* can only become relevant here as a conflict rule.

179.   *Third*, and in any event, the *lex specialis* principle is not automatically applicable. The Tribunal must first "*distinguish what is 'general' and what is 'particular'*". This distinction cannot be made in the abstract; rather, the Tribunal must look at the relevant subject matter and the actors whose conduct is to be regulated. This is consistent with Respondent's position that the subject matter and the number of actors whose behavior is regulated are the relevant criteria.[116]

180.   *Fourth*, and with respect to subject matter, the Tribunal considers that in order to properly assess the relevant subject matter in the present case, it must consider both the overall subject matter of the instruments and that of the allegedly conflicting norms. In the present case, this means the subject matter of the ATA and the BIT as well that of their dispute settlement provisions.

181.   *Fifth*, and in relation to the relevant actors, again the Tribunal finds it pertinent to see the relevant actors in each respect, that is, with respect to the Treaties themselves and with respect to their respective dispute resolution provisions.

182.   *Finally*, and in any event, it is of paramount importance for the application of the principle that there is an actual contradiction or intention that one instrument or provision excludes the other. In this regard, the Tribunal must evaluate other considerations in its analysis, such as, for example, the wording of the instruments and the intent of the Contracting Parties, if any can be inferred.

---

[114] *Agreement between the Government of Canada and the Government of the Republic of Venezuela* (the ATA) was entered into on *26 June 1990. See* Exh. C-5 (ATA).

[115] *Agreement between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and Protection of Investments* (the BIT) was signed in Caracas on 1 July 1996 and entered into force on 28 January 1998. See Exh. C-1 (BIT).

[116] Counter-Memorial, para. 111 referring to Exh. RL-7, M. Koskenniemi, *Fragmentation of International Law: Topic (a): The function and scope of the lex specialis rule and the question of 'self-contained regimes': An outline, International Law Commission – Study Group on Fragmentation* (undated).

*(iii)*      *The ATA and the BIT*

a.  <u>In general</u>

183.    Having set out the relevant principles in the context of the *lex specialis* maxim and in the context of the present case, the Tribunal will examine the "competing" instruments in light of these principles.

184.    It is recalled that the present case concerns the ATA, concluded between Canada and Venezuela in 1990, and the BIT, signed between Canada and Venezuela in 1996 and in force since 1998 (see *supra* para. 177). While the instruments are consecutive, and Claimant only argues in its Post-Hearing Brief that *lex specialis* must be considered even in the midst of related principles such as *lex posterior derogate priori* found in Article 30(3) VCLT, Respondent objects, *inter alia*, that this argument is new.[117] Indeed, no such principle was raised by Claimant in its earlier submissions.[118] However, the Tribunal notes that the *lex posterior* principle is part of the international law applicable in this case through Article XXI(1) of the BIT. It may therefore take it into account only to the extent necessary and only if Respondent has adequately responded to Claimant's submissions in this regard in its Reply Post-Hearing Brief (see also the Tribunal's reasoning *supra* at paras 169-171).

185.    Similarly, in its Post-Hearing Brief, Claimant develops the argument that it is clear from the text of the BIT itself that Canada and Venezuela had a common intention to apply the BIT and in particular Article XII of the BIT, to investors in the aviation sector.[119] Respondent challenges the correctness of this argument.[120] The Tribunal reiterates its above considerations on its approach (see paras 169-171 and 184) and emphasizes that an interpretation of the instrument on which it is based, including the intention of the relevant signatory parties, when its jurisdiction is challenged is an exercise it must undertake in any case, including on its own motion, in order to comply with its mandate.

b.  <u>The ATA</u>

186.    With regard to the ATA, the Tribunal observes the following:

  –   Its ***purpose*** is set forth in its preamble, which states that the Contracting Parties "[d]*esir*[ed] *to conclude an agreement supplementary to the* [Convention on International Civil Aviation, i.e., the Chicago Convention] *for the purpose of establishing commercial air services*".[121] Further, Article II on the "Applicability of the Chicago Convention" states that the ATA "*shall be subject to the provisions*

---

[117] C-PHB, para. 100. See also C-PHB, paras 122-128, 148-149, Reply C-PHB, paras 32-33 and Reply R-PHB, paras 38-44.
[118] See also Rejoinder, para. 33.
[119] C-PHB, paras 102-114, 138; Reply C-PHB, paras 16-21, 31.
[120] Reply R-PHB, paras 14-22.
[121] Exh. C-5 (ATA).

*of the Chicago Convention to the extent that these provisions are applicable to international air services*".[122] At this point, it is important to note that the Chicago Convention is a multilateral treaty concluded for the purpose of agreeing "*on certain principles and arrangements in order that international civil aviation may be developed in a safe and orderly manner and that international air transport services may be established on the basis of equality of opportunity and operated soundly and economically*".[123] In the context of its purpose, the ATA grants each Contracting Party "*the right to designate an airline or airlines to operate the agreed services on the specified routes*".[124]

– In the context of the **substantive rights** of designated airlines, Article XXI provides that "[e]*ach designated airline shall have the right to engage in the sale of air transportation in the territory of the other Contracting Party*" and "*the right to convert and remit to its country on demand earnings obtained in the normal course of its operations* […] *at the foreign exchange market rates for current rates prevailing at the time of the transfer* […] *in accordance with national legislation* […] *under legislative and regulatory conditions no less favourable than those applied to any other foreign airline operating international air services to and from the territory of the other Contracting party*".[125]

– In the context of **procedural rights** in general, Article XVIII, set out above (see para. 133), provides for settlement by negotiation in the event of disputes "*between the Contracting Parties relating to the interpretation or application*" of the ATA.[126] If no satisfactory settlement is reached within 180 days, and unless the Contracting Parties agree otherwise, Article VII applies.[127] Article VII, also set out above (see para. 134), provides for the possibility for the aeronautical authorities of the Contracting Parties to refuse operating licenses in respect of certain airlines if those airlines fail to comply with certain laws or regulations or "*operate in accordance with the conditions prescribed under the*" ATA.[128] In addition, according to Article XXIII, any Contracting Party may "*give notice in writing through diplomatic channels to the other Contracting Party of its decision to terminate*" the ATA.[129]

187.    Thus, in the context of the ATA, the following can be deduced:

– Its purpose is to develop and establish commercial air services in a bilateral context, subject to and in addition to the Chicago Convention. Air Canada, as the

---

[122] Exh. C-5 (ATA).
[123] Exh, CL-1, Convention on International Civil Aviation, signed on 7 December 1944 ("Chicago Convention"), Preamble. Article 84 provides for settlement of dispute "*between two or more contracting States relating to the interpretation or application*" of the Chicago Convention.
[124] Article V(1) of the ATA, Exh. C-5.
[125] Article XXI on the ATA on "Sales and Transfer of Earnings", Exh. C-5.
[126] Exh. C-5 (ATA).
[127] Exh. C-5 (ATA).
[128] Exh. C-5 (ATA).
[129] Exh. C-5 (ATA).

designated airline for Canada, plays an indispensable role in the establishment of such services. As such, the ATA, like the Chicago Convention, provides certain rights and obligations for the designated airlines. Thus, the ATA governs the conduct of three actors, namely the Contracting States and the respective designated airline through the assurance of the Contracting States.

– In the event of a dispute between Canada and Venezuela over the interpretation and application of the ATA, such dispute can be referred to negotiations. In the event that no satisfactory agreement is reached between Canada and Venezuela, the appropriate aeronautical authority may revoke the designated airline's authorization if it fails to comply with the relevant laws or the ATA. Negotiation is thus only provided as a State-centric remedy[130] and apparently only when the designated airline is in the wrong. The designated airline certainly has no right to bring a claim, or no right to do so without the proxy of its State. Even if such a claim were made and successful, the ATA does not provide for any monetary compensation to the designated airline itself.

    c.  <u>The BIT</u>

188.    In relation to the BIT, the Tribunal finds the following:

– Its ***purpose*** is set out in its first and second preambles. According to its first preamble, the BIT "*establishes the framework for cooperation in the cultural, economic and technological fields between them*".[131] According to its second preamble, the BIT "*recognizes that the promotion and the protection of investments of investors of one Contracting Party in the territory of the other Contracting Party will be conductive to the stimulation of business initiative and to the development of economic cooperation between them*".[132]

– The BIT provides, *inter alia*, the following relevant ***substantive protections***: Article II(2) provides for "*fair and equitable treatment*" of investments or returns of investors.[133] Article III prohibits the expropriation of investors' investments or returns unless certain conditions are met.[134] Article VIII protects the investor's "*unrestricted transfer of investments and returns*", "*without delay in the convertible currency in which the capital was originally invested or in any other convertible currency agreed by the investor and the Contracting Party concerned*" and "[u]*nless otherwise agreed by the investor*", "*at the rate of exchange applicable on the date of the transfer*". This protection is subject, *inter alia*, to "*the equitable, non-discriminatory and good faith application*" of certain laws of the Contracting Party.[135]

---

[130] Exh. CL-98 (Steinberg).
[131] Exh. C-1 (BIT).
[132] Exh. C-1 (BIT).
[133] Article II(1) of the BIT on "Establishment, Acquisition and Protection of Investment", Exh. C-1.
[134] Article III of the BIT on "Expropriation" Exh. C-1.
[135] Article VIII of the BIT on "Transfer of Funds", Exh. C-1.

–  The BIT also provides for the following **procedural safeguards**: In the context of a dispute between an investor and a Host Contracting Party "*relating to a claim by the investor that a measure taken or not taken by the* […] *Contracting Party is in breach of* [the BIT]", Article XII already outlined above (see para. 132) provides for the possibility of investor-state arbitration. In deciding the dispute, the investor-state tribunal "*shall decide the issues in dispute in accordance with this Agreement and applicable rules of international law*" and is bound by an interpretation of the BIT contained in an annex.[136] In the context of a dispute between the Contracting Parties over the "*interpretation or application*" of the BIT, Article XIV provides for amicable settlement through consultations followed by arbitration.[137]

–  The interpretation of the BIT, agreed to by the Parties in an Annex that forms "*an integral part*" of the BIT,[138] provides the following with respect to certain exceptions to the protection of the BIT: Pursuant to Article II(4) of the Annex, Article II(3) and Article III(1) and (2) of the BIT, "*do not apply to treatment by a Contracting Party pursuant to any existing or future bilateral or multilateral agreement:* […] (b) *relating to* **aviation**; *telecommunications transport networks and telecommunications transport services; fisheries, maritime matters, including salvage; or financial services*" (emphasis added). Pursuant to Article III(8) of the Annex, Articles II, III, IV and V of the BIT and the related provisions of the Annex "*do not apply to (a) procurement by a government or state enterprise* […]; *(b) subsidies or grants* […]; *(c) any measure denying investors* […] *and their investments any rights* […] *provided to the aboriginal peoples of either country; or (d) any current or future foreign aid program* […]". According to Article III(9) of the Annex, "[i]*nvestments in cultural industries are exempt from the provisions*" of the BIT.

189.  In the context of the BIT, therefore, the following can be deduced:

–  Its purpose is to develop economic cooperation in general at the respective bilateral level. An important way to achieve this is through the promotion and protection of investment. In terms of content, the BIT is therefore entirely focused on the rights and obligations of the Contracting State *vis-à-vis* the investor of the other Contracting State. As such it primarily regulates the conduct of these two actors.

–  Procedurally, the Tribunal envisages two options: first, the possibility of arbitration where there is a dispute between the investor and the host State over the investment as defined by the BIT itself; second, any dispute over the interpretation and application of the BIT, to be resolved by negotiation and then by arbitration at the inter-State level.

---

[136] Article XII of the BIT, Exh. C-1.
[137] Article XIV of the BIT on "Disputes between the Contracting Parties", Exh. C-1.
[138] Article XVI(2) of the BIT on "Application and Annex", Exh, C-1.

–   Disputes relating to the cultural industries appear to be excluded from the BIT's protections. Disputes over treatment under a bilateral agreement relating to the aviation sector are excluded only to the extent set out in Article II(4) of the Annex to the BIT.

### d.   The application of the *lex specialis*

190.   It follows from the above conclusions on the ATA (see *supra* para. 187) and on the BIT (see *supra* para. 189) that, contrary to Respondent's view,[139] there is not or cannot be any overlap between the ATA and the BIT.

191.   *First*, the subject-matters of the ATA and of the BIT are generally different. The ATA deals with the establishment of relationships between commercial airlines in accordance with the principles and agreements of the Chicago Convention (see *supra* para. 186). The BIT, on the other hand, deals with the protection of investors who have made an investment for the purpose of developing economic cooperation in general (see *supra* para. 188). It does not deal with the legal regulation of cross-border air operations when such operations are directly related to an air carrier's investment in the destination State. However, the BIT requires that such operations, to the extent that they qualify as an investment, be treated in a specific manner.

192.   Moreover, the subject-matter of the dispute settlement provision of the ATA does not overlap with that of the BIT. While the latter aims to provide the investor with an opportunity for financial redress in the form of a private lawsuit, the former does not provide for such an opportunity. Instead, the ATA provides for negotiations between states. If no settlement or agreement is reached after such negotiations, the only consequence appears to be the revocation of the airline's operating authorization or the termination of the ATA, both at the option of the state designating the airline. If anything, the dispute settlement clause of the BIT may overlap with that of the ATA if disputes arise over the interpretation or application of the ATA (see *infra* para. 195). There is therefore nothing to compensate the airline as a private actor or investor in the event of a complaint. For this reason, the Tribunal does not consider relevant any argument that:

–   Aviation disputes are resolved through state-to-state negotiation and there are no arbitrations involving air transportation.[140]

–   The BIT provides an optional dispute settlement clause, while the ATA provides a mandatory clause.[141]

–   The ATA provides substantive protections for the designated airlines that are inconsistent with the protections for investors set forth in the BIT.[142]

---

[139] Rejoinder, para. 31.
[140] Rejoinder, paras 46, 53-56.
[141] Rejoinder, para. 50; R-PHB, paras 13-16 quoting Exh. CL-107 (Lowe), pp. 194-195.
[142] Application for Bifurcation, paras 11-38; Counter-Memorial, paras 102-133; Rejoinder paras 13-56; R-Opening, Slides 3-19; R-PHB, paras 21-26.

193.    Similarly, it does not consider it necessary to address Claimant's new argument on the principle of harmonization in this context,[143] or Claimant's *lex posterior* argument under Article 30 VCLT, or any investment arbitration jurisprudence interpreting and applying this provision (see *supra* para. 184).[144]

194.    Regardless, it is emphasized that the fact that two treaties – in this case the ATA and the BIT – may apply to the same facts, does not imply their subject matter is the same.

195.    *Second*, the ATA regulates the conduct of states, which in turn control the conduct of their national carriers through the agreement in the ATA. This means that it is the states themselves that bear the consequences when these carriers misbehave. Rather, the BIT regulates the conduct of the states towards the investor of the other state. Thus, it is either the host state or the investor that bears the consequences of applying the BIT. The home State is not regulated and bears consequences for the conduct of its national investor in the host state. Again, and at best, the BIT also raises the possibility of interstate negotiation on the interpretation and application of the BIT for the sole purpose of defining standards of investment protection that are to the benefit of both states.

196.    *Third*, the Tribunal sees no discernible intention from the Contracting Parties to the BIT to exclude investments in the aviation industry from the scope of the BIT and thus to make the ATA the proper and sole *forum* in relation thereto. It is true that the Contracting States Parties to the BIT excluded the application of Articles II(3) and III(1) and (2) to treatment under an existing bilateral agreement relating to aviation. The relevance of this exclusion to the present case has no bearing on the jurisdiction of the Tribunal. If anything, it is a question of admissibility and is relevant only if there are claims under those provisions, which there are not in this case. That is not the case with respect to investments in cultural industry, where the parties have expressly stipulated an exception in that regard. As to its authority in relation to the ATA,[145] the Tribunal refers to its reasoning in paragraph 202 below.

197.    Accordingly, the Tribunal is not of the opinion that this is a situation where there is a general and a specific treaty or general or specific provisions therein providing for different directions. As such, there can be no inconsistency and the principle of *lex specialis* principle cannot be applied.

198.    For the same reasons developed above, Respondent's argument that *lex specialis* applies even in the absence of a conflict[146] has no merit.

---

[143] See C-PHB, paras 129-135 quoting, in particular, the Exh. RL-1 (Koskenniemi), para. 229. See also Respondent objecting to the correctness of this argument in Reply R-PHB, paras 23-37.
[144] See C-PHB, paras 100, 122-128, referring also to new legal authority submitted by Claimant with its Post-Hearing Brief, Exh. CL-157, *Theodoros Adamakopoulos and others v. Republic of Cyprus*, ICSID Case No. ARB/15/49, Decision on Jurisdiction, 7 February 2020. See specifically C-PHB, para. 122.
[145] R-PHB, para. 28.
[146] Rejoinder, paras 40-42. See also R-PHB, para. 27 quoting Article I(4)(b) of the BIT, Exh. C-1.

*(iv)    Does the ATA supersede the BIT in the present case?*

199.    Having found that the *lex specialis* does not apply to the present case, the Tribunal will examine whether the ATA still supersedes the BIT.

200.    *First*, the Tribunal has already examined the BIT and the ATA. It did so in the context of the examination of the *lex specialis* principle and having regard to the wording of the instruments, as well as any related agreements. The Tribunal found no overlap between the subject matters of the two instruments or between their respective dispute settlement provisions. It also found no conflict or discernible intent to exclude the aviation industry from the scope of the BIT.

201.    *Second*, the Tribunal does not find that its conclusions in the context of the *lex specialis* examination are influenced by the facts presented by Respondent regarding the Parties' position and practice with respect to the ATA. Specifically:

–    The fact that Air Canada participated in the negotiations[147] is not relevant to its possible status as an investor bringing a private claim for pecuniary loss under a different instrument.

–    The fact that the ATA had already governed the operations of airlines such as Air Canada six years prior to the signing of the BIT[148] has no bearing on Canada's and Venezuela's express intention to have investment-related disputes, including those involving their commercial airlines, settled by arbitration under the BIT.

–    The official statements of the Legal Bureau of Legal Affairs of Canada in 1990[149] show no intention to make the ATA relevant to an investment dispute in the manner advocated by Respondent.

–    Air Canada's 10 December 2013 email referencing the Embassy of Canada in Venezuela addressing the issue of repatriation of funds under the ATA[150] does not negate the fact that Air Canada had or has the ability to pursue investor-state claims through the BIT. Nor does the view expressed by INAC and ALAV view in a letter to Air Canada dated 19 March 2014 on the application of the ATA.[151]

202.    Equally, there is no merit in Respondent's argument that a refusal by this Tribunal to give effect to the ATA will nullify the ATA and deprive it of any purpose.[152] Neither does the contention that there are no prior Tribunals that have entertained claims by airlines, given

---

[147] Application for Bifurcation, para. 14; Counter-Memorial, paras 7, 105.
[148] Application for Bifurcation, paras 2, 14; Counter-Memorial, paras 21-22, 37.
[149] Rejoinder, para. 28 quoting Exh. RL-124 (Mawhinney), p. 465.
[150] Exh. R-51, Air Canada's internal communication, email thread from 6 December 2013 to 11 December 2013, *subject: Re: Venezuela – repatriation of funds – Call for Dec 11 at 11:30 CT* ("AC internal communication December 2013"); Rejoinder, paras 47-48; R-PHB, paras 10, 17, 18, 20, 50. See also Exh. R-72, Internal presentation, Venezuela, Excom – 12 March 2014, p. 4.
[151] Exh C-45, INAC letter to Air Canada, dated 19 March 2014, p. 2; R-PHB, para. 10.
[152] Memorial, paras 116-117.

that such claims require the authority of the airlines' states.[153] The Tribunal has already found on the basis of the wording of the relevant Treaties, that this is not the case in the present dispute (see *supra* paras 183-189). Instead, it is clear to the Tribunal it that the ATA becomes relevant and vital to the present dispute by Article XII(7) of the BIT, which requires this Tribunal to "*decide issues in dispute in accordance with* [the BIT] *and applicable rules of international law*". There is no question that the Chicago Convention provides for the establishment of bilateral relations on the regulation of the aviation sector and establishment of commercial airline activities. There is also no question that the ATA itself explicitly affirms that it stands to complement the Chicago Convention itself. There is therefore no doubt that the ATA falls within the international law reference of Article XII(8) of the BIT. Therefore, consideration of the substantive provisions of the ATA would not be impermissible in this case.

203.    The Tribunal therefore reiterates that neither the wording nor the purpose of the two Treaties, nor any purported intention of the States concerned or of the Parties, lead to the conclusion that there is a conflict between them such that the ATA would override the BIT in a case such as the present.

*(v)    Conclusion*

204.    Based on the foregoing, the Tribunal concludes **that Respondent's objection to jurisdiction based on the ATA is dismissed**.

**3.    Objection to jurisdiction based on the waiver provision of the BIT**

*3.1    The Parties' positions*

*(i)    Respondent*

205.    Respondent submits that paragraph 43 of the Request for Arbitration does not meet the waiver requirement of Article XII(3)(b) of the BIT and, in the alternative, that Claimant has failed to comply with its own waiver.[154]

206.    *First*, a good faith interpretation in accordance with the ordinary meaning of the language "*dispute settlement procedure*" of Article XII(3)(b) of the BIT in the context of dispute resolution encompasses non-adversarial mechanisms such as negotiation.[155] Respondent points to the negotiation references in Article XII(1) of the BIT and Article XVIII of the ATA in support of its position that negotiation is a dispute settlement procedure and was considered as such by Venezuela and Canada at the time the BIT was entered into.[156]

207.    There can be no controversy as to the good faith and ordinary meaning of "*dispute settlement procedure of any kind*" which may only be constructed as inclusive of all kinds

---

[153] Rejoinder, para. 55.
[154] Application for Bifurcation, Section II.A; Counter-Memorial, Section III.B.1; Rejoinder, paras 58, 69, 74.
[155] Rejoinder, para. 59.
[156] Rejoinder, paras 60-61.

of dispute settlement procedures.[157] Nothing indicates that Venezuela and Canada intended to ascribe any other meaning to those terms than their ordinary one. An interpretation that encompasses negotiation is in line with the letter and spirit of Article XII of the BIT. Allegedly protected investors must waive their rights to negotiate a dispute in order to be allowed to refer the same dispute to arbitration in circumstances where arbitration is only meant to be initiated in case negotiation fails.[158] Further, the only thing that such a waiver prevents is cumulating arbitration with any other kind of dispute settlement mechanism.[159]

208.　Claimant's most recent submission is a clear, unequivocal and express recognition that it never intended to waive such a right because it does not and did not consider at the time it issued its waiver that "negotiation" was a dispute resolution procedure encompassed by Article XII(3)(b). Therefore, Claimant cannot be deemed to have waived such a right through paragraph 43 of its Request for Arbitration.[160]

209.　*Second*, and in the alternative, if the Tribunal were to find that Claimant formally waived its rights to any kind of dispute settlement procedure and not just to "*legal actions*" at paragraph 43 of its Request for Arbitration, Respondent maintains that Claimant has failed to comply with the waiver requirement in breach of the BIT.[161]

210.　Claimant does not deny having been involved in negotiations relating to the measures alleged to be in breach of the BIT; such negotiations were engaged or continued by the ALAV, the Venezuelan Airlines Association, with officials of the Republic and with other international airlines directly and/or through IATA, both after the Request for Arbitration was filed.[162]

211.　Claimant must therefore be deemed to have directly or indirectly continued, after the submission of the Request for Arbitration, to take part into negotiations in relation to the measures allegedly contravening the BIT, therefore multiplying parallel dispute resolution procedures, which is precisely what the waiver requirement of the BIT precludes.[163]

*(ii)*　*Claimant*

212.　Claimant submits that it waived its right to initiate or continue any other proceedings under Article XII(3)(b) of the BIT in paragraph 43 of its Request for Arbitration.[164]

213.　The first prong of Article XII(3)(b) focuses on formal proceedings before Venezuela's domestic courts, while the second prong focuses on other dispute proceedings.[165] In this

---

[157] Rejoinder, para. 62.
[158] Rejoinder, paras 63-66.
[159] Rejoinder, para. 67.
[160] Rejoinder, paras 68-69.
[161] Application for Bifurcation, paras 50-61; Counter-Memorial, paras 181-186; Rejoinder, para. 70.
[162] Rejoinder, para. 71.
[163] Rejoinder, para. 73.
[164] Response to Application for Bifurcation, paras 20-31; Reply, paras 55-56.
[165] Response to Application for Bifurcation, para. 27; Reply, para. 58.

way, Article XII(3)(b) guarantees against the possibility of duplicative proceedings and inconsistent judgments in multiple fora. In this connection, Claimant points to the explanation of the tribunal in *Supervision v. Costa Rica* that the point of these type of waiver provisions is to "*avoid the duplication of procedures and claims, and therefore to avoid contradictory decisions*".[166]

214.    Paragraph 43 of the Request for Arbitration unequivocally confirmed that Claimant had not commenced either of the types of proceeding described in Article XII(3)(b) and that it waived to do so in the future. Further, Claimant confirmed the broad scope of that waiver again in its Response to the Application for Bifurcation.[167]

215.    Respondent's position is also inconsistent with its prior arguments regarding the interpretation of Article XII(3)(b) in other disputes brought under the BIT.[168]

216.    There is no basis therefore for the argument that the second prong of Article XII(3)(b) encompasses non-adversarial proceedings. Such interpretation would bar any attempts at amicable dispute resolution, an illogical result because a party cannot be compelled to settle and there is no risk that amicable settlement talks will lead to a contrary binding decision or to double recovery, the concerns that underlie the requirement for waivers in bilateral investment treaties. Such interpretation would also be impossible to define as it would preclude assertions of rights, requests to comply, exchanges between parties or discussion, thereby effectively preventing recourse to the BIT's dispute resolution provisions.[169]

217.    Concerning the negotiations through the IATA and ALAV on which Respondent relies, Claimant submits that Respondent has inaccurately described the nature of these events as neither of these negotiations constitute proceedings for the purposes of Article XII(3)(b). Negotiations which are no more than discussions are not legal proceedings.[170]

218.    Consequently, Respondent's waiver objection must be dismissed.[171]

### 3.2    The Tribunal's analysis

*(i)    The issue*

219.    The *issue* is whether Claimant has complied with the waiver requirement of Article XII(3)(b) of the BIT so that this Tribunal has jurisdiction to decide the dispute before it or that the claims are admissible (see *supra* paras 205 and 212).

---

[166] Reply, para. 58 quoting Exh. CL-101, *Supervision y Control S.A. v. Republic of Costa Rica,* ICSID Case No. ARB/12/4, Award, dated 18 January 2018 ("Supervision").

[167] Reply, para. 59.

[168] Reply, para. 61 quoting Exh. CL-88, *Vannessa Ventures Ltd. v. Bolivarian Republic of Venezuela*, ICSID Case no. ARB(AF)/04/6, Decision on Jurisdiction, 22 August 2008.

[169] Reply, para. 62.

[170] Response to Application for Bifurcation, paras 29-30; Reply, para. 63.

[171] Reply, para. 63.

The Tribunal will address this issue as follows:

–   *First*, it will set out Article XII(3)(b) of the BIT and determine its scope (Section (ii)).

–   *Second*, it will assess whether Claimant has complied with said provision (Section (iii)).

–   *Finally*, it will conclude (Section (iv)).

*(ii)    Article XII(3)(b) of the BIT*

220.   The Parties disagree on whether Article XII(3)(b) of the BIT includes non-adversarial measures such as negotiations.[172] To decide this question, the Tribunal will set out Article XII in full and then determine the scope of the provision.

221.   *First*, Article XII of the BIT, which deals with the "*Settlement of Dispute between and Investor and the Host Contracting Party*" (already set out *supra* para. 131), provides in the relevant part the following:

> *1. Any dispute between one Contracting Party and an investor of the other Contracting Party, relating to a claim by the investor that a measure taken or not taken by the former Contracting Party is in breach of this Agreement, and that the investor or an enterprise owned or controlled directly or indirectly by the investor has incurred loss or damage by reason of, or arising out of, that breach, shall to the extent possible, be settled amicably between them.*
>
> *2. If a dispute has not been settled amicably within a period of six months from the date on which it was initiated, it may be submitted by the investor to arbitration in accordance with paragraph (4). For the purposes of this paragraph, a dispute is considered to be initiated when the investor of one Contracting Party has delivered notice in writing to the other Contracting Party alleging that a measure taken or not taken by the latter Contracting Party is in breach of this Agreement, and that the investor or an enterprise owned or controlled directly or indirectly by the investor has incurred loss or damage by reason of, or arising out of, that breach.*
>
> *3. An investor may submit a dispute as referred to in paragraph (1) to arbitration in accordance with paragraph (4)* **only if**:
>
> *[…]*
>
> *(b) the investor* **has waived its right to initiate or continue any other proceedings in relation to the measure that is alleged to be in breach of this Agreement before**

---

[172] Respondent (Application for Bifurcation, paras 40-63; Counter-Memorial, paras 136-188; Rejoinder, paras 62-67; R-PHB, para. 30); Claimant (Response to Application for Bifurcation, paras 26-27; Reply, para. 62; Reply C-PHB, para. 46).

> *the courts or tribunals of the Contracting Party concerned or in a dispute settlement procedure of any kind;*
>
> […] (emphasis added)

222. The Tribunal must interpret this provision in accordance with the rules of treaty interpretation set forth in Article 31 of the VCLT[173] and, "*in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose*".[174] For the purposes of interpretation, the "context" includes the text, the preamble of the Treaty and its Annexes, and matters referred to in Article 31(1)(a) and (b) of the VCLT. In addition, the Tribunal "*must take into account together with context: (a) any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions*".[175] In addition, the Tribunal may have recourse to "*supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of Article 31, or to determine the meaning when the interpretation according to Article 31: (a) leaves the meaning ambiguous or obscure; or (b) leads to a result which is manifestly absurd or unreasonable*".

223. The BIT imposes certain conditions on Respondent's consent to arbitrate claims under the BIT. This follows from the wording of Article XII(3)(b) that the investor, in this case allegedly Air Canada, may submit its claims to arbitration "*only if*" it "**has waived its right to initiate or continue any other proceedings in relation to the measure that is alleged to be in breach of this Agreement before the courts or tribunals of the Contracting Party concerned or in a dispute settlement procedure of any kind**" (emphasis added).

224. Accordingly, the so-called "waiver" provision, is a condition of Respondent's consent to arbitration. It is therefore a precondition to the jurisdiction of the Tribunal.

225. *Second*, as Respondent correctly submits, the waiver requirement has a formal and a material aspect.[176]

---

[173] Article 31 of the Vienna Convention on the Law of Treaties ("VCLT") provides as follows: "*1. A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose. 2. The content of the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes: (a) any agreement relating to the treaty which was made between all the parties in connection with the conclusion of the treaty; (b) any instrument which was made by one or more parties in connection with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty. 3. There shall be taken into account, together with the context: (a) any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions; (b) any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation; (c) any relevant rules of international law applicable in the relations between the parties. 4. A special meaning shall be given to a term if it is established that the parties so intended.*" Respondent notes that Claimant is not a party to the VCLT but that "*the rule of treaty interpretation embedded in the VCLT are often referred to as being customary rule of international law*" which is not the case with other provisions. See Reply R-PHB, para. 40.

[174] VCLT, Article 31(1).

[175] VCLT, Article 31(3).

[176] Application for Bifurcation, para. 41.

226. The <u>formal</u> aspect requires that, in the same way that a claimant must satisfy the procedural and jurisdictional requirements in its Request for Arbitration, it must do so with respect to the waiver requirement, i.e., the existence of a conforming written waiver.[177] Accordingly, Claimant in the present case, must provide a written waiver of "*its right to initiate or continue any other proceedings in relation to the measure that is alleged to be in breach of this Agreement before the courts or tribunals of the Contracting Party concerned or in a dispute settlement procedure of any kind*".

227. The <u>material</u> aspect requires that a claimant has not actually initiated or continued such proceedings, i.e., the investor's compliance with the waiver. Unlike the formal aspect of the requirement, compliance with this requirement requires proof of the negative or proof of absence. The Tribunal therefore considers that compliance with the formal requirement also requires an intent on the part of a claimant to have complied with the material requirement. It is at this moment, that the respondent party must prove the non-fulfilment of the material aspect, in which case the burden shifts.

228. *Third*, as to the scope of the waiver requirement, the Tribunal considers the following:

 – The phrase "***any other proceedings in relation to the measure that is alleged to be in breach of this Agreement***" includes proceedings commenced or continuing at the time of the filing of the Request for Arbitration and during the pendency of the arbitration. The temporal scope of the requirement therefore includes the period during which the alleged breach is filed and pursued.

 – The purpose of the waiver provision is to protect a respondent State from having to defend itself in multiple *fora* with respect to the same measure and to minimize the risk of inconsistent decisions and double recovery with respect to such measure.[178]

 – While the Parties agree on the meaning of "*the courts or tribunals of the Contracting Party concerned*", i.e., the first part of the provision per Claimant, they disagree on the meaning of "*in a dispute settlement procedure of any kind*", i.e., the second part of the provision.[179] It is true that "negotiations" between the

---

[177] Exh, RL-8, *The Renco Group Inc v. Republic of Peru*, UNCITRAL No. UNCT/13/1, Partial Award on Jurisdiction, dated 15 July 2016, para. 60 ("*the provisions of Article 10.18(2)(b) dealing with waiver encompass two distinct requirements: a formal requirement (the submission of a written waiver which complies with the terms of Article 10.18(2)(b)) and a material requirement (the investor abstaining from initiating or continuing local proceedings in violation of its written waiver*"); Exh. RL-10, *Waste Management, Inc. v. United Mexican States*, ICSID Casen No. ARB(AF)/98/2, Arbitral Award, dated 2 June 2000, para. 20 ("*Any waiver […] implies a formal and material act on the person tendering same. To this end,* [the] *Tribunal will therefore have to ascertain whether* [the claimant] *did indeed submit the waiver in accordance with the formalities envisaged under* [the treaty] *and whether it has respected the terms of the same through the material act of dropping or desisting from initiating parallel proceedings.*"; Exh. RL-12, *Commerce Group Corp et al. v. The Republic of El Salvador*, ICSID Case No. ARB/09/17, Award, dated 14 March 2011, para. 84 ("*requires Claimants to file a formal 'written waiver', and then materially ensure that no other legal proceedings are 'initiated' or continued*'").
[178] Response to Application for Bifurcation, paras 27-28; Reply, para. 58; Exh. CL-101 (Supervision), para. 294 ("*avoid the duplication of procedures and claims, and therefore to avoid contradictory decisions*").
[179] Reply, para. 58.

Parties in an attempt to reach settlement of a dispute with respect to a measure alleged to be in violation of the BIT can <u>in principle</u> be categorized as "*dispute settlement procedures*".[180] If anything, the subsequent term "*any kind*" expands the category of dispute settlement procedures. However, this category cannot include a procedure that has no third-party adjudicator or neutral, such as the "negotiation process" alleged in the present case.[181] Further, it cannot include a procedure the result of which can be complied with by a party at its choice.[182] To hold otherwise would be contrary to the purpose of the waiver provision. Further, it would mean that every time the parties to an arbitration agreement enter into good faith negotiations to resolve their dispute, the tribunal must automatically find that it lacks jurisdiction or that it loses its jurisdiction. In such a case, the parties themselves – and in particular the claimant – would do their utmost not to engage in any settlement options.

229.    It would therefore appear that the second part of Article XII(3)(b) does not cover negotiations, but a procedure in which Respondent defends itself against a binding result in a dispute with Claimant concerning the measures alleged to have violated the BIT.

*(iii)    Has Claimant complied with Article XII(3)(b)?*

230.    The Tribunal refers to paragraph 43 of Claimant's Request for Arbitration, which states as follows:

> *In accordance with Article XII(3)(a) of the BIT, Air Canada consented to arbitration in its notice letter of June 15, 2016, and it does so here again. **In regard to Article XII(3)(b), Air Canada has not commenced any other proceedings in relation to the measures of Venezuela that are at issue in this dispute, and it expressly waivers its right to initiate any such proceedings**.* (emphasis added)

231.    The Tribunal finds that Claimant has satisfied the formal requirement of the waiver provision of Article XII(3)(b) by making the foregoing statement. The statement is clear and unambiguous. The fact that Claimant did not reproduce the entire text of the provision to include its two parts and the possible procedures waived is not relevant. Claimant's express reference to Article XII(3)(b) and its intent to waive "proceedings" is sufficient.

232.    With respect to Respondent's assertion that documentary evidence produced by Claimant confirm that it participated in at least two third-party dispute settlement procedures after the alleged waiver was made,[183] the Tribunal notes the following.

---

[180] Exh, R-52, Canada Department of Justice, *Dispute Resolution Reference Guide*, Negotiation, dated 31 July 2017 ("Dispute Resolution Reference Guide"); Article XII(1) of the BIT, Exh. C-1 and XVIII of the ATA, Exh. C-5.

[181] Exh. R-52 (Dispute Resolution Reference Guide).

[182] Exh. R-52 (Dispute Resolution Reference Guide).

[183] Application for Bifurcation, paras 40-63; Counter-Memorial, paras 136-188; Rejoinder, paras 58-74; R-PHB, para. 30.

– *Concerning the "Application of IATA for Approval and Antitrust Immunity of Certain Discussions" of 28 April 2016,*[184] this procedure does not fall within the scope of Article XII(3)(b). This is because the application was made by a party other than Claimant and has the negotiation features that the provision excludes. In this regard, the Tribunal agrees with Claimant that the Application does not involve Claimant's assertion of any action or claims against Venezuela before any court, tribunal, or similar forum, but instead is a request by a third party trade association to the U.S. authorities to "*meet and discuss joint courses of action*" rather than an impermissible dispute settlement proceeding.[185]

– *Concerning the December 2017 meeting between representatives of ALAV – of which Claimant is a member – with the Ministry of Popular Power for Foreign Trade and International Investment of Venezuela and the General Director of INAC to discuss the "repatriation of the outstanding amounts of the airlines",*[186] this "procedure" does not fall within the scope of Article XII(3)(b). For the same reasons as with the IATA Application, and as Claimant correctly submits, this meeting of a third-party industry group does not constitute the assertion by Claimant of separate formal actions or claims against Venezuela before a court, tribunal or similar forum.[187]

233.    As a result, Claimant has also not violated the material requirement of Article XII(3)(b).

234.    Accordingly, Claimant has not breached the waiver provision of the BIT.

*(iv)    Conclusion*

235.    Based on the foregoing, the Tribunal concludes **that Respondent's objection to jurisdiction based on the waiver is dismissed**.

**4.    Objection to jurisdiction based on the time-bar provision of the BIT**

*4.1    The Parties' positions*

*(i)    Respondent*

236.    Respondent submits that the Tribunal lacks jurisdiction because Claimant initiated the arbitration after the statutory period provided by Article XII(3)(d) of the BIT had expired.[188] As Claimant bears the onus to establish the jurisdiction of the Tribunal, it must show that it submitted the dispute to arbitration no more than three years from the date on which it first acquired knowledge or should have first acquired knowledge of the alleged BIT breaches. Given that the Request for Arbitration was submitted on 16 December

---

[184] See Exh. C-95, Application of IATA for Approval and Antitrust Immunity of Certain Discussions, dated 28 April 2016 ("IATA Application").
[185] Response to Application for Bifurcation, para. 29.
[186] See Exh. C-100, Letter from ALAVA to the Minister of Popular Power for Commerce, dated 18 December 2017.
[187] Response to Application for Bifurcation, para. 30.
[188] Rejoinder, para. 75.

2016, the cut-off date is 16 December 2013. Claimant nonetheless has not specified with precisions the date(s) on which it considers that Respondent allegedly breached its BIT obligations. This, in and of itself, suffices to dispose of Claimant's entire case. All the more as Respondent has pointed to a number of specific admissions by Claimant that show that it had acquired or should have acquired knowledge of the alleged BIT breaches well before 16 December 2013.[189] In fact, Claimant modified three times its position on the alleged timeliness of its Request for Arbitration.[190]

237.    The record shows that  Claimant first acquired knowledge of the alleged refusal to authorize the 15 AAD requests at the very least on 28 November 2013.[191] Claimant's account of its own knowledge as of 28 November 2013 is in line with the information to which Claimant had access through its active participation in IATA and is further confirmed by documents obtained during the document production phase.[192] Further, contemporaneous evidence also show that Claimant had already organized its departure from the country well before the cut-off date.[193] Moreover, by admission of one of Claimant's high representatives, Claimant was at the very least aware of the alleged breaches before the cut-off date of 16 December 2013.[194]

238.    Claimant's Request for Arbitration was therefore filed in breach of the requirement of Article XII(3)(d) of the BIT. Consequently, the precondition to Respondent's consent embodied in the BIT is not met and the Tribunal must declare that it lacks jurisdiction to hear Claimant's claims.

*(ii)    Claimant*

239.    Claimant submits that it is well within the three-year period allowed under Article XII(3)(d) of the BIT as it filed its Request for Arbitration on 16 December 2016.[195]

240.    Article XII(3)(d) also requires an investor's actual or constructive knowledge of the loss or damages it has suffered as a result of the measures not only knowledge of the measures.[196]

241.    Prior to 16 December 2013, Claimant did not have actual or constructive knowledge that Respondent would ultimately not approve the outstanding AADs, or that Claimant would suffer loss due to Respondent's failure to do so. Claimant had knowledge of Respondent's acts and omissions leading up to 16 December 2013 – specifically its failure to approve, by that date, Claimant's outstanding AADs – but that omission did not give rise to actual or constructive knowledge that Respondent would not subsequently approve the AADs or that Claimant would suffer loss or damage as a result. Indeed, Respondent had always

---

[189] Rejoinder, paras 76-78.
[190] Rejoinder, paras 79-82.
[191] Rejoinder, para. 83.
[192] Rejoinder, para. 84.
[193] Rejoinder, para. 86.
[194] Rejoinder, para. 87.
[195] Reply, para. 64.
[196] Reply, paras 65-66 quoting Exh. CL-12, *Rusoro Mining limited v. The Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/12/15, Award dated 22 August 2016 ("Rusoro").

complied with its AAD approval obligations, albeit often with delay, and Respondent was giving every indication that this would again be the case in the weeks leading up to and after 16 December 2013.[197]

242. Further, throughout the ten years during which Claimant ran the Toronto-Caracas-Toronto route, there had been instances where Claimant had been concerned about CADIVI's delay. Each time, CADIVI periodically assured the airlines that it would approve the airlines currency conversion requests promptly or would approve multiple AADs at the same time. Through this process, Claimant had been able to convert and transfer U.S.$ 91 million of returns to its bank account in New York and for use in its global operations. Therefore, the state of affairs in December 2013 was not entirely out of the ordinary.[198]

243. Moreover, Respondent approached Claimant and other airlines on 28 November with an offer to negotiate settlement.[199]

244. In addition, Respondent's own actions following 16 December 2014 contradict its arguments. As late as 28 January 2014, Claimant still had no basis to conclude that Venezuela would breach its obligations under the BIT or that Claimant would suffer harm. Respondent's agents themselves were reassuring Claimant that none of Respondent's delays were going to crystalize into permanent rejections, and that several potential payment methods were being assessed.[200]

245. Therefore, Respondent's argument that Claimant's claims are time-barred under the BIT is unfounded and should be rejected.[201]

### 4.2    The Tribunal's analysis

### (i)    The issue

246. The *issue* is whether Claimant's claims are time-barred under Article XII(3)(d) of the BIT so as to affect the Tribunal's jurisdiction or the admissibility of those claims (see *supra* paras 236 and 239). The Tribunal will address this issue as follows:

   – *First*, it will set out the requirements of Article XII(3)(d) (Section (ii)).

   – *Second*, it will consider whether Claimant has complied with that provision (Section (iii)).

   – *Finally*, it will conclude (Section (iv)).

---

[197] Reply, para. 68.
[198] Reply, para. 69.
[199] Reply, para. 70.
[200] Reply, para. 71.
[201] Reply, para. 72.

*(ii)*     *The requirements of Article XII(3)(d)*

247.    The Parties disagree on the requirements of Article XII(3)(d) of the BIT.[202] However, both Parties agree that the concept of knowledge set forth therein is governed both by the text of the BIT itself and by international law.[203] Accordingly, in order to decide, the Tribunal will set out the provision encompassing Article XII(3)(d) and interpret that provision in accordance with the rules of treaty interpretation of Article 31 of the VCLT[204] (which form part of customary international law) and as set out above (see *supra* para. 222 ).

248.    Article XII(3)(d) of the BIT, which is found in the provision on "*Settlement of Dispute between and Investor and the Host Contracting Party*" (already set out above in para. 132), reads in relevant part as follows:

> *1. **Any dispute between one Contracting Party and an investor of the other Contracting Party, relating to a claim by the investor that a measure taken or not taken by the former Contracting Party is in breach of this Agreement**, […].*
>
> *2. If a dispute has not been settled amicably within a period of six months from the date on which it was initiated, it may be submitted by the investor to arbitration in accordance with paragraph (4). For the purposes of this paragraph, a dispute is considered to be initiated when the investor of one Contracting Party has delivered notice in writing to the other Contracting Party alleging that a measure taken or not taken by the latter Contracting Party is in breach of this Agreement, and that the investor or an enterprise owned or controlled directly or indirectly by the investor has incurred loss or damage by reason of, or arising out of, that breach.*
>
> *3. **An investor may submit a dispute as referred to in paragraph (1) to arbitration in accordance with paragraph (4) only if**:*
>
> *[…]*
>
> *(d) **not more than three years have elapsed from the date on which the investor first acquired, or should have first acquired, knowledge of the alleged breach and knowledge that the investor has incurred loss or damage**.*
>
> *[…] (emphasis added)*

249.    *First*, as with the waiver provision, it is clear from the wording of Article XII(3)(d) that the investor may submit its claims to arbitration "***only if*** […] ***not more than three years have elapsed from the date on which the investor first acquired, or should have first acquired, knowledge of the alleged breach and knowledge that the investor has***

---

[202] Respondent (Application for Bifurcation, para. 66; Counter-Memorial, paras 209-210; Rejoinder, paras 75-88); Claimant (Reply, paras 64-72; C-PHB, paras 154-161).
[203] C-PHB, para. 151; R-PHB, para. 55.
[204] R-PHB, para. 43.

*incurred loss or damage*" (see *supra* para. 248). Therefore, the time-bar is also a condition of Respondent's consent to arbitration in the present case.[205]

250.  *Second*, it is undisputed that the relevant time-frame set by the time-bar rule is <u>three years</u>. For purposes of counting the time-frame, it is apparent form the first sentence of paragraph (3) – "[a]*n investor may submit a dispute as referred to in paragraph (1) to arbitration*" (emphasis added) – that it is the date of submission of the Request for Arbitration that is relevant, not the date of the Notice of Dispute.[206] In this regard, the Tribunal notes that the fact that Claimant submitted in its Memorial that the relevant date is that of the notice of dispute,[207] Claimant referred to the date of the Request for Arbitration in its responses to Respondent's time-bar objection,[208] is not an indication of bad faith or a situation that would require the Tribunal to draw adverse inferences, as Respondent requests; the Tribunal simply disagrees with Claimant's interpretation and agrees with Respondent's interpretation regarding the setting of the *dies ad quem*.[209]

251.  *Third*, with respect to the "knowledge" requirement, the provision provides for two possibilities: (a) the date on which knowledge was first acquired; or (b) the date on which knowledge should have been first acquired. The latter, i.e., the date on which a reasonable person in circumstances would have first acquired knowledge, is usually more relevant, as the date of actual knowledge is often difficult to determine.[210]

252.  *Finally*, the wording of Article XII(3)(d) is clear in that it requires both "*knowledge of the alleged breach **and** knowledge that the investor has incurred loss or damage*", not one or

---

[205] Application for Bifurcation, para. 64; Counter-Memorial, para. 189.

[206] This is contrary to Claimant's argument in its Memorial, para. 100. This is in line with Respondent's argument in its Application for Bifurcation, para. 78.

[207] Memorial, para. 100.

[208] Response to Application for Bifurcation, paras 21-23; Reply, para. 64.

[209] Counter-Memorial paras 207-208.

[210] Exh. RL-13, *Spence International Investments, LLC, Berkowitz, et al v. Republic of Costa Rica*, ICSID Case No. UNCT/13/2, Interim Award dated 30 May 2017 ("Spence"), para. 209 ("*the requirement of knowledge on the part of a claimant is a requirement of actual knowledge or of constructive knowledge. **As the actual knowledge of a claimant will often be difficult to determine, tribunals are frequently called upon to consider what a claimant must be deemed to have known**. The "should have first acquired knowledge" test in Article 10.18.1 is an objective standard; what a prudent claimant should have known or must reasonably be deemed to have known. In this regard, the Tribunal agrees with the analysis by the tribunal in Grand River on this issue, viz: "'Constructive knowledge' of a fact is imputed to a person if by exercise of reasonable care or diligence, the person would have known of that fact. Closely associated is the concept of 'constructive notice.' This entails notice that is imputed to a person, either from knowing something that ought to have put the person to further enquiry, or from wilfully abstaining from inquiry in order to avoid actual knowledge*") (emphasis added); Exh. RL-14, *Corona Materials, LLC v. Dominican Republic*, ICSID Case No. ARB(AF)/14/3, Award on the Respondent's Expedited Preliminary Objections in Accordance with Article 10.20.5 of the DR-CAFTA, dated 31 May 2016 ("Corona"), para. 217 ("*DR-CAFTA Article 10.18.1 contemplates two forms of knowledge of breach and loss or damage: actual knowledge – what the Claimant did in fact know at a given time – and constructive knowledge – what the Claimant should have known at a given time. For the running of the three-year period to be triggered, it is sufficient that the Claimant acquired either actual or constructive knowledge. The Tribunal shall first consider any evidence of the Claimant's actual knowledge of the Respondent's decision not to grant the environmental license for the Claimant's project; only when such an inquiry would lead to the conclusion that actual knowledge was not acquired by the Claimant before the critical date, would the Tribunal then need to engage in an objective determination of whether in light of all the circumstances it can be held that the Claimant should have first acquired knowledge of the breach and loss or damage at a particular point in time.*"). See also, R-PHB 44-45 and 46 noting that first knowledge test is a subjective standard.

the other (emphasis added). Thus, the Tribunal agrees with Claimant that the relevant date must involve knowledge of <u>both the BIT breach and the resulting consequences, i.e., that a loss would or did occur</u>. This does not require quantification of the loss itself.[211]

253.    More specifically, it must be sufficiently clear that Claimant had clear knowledge of a clear breach of the BIT with the resulting consequences in terms of loss – but not quantification thereof – so that Claimant is in a position to arbitration immediately.

254.    The Tribunal should now assess whether Claimant has complied with the requirements of Article XII(3)(d) of the BIT.

*(iii)    Has Claimant complied with Article XII(3)(d) of the BIT?*

255.    In the present case, Claimant filed its Request for Arbitration on 16 December 2016. Accordingly, Claimant must prove that it had or should have had first knowledge of the BIT violations and resulting damages or losses <u>as of 16 December 2013, and not before,</u> for this Tribunal to have jurisdiction. This is in dispute between the Parties.[212]

256.    The Tribunal recalls that the present dispute concerns Respondent's alleged breaches of the BIT arising from Respondent's failure to approve the 15 AAD requests filed by Claimant. Relevant for the purposes of the time-bar rule, therefore, is the date on which Claimant first knew or ought to have known that Respondent's failure to approve *the 15 AAD requests or its "omission" to do so, breached its treaty obligations and caused Claimant damage or loss*. In this regard, the following facts are relevant.

257.    *First*, Claimant filed the 15 AAD requests <u>between 20 September 2013 and 22 January 2014</u>. These AAD requests covered the period between October 2012 and July 2013 (see *supra* para. 21). According to Mr. Blanco's testimony, a normal process required CADIVI to approve, reject, or suspend an AAD request within a few days of each request. At the same time, it appears that Respondent had a practice of processing AAD requests somewhat late and collectively.[213] And, pursuant to Article 60 in conjunction with Article 4 of the *Administrative Procedure Law (or Ley Orgánica de Procedimientos*

---

[211] Reply, paras 65-67; C-PHB, paras 152-153; Exh. CL-12 (Rusoro), paras 214, 217 ("*However, Art. XII.3 (d) requires, for the time bar to apply, not only that the investor knows about the alleged breach, but also that the investor is aware that such breach would cause loss or damage to its investment.*"; "*In accordance with established NAFTA case law, what is required is simple knowledge that loss or damage has been caused, even if the extent and quantification are still unclear*"). See also Exh. RL-13 (Spence), para. 209; Exh. RL-14 (*Corona*), para. 234 ("*The answer to this question cannot be other than positive, as the Claimant, during the same period, proved not only to be conscious of the reality of damage caused by the DR refusal to grant the environmental license but was even able to evaluate it.*"). See also R-PHB, para. 47 quoting Exh. RL-13 (Spence), para. 213 ("*does not require full or precise knowledge of the loss or damage*").

[212] Respondent (Application for Bifurcation, paras 67-68, 77, 80, 82; Counter-Memorial, paras 192, 195, 200, 203, 205, 214-215; Rejoinder, paras 81, 93, 86-88; R-PHB, paras 31-38); Claimant (Response to Application for Bifurcation, paras 32, 35-38; Reply, paras 68-71; C-PHB, paras 154-161).

[213] Tr. Day 2, 100:14-101:8 ("*It was a surprise to Air Canada at the time because we had been able to repatriate our funds from the beginning, from 2004, up until the 2012 timeframe, which the applications were approved by CADIVI and the repatriations occurred; sometimes with delays, but they did happen.*"); C-PHB, para. 156. Indeed this was the case with the 91 AADs. See also Pittman WS, para. 23, FTI Report, Figure 4 and Schedule 6 and C-PHB, para. 157.

*Administrativos*[214]*)* administrative files need to be processed and resolved within four months; absent an express decision, the interested party can assume that the request has been denied and seek judicial recourse – Air Canada, as the interested party, could in no way have presumed that a breach had occurred before the lapse of these four months. Therefore, it appears that any failure by Respondent in this regard resulting in a breach of international obligations could not have commenced prior to 2014.[215] As such, Respondent's reliance on statements by IATA in November 2013 – of which Claimant's CEO was a member – regarding the delay in repatriating U.S.$ 1.5 billion to all corners of the world, including Respondent, cannot be considered evidence that attributes knowledge of Respondent's BIT breaches on Claimant.[216]

258.     *Second*, it is true, and Claimant does not dispute this, that as of November 2013, CADIVI had not yet approved the AAD requests submitted by Claimant (out of the 15 AAD requests).[217] On 28 November 2013, the President of INAC, Mr. Pedro González Díaz, allegedly approached Claimant and other airlines to discuss a number of pending applications for AAD requests and proposed to pay outstanding AADs with jet fuel or through government bonds.[218] While the content of this meeting itself indicates knowledge of Respondent's failure to approve AADs for several airlines, there is nothing to indicate any knowledge of Respondent's breach of the BIT and resulting loss or damage with respect to its 15 AADs, the first of which was filed two months before the meeting. If anything, the meeting itself evidences an effort on Respondent's part to find a solution to the situation that existed at that time well into 2014.[219] Accordingly, the Tribunal rejects Respondent's argument that Claimant's perception of this meeting as an offer to negotiate a settlement is sufficient to be considered knowledge or notice of the BIT breach

---

[214] Exh. RL-54.

[215] Air Canada had submitted the last three out of the 15 AAD requests in January. See C-PHB, para. 158.

[216] Exh. R-54, IATA Annual Review, pp. 5, 50; Rejoinder para. 83.

[217] By that time Air Canada had submitted 12 out of the 15 AAD requests (12 on 20 September 2013 and two on 11 October 2013 and 29 October 2013 respectively). See Memorial, paras 25, 58; C-PHB, para. 158; Reply C-PHB, para. 59.

[218] Babun WS, paras 14-17; Application for Bifurcation, para. 76; Counter-Memorial, para. 202; Rejoinder, para. 83; Exh. C-37, ALAV's summary of INAC's proposal dated 4 December 2013; Exh. C-38, El Universal News Article dated 30 November 2013.

[219] See Exh. C-95 (IATA Application), p. 11 comprising Letter from IATA to President of Venezuela, dated 17 February 2014: "*Last year the President of INAC speaking on behalf of the government and the Minister of Air Transportation, said that Venezuela would honor the debt (US$ 3 billion at the time) and would discuss with the airlines possible alternative means of payment* […]. *On January 23, 2014, the Minister of Air Transportation the President of INAC, together with the Minister of Finance and the President of the Centre of Foreign Commerce said that an approach to addressing the payments would be announced by February 4th. As of today, nothing has materialized*"). See also Babun WS, para. 15 ("*On January 28, 2014, I attended a meeting with INAC''s president, Mr. Pedro González Díaz, and our GSA. The meeting was specifically to negotiate how to resolve the Government's failure to grant Air Canada's Authorization for Currency Acquisition requests. During the meeting, I explained to Mr. González Díaz that it was vital for Air Canada to receive the required authorizations to be able to transfer its own revenue out of the country and to normally operate the route. Mr. González Díaz seemed to understand and be pro-business. Mr. González Díaz also explained that he had prepared several payment options for the Government to review and was confident that CADIVI would make an announcement along those lines towards the end of that week. As he explained it, the goal was to have the Government pay a percentage in cash, reach a deal as to the remainder, and start fresh in 2014, i.e. paying on time.*").

and resulting loss.[220] Similarly, it rejects Respondent's argument that the fact that Claimant had already arranged its departure from the country in 2021 is in any way relevant to early knowledge.[221]

259.    Equally irrelevant is the letter sent by the Ministry of the Presidency to ALAV on 8 November 2013, which asked ALAV to provide information on ticket sales by the 26 member airlines of ALAV, including Claimant, in 2012 and between January and October 2013. The fact that Claimant cites this letter in support of its argument in its Memorial that Respondent prevented Claimant from repatriating its revenues does not demonstrate that Claimant had first knowledge of Respondent's BIT violations with respect to the 15 AAD requests and the resulting losses or damages.[222] To the extent necessary, and if the Tribunal finds that it has jurisdiction, it will evaluate Claimant's reliance on this document if and when it addresses the Merits.

260.    *Third*, Respondent relies on Claimant's December 2013 internal communications to argue that Claimant had constructive knowledge of and was preparing to resolve the breach of the BIT and the resulting harm: (i) on 5 December 2013, by which BASSA informed Claimant that "*the government has halted payments since what they own to the airline industry is $3B (significant amount for a struggling economy) and thus want us to consider accepting USD denominated government bonds instead of case*";[223] (ii) on 6 December 2013, with Claimant's Senior Sale Assistant stating: "*there is a strong possibility that we will never see our money – so I suggest we expedite the negotiations to understand if there is good faith and really an option to receive fuel in exchange and how quickly we can offset our credit*"[224]; (iii) dated 9 December 2013, with Claimant's Senior Sale Assistant proposing to "*take this to a higher level*";[225] (iv) in which the same refers to "*rescue*[ing] *at least some of* [Air Canada's] *money*"; and (v) dated 10 December 2013, in which Claimant's Vice President-Alliances & Regulatory Affairs insists that Claimant's liaison officer with the Canadian officer participate on the conference call scheduled on 11 December 2013, along with various top Claimant executives, to discuss the repatriation of the funds,[226] stating that Claimant was "*now waking up internally*".[227] This internal correspondence may *prima facie* indicate recognition of the impending impairment. However, it suggests that Claimant is willing to engage in discussions and

---

[220] Reply, para. 70; Rejoinder, para. 83. See also R-PHB, paras 35-36. Nor does the Tribunal consider Claimant's statement during the Hearing on this issue to be a new argument.

[221] Exh. R-56, IATA Annual Review 2012; Exh. R-2 (Passenger General Sales Agency Agreement); Rejoinder, para. 86.

[222] Exh. C-36, Letter from CADIVI to ALAV dated 8 November 2013; Application for Bifurcation, para. 74; Counter-Memorial, paras 199-200. See also Memorial, Section III(c).

[223] Exh. R-51 (AC internal communication December 2013); Rejoinder, para. 83. In relation to this the Tribunal does not find that an alleged "*discomfort of Mr Babun when he was questioned on this topic*", who was copied on the email of 6 December 2013 and who first denied having received the email or Respondent's allegation in this connection, to confirm that Air Canada had acquired knowledge of the alleged breach and damages as a result prior to 16 December 2013. See R-PHB, para. 34.

[224] Exh. R-55, Air Canada's international communication, email thread from 5 December to 9 December 2013, *Subject: Re: CADIVI Update* ("AC internal communication December 2013 II"); Rejoinder, para. 83; Tr. 10.03.2020, 129:7-16, 143:18-146:21.

[225] Exh. R-55 (AC internal communication December 2013 II); Rejoinder, para. 83.

[226] Exh. R-51 (AC internal communication December 2013); Rejoinder, para. 83.

[227] Exh. R-51(AC internal communication December 2013); Rejoinder, para. 83; R-PHB, para. 49.

explore *bona fide* alternatives, implying that there can be no form of knowledge of a breach of the BIT, much less of the resulting loss or damage with respect to its 15 AADs, the first of which was filed two or three months before and the last of which was filed two months after.[228] Had the negotiations resulted, for example, in an agreement to settle the amount (allegedly) due with fuel payments, no loss or damage would have resulted. Certainty as to the loss or damage associated with the breach of the BIT breach could only be obtained at a much later stage, when the negotiations proved unsuccessful.

261.    *Fourth*, Respondent also relies on Claimant's references in its submissions to argue that Claimant knew or should have known of the situation it describes as causing its alleged harm prior to the 16 December 2013 cut-off date:[229]

– Claimant's Notice of Dispute states that "[b]*eginning in October 2012, however, Venezuela ignored Air Canada's properly submitted AADs, simply refusing to act on the company's requests to exchange Bolivars for Dollars, thereby preventing from Air Canada repatriating its funds. Specifically, Venezuela has refused to adjudicate Air Canada's fifteen AADs filed from October 2012 to December 2013. Venezuela, thus, prevented Air Canada from exchanging 330 million Bolivars earned through local ticket sales into Dollars and repatriating them*".[230] (emphasis added by Respondent)

– Claimant's Request for Arbitration states that "[b]*eginning in 2013, however, Venezuela ignored Air Canada's properly submitted AADs, simply refusing to act on the company's requests to exchange Bolivars for US Dollars, thereby preventing Air Canada from converting and repatriate its earnings. Specifically, up to the present date, Venezuela has refused to process fifteen AADs submitted by Air Canada in relation to domestic ticket sales between October 2012 and December 2013*".[231] (emphasis added by Respondent)

---

[228] See specifically 5 December 2013 email in Exh. R-51 (AC internal communication December 2013), p. 5, containing a report from Air Canada's GSA: "*Applications are now again in "analysis" waiting for authorization. Our application for Feb 2013 went thru the same process on Nov 06, it is also in "analysis" again waiting for approval. However a new situation came recently when the government realized that with the latest's airlines applications, the debt will be close to 3BB American dollars, and President Maduro has designated Aeronautical authorities to give us a proposal to reach an agreement for backlogs debt via Venezuela Public Debt Bonds (I do not recommend this option) and/or Fuel in our country or allied countries (such as Argentina). During this meeting I took the liberty to ask if Cuba will be an option and they say yes. Also they explain to us that CADIVI will continue current process and eventually some of our applications will be approved meanwhile negotiations go on. This is an option for backlogs only and they promised that their goal is to pay within 90 days maximum, for 2014.*" Similarly, neither the emails of 6 December 2013 in which Air Canada's Senior Sales Assistant informed his colleagues that there was a strong possibility that Air Canada "*will never see* [its] *money*", Exh. R-55 (AC internal December communication 2013 II) and on 10 December 2013, Air Canada was wondering how to "*rescue at least some of* [its] *money*" in Exh. R-51 (AC internal communication December 2013) meant that Air Canada had the believe that the alleged breach would cause it an alleged loss or damage. What was necessary was the knowledge of a breach plus actual loss not possible loss. See R-PHB, paras 37 and 49.

[229] Counter-Memorial, paras 192, 195, 214.

[230] Exh. C-14 (Notice Letter); Application for Bifurcation, para. 67; Counter-Memorial, para. 192.

[231] RfA, para. 25; Application for Bifurcation, para. 68; Counter-Memorial, para. 193; Reply, paras 81. 84, 157, 170, 184, 211; Rejoinder, para. 83.

- Claimant's Memorial states that "[s]*tarting in late 2012 and throughout 2013, Venezuela took a series of measures that made it much harder for airlines, including Air Canada, to file their AADs. CADIVI and other Government agencies significantly increased the level of paperwork, information, and bureaucratic interaction necessary to process each AAD*"[232] (emphasis added by Respondent)

- Mr. Babún's witness statement states that "[t]*hroughout 2013 [...] Air Canada, and airlines in general, became increasingly concerned about the Government's failure to grant exchange requests*".[233] (emphasis added by Respondent)

- Mr. Pittman's witness statement states that "[b]*y the end of 2012 and during 2013, CADIVI increased the level of paperwork and information necessary to process each Authorization for Currency Acquisition*".[234] (emphasis added by Respondent)

262.    The Tribunal does not find that any of these statements show that Claimant first became aware of a material breach of the BIT prior to 16 December 2013. Consistent with the documents discussed above, these statements relate to what was undisputed at that time (Venezuela's delay in adjudicating requested AADs), but not knowledge of actual breach of the BIT for failure to adjudicate all 15 AADs and resulting in losses and damages, since it was still feasible that Venezuela – albeit with some delay – would process the AADs.

263.    As a result, the Tribunal does not find that it is sufficiently clear that Claimant had first knowledge of Respondent's alleged breaches of the treaty and resulting consequences prior to 16 December 2013. Instead, the Tribunal considers that, in the circumstances of the case, such knowledge should not reasonably have been first acquired sometime between Claimant's decision to suspend its flights to and from Venezuela in 2014 and Claimant's notice of dispute in relation to Respondent's alleged breaches of the in 2016: that is, at time when Claimant could realize that the 15 AADS would not be processed and assess whether it might commence the present proceedings.

264.    Accordingly, the Tribunal finds that Claimant has complied with the time-bar provision of the BIT.

*(iv)    Conclusion*

265.    Based on the foregoing, the Tribunal concludes that Respondent's objection to jurisdiction based on the time-bar provision of Article XII(3)(d) of the BIT is dismissed.

---

[232] Memorial, para. 49; Counter-Memorial, para. 194.
[233] Babun WS, para. 13; Application for Bifurcation, para. 71; Counter-Memorial, para. 196.
[234] Pittman WS, para. 24; Application for Bifurcation, para. 72; Counter-Memorial, para. 197.

**5.**     **Objections to jurisdiction *ratione materiae* and *ratione personae***

*5.1*     ***The Parties' positions***

    *(i)     Respondent*

266.   Respondent submits that Claimant has failed to demonstrate that it meets (i) the *ratione materiae* requirement of the BIT and (ii) the *ratione personae* requirement of the BIT.[235]

    a.   <u>*Ratione materiae*</u>

267.   Claimant needs to establish that its alleged investment meets four requirements to qualify as a protected investment under the BIT,  specifically that: (i) there must be an asset within the meaning of the BIT; (ii) Claimant must control that asset, directly or indirectly; (iii) the asset must be located in the territory of the Republic; and (iv) the control over the asset must comply with the laws of the Republic.[236]

268.   *First*, Claimant has not been able to establish the existence of an "asset" in the terms of the BIT.[237] Specifically:

–   Claimant never had any "*claim to money*" in the terms of Article I(f)(iii) of the BIT, which is a reference to enforceable rights, i.e., a right to a payment, rather than a mere demand for money.[238] This is in line with the three authenticated versions of the BIT.[239] It is in any event common ground that the alleged "*claims to U.S. dollars*" were not previously declared or recognized by any court or competent authority in the Republic or elsewhere. Those claims are mere requests from Claimant and cannot serve to establish the jurisdiction of the Tribunal. Especially since neither Article XXI of the ATA nor Article 2 of Providencia No. 23 granted Claimant with a right or an absolute and enforceable claim to US dollars.[240]

–   Article XXI of the ATA and *Providencia No. 23* do not amount to a "*right conferred by law or under contract, to undertake any economic and commercial activity*". Neither the ATA nor Providencia Nor. 23 granted Air Canada any absolute right to acquire foreign currency, but the right to apply for the acquisition of foreign currency through CADIVI and this subject to the conditions set forth in said Providencia.[241] Transferring funds through CADIVI does not per se constitute a commercial activity.[242]

---

[235] Counter-Memorial, paras 221-251; Rejoinder, para. 90.
[236] Rejoinder, para. 93.
[237] Counter-Memorial, para. 112; Rejoinder, para. 94.
[238] Rejoinder, para. 103.
[239] Rejoinder, para. 104.
[240] Rejoinder, para. 106.
[241] Rejoinder, para. 107.
[242] Rejoinder, para. 108.

    – Under the BIT, "returns" "*means all amounts yielded by an investment*". A return cannot therefore itself, *in abstracto*, constitute an investment. Claimant must first establish that it made an investment in order to claim to have a "return" and cannot claim to have a return in hope to establish that it made an "investment" in the territory of the Republic.[243]

    – The Tribunal should in addition to the BIT requirements use the objective parameters of the *Salini* test as guidance and, therefore, verify that the alleged investment has been made with (i) a certain duration, (ii) an element of risk, (iii) a substantial contribution, and (iv) a significant contribution to the host State's development.[244] In fact, the Additional Facility Rules contain a provision almost identical to Article 25(1) of the ICSID Convention justifying the relevance of the *Salini* test, i.e., Article 2(a) of the Additional Facility Rules.[245] In this connection, the examination of the criteria of the *Salini* test must not be disconnected from Claimant's allegation of what its alleged investment is under the BIT. When it comes to this test, Claimant does not refer once to its alleged "*claims to money*" its "*right to acquire foreign currency*" or its "returns" but rather lists some "resources" that it claims to have invested in the Republic which it does not even claim to be part of its protected investment in the instant case.[246]

269. Claimant fails to identify (i) its alleged "investment" under the terms of the BIT and (ii) that the dispute directly arises out of an investment, in the terms of Article 2(a) of the Additional Facility Rules.[247]

270. *Second*, Claimant failed to own or control its alleged investment in compliance with the laws of the Republic.[248]  Specifically:

    – Claimant failed to establish that it operated its alleged investment in compliance with the laws of the Republic pursuant to Article I(f) of the BIT.[249] The legality requirement under the BIT relates to the ownership and control of an alleged investment throughout its life and not only at the time of its acquisition or inception.[250] Claimant cannot prove that it met with such requirement as it notably sold tickets in the territory of the Republic through unlawful contracts which aimed to circumvent the Forex regime in place in the Republic since 2003.[251]

    – Between 2004 and 2014, under various GSAAs, BASSA offered, and Claimant accepted, services to be rendered in the territory of the Republic for which Claimant agreed to pay compensation in U.S. dollars. Moreover, Claimant

---

[243] Rejoinder, para. 109.
[244] Rejoinder, para. 110.
[245] Rejoinder, para. 112.
[246] Rejoinder, para. 113.
[247] Rejoinder, paras 114-115.
[248] Counter-Memorial, paras 239-244; Rejoinder, para. 115.
[249] Rejoinder, para. 118.
[250] Rejoinder, paras 119-124.
[251] Rejoinder, para. 125.

actually paid BASSA in U.S. dollars outside of the Republic for other services included in the GSAAs that were provided within the Republic and should thus have been paid in Bolivars as per the applicable laws and the contracts in place between BASSA and Claimant.[252] This payment scheme contravened the laws of the Republic. Specifically: (i) it entailed a breach of the prohibition in place since 2005 for Venezuelan companies to offer to be paid in foreign currency for services within the Republic, which vitiated the GSAAs; (ii) it artificially reduced the in-country costs that Claimant had to pay to BASSA and that were to be deducted from Claimant's AAD requests, in breach of both Providencia No. 23 and Providencia No. 124.[253]

– Further, unlawful contracts are null and void pursuant to the Venezuelan Civil Code. In the present case, the contracts executed by Claimant with third parties, i.e., the provision of services in the Republic against payment in foreign currencies, was illicit because it contravened the Laws Against Foreign Exchange Crimes in place in the Republic between 2005 and 2014.[254] Claimant could not have operated as an airline in the Republic without those agreements and therefore cannot be deemed to have operated, i.e., owned and controlled any of its alleged investments.[255]

– Claimant misrepresented key aspects of its operations to Venezuelan authorities. Claimant has admitted that its legal representatives misrepresented to INAC the company's employment practices in 2005 in order to obtain access and security clearance with highly secured premises belonging to the Republic, namely the limited access areas of the Maiquetía airport. By doing so, Claimant has not operated, i.e., owned and controlled its alleged investments in accordance with the laws of the Republic.[256] Claimant further misrepresented to INAC during work inspections in February 2010, November 2010, 2011, 2012 and 2013 having employees in charge of security matters.[257] In addition, Claimant's position that it had no employee between 2005 and 2013 and hired Mr. Roberto Serafini in June 2013 remains doubtful. Claimant's sale ledgers for the months of October through December 2012 show that Claimant was already making direct payment to Mr. Serafini. Respondent maintains its doubts as to Claimant's compliance with Venezuelan labor laws.[258]

– Pursuant to the Venezuelan Law of Civil Aviation, international air transportation of passengers is considered a "public service". Thus, Claimant could not suspend the operation of the Toronto-Caracas-Toronto Route neither by interrupting the

---

[252] Rejoinder, para. 127.
[253] Rejoinder, paras 128-135.
[254] Rejoinder, para. 136.
[255] Rejoinder, paras 137-138.
[256] Rejoinder, paras 141-146.
[257] Rejoinder, para. 147.
[258] Rejoinder, para. 149.

sale of its tickets in Bolivars nor by cancelling the route without prior notice. Claimant was fully aware of the unlawfulness of its two consecutive decisions.[259]

#### b. _Ratione personae_

271.   In any event, Respondent contends that Claimant is not entitled to protection under the BIT as it failed to establish that it qualifies as a protected "investor."[260]

272.   Article I(g) of the BIT defines a Canadian investor through five criteria, namely (i) lawful incorporation in the territory of Canada, (ii) lack of Venezuelan citizenship, (iii) existence of an investment, (iv) localization of the investment in the territory of the Republic and (v) making of the investment by the alleged investor.[261] The last two requirements remain unproven. Claimant cannot prove that it made "_a claim to money_" in the territory of the Republic, where according to Claimant such claim derives from an international treaty between the Republic of Canada, namely the ATA and/or Providencia no. 23, neither of which was made by Claimant. Similarly, Claimant cannot be deemed as having itself made its alleged "_right to acquire foreign currency_" or Providencia No. 60 in the territory of the Republic where it claims the former derives from the ATA between the Republic and Canada and where the latter was granted by INAC and obviously not Claimant.[262]

#### (ii)   Claimant

##### a. In general

273.   Claimant submits that it is a protected "investor" with protected "investments" and protected "returns" as those terms are defined under the BIT.[263] Claimant satisfies the requirements of Article I(g) of the BIT because it is an enterprise incorporated in accordance with Canadian law, that made an investment in Venezuela and that does not possess Venezuelan citizenship.[264]

##### b. Investment under Article I(f) of the BIT

274.   Claimant argues that Article I(f) of the BIT is a broad, non-exclusive, asset-based definition, typical of the definitions contained in many bilateral and multilateral treaties. Claimant's assets, money, claims to money and right conferred by law squarely fall within Article I(f)'s definition of investment.[265] The BIT also extends its substantive protections to both "investments" and "returns". Claimant's income and profit earned on ticket sales in Venezuela are covered by this definition of "returns" as well as by the broader terms used to define "investment".[266]

---

[259] Rejoinder, paras 152-154.
[260] Rejoinder, para. 155.
[261] Rejoinder, para. 156.
[262] Rejoinder, paras 157-158.
[263] Reply, para. 11.
[264] Reply, para. 12.
[265] Reply, para. 14.
[266] Reply, para. 15.

275.    *First*, Claimant has "claims to money" for the purposes of Article I(f)(iii) of the BIT, specifically claims to the U.S. dollars that Claimant was entitled to receive in exchange for the Bolivar-denominated returns that Claimant held in its Venezuelan bank account. Claimant's claim to those U.S. dollars arose pursuant to Article XXI of the ATA and Article 2 of Providencia No. 23, i.e., claims to the U.S. dollars that it was entitled to receive and should have received in late 2013 and early 2014 in exchange for the Bolivar-denominated returns that Claimant held in its Venezuelan bank account.[267] Specifically:

  –  Article XXI(2) of the ATA granted Claimant the right to convert its Venezuelan Bolivar earnings into the currency of its choice, in this case U.S. dollars.[268]

  –  Article 2 of Providencia No. 23 empowered foreign airlines to apply for foreign currency on a monthly basis upon submission of certain information. Once CADIVI approved the AAD, the requesting airline was able to expatriate its revenue in a hard, convertible currency, such as the U.S. dollars.[269]

276.    *Second*, Claimant's rights to convert its local returns into U.S. dollars for onward repatriation necessarily constitute "*rights, conferred by law … to undertake any economic and commercial activity*" for the purposes of Article I(f)(vi). Article XXI(2) of the ATA and Article 2 of Providencia No. 23 granted Claimant rights to acquire foreign currency needed for the repatriation of returns at the official exchange rate in fore at the time. In addition, Article VIII of the BIT, Article XXI(2) od the ATA and Article 2 of Providencia No. 23 granted Claimant rights to repatriate those returns. The conversion and repatriation of locally generated returns are an intrinsic part of a foreign investor's economic and commercial activity in a host state.[270]

277.    Claimant's broader rights to operate in Venezuela under the ATA and Providencia No. 60 also constitute "*rights, conferred by law … to undertake any economic and commercial activity*". Claimant's conversion and free transfer rights are part and parcel of its rights to operate in Venezuela.[271]

278.    *Third*, the returns that Claimant sought to convert and repatriate undoubtedly constitute "assets" and "money" as well as "returns" as defined by the BIT. Claimant deposited its Bolivar-denominated returns in its Venezuelan bank accounts. Cash deposited in a company's bank account is treated as an asset on a company's balance sheet. Accordingly, Claimant's cash deposits in its Venezuelan bank account constitute an "*asset owned or controlled by an investor of one Contracting Party* [Air Canada] … *in the territory of the other Party* [Venezuela]".[272]

---

[267] Reply, paras 17, 20.
[268] Reply, para. 18.
[269] Rejoinder, para. 19.
[270] Reply, para. 21.
[271] Reply, para. 22.
[272] Reply, para. 23.

c.  The *Salini* test

279.  Claimant argues that the *Salini* test does not apply to the present dispute. Even if it were to apply, Claimant's investments would satisfy the test.[273]

280.  *First*, the plain language of the BIT does not condition protection of an "investment" or a "return" on any criteria beyond those contained in Article I.[274] Article 3 of the AF Rules are likewise clear. Therefore, Article 25(1) of the ICSID Convention is irrelevant in the present case and neither the *Salini* factors nor any other objective test is applicable to determine the existence of an investment under the BIT.[275]

281.  *Second*, and in any event, Claimant invested significant resources to establish and conduct its operations in Venezuela and to generate the returns at issue in this case.[276] During its operations, Claimant spent over U.S.$ 118 million operating the Toronto-Caracas-Toronto route, not including taxes paid to the Venezuelan and Canadian governments. That figure does not include the significant costs that Claimant incurred outside of Venezuela to support its investment in Venezuela, including salaries and social charges of personnel assigned to the Toronto-Caracas-Toronto route, or general overhead linked and attributable to Claimant's investment in Venezuela, or the aircraft purchase and leasing costs for the aircraft that were dedicated to that route.[277] In addition, Claimant made significant intangible contributions to Venezuela's economy and people.[278] Venezuela itself acknowledge the contribution that civil aviation and Air Canada specifically made to Venezuela.[279] In addition, Claimant also bore the risk that its investment would prove unprofitable. Claimant had no guarantee of profit when it invested in the Toronto-Caracas-Toronto Route.[280]

d.  Compliance with Venezuelan law

282.  Claimant submits that it respected Venezuelan law at all times in relation to its investments and during the course of its operations in Venezuela.[281]

283.  *First*, Respondent is incorrect that Claimant's operations did not comply with the legal framework in place in Venezuela in relation to the sale of SOTI tickets.[282]

284.  *Second*, Respondent's criticisms that Claimant's investment did not comply with Venezuelan law because Claimant hired an employee, Mr. Serafini in 2013 "for the sole purpose of benefiting from the possibility to seek an authorization from CADIVI" is

---

[273] Reply, paras 26, 45.
[274] Reply, para. 27,
[275] Reply, para. 28.
[276] Reply, paras 32-36.
[277] Reply, para. 37.
[278] Reply, para. 39.
[279] Reply, para. 40.
[280] Reply, para. 44.
[281] Reply, para. 46.
[282] Reply, para. 47.

misplaced.[283] Claimant had consistently informed CADIVI that it did not maintain any direct employees in Venezuela before 2013. Moreover, Claimant always disclosed to CADIVI its status as a non-contributing company to the IVSS.[284] It was CADIVI itself that suggested that Claimant hire an employee in 2013 so that Claimant could obtain the good standing certificate that the IVSS was refusing to issue unless Claimant became a contributing company.[285] Claimant's general sales agent prepare and submitted the six employment contracts relied on by Respondent to INAC in 2005 in order to obtain security clearance for individuals who were providing fate and security services on behalf of Claimant. None of these individuals were Claimant's direct employees at any point in time between 2005 and 2013.[286]

285.    *Third*, none of these allegations, even if accurate, would have any bearing on the Tribunal's jurisdiction.[287] The relevant point in time for determining whether an investment was made "*in accordance with law*" for the purposes of establishing a tribunal's jurisdiction is at the investment's inception.[288] There is no basis to conclude that Claimant's investment was not in accordance with law at any time, much less at its inception. The fact that Respondent formally approved Claimant's operations in Venezuela and certified Claimant's status as a foreign company in Venezuela in 2004, confirms the legality of that investment at its inceptions. Any subsequent violations of Venezuelan law of the sort alleged by Respondent could only give rise to liability under Venezuelan domestic law and would not affect the conformity of Claimant's investment in the eyes of international law or deprive the Tribunal of jurisdiction over this dispute.[289]

286.    Claimant submits that Article I(f)'s reference to "any kind of asset" followed by an illustrative list of qualifying assets, is typical of the definition contained in many bilateral and multilateral treaties. As the tribunal in *Mytilineos* noted "[s]*uch a definition, usually referred to as a "broad asset-based definition of investment" follows a well-established pattern pursued by many BITs. It combines a broad definition ("every kind of asset") with an illustrative list of assets categories that fall within the definition of investment.*"[290] Indeed "[a]*ccording to a recent UNCTAD study ... a BIT stating that ""investment includes "every kind of asset suggest[s] that the term embraces everything of economic value, virtually without limitation'*".[291]

287.    In the present case, Air Canada's activities, operations, assets, and funds fall squarely within Article I(f)'s definition of an investment.[292]

---

[283] Reply, para. 48.
[284] Reply, para. 49.
[285] Reply, para. 50.
[286] Reply, para. 51.
[287] Reply, para. 52.
[288] Reply, para. 53.
[289] Reply, para. 54.
[290] Exh. CL-91, *Mytilineos Holdings SA v. State Union of Serbia and Montenegro and Republic of Serbia*, UNCITRAL, Partial Award on Jurisdiction, 8 September 2006 ("Mytilineos").
[291] Exh. CL-91 (Mytilineos), para. 106; Response to Application for Bifurcation, para. 43.
[292] Response to Application for Bifurcation, paras 44-45; Memorial, paras 24-28, 30-32.

*5.2*      ***The Tribunal's analysis***

(i)      *In general*

288.   The Tribunal will determine whether it has jurisdiction *ratione materiae* and *ratione personae*. In this regard, the Parties disagree as to whether Claimant qualifies as a protected investor who has made a protected investment within the meaning of the BIT (see *supra* paras 267, 269, 271 and 273).

(ii)      *Ratione materiae*

a.   The issue

289.   The Parties disagree on the definition of "investment" and whether Claimant's alleged investment falls within that definition.[293] The Tribunal will therefore consider whether or not the dispute submitted before it arises out of an "investment". In doing so, it will proceed as follows:

   – *First*, it will set out the definition of "investment" that is relevant to the dispute before it (Section (b)).

   – *Second*, it will consider whether the facts established by Claimant meet the relevant definition of "investment" (Section (c)).

   – *Finally*, it will conclude on the question of jurisdiction *ratione materiae* (Section (d)).

b.   The definition

290.   To determine whether an investment exists, the Tribunal will look to the relevant definition in Article I(f) of the BIT. In interpreting the definition, the Tribunal will again be guided by the rules of treaty interpretation of the VCLT and in particular Article 31. It will be recalled that Article 31 provides that "[a] *treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in the context and in the light of its object and purpose*" (see *supra* paras 222, 247). The starting point is thus the "ordinary meaning" of the term "investment".

291.   Article I(f) of the BIT defines the term "investment" as follows:

   *ARTICLE I*

   *Definitions*

   *For the purpose of this Agreement: […]*

---

[293] Respondent (Counter-Memorial, paras 221-223, 245-247, 249; R-PHB, paras 55-61); Claimant (Reply, paras 14-54).

*(f) "investment" means any kind of asset owned or controlled by an investor of one Contracting Party either directly or indirectly, including through an investor of a third State, in the territory of the other Contracting Party in accordance with the latter's laws. In particular, though not exclusively, "investment" includes:*

*(i) movable and immovable property and any related property rights, such as mortgages, liens or pledges;*

*(ii) shares, stock, bonds and debentures or any other form of participation in a company, business enterprise or joint venture;*

*(iii) money, claims to money, and claims to performance under contract having a financial value;*

*(iv) goodwill;*

*(v) intellectual property rights;*

*(vi) rights, conferred by law or under contract, to undertake any economic and commercial activity, including any rights to search for, cultivate, extract or exploit natural resources.*

*but does not mean real estate or other property, tangible or intangible, not acquired in the expectation or used for the purpose of economic benefit or other business purposes.*

*Any change in the form of an investment does not affect the character as an investment.*

292.    Article I(f) of the BIT provides that an "investment" is "*any kind of asset*", which for purposes of this case includes "*though not exclusively*" "*money, claims to money*" and "*rights, conferred by law or under contract, to undertake any economic and economic activity*". The BIT therefore encompasses a broad concept of investment found in several BITs.[294] This means that to the extent that Claimant's alleged investment includes assets such as those enumerated in Article I(f), those assets may be considered an "investment" for purposes of the BIT.

293.    However, in considering whether or not there is an investment for purposes of Article I(f), the test should not be limited to the identification of a defined "asset".[295] This is

---

[294] Reply, para. 14 citing Exh. CL-91 (Mytilneos), paras 102-103 ("*The BIT contains a broad definition of investment, Article 1 of the BIT defines "investment" as "every kind of asset invested by an investor of one Contracting Party in the territory of the other Contracting Party." In its non-exhaustive list of examples, it includes "claims to money or any other claim under contract having an economic value". Such definition, usually referred to as a "broad asset-based definition of investment," follows a well-established pattern pursued by many other BITs. It combines a broad definition ("every kind of asset") with an illustrative list of assets categories that fall within the definition of investment.*").

[295] Exh. RL-15, *Nova Scotia Power Incorporated v. Bolivarian Republic of Venezuela,* ICSID Case No. ARB(AF)/11/1, Excerpts of the Award, dated 30 April 2014 ("Nova Scotia"), para. 77

because the Tribunal considers that, while the defined asset in the BIT *prima facie* evidences the intention of the Parties as to which disputes should be subject to BIT arbitration, that asset is part of the broader concept of the investment whose protection is the subject-matter of the BIT (see *supra* paras 188-189). As such, it is recognized that the term "investment", as part of its ordinary meaning, carries inherent characteristics that must be taken into account in establishing jurisdiction under the BIT.[296] In this context, the fact that the present arbitration is not governed by the ICSID Convention, but initiated under the ICSID AF Rules, is not a reason to dispense with an examination of the existence of the inherent elements of an investment. This is for the following reasons (which have also been properly explained by the *Nova Scotia* tribunal[297]):

- *First*, a mechanical application of the categories listed in Article I(f) of the BIT would lead to an undesirable result contrary to the object and purpose of the BIT, which in this case is to recognize the need to promote and protect foreign investment with the aim of promoting the economic prosperity for both Venezuela and Canada, and the desire to intensify economic cooperation for the mutual benefit of both States (see *supra* paras 188-189). It is clear that a mechanical application would blur any conceptual distinction that exists between ordinary commercial transactions on the one hand, and investments on the other.[298]

- *Second*, and in the same spirit, it cannot be the case that the scope of the investment in a BIT or the substantive protection afforded by the BIT changes depending on the arbitral forum chosen by the investor. Indeed, it would be unreasonable to conclude that the Convention's Contracting Parties contemplated a definition of the term "investments" that effectively precludes recourse to the ICSID Convention and therefore renders meaningless the provision giving the investor a choice between ICSID and UNCITRAL arbitration. Therefore, (i) the fact that this is not an arbitration for which Article 25 of the ICSID Convention

---

[296] Nova Scotia, para. 81.

[297] Nova Scotia, paras 75-81. Claimant argues that the *Nova Scotia* tribunal is the only tribunal constituted under the Canada-Venezuela BIT that has chosen to include additional requirements in the definition of "investment", but that in this case the claimed investment consisted of rights to coal from a particular mine under a coal supply agreement that the tribunal dismissed as "[a] *commitment to simply pay money in the future after delivery of goods*". Reply, para. 29. The Tribunal does not dispute that there are different facts between the present case and Nova Scotia. However, it considers the analysis of the Nova Scotia tribunal on the principle of investment appropriate.

[298] Exh. RL-34, *Joy Mining Machinery Limited v. Arab Republic of* Egypt, ICSID Case No. ARB/03/11, Award on Jurisdiction, dated 6 August 2004, para. 58 ("*if a distinction is not drawn between ordinary sales contracts, even if complex, and an investment, the result would be that any sales or procurement contract involving a State agency would qualify as an investment. International contracts are today a central feature of international trade and have stimulated far reaching developments in the governing law, among them the United Nations Convention on Contracts for the International Sale of Goods, and significant conceptual contributions. Yet, those contracts are not investment contracts, except in exceptional circumstances, and are to be kept separate and distinct for the sake of a stable legal order. Otherwise what difference would there be with the many State contracts that are submitted every day to international arbitration in connection with contractual performance, at such bodies as the International Chamber of Commerce and the London Court of International Arbitration?*").

must be considered[299] and (ii) whether the AF Rules provide for a similar notion of investment in Article 2(a) of the AF Rules[300] are irrelevant.

– *Third*, the fact that the inherent notion of investment should not differ depending on the forum, does not mean that the so-called "*Salini* test" used to determine the notion of investment under Article 25 of the ICSID Convention automatically becomes applicable in the present case. The *Salini* criteria are not rules of law or jurisdictional requirements that the Tribunal must follow.[301] Moreover, their global application, however "objective" they may appear, is not always appropriate, as each case is different and should be assessed in its own separate and appropriate context. This is because what may be considered a significant contribution for one tribunal or arbitrator may not necessarily be considered as such by another tribunal or arbitrator. In such a case, it depends on a discretionary consideration of the facts. Instead, in the view of the Tribunal, it is relevant and appropriate to consider an investment in the legal sense: that is, whether there is an ongoing cross-border business activity that can be evidenced in the form of equity or contributions, or in the form of committed capital that generates rights of value.

– *Finally*, and in light of the foregoing, finding an inherent concept does not mean that the Tribunal will condition the protection of an investment on any criteria beyond those contained in Article I(f).[302]

294.    Thus, the Tribunal cannot simply confirm whether or not Claimant's assets fall within one or more of the categories listed in Article I(f) of the BIT but must instead additionally look for the existence of an "investment" in the legal sense.

295.    *Concerning Claimant's argument that the BIT extends its substantive protections to both "investments" and "returns"*,[303] the Tribunal agrees with Respondent that a return cannot constitute an investment in the abstract sense.[304] Under Article I(i) of the BIT, returns are

---

[299] Reply, para. 28.

[300] Rejoinder, para. 112.

[301] Reply, para. 38; Exh. CL-94, *White Industries Australia Limited v. Republic of India*, UNCITRAL, Final Award, dated 30 November 2011, para. 7.4.8 ("*As regards the so-called Salini Test for what constitutes an investment, this test was developed in order to determine whether an 'investment' had been made for the purposes of the ICSID Convention. The cases cited by India in support of these requirements were also ICSID Decisions. The present case, however, is not subject to the ICSID Convention. Consequently, the so-called Salini Test, and Douglas's interpretation of it, are simply not applicable here*"); Air Canada notes that the Salini factors do not constitute jurisdictional requirements, even in cases under the ICSID Convention. See Reply, fn 32. See also Exh. RL-21, *Philip Morris Brand Sàrl (Switzerland), Philip Morris Products S.A. (Switzerland) and Abal Hermanos S.A. (Uruguay) v. Oriental Republic of Uruguay*, ICSID Case No. ARB/10/7, Decision on Jurisdiction, dated 2 July 2013, para. 206 ("*the four constitutive elements of the Salini list do not constitute jurisdictional requirements to the effect that the absence of one or the other of these elements would imply a lack of jurisdiction. They are typical features of investments under the ICSID Convention, not a set of "mandatory legal requirements." As such, they may assist in identifying or excluding in extreme cases the presence of an investment but they cannot defeat the broad and flexible concept of investment under the ICSID Convention to the extent it is not limited by the relevant treat, as in the present case.*").

[302] *Cf.* Reply, para. 27.

[303] Reply, para. 15.

[304] Rejoinder, para. 109.

"[a]*ll amounts yielded by an investment and in particular, though not exclusively, includes profits, interest, dividends, royalties, feels other current income or capital gains*". As such, "returns" are protected only to the extent that they (i) comprise a defined category that is additionally considered an investment in the legal sense, or (ii) are derived from a proven investment as defined in the BIT.

296.    *Concerning the requirement of compliance with Venezuelan law*, the Parties disagree as to whether an investment must comply with Venezuelan law at the time the investment is made or instead during its operation.[305]

297.    The Tribunal recalls – once again – that Article I(f) of the BIT provides:

> *(f) "investment" means any kind of asset owned or controlled by an investor of one Contracting Party either directly or indirectly, including through an investor of a third State, in the territory of the other Contracting Party **in accordance with the latter's laws**. In particular, though not exclusively, "investment" includes:* […] (emphasis added)

298.    The definition of "investment" in Article I(f) expressly requires "*any kind of asset owned or controlled* […] *in accordance with*" the laws of the territory of the other Contracting Party. The definition makes no explicit reference to whether compliance with the law refers to the creation of the investment or to its operation. Indeed, ownership and control of an asset could be relevant both at the time of acquisition of an asset and during its operation.

299.    Respondent acknowledges that there is a distinction between legality at the inception of the investment and legality during the operation of the investment. It refers to specific provisions in the BITs relied upon by some tribunals to support the choice of one or the other temporal scope of legality.[306] The Tribunal does not dispute that such a distinction exists, sometimes more clearly than others, depending on the language of the specific treaty. Nonetheless, the Tribunal believes that regardless of the language, and particularly in cases such as the present where there is no express intent, only the first legality requirement becomes unquestionably relevant to its jurisdiction.[307] The Tribunal considers that legality in relation to the inception of the investment is relevant to the

---

[305] Respondent (Counter-Memorial, paras 239-244; Rejoinder, paras 116, 118-124; R-PHB, para. 58); Claimant (Reply, para. 53; Reply PHB, paras 38-42).

[306] Rejoinder, para, 120.

[307] Exh. RL-17, *Gustav F W Hamester GmbH & Co KG v. Republic of Ghana*, ICSID Case No. ARB/07/24, Award, dated 18 June 2010, para. 127 ("*The Tribunal considers that a distinction has to be drawn between (1) legality as at the initiation of the investment ("made") and (2) legality during the performance of the investment. Article 10 legislates for the scope of application of the BIT, but conditions this only by reference to legality at the initiation of the investment. Hence, only this issue bears upon this Tribunal's jurisdiction. Legality in the subsequent life or performance of the investment is not addressed in Article 10. It follows that this does not bear upon the scope of application of the BIT (and hence this Tribunal's jurisdiction) – albeit that it may well be relevant in the context of the substantive merits of a claim brought under the BIT. Thus, on the wording of this BIT, the legality of the creation of the investment is a jurisdictional issue; the legality of the investor's conduct during the life of the investment is a merits issue. In the Tribunal's view, the broader principle of international law identified in paragraphs 123-124 above does not change this analysis of Article 10, and in particular its distinction between legality at different stages of the investment.*").

existence of the investment itself and therefore to the Tribunal's jurisdiction.[308] If the law of the host State was complied with at the time of the commencement of the investment, allegations of host State law during the operation of the investment could serve as a defense to alleged substantive violations of the BIT (and only if raised in that context), but would not deprive a tribunal of jurisdiction under the BIT.[309] For jurisdictional purposes, therefore, the Tribunal must consider the lawfulness of the commencement of the investment.

300.    Therefore, relying on the ordinary meaning of the terms of the BIT in their context and in light of its object and purpose, the Tribunal finds that investment includes the assets categorized in Article I(f) of the BIT and investment in the legal sense that is "made" in in accordance with Venezuelan law.

c.    The facts

301.    The Tribunal will now turn to the facts of this case and consider whether Claimant has made a protected investment.

302.    At the outset, the Tribunal considers that Claimant must positively establish the facts which are intended to prove that an investment has been made in Respondent's territory, while facts which are part of the merits may be provisionally "*accepted at face value*" for the purposes of jurisdiction.[310] In this context, the Tribunal recalls that Claimant must prove that it has assets falling within the broad definition of Article I(f) of the BIT and of the term "investment" in the legal sense (see *supra* paras 292-300). The Tribunal considers the following for purposes of jurisdiction:

–    *First*, Claimant asserts claims for money in U.S. dollars allegedly entitled to receive in exchange for the bolivar-denominated returns held in its Venezuelan Bank account. For such claims, Claimant relies on Article XXI(2) of the ATA, which provides that "[e]*ach designated airline shall have the right to convert and remit to its country on demand earnings obtained in the normal course of its operations*".[311] It also relies on Article 2 of Providencia No. 23, which provides that "[f]*oreign international air transportation providers duly authorized by* [INAC] *may, acting through authorized currency exchange operators, acquire the foreign currency necessary for them to remit to their home offices, in their home country, the net balance of their revenue from ticket sales, cargo and mail freight at each sales point minus all costs, expenses and taxes payable by them in Venezuela for their adequate and safe operation*".[312] The Tribunal is of the opinion that both instruments indisputably contemplate a right for payment in

---

[308] Reply, para. 53; Exh. CL-97, *Vannessa Ventures Ltd. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/04/6, Award, 16 January 2013, para. 167 ("*the jurisdictional significance of the 'legality requirement' in the definition of an investment in Article I(f) is exhausted once the investment has been made.*").

[309] Accordingly, Respondent's arguments regarding Claimant's alleged violation of Venezuela's laws by employing staff without declaring them and misrepresenting aspects of its operations to INAC, as well as regarding allegedly false employment contracts, are not relevant at this stage. See Tr. Day 2, 4, 29, 79, 81-82; R-PHB, paras 59-62.

[310] Application for Bifurcation, para. 87 quoting Exh. RL-15 (Nova Scotia), para. 50.

[311] Exh. C-5 (ATA); Reply, paras 17-20.

[312] Exh. C-9 / R-11 (Providencia No. 23); Reply, paras 17-20.

favor of Claimant and thus a valid claim for such payment.[313] While it takes no position on whether such a right is absolute, the Tribunal considers it falls within the broad category of "claims to money" within the meaning of Article I(f)(iii) of the BIT for jurisdictional purposes.

–  *Second*, Claimant alleges that it is entitled to the conversion and repatriation of locally generated returns that are an integral part of its economic and commercial activities in Venezuela. In this regard, Claimant again relies on Article XXI(2) of the ATA and Article 2 of Providencia No. 23. Claimant also relies on Article VIII of the BIT, which provides for the free transfer of funds, and argues that its right to convert its local returns falls within this provision.[314] In addition, Claimant relies on the rights granted to Air Canada by the ATA to operate certain international air services in Venezuela, including landing in Venezuela for the purpose of picking up and dropping off international passengers, cargo and mail while operating certain routes,[315] and Providencia No. 60, which authorizes Air Canada to operate as a commercial airline in Venezuela.[316] As set forth above, the Tribunal considers that the foregoing instruments confer *prima facie* rights on Claimant in connection with its activities in Venezuela, although it does not rule on their scope. Therefore, for jurisdictional purposes, the Tribunal considers that Claimant has "*rights, conferred by law* [..]*, to undertake any economic and commercial activity*" within the meaning of Article I(f)(vi) of the BIT.

---

[313] See Respondent's argument in Rejoinder, paras 103-106 ("*103. First, Air Canada never had any "claim to money" in the terms of Article I(f)(iii) of the BIT. The term "claim to money" of Article I(f)(iii) of the BIT is a reference to enforceable rights, i.e., to rights that have already been declared or recognized by a competent court or authority or originate from a binding agreement providing for the payment of monies, thereby giving rise to a payment, rather than a mere demand for money. 104. This is in line with the three authenticated versions of the BIT [...]. 105. Accepting that a "claim to money" under the BIT equates to a mere pretention to payment would mean that in order to establish the existence of an investment under the BIT, it suffices to articulate a claim for payment against the host State. This is absurd and leads, de factor, to wiping out the existing ratione materiae requirement from the BIT by rendering it meaningless. [...] Therefore, as things stand, those claims are mere requests from Air Canada and cannot serve to establish the jurisdiction of the Arbitral Tribunal. Especially since, as the Republic maintains, neither Article XXI of the ATA nor Article 2 of Providencia No. 23 granted Air Canada with a right or an absolute and enforceable claim to U.S. dollars. Rather, as Air Canada itself describes, Providencia No. 23 "empowered airlines to apply for foreign currency on a monthly basis" and as we have seen this is not an automatic right to conversion.*")

[314] Article VIII of the BIT provides in relevant part: "*1. Each Contracting Party shall guarantee to an investor of the other Contracting Party the unrestricted transfer of investments and returns. [...] 2. Transfers shall be effected without delay in the convertible currency in which the capital was originally invested or in any other convertible currency agreed by the investor and the Contracting Party concerned. Unless otherwise agreed by the investor, transfers shall be made at the rate of exchange applicable on the date of transfer. [...] 4. Notwithstanding paragraphs 1, 2 and 3, a Contracting Party may prevent a transfer through the equitable, non-discriminatory and good faith application of its laws* [...]." See Exh. CL-1 (BIT).

[315] Exh. C-5 (ATA); Exh. C-30, Printout from the Canadian Transportation Agency's website, Summary of Agreement with Venezuela, last modified 23 November 1998; Exh. C-6, Canadian Transportation Agency's website; Exh. C-67, Printout from INAC's website, Air Transport Agreements signed by the Bolivarian Republic of Venezuela; Reply, para. 22.

[316] Exh. C-8 (Providencia No. 60); Exh. C-125, Venezuela's Civil Aviation Law, Articles 9, 119; Reply, para. 22; Reply C-PHB, para. 36.

    –   *Third*, the Tribunal agrees with Claimant that the cash deposited in its bank account is treated as an asset on a cooperation's balance sheet[317] and is therefore an "asset" in and of itself within the meaning of the BIT. These funds are undoubtedly related to Claimant's air transportation activities in Venezuela.[318] As Claimant's claims for "returns", the Tribunal does not consider that its claims for conversion and repatriation and its assets per se fall within the definition of "returns", for the reasons explained above (see *supra* para. 268).[319]

303.      In the broader context, therefore, Claimant has demonstrated that it has assets that fall within the definition of Article I(f) of the BIT.

304.      With respect to the broader context of the definition of investment in the legal sense, the Tribunal notes that Air Canada established a local branch in Venezuela on 24 October 1989 by contributing U.S.$ 50,000 in equity and registering it in the Venezuelan Commercial Registry.[320] On 1 July 2004, it began three weekly round-trip flights between Toronto and Caracas using a 120-seat Airbus 319. For the next ten years, it was the only airline offering scheduled flights between Canada and Venezuela.[321] On 5 October 2004, the Venezuelan SIEX issued a *Constancia de Calificación de Empresa to Air Canada*.[322] The registry classifies the local branch of Air Canada as a "*foreign enterprise*" and expressly recognizes the status of Air Canada as a "*foreign shareholder*" whose "*principal economic activity*" is the "*air transportation of cargo and passengers*".[323] The Tribunal therefore considers that Claimant was engaged in an ongoing cross-border business activity, namely air transport, which evidenced at least by its capital contribution in the establishment of its local branch in Venezuela since 1989 and the contribution of equity in the amount of U.S.$ 50,000. With this contribution, Claimant generated rights of value related to the Toronto-Caracas-Toronto route and, in particular, ticket sales therefrom. Claimant has therefore demonstrated that it also has an investment in the legal sense.

305.      Finally, the Tribunal notes that Venezuela issued Providencia No. 60 on 25 June 2004, allowing Air Canada to operate as a commercial airline in Venezuela,[324] and a *Constancia de Calificación de Empresa* on 5 October 2004, when Air Canada began to use the Toronto-Caracas-Toronto route.[325] The fact that Venezuela formally authorized the operation of Air Canada in Venezuela and certified Air Canada's status as a foreign company in Venezuela in 2004 confirms the legality of this investment at its inception. Subsequent violations of Venezuelan law, as alleged by Venezuela could only give rise

---

[317] Exh. C-93, Letter from Air Canada to CADIVI dated 19 February 2013; Reply, para. 23; Reply C-PHB, para. 36.

[318] Counter-Memorial, para. 233; Reply, para. 24; Reply C-PHB, para. 36.

[319] Reply, para. 23.

[320] Exh. C-7, Certificate issued by the Registry of Commerce domiciling Air Canada's Venezuelan branch, dated 25 June 2005; Pittman WS, para. 6.

[321] Pittman WS, para. 11; Reply, para. 30.

[322] Exh. C-103, *Constancia de Calificación de Empresa*, Application No. 4732 dated 5 October 2004 ("Application No. 4732").

[323] Exh C-106, Fax from INAC authorizing Air Canada Operations, dated 30 June 2004; Exh. C-132, Fax from INAC authorizing Air Canada's Operations, dated 26 February 2014; Reply, para. 31.

[324] Exh. C-8, INAC *Providencia Administrativa No. 60*, dated 2 May 2003.

[325] Exh. C-103 (Application No. 4732).

to liability under Venezuelan domestic law and would not deprive the Tribunal of jurisdiction over this dispute.[326]

306.   The Tribunal therefore finds that Claimant has made an investment that is protected under the BIT, and hence, that it has jurisdiction *ratione materiae*.

### d.   Conclusion

307.   For all of the foregoing reasons, the Tribunal has decided to dismiss **Respondent's ratione materiae objection to jurisdiction**.

### (iii)   *Ratione personae*

#### a.   The issue

308.   The Parties dispute whether Claimant is a protected investor under the BIT.[327] To decide this issue, the Tribunal will proceed as follows:

–   *First*, it will set forth the definition of "investor" that is relevant to this dispute (Section (b)).

–   *Second*, it will consider whether the facts established by Claimant meet the definition of "investor" (Section (c)).

–   *Finally*, it will conclude whether it has jurisdiction *ratione personae* (Section (d)).

#### b.   The definition

309.   "Investor" is defined in Article I(g) of the BIT as follows:

> *(g) "investor" means*
>
> *In the case of Canada:*
>
> *(i) any natural person possessing the citizenship of Canada in accordance with its laws; or*
>
> *(ii) any enterprise incorporated or duly constituted in accordance with the applicable laws of Canada,*
>
> *Who makes the investment in the territory of Venezuela and who does not possess the citizenship of Venezuela; and*
>
> […]

---

[326] Reply, para. 54.
[327] Respondent (Counter-Memorial, paras 250-252); Claimant (Reply, para. 12).

310. According to its ordinary meaning found in Article I(f)((ii) (see *supra* para. 309), investor in the present case means, for non-natural persons, "*any enterprise incorporated or duly constituted in accordance with the applicable laws of Canada who makes the investment in the territory of Venezuela and who does not possess the citizenship of Venezuela*". Therefore, Claimant must prove that: (i) it is an entity incorporated or duly constituted under the applicable laws of Canada; (ii) it does not have Venezuelan citizenship; and (iii) it made a protected investment in the territory of Venezuela.

### c. The facts

311. The Parties' disagreement on whether Claimant is a protected investor lies in whether Claimant has made an investment that is part of the definition of investor in the BIT.[328] The Tribunal notes that the requirement of having made a protected investment in the territory of Venezuela has already been established by the Tribunal above (see *supra* paras 306-307). It is also undisputed that Claimant is a company incorporated under the laws of Canada, which does not have Venezuelan citizenship.

312. The Tribunal therefore finds that Claimant is a Canadian company within the meaning of investor under the BIT.

### d. Conclusion

313. Claimant is therefore a protected investor under the BIT and the Tribunal has jurisdiction *ratione personae*

### (iv) Conclusion

314. The Tribunal finds that it has jurisdiction *ratione materiae* and jurisdiction *ratione personae* in this case.

## 6.    Conclusion

315. Based on the foregoing, the Tribunal concludes that ***the present dispute is within its jurisdiction and is admissible.***

## IV.    Merits

## 1.    The issue

316. Having determined that the present dispute falls within its jurisdiction and is admissible, the Tribunal will proceed to decide the merits of the case, in particular whether Respondent has breached its obligations under the BIT and international law in relation to Claimant's investments.

---

[328] Counter-Memorial, paras 239, 248-249, 254.

317.    ***Claimant*** requests the Tribunal to find that:

> "*Venezuela has breached its obligations under the BIT and international law with respect to Claimant's investments*" [Claim. 2].

318.    ***Respondent*** requests the Tribunal to find that:

> "*the Bolivarian Republic of Venezuela has not violated either Article II, Article VII or Article VIII of the BIT*" [Resp. 4].

319.    ***The Tribunal*** will address the merits of this case as follows:

– *First*, it will address the alleged violation of the Free Transfer of Funds ("FTF") provision found in Article VIII of the BIT (see *infra* Section 2).

– *Second*, it will address the alleged breach of the provision on Fair and Equitable Treatment ("FET") found in Article II of the BIT (see *infra* Section 3).

– *Third*, it will address the alleged violation of the expropriation provision found in Article VII of the BIT (see *infra* Section 4).

– *Fourth*, it will conclude (see *infra* Section 5).

## 2.    Article VIII of the BIT: Free Transfer of Funds

### 2.1    The Parties' positions

### (i)    Claimant

320.    Claimant submits that Respondent breached the FTF provision in the BIT when it refused to approve Claimant's AAD requests to convert its Bolivar-denominated returns into U.S. dollars for repatriation.[329]

321.    *First*, the right to freely transfer funds is central to the international regime for promotion and protection of investments.[330] The FTF obligation is absolute. Article VIII of the BIT establishes the principle that protected Canadian investors can make unrestricted transfers of their investments and returns in Venezuela, and that such transfers be "*effected without delay*".[331]

322.    *Second*, the protections provided for in the BIT itself protect Claimant from Respondent's refusal to allow the free repatriation of Claimant's revenues in a convertible currency such as the U.S. dollars.[332] Article VII of the BIT specifically protects "returns" as well as "investments". The Bolivar-denominated funds that Claimant sought to convert and

---

[329] Reply, para. 84.
[330] Memorial, paras 109-111.
[331] Memorial, para. 113.
[332] Memorial, para. 118.

repatriate were returns "*yielded by an investment*".[333] Further, Claimant has presented ample evidence that it made a substantial part of its investments in relation to its Venezuelan operations in U.S. dollars.[334]

323.   Respondent should not be allowed to escape its free transfer obligations even if the Tribunal were to conclude that Claimant did not make substantial U.S. dollar expenditures in relation to its Venezuelan operations. Specifically:

–   The Parties' entire course of dealing reflects that they agreed Claimant could convert its returns into U.S. dollars, regardless of whether its investments had originally been made in U.S. dollars.[335]

–   In practice, Respondent used the U.S. dollars as its hard, convertible currency almost exclusively until the latter part of 2017, including when Claimant submitted its AADs in late 2013 and early 2014.[336]

324.   *Third*, Claimant never contended that Respondent's foreign exchange control regime constitutes a *per se* breach of BIT Article VIII. Instead, Respondent's refusal to process the AADs in a manner consistent with past practice and in accordance with its foreign exchange control regime constitutes breach of BIT Article VIII.[337] Concerning Respondent's arguments:

–   No alterative mechanisms for obtaining foreign currency in Venezuela were available to Claimant in 2013 and 2014.[338]

–   The fact that Claimant retained control over the bank accounts in Venezuela where its local currency was held throughout the period during which CADIVI was considering its requests and thereafter is irrelevant. The right enshrined in BIT Article VIII pertains to the free transfer of returns abroad not to the control of domestic bank accounts in which local currencies are held.[339]

–   Respondent's measures cannot be justified by Venezuela's "*sovereign prerogatives under international law over its monetary policy to safeguard its national economy*".[340]

325.   Respondent's failure to take action on Claimant's 15 AADs is plainly inconsistent with the mandate of the BIT that all transfers of an investor's investments and returns "*shall be effected without delay*".[341]

---

[333] Reply, paras 86-88.
[334] Reply, paras 90-94.
[335] Reply, para. 96.
[336] Reply, paras 97-102.
[337] Reply, para. 105.
[338] Reply, paras 109-113.
[339] Reply, paras 114-115.
[340] Reply, paras 116-117.
[341] Reply, paras 119-120.

326.    *Fourth*, and in any event, Claimant's protection is not limited to Article VIII of the BIT. Pursuant to the provisions of Article III of the BIT which accord investments or returns "*most-favored-nation treatment*", Claimant is entitled to rely upon more favorable FTF provisions of other treaties, domestic law, and international law.[342] Specifically, through the MFN clause, Claimant may rely on any FTF provision in any BIT entered into by Respondent and another State, for example, the Spain-Venezuela and Costa-Rica BITs, that provide that the transfer should occur within three months from the date of the transfer request. Consequently, Claimant was entitled to receive its transfers of funds, in U.S. dollars, either "without delay" or within three months from submitting each AAD request, whichever was shorter.[343]

327.    *Fifth*, Respondent's failure to permit Claimant to freely repatriate its revenues in a convertible currency violates the express terms of the ATA, which provides applicable rules of international law that the Tribunal may consider in determining Respondent's liability. Under Article XXI of the ATA, Claimant, as a "designated airline" has the right to convert and repatriate any revenues it generated in Venezuela.[344]

328.    *Finally*, in light of MFN language in the ATA, Claimant invokes (i) Article 15(1) of the Brazil-Venezuela Air Services Agreement, which provides that "*conversion and remittance shall be allowed promptly at the exchange rate applicable on the date of the request*"; and (ii) Article 8(4) of the Caribbean Countries-Venezuela Air Services Agreement which provides that "*conversion and remittance shall be allowed promptly and without taxes or restrictions, at the exchange rate applicable to the transactions on the date the airline made the initiate remittance request, pursuant to the legislation in force in each country*".[345]

329.    Accordingly, the Tribunal should conclude that Respondent breached the FTF provision in Article VIII of the BIT and related rules of international law.[346]

*(ii)*    *Respondent*

330.    Respondent submits that there have been no illegal restrictions to the transfer of funds[347] and that Claimant has failed to establish that there has been a breach of Article VIII of the BIT.[348]

---

[342] Memorial, paras 114-116.

[343] Memorial, paras 117-118; Reply, paras 122-125 referring to Exh. C-64, *Agreement between the Kingdom of Spain and the Bolivarian Republic of Venezuela for the Reciprocal Promotion and Protection of Investments*, signed on 2 November 1995, Article VII(4) and Exh. C-65, *Agreement between the Republic of Costa Rica and the Bolivarian Republic of Venezuela for the Reciprocal Promotion and Protection of Investments*, signed on 7 March 1997, Article 8(2).

[344] Memorial, para. 119 referring to Exh. C-5 (ATA), Article XXI(2).

[345] Memorial, paras 120-121 referring to and/or quoting Exh. C-5 (ATA), Article XXI(2), Exh. C-24, *Agreement Between Brazil and the Bolivarian Republic of Venezuela for Air Services*, Article 15(1) and Exh, C-32, *Agreement Between Caribbean Countries and the Bolivarian Republic of Venezuela for Air Services*, Article 8(1).

[346] Memorial, para. 131.

[347] Rejoinder, para. 175.

[348] Counter-Memorial, para. 272.

331. *First*, the appropriate standard to assess Respondent's conduct regarding FTF arises exclusively under the BIT. The Tribunal does not have jurisdiction to find any "breaches" of the ATA. It may rely on the ATA as an international law instrument in force between Respondent and Claimant's home State in its assessment of the conduct of Claimant and Respondent. It may do so in order to interpret and apply the BIT.[349]

332. *Second*, Claimant's "transfers" are not protected by Article VIII of the BIT. Article VIII(2) of the Venezuela-Canada BIT establishes a clear link in Article VIII between the existence of an investment and the FTF standard. By including this language, Venezuela and Canada sought to limit the type of transfers that would be protected.[350] In the present case, there is no question that the "investment" must have been made in U.S. dollars, that the "returns" mentioned in the same provision must be linked to the "investment" previously made in U.S. dollars, and that the "investment" must have been made in the territory of the Republic.[351]

333. Claimant has not proven that it ever made an investment in U.S. dollars.[352] If the Tribunal were to find that it has jurisdiction *ratione materiae* and *ratione personae*, a detailed analysis of Claimant's alleged investment would still be necessary. Respondent's foreign exchange control regime rests on the assumption that economic actors will transact in the national currency, i.e., Bolivars. This means that if income was generated in local currency, so were the expenses incurred. Therefore, in the absence of any investment made in U.S. dollars, the currency it now seeks, Claimant is barred from relying on Article VIII of the BIT.[353]

334. Furthermore, Claimant's claim that its AAD requests were historically approved for acquiring U.S. dollars is legally unsound. Continuous practice is not a valid criterion under international law to counter the clear language which requires an investment made in U.S. dollars for a claim for U.S. dollars.[354]

335. *Third*, Respondent has not illegally restricted Claimant's transfers of funds and has at all times acted in accordance with the provisions of Article VIII of the BIT. Claimant's case rests on an improper interpretation of the articulation between the provisions of Article VIII and Respondent's Forex regime. The mere existence of a foreign exchange control regime does not constitute a violation of the international obligation under Article VIII.[355] The main relevant feature of this regime is the possibility airlines had to request an authorization to have their in-country earned Bolivars converted into foreign currency, notably U.S. dollars, if they wanted to acquire such currency through CADIVI at the particularly attractive and subsidized proposition exchange rate: 6.3 Bolivars per U.S.

---

[349] Counter-Memorial, paras 273-280.
[350] Counter-Memorial, paras 281-286.
[351] Rejoinder, para. 186.
[352] Rejoinder, para. 189.
[353] Counter-Memorial, paras 287-291.
[354] Rejoinder, para. 188.
[355] Rejoinder, para. 193.

dollar.[356] Claimant is seeking to misuse the protection of the BIT as a safeguard against devaluation risk.[357]

336.  In this connection, the Tribunal must necessarily address the following two questions: (i) whether *Providencia No. 23* provides for a possibility to request the conversion of local currency into foreign currency; whose flipside is Respondent's possibility to approve said request or not; and (ii) if answered in the affirmative, whether Respondent could validly adopt a foreign currency exchange regime with such a feature under the BIT? The answer to both questions is in the affirmative.[358] In any event, the possibility of requesting foreign currency by submitting requests to CADIVI, as provided for in Providencia No. 23, was subject to the availability of currency, as determined by the Central Bank of Venezuela and the directives issued by the National Executive.[359] Further, Respondent could in exercise of its sovereign powers establish a foreign exchange control regime like the one it did.[360]

337.  In the instant case, currency controls are not in breach of Article VIII of the BIT because:

–  Respondent put in place a foreign exchange control regime, which existed well before Claimant started operating the Toronto-Caracas-Toronto route. This foreign exchange regime was subject to a fixed exchange rate that evolved over time, as well as to the availability of foreign currency. The main features of this regime were known to Claimant when it decided to start operations.[361]

–  Claimant has failed to comply with the procedures established by Respondent to authorize the acquisition of foreign currency.[362]

–  The currency controls have not "imprisoned" Claimant's money because it had at all relevant times alternatives to the CADIVI regime to acquire foreign currency. The CADIVI regime was the most attractive one, as it was heavily subsidized by the State. Claimant chose not to use the alternatives, preferring instead to wait for years and then commence the instant arbitration proceedings.[363] Specifically, it could have relied on the Transaction System for Foreign Currency Denominated Securities system ("SITME"), the System for Initial Placement of Bonds denominated in Foreign Currency ("SICOTME"), SICAD II, the Marginal Currency System ("SIMADI") or could have explored non-regulated options available outside the territory of the Republic for the conversion of its Bolivars.[364]

---

[356] Counter-Memorial, para. 271; Rejoinder, para. 176.
[357] Rejoinder, para. 197.
[358] Rejoinder, paras 177-178.
[359] Rejoinder, paras 181-184.
[360] Rejoinder, paras 181-184.
[361] Counter-Memorial, paras 292-296; Rejoinder, paras 194, 199.
[362] Counter-Memorial, paras 75-84, 373-389; Rejoinder, para. 201.
[363] Counter-Memorial, paras 292, 297-300; Rejoinder, para. 202.
[364] Rejoinder, paras 203-207.

–  There was likewise no "imprisonment" since Claimant had always been free to dispose of such moneys as indeed it did.[365]

338.  Claimant did not and could not point to any measures taken by Respondent that positively restrict transfers of funds. As such, Article VIII is not applicable.[366]

339.  *Fourth*, and in any event, Respondent enjoys sovereign prerogatives under international law over its monetary policy to safeguard the national economy.[367] These prerogatives have been codified into the BIT. Article VIII of the BIT carves out the possibility for the enactment and application of "*equitable, non-discriminatory and good faith*" regulation. Such regulation does not contravene the standard of treatment provided for in Article VIII of the BIT. In the case at hand, Respondent was confronted with a situation of ebbing availability of currency, which created a difficult economic environment. In regulating the administration of foreign currency, Respondent issued the *Ley del Régimen Cambiario y sus Ilícitos* ("Law of the Foreign Exchange Regime and its Crimes") of 19 February 2014, which spelled out the priorities for the allocation of the limited resources available in terms of foreign currency. Thus, the treatment given to the pending AAD requests of international airlines was justified as an "*equitable, non-discriminatory and good faith application of measures relating to maintenance of the safety, soundness, integrity or financial responsibility of*" the national economy.[368]

340.  *Fifth*, the appropriate standard to assess Respondent's conduct regarding FTF may not be expanded by invoking the BIT's MFN clause.[369] Under a proper interpretation of the treaty, in accordance with the general rule of interpretation included in Article 31 of the VCLT, the Tribunal cannot ignore the Contracting Parties' inclusion of the expression "*in like circumstances*" into the MFN clause. In the instant case, the Tribunal is not in a position to compare any treatment that may have been accorded to Spanish and Costa Rican airlines with that received by Claimant, as it did not provide any factual elements in this respect.[370]

341.  In any event, Respondent has always processed AAD requests in accordance with its foreign exchange control regimes, i.e., in strict application of the governing legal provisions, namely *Providencia No. 23* and *Providencia No. 124*. Under both legal instruments, air transportation of passengers is considered a public service, and the

---

[365] Counter-Memorial, paras 292, 301-302.

[366] Counter-Memorial, para. 303.

[367] Counter-Memorial, paras 292, 304-307; Rejoinder, para. 208.

[368] Counter-Memorial, paras 308-311 referring to Exh. RL-76, *Decree with Rank, Value and Force of Law of the Exchange Regime and its Crimes No. 798, published in Extraordinary Official Gazette No. 6.126*, dated 19 February 2014, Article 6 and Exh. RL-77, *Decree with Rank, Value and Force of Law of the Exchange Regime and its Crimes No. 1.403 (as amended in November 2014)*, published in Extraordinary Official Gazette No. 6.150, dated 18 November 2014, Article 6, and Exh. RL-78, *Decree with Rank, Value and Force of Law of the Exchange Regime and its Crimes No. 2.167 (as amended in December 2015)*, published in Extraordinary Official Gazette No. 6.210, dated 30 December 2015, Article 8; quoting also Exh. C-1 (BIT), Article VIII; Rejoinder, para. 209.

[369] Rejoinder, para. 211.

[370] Counter-Memorial, paras 315-316 quoting Exh. C-1 (BIT), Article III; Rejoinder, para. 212 referring to Exh, RL-80, *Içkale İnşaat Limited Şirketi. v. Turkmenistan*, ICSID Case No. ARB/10/24, Award, dated 8 March 2016, paras 328-329.

administration of foreign currency by CADIVI was always subject to currency availability. Spanish and Costa Rican airlines continued to fly to and from Caracas long after Claimant decided to abandon the Toronto-Caracas-Toronto route. As such they are not suitable comparators for the "*in like circumstances*" element of the MFN clause. In any event, Claimant has not made any particularized allegation that such airlines were paid within the three-month window it suggests is the standard.[371]

342. In addition, *Providencia No. 23* and *Providencia No. 124* are clear in setting forth the criteria for the processing of AAD requests from airlines operating in the country. Neither Providencia provides for any time-limit for the processing of AAD requests. No such time-limit can be found elsewhere in the Venezuelan legal framework.[372]

343. In its Reply, Claimant had abandoned its reliance on the MFN imported timeframes and is instead focused on the "*without delay*" element of the standard. The question of delay is a false question. As has been established, the 15 AAD requests were rejected by operation of the administration's negative silence. Such rejection operated four months after the submission of the requests and therefore renders the question of delays moot.[373]

344. Therefore, Claimant failed to meet its burden of proving that, under the applicable standard of the BIT, Respondent had incurred in any liability with regard to the FTF guarantee.[374]

## 2.2    *The Tribunal's analysis*

### (i)    *The issue*

345. The *issue* is whether Respondent breached its FTF obligations under the BIT by failing to approve Claimant's AAD requests to convert its bolivar-denominated proceeds into U.S. dollars for repatriation (see *supra* paras 320 and 330).

346. To address this issue, the Tribunal will proceed as follows:

   – *First*, it will set out the FTF requirements of Article VIII of the BIT and determine whether Claimant's FTF claim falls within the scope of that provision (Section (ii)).

   – *Second*, it will address whether Respondent has violated Article VIII of the BIT (Section (iii)).

---

[371] Counter-Memorial, para. 317.

[372] Counter-Memorial, paras 318-320 referring to Exh. C-9 / R-11 (Providencia No. 23) and Exh. C-12, CADIVI Providencia No. 124, published in Extraordinary Official Gazette No. 6.122, dated 23 January 2014 ("Providencia No. 124").

[373] Rejoinder, para. 213 referring to Exh. RL-54, Organic Law of Administrative Procedures, published in Extraordinary Official Gazette No. 2.818, dated 1 July 1981 ("LOPA"), Articles 4, 60.

[374] Counter-Memorial, para. 321; Rejoinder, para. 214.

&ndash;  *Third*, it will consider, to the extent necessary, other arguments of the Parties relating to the alleged violation of Claimant's right to exchange and repatriate its bolivar-denominated proceeds (Section (iv)).

&ndash;  *Fourth*, it will conclude (Section (v)).

*(ii)    Article VIII of the BIT*

347.   At the outset, the Tribunal notes that Respondent objects to the Tribunal's jurisdiction over the ATA.[375] Indeed, the ATA has a provision on free transfer of funds similar to that of Article VIII of the BIT.[376]

348.   The Tribunal has already decided that its jurisdiction is based on the BIT itself (see *supra* para. 204). It has also determined that the ATA does not displace the BIT; quite the contrary, the ATA is made relevant and decisive for the present dispute by Article XII(7) of the BIT, which requires this Tribunal to "*decide issues in dispute in accordance with* [the BIT] *and applicable rules of international law*" (see *supra* para. 202).   As Respondent submits, such an agreement can therefore be relied upon to adjudicate the Parties' conduct.[377] This being said, the Tribunal is called upon to find or reject international liability under the BIT alone.

349.   The Parties disagree on the proper interpretation of Article VIII of the BIT and, in particular, whether it covers Claimant's AAD requests.[378] In order to decide this question, the Tribunal will first set out Article VIII and determine its scope and conditions in accordance with the rules of treaty interpretation of Article 31 of the VCLT (see *supra* para. 222).

350.   Article VIII of the BIT, which deals with the "*Transfer of Funds*", provides as follows:

> *1. Each Contracting Party shall guarantee to an investor of the other Contracting Party the unrestricted transfer of investments and returns. Without limiting the generality of the foregoing, each Contracting Party shall also guarantee to the investor the unrestricted transfer of:*
>
> *(a) funds in repayment of loans related to an investment;*

---

[375] Counter-Memorial, paras 273-280.

[376] Article XXI on "Sales and Transfer of Earnings" provides the following: "*1. Each designated airline shall have the right to engage in the sale of air transportation in the territory of the other Contracting Party directly and, at its discretion, through its agents, subject to the national monetary laws of that Contracting Party. 2. Each designated airline shall have the right to convert and remit to its country on demand earnings obtained in the normal course of its operations. Conversion and remittance shall be permitted at the foreign exchange market rates for current rates prevailing at the time of transfer and shall not be subject to any charges except normal service charges collected by banks for such transactions. Such transfers of earnings shall be carried out on the basis of reciprocity in accordance with the national legislation in effect at the time of the transfer in each country, under legislative and regulatory conditions no less favourable than those applied to any other foreign airline operating international air services to and from the territory of the other Contracting Party*." See Exh. C-5 (ATA).

[377] Counter-Memorial, para. 277.

[378] Claimant (Reply, paras 85-104); Respondent (Rejoinder, para. 186).

*(b) the proceeds of the total or partial liquidation of any investment;*

*(c) wages and other remuneration accruing to a citizen of the other Contracting Party who was permitted to work in a capacity that is managerial, executive or involves specialized knowledge in connection with an investment in the territory of the other Contracting Party;*

*(d) any compensation owed to an investor by virtue of Articles VI or VII of the Agreement.*

*2. Transfers shall be effected without delay in the convertible currency in which the capital was originally invested or in any other convertible currency agreed by the investor and the Contracting Party concerned. Unless otherwise agreed by the investor, transfers shall be made at the rate of exchange applicable on the date of transfer.*

*3. Neither Contracting Party may require its investor to transfer, or penalize its investors that fail to transfer, the returns attributable to investments in the territory of the other Contracting Party.*

*4. Notwithstanding paragraphs 1, 2 and 3, a Contracting Party may prevent a transfer through the equitable, non-discriminatory and good faith application of its laws relating to:*

*(a) bankruptcy, insolvency or the protection of the rights of creditors;*

*(b) issuing, trading or dealing in securities;*

*(c) criminal or penal offenses;*

*(d) reports of transfers of currency or other monetary instruments; or*

*(e) ensuring the satisfaction of judgments in adjudicatory proceedings.*

*5. Paragraph 3 shall not be construed to prevent a Contracting Party from imposing any measure through the equitable, non-discriminatory and good faith application of its laws relating to the matters set out in subparagraphs (a) through (e) of paragraph 4. Notwithstanding paragraphs 1, 2 and 3 and without limiting the applicability of paragraph 4, to a Contracting Party may prevent or limit transfers by a financial institution to, or for the benefit of, an affiliate of or person related to such institution, through the equitable, non-discriminatory and good faith application of measures relating to the maintenance of the safety, soundness, integrity or financial responsibility of financial institutions.*

351.    *First*, Article VIII is a typical transfer clause found in BITs, providing for the possibility of a free transfer of funds, and granting investors important freedoms related to their investments and the resulting benefits. Thus, it is an imperative right for the investor itself.[379]

352.    However, contrary to Claimant's view, this right is not absolute.[380] While the text of Article VIII speaks of a right that is mandatory, i.e., "[e]*ach Contracting Party shall guarantee to an investor of the other Contracting Party the unrestricted transfer of investments and returns*"[381], the same text provides for the possibility of preventing a transfer by the host State Contracting Party, i.e., "*a Contracting Party may prevent a transfer through* […]"[382], "*a Contracting Party may prevent or limit transfers by* […]"[383]. Indeed, there is a competing interest contemplated by Article VIII and that is the right of host States to control such transfers, arguably in an attempt to prevent immediate capital flight that may have a negative impact on States, particularly in relation to their foreign currency reserves. This competing right was recognized by the tribunal in *Rusoro Mining v. Venezuela*, which dealt with the same provision and found that:

> *576. Art. VIII.1 and 2 of the BIT guarantee investors that they will be able to transfer funds related to their investments and returns without delay, in a convertible currency and at the exchange rate prevailing at the date of transfer.*
>
> *577. Provided that this triple guarantee is complied with, the BIT does not impose restrictions on the manner in which Contracting States decide to regulate their exchange control regime. States have the choice of abolishing all exchange control restrictions, of establishing certain limits or of submitting all foreign currency transactions to administrative control.*
>
> *578. After 2010 the Bolivarian Republic has chosen to impose a stringent exchange control mechanism, in which residents in Venezuela must acquire foreign currency via an administrative authorization, must sell a high percentage of foreign currency earned to the BVC, and in which the Official Exchange rate is established by fiat of the BVC. Each of these choices is a policy decision, which the Bolivarian Republic is empowered to adopt exercising its monetary*

---

[379] Exh. CL-8, *Continental Casualty Co. v. Argentine Republic,* ICSID Case No. ARB/03/9, Award, 5 September 2008 ("Continental Casualty"), para. 239 ("*This type of provision is a standard feature of BITs: the guarantee that a foreign investor shall be able to remit from the investment country the income produced, the reimbursement of any financing received or royalty payment due, and the value of the investment made, plus any accrued capital gain, in case of sale or liquidation, is fundamental to the freedom to make a foreign investment and an essential element of the promotional role of BITs. On the other hand, the Treaty terms show that such freedom is not without limit.*")

[380] Claimant refers to Exh. CL-10, Transfer of Funds, UNCTAD, UNCTAD Series on Issues in International Investment Agreements 6 (2000) ("UNCTAD Series"), noting that the free transfer is "*normally of an absolute rather than relative nature*". See Memorial, para. 112. The Tribunal does not disagree with this statement, but this does not override the clear wording of Article VIII of the BIT.

[381] Article VIII(1) of the BIT, Exh. C-1.

[382] Article VIII(4) of the BIT, Exh. C-1.

[383] Article VIII(6) of the BIT, Exh. C-1.

*sovereignty, and which is compatible with the guarantees offered to protected investors in the BIT. Art. VIII simply requires that if a protected investor requests foreign currency in relation to its investment or returns, the application must be approved without delay, the funds delivered in convertible currency and at the Official Exchange Rate prevailing at the date of transfer.*[384]

353. The Contracting Parties to the BIT thus intended to allow the host State to restrict an investor's right to freely transfer funds in certain situations. In the present case, this means that, while Claimant has the right to freely transfer or repatriate its funds – indeed, such right was an incentive for its initial investment in Venezuela – this right is not absolute, but subject to the restrictions imposed by Respondent. This does not imply that authorization of free transfers is at the discretion of the host State or that the exercise of the host State's regulatory power should be in any way capricious or discriminatory. The BIT is clear that any restrictions be made in accordance with the provisions of Article VIII itself, and in particular paragraphs (4) to (6) of that provision, which refer to "*equitable, non-discriminatory and good faith application of its laws*" (see above para. 350).

354. The freedom of Contracting States (here, Venezuela) to regulate their foreign exchange control regime is recognized also in Article XII(1) of the ATA which provides that "*the right to engage in the sale of air transportation in the territory of the other Contracting Party*" is "*subject to the national monetary laws of that Contracting Party*" and in Article XII(2) of the ATA which provides that "[s]*uch transfers of earnings shall be carried out* […] *in accordance with the national legislation in effect at the time of the transfer in each country*" (see *supra* fn 376).

355. *Second*, the wording of Article VIII(1) of the BIT is clear in that it covers both "*transfer of investments and returns*".[385] Article I(i) of the BIT defines "returns" as "*all amounts yielded by an investment and in particular, though not exclusively, includes profits, interest, dividends, royalties, fees, other current income or capital gains*". This means that the type of transfers covered by the BIT must necessarily be related to the investment, i.e., transfer of the investment itself or of income "*yielded by an investment*".[386]

356. The Tribunal found that Claimant had made an investment protected by the BIT (see *supra* para. 306). This investment comprises assets categorized in Article I(f) of the BIT and constitutes an investment in the legal sense, made in accordance with Venezuela law (see *supra* para. 300). It includes the following: Claimant's claims to receive money in U.S. dollars allegedly in exchange for the bolivar-denominated proceeds it held in its Venezuelan Bank, proceeds that are an integral part of its economic and commercial activity in Venezuela, cash deposited in its Venezuelan bank account (see *supra* para. 302), and in a broader legal sense, the establishment of its local branch, the deposit of U.S.$ 50,000 as equity, its airline operations and its economic activity, including the generation of rights of value, in particular the ticket sales (see *supra* para. 304). As such,

---

[384] Exh. CL-12 (Rusoro), paras 576-578.
[385] See also Reply, para. 86.
[386] See also Counter-Memorial, paras 284-286; Rejoinder, para. 186.

the Tribunal considers that "*transfer of investments and returns*" under Article VIII of the BIT covers Claimant's claims relating to the currency exchange and repatriation of funds derived from ticket sales in Venezuela and, in particular, the claims brought before this Tribunal, i.e., in relation to the 15 AAD requests.

357.  *Third*, as to whether Claimant's claim for U.S. dollars falls under the BIT, the Tribunal refers to the following:

    –    The wording of Article VIII(2), which considers the type of currencies available for transfer, namely, "[*t*]*ransfers shall be effected without delay in the convertible currency in which the capital was originally invested or in any other convertible currency agreed by the investor and the Contracting Party concerned*" and "[u]*nless otherwise agreed by the investor, transfers shall be made at the rate of exchange applicable on the date of transfer*".[387]

    –    The Parties' past practice in relation to the exchange of bolivar-denominated proceeds from ticket sales into U.S. dollars in accordance with the foreign exchange system in force in Venezuela (i.e., the CADIVI system, which in fact defined only two currencies – the bolivar and the U.S. dollar – and whose application process required Air Canada to apply for foreign currency exchange in U.S. dollar).[388]

358.  Accordingly, the Tribunal finds that Claimant's claim for U.S. dollars in the present case involves "*convertible currency*" within the meaning of Article VIII of the BIT.

359.  *Fourth*, with respect to the exchange rate, the Tribunal notes that the wording of Article VIII(2) is clear in that it is intended to be the applicable rate "*on the date of transfer*".[389] It is understood that this means the rate fixed by the applicable legislation of the host State on the relevant date.[390] Since it is undisputed that no such transfer took place (see *supra* para. 21), the Tribunal will address the relevant rate – which is in dispute between the Parties – when addressing the specific facts relating Claimant's FTF claim below (see *infra* paras 367 *et seq.*).

360.  *Fifth*, an important element of the FTF claim under Article VIII is, of course, the temporal element. Article VIII provides that "[t]*ransfers shall be effected without delay*". It is clear from the wording of the provision that the Contracting States have not set a precise time

---

[387] Exh. C-1 (BIT).

[388] Reply, paras 97-104; C-PHB, para. 34; Tr. Day 1, 12:16-19, 58:23-59:7; Blanco WS, para. 33 ("*After the granting of an ALD, the exchange operator would block the necessary amount in bolivars in the applicant's funds to acquire the foreign currency approved. After converting them into US dollars, it transferred them to the account indicated by the requesting airline*."). See also, C-31 / RL- 52 (Exchange Agreement No. 1), Article 6; Exh. C-144 CENCOEX's website; Exh. C-11, CADIVI Request for Registration and Authorization for Currency Acquisition Allocated to International Air Carriers Form). At this point, the Tribunal clarifies that the Parties' practice in relation to the 91 AADs is not referred to as support for an investment made in U.S. dollars, but as support for the U.S. dollar being a convertible currency under the BIT. *Cf.* Rejoinder, paras 188-191.

[389] See also Article XXI(2) of the ATA which provides that "[c]*onversion and remittance shall be permitted at the foreign exchange market rates for current rates prevailing at the time of transfer*", Exh. C-5.

[390] Exh. CL-10 (UNCTAD Series), p. 34.

limit within which a transfer must be effected, nor have they defined the phrase "*without delay*" in the BIT. It is explicit, however, that the time limit begins to run on the day on which the request for transfer was made.

361.    The following facts seem to be relevant in the context of the time taken to process AAD requests:

–    There have been recurring delays in the processing of Claimant's AAD requests, but as Claimant submits, the system has worked.[391] In the context of the 91 AAD requests approved by CADIVI and on file,[392] the time frame for completing the necessary formalities appears to have ranged between one to seven months.[393]

–    During the Hearing, Respondent's witness, Mr. Blanco, an employee of CADIVI during the time relevant to the dispute, testified that CADIVI would at best scenario make its decisions within three weeks once it had all the relevant documents.[394]

–    The law governing CADIVI's practice does not set a time limit for issuing a formal decision on the requests for AADs. The *Organic Law of Administrative Procedures* ("LOPA") – on which Respondent relies[395] and which applies to all administrative procedures – states that in principle, all petitions must be resolved in four months and if no decision is rendered within that time period the *silencio administrativo negativo* applies.[396] Accordingly, under the LOPA, the interested party may assume that the application has been denied and can start appeal proceedings (following the four-month lapse), arguably in an effort to prevent the State from delaying a decision forever without providing any justification.[397] It does not *per se* set a firm deadline for decisions and thus cannot be relied on to determine the temporal element of Article VIII of the BIT.

362.    It is clear from the above that no consideration was given to defining the timeframe for the implementation of a transfer in the BIT as it is specific to the foreign exchange system in place in the Contracting State. This means that the time frame should reflect the period

[391] Reply, para. 106; see also Pittman WS, para. 23.
[392] Claimant confirms that only six out of 91 AADs are in the record and on which its expert, Mr. Rosen, relies for the purposes of its damages' assessment.
[393] See Exhs FTI-7 to FTI-12, Currency Acquisition Requests dated April to September 2012; FTI Report, para. 3.9 and Figure 4.
[394] Tr. Day 2, 155:1-8.
[395] Rejoinder, para. 379.
[396] Exh. RL-54 (LOPA), Article 4 provides as follows: "*In the cases in which a public administration body does not resolve a matter or recourse within the corresponding periods, it shall be considered that it has resolved it negatively and the interested party may attempt the next immediate recourse, unless expressly provided otherwise. This provision does not relieve the administrative bodies, or their representatives, of the responsibilities that are attributable to the omission or delay*". Further, Article 60 states as follows: "*Processing and concluding files shall not exceed four (4) months, except if there are exceptional circumstances, whose existence shall be recorded, with an indication of the extension granted*".
[397] Exh. RL-54 (LOPA), Article 9 states as follows: "*The administrative acts of individual nature need to be reasoned, save for those of mere procedure or express provision in the Law. To that effect, they shall refer to the facts and the legal basis of the act.*" See also Article 94 on "Reconsideration Recourse".

of time normally required to complete the necessary formalities related to the requested transfer. In the present case, this period appears to be between:

- <u>a few weeks</u> from when CADIVI had all the relevant documents according to the uncontradicted testimony of Mr. Blanco,[398] and

- <u>one to seven months</u>, which corresponds to the actual time required to repatriate the six AAD requests on file from the 91 approved ones submitted in 2012.[399]

363. From the foregoing, it can be inferred that the review of an AAD request should normally be short but may take up to seven months (as was the case with some of the 91 approved AAD requests). The use of the maximum time does not necessarily mean that there has been a violation that rises to the level of a violation of international treaty law. However, repeated delays without explanations could indicate such violation. This is true regardless of whether a delay can be attributed to a State's right to take policy decisions in this context. Accordingly, the temporal element of Article VIII of the BIT must be assessed in light of the specific facts of each case.

364. In this context, the Tribunal does not consider it appropriate to decide Claimant's MFN argument to adopt a specific timeframe of two to four months from third country BITs.[400]

365. *Finally*, and in light of the foregoing, the Tribunal finds that Claimant's FTF claim falls within the scope of Article VIII of the BIT and the claim must be decided in accordance with the Tribunal's interpretation of that provision.

*(iii)    Did Respondent violate Article VIII of the BIT?*

366. The Parties dispute whether Respondent prevented Claimant from repatriating its funds in connection with the 15 AAD requests, in violation of Article VIII of the BIT.[401] To decide this question, the Tribunal will first set out the relevant and undisputed facts and then assess whether Respondent is liable based on its interpretation of Article VIII (see *supra* paras 347-365).

      a.   <u>The facts</u>

367. The Tribunal recalls the following pertinent facts:

- <u>On 5 February 2003</u>, the then President Hugo Chávez, created, by separate decree, the *CADIVI* or *CADIVI Commission*, a collegial body composed of five members also appointed by the President of Venezuela. The CADIVI administers the legal exchange of currency in Venezuela under the terms established in Exchange Rate Agreements between the Venezuelan Central Bank and the Ministry of Finance.[402]

---

[398] Tr. Day 2, 155:1-8.
[399] See FTI Report, para. 3.9 and Figure 4, as well as Exhs FTI 7 to FTI 12 comprising the six approved AAD requests that are in the record of these proceedings.
[400] See Reply, paras 122-125.
[401] Claimant (Reply, paras 105-121); Respondent (Rejoinder, paras 194-209).
[402] Exh. C-10, (Decree No. 2,302), Article 2. See also C-PHB, para. 12; R-PHB, para. 92.

At that point in time, The CADIVI Exchange rate, representing the official fixed exchange rate that changed from time to time, was fixed at Bs. 1,600 per U.S. dollar.[403]

On the same day, the Central Bank and the Ministry of Finance signed *Exchange Agreement No. 1*, pursuant to which (i) the purchase and sale of foreign currency in Venezuela was centralized in the Central Bank;[404] (ii) the Central Bank and the Ministry of Finance would set the official exchange rate for certain sectors and activities;[405] and (iii) the Central Bank would be authorized to sell foreign currency at the official exchange rate and at the request of the CADIVI.[406]

– On 7 April 2003, CADIVI issued *Providencia No. 23* for the purpose of "*Regulating Authorization for Currency Acquisition by International Air Transportation Providers in Venezuela*". Providencia No. 23 established the procedure that foreign airlines had to follow in order to acquire foreign currency at the exchange rate established by the Central Bank and the Ministry of Finance in order to repatriate their proceeds to their home countries.[407]

– In June 2013, CADIVI and the Executive Branch created the "Alternative System for the Acquisition of Currency" ("SICAD 1") which established a periodic system of auctions in order to acquire foreign currency for different sectors of the economy. The rate of SICAD 1 was originally set at 11,36 per U.S. dollar.[408]

---

[403] Econ One Report, paras 27-28; Counter-Memorial, para. 343. On 9 February 2004 it was fixed at Bs. 1,920 per U.S. dollar and on 3 March 2005 at Bs. 2,150 per U.S. dollar. On 9 February 2013, the CADIVI rate was fixed at Bs. 6.3 per U.S. dollar. See Exh. RL-56, Exchange Agreement No. 14, published in Official Gazette No. 40.108, dated 8 February 2013.

[404] Exh. C-31 / RL- 52 (Exchange Agreement No. 1), Article 1 ("*The Central Bank of Venezuela shall centralize the purchase and sale of foreign currency in the country*") and Article 2 ("CADIVI "*shall be in charge of coordinating, administering, controlling and setting any requirements, procedure and restrictions required for the performance of this Foreign Exchange Agreement*"). See also C-PHB, para. 13.

[405] Exh. C-31 / RL- 52 (Exchange Agreement No. 1), Chapters II and III. In accordance with Article 26, "[t]*he acquisition of foreign currency by natural and legal persons for transfer, remittances, and payment of imports of goods and services, as well as the capital and interest of duly registered external private debt, will be limited and subject to the requirements and conditions established for that purpose by [...] (CADIVI).*" See also C-PHB, para. 13.

[406] Exh. C-31 / RL- 52 (Exchange Agreement No. 1), Chapter IV. See also C-PHB, para. 13.

[407] Exh. C-9 / R-11 (Providencia No. 23), Article 1 provides as follows: *This order shall regulate the handling and processing of requests for an Authorization for Currency Acquisition (AAD) by foreign providers of international air passenger, cargo, and mail transportation service under authorization by the National Executive.*" Article 2 states as follows: "*foreign international air transportation companies, duly authorized by the National Civil Aviation Institute, may acquire the foreign currency necessary for them to remit to their home offices, in their home country, the net balance of their revenue from ticket sales, cargo and mail freight at each sales point minus all costs, expenses and taxes payable by them in Venezuela for their adequate and safe operation*". See also C-PHB, paras 14-15; R-PHB, para. 92.

[408] Exh. RL-57, Exchange Agreement No. 21, published in Official Gazette No. 40.134, dated 22 March 2013; Econ One Report, para. 44.

–   Between July 2004 and November 2012, Air Canada submitted 91 AAD requests for the exchange and repatriation of bolivar-denominated funds into U.S. dollars. CADIVI had approved all 91 AADs.[409]

–   Between September 2013 and January 2014, Air Canada submitted 15 AADs for the repatriation of U.S.$ 50.6 million in proceeds that it had generated from ticket sales in Venezuela between October 2012 and December 2013.[410]

–   Between 21 October 2013 and 6 November 2013, CADIVI sent Air Canada requests for additional information on five (of the 15) AADs that covered the period between October 2012 and February 2013. Specifically, CADIVI requested Air Canada to provide the following: (i) a detailed report explaining the reasons for remittance increases between the requesting month and the same month in the previous year; (ii) the tariff structure for the requesting month and the same month in the previous year; and (iii) a summary table showing the quantities of tickets sold in the requesting month and the same month in the previous year, indicating the rate applied in each case. CADIVI suspended the processing of these five AADs pending Air Canada's response to its requests for information. Air Canada responded by providing CADIVI with the requested information between 5 and 22 November 2013. After receiving the responses from Air Canada, CADIVI did not request any additional information from Air Canada regarding the five AADs, nor did it provide any indication that the information provided by Air Canada was complete. Instead, it changed the status of these five AADs in its system back to "*under analysis*".[411] It is undisputed that all 15 AAD requests remained "*under analysis*" in CADIVI's system at least until 2018[412] and that CADIVI never issued a decision to accept or reject these AADs.[413]

–   In November 2013, through Decree No. 601, the Executive Branch created the Centro Nacional de Comercio Exterior ("CENCOEX"), which succeeded CADIVI in its prerogatives.[414]

–   On 8 November 2013, INAC issued a request for information to ALAV, the Venezuelan Airlines Association.[415]

–   On 24 January 2014, *Providencia No. 124* ("Order Establishing the Requirements and Processing for the Authorization for Currency Acquisition (AAD) by International Air Transportation Providers") entered into force, replacing Providencia No. 23. According to its Article 12, "[t]*he exchange rate applicable*

---

[409] Memorial, para. 47; Pittman WS, paras 23-24; C-PHB, para. 26.
[410] Memorial, para. 58; C-PHB, para. 18.
[411] Babun WS II, para. 8; C-PHB, paras 176-177.
[412] Exh. C-70, Printout from CENCOEX's website showing Air Canada's AAD requests as pending, 2 March 2018; C-PHB, para. 178.
[413] Counter-Memorial, para. 84; Rejoinder, paras 213, 245; Tr. Day 1, 165:12-16.
[414] Exh. RL-58, Decree with Rank, Value and Force of Law No. 601, published in Extraordinary Official Gazette No. 6.116, dated 29 November 2013. See also Counter-Memorial, para. 60.
[415] Exh. C-36, Letter from CADIVI to ALAV, dated 8 November 2013.

*to the operations specified in this Order at the time of the Authorization of currency conducted through the Ancillary Foreign Currency Administration System (SICAD).*" [416] Other than the implementation of another rate, Providencia No. 124 did not substantially alter the requirements or process in connection with the acquisition of foreign currency. [417]

–  In January 2014, representatives of Air Canada met with the President of INAC. Mr. Babún testified that the purpose of the meeting was "*to negotiate how to resolve the Government' failure to grant Air Canada's Authorization for Currency Acquisition requests*". [418]

–  On 23 January 2014, Air Canada informed the public that its "*flights continue operating as normal*" but that "*the issuance of tickets* [has been] *temporarily suspended*". [419]

–  On 27 January 2014, INAC submitted a request for information to Air Canada. [420]

–  On 14 March 2014, according to press reports, President Nicolás Maduro stated in connection with the repatriation of funds that "[w]*e will be making payment as we should*". [421]

–  On 17 March 2014, Air Canada informed INAC of its decision to suspend its flights to Caracas from the same date until further notice, due to the unrest and challenges in conducting business in Venezuela, including the possibility of repatriating its funds from Venezuela. It indicated that its office in Caracas would remain open to assist passengers with tickets out of Venezuela. It further stated that it would monitor the situation and reassess the reprogramming of its flights with a view to resuming operations on this route once the situation in Venezuela had stabilized. [422]

–  On 19 March 2014, INAC acknowledged receipt of the notification from Air Canada that it intended to suspend its flights to Caracas. INAC stated that relations between Air Canada and Venezuela were subject to the ATA and that the ATA provided for a specific termination regime. INAC also stated that Air Canada's motivations for terminating the flights could be resolved through the dispute settlement mechanism of Article XVIII of the ATA. Finally, INAC reminded Air Canada that air transport is a public service and it is up to the State to decide when a private entity ceases to provide such a service. In particular, it stressed that

---

[416] Exh. C-12 (CADIVI Providencia No. 124). See also Exh. RL-59, Exchange Agreement No. 25, published in Extraordinary Official Gazette No. 6.122, Article 1.e.
[417] Counter-Memorial, para. 61.
[418] Babun WS, para. 15; C-PHB, para. 181.
[419] Exh. R-45, Printout if Air Canada Venezuela's Twitter webpage, dated 23 January 2014.
[420] Exh. C-60, Letter from INAC to Air Canada, dated 27 January 2014.
[421] Exh. C-20, La Razón press article dated 14 March 2014.
[422] Exh. C-49, Letter from Air Canada to the President of INAC, dated 17 March 2014; RfA, para. 29; Memorial, para. 67.

foreign companies that comply with the Venezuelan legal framework will be protected and their investments encouraged, but those that choose to break the law will not benefit from exemptions or privileged treatment.[423]

−  Air Canada clarified to INAC on 26 March 2014 that it had notified the suspension of the service, but that Air Canada could not terminate the ATA because it was an intergovernmental treaty.[424]

−  In late March 2014, Venezuela announced that it would allow airlines to repatriate their revenues.[425]

−  On 28 April 2014, Air Canada wrote to the President of INAC requesting a meeting to clarify any misunderstandings regarding Air Canada's suspension notice of 17 March 2014 and the repatriation of its funds.[426]

−  On 28 May 2014, Air Canada wrote to the Venezuelan Vice President to discuss the suspension of its operations in Venezuela and to clarify any misunderstandings in relation to the suspension notice of 17 March 2014. Air Canada clarified that it had never been involved in the domestic or foreign affairs and therefore had not publicly commented the restriction to transfer its funds necessary to maintain operations. Air Canada stated that despite the suspension, it remained committed to its operations and investments in Venezuela and intended to return once the situation was regularized. To this end, it indicated the hope to find a workable solution to restore operations. Finally, Air Canada indicated its intention to meet with government officials to resolve the issue and negotiate a plan for moving forward.[427]

−  On 13 June 2014, IATA's Director General and CEO sent a letter to the President of Venezuela "*on behalf of the airline members of the* [IATA] *that operate flights to Venezuela*", concerning the members' "*blocked monies from airline ticket sales in Venezuela*" and "*a number of serious concerns*" expressed from them in this respect.

−  Air Canada wrote to the Minister for Popular Power, Air and Water Transport, on 10 July 2014, in relation to the suspensions of Air Canada operations in Venezuela. Air Canada noted that it had contacted the Vice President directly but had not received a response. Air Canada referred to agreements reached on 3 July 2014 between the Government and 14 airlines regarding their requests for currency exchange in connection with their operations in Venezuela. It described this event as encouraging and indicated its intention to move Air Canada's operations forward in Venezuela. Air Canada reiterated the fact that it was unable to maintain its operations due to the prevention of repatriation of its funds and

[423] Exh. C-45, Letter from INAC to Air Canada, dated 19 March 2014; Memorial, para. 75.
[424] Exh. C-46, Letter from Air Canada to INAC, dated 26 March 2014; Memorial, para. 75.
[425] Memorial, para. 78.
[426] Exh. C-91, Letter from Air Canada to the President of INAC, dated 28 April 2014; Memorial, para. 83.
[427] Exh. C-56, Letter from Air Canada to the Vice-President of Venezuela, dated 28 May 2014; Memorial, para. 84.

indicated its hope to find a viable solution in this regard. Finally, Air Canada stated its willingness to meet and negotiate a mutually acceptable agreement.[428]

– Air Canada wrote to the Minster for Popular Power of Economic, Finance and Public Banks on 3 October 2014, reiterating what it had already written to the Minister for Popular Power, Air and Water Transport and noting its willingness to meet and resolve the issue of repatriating Air Canada's funds. Air Canada also noted that while its proposal was the preferred option, it would continue to consider and assess its options in this regard, including legal options.[429]

– Meanwhile, between May and October 2014, Venezuela entered into agreements with other international airlines and negotiated settlements regarding their outstanding AADs. Under these agreements, Venezuela had approved their AAD requests for U.S. dollars corresponding to ticket sales in the country in 2012 and 2013, using the exchange rate of 6.3 bolivars.[430]

– On 15 June 2016, Air Canada provided Venezuela with a written notice of dispute pursuant to Article X(II) of the Canada-Venezuela BIT.[431]

368. Further, the Tribunal refers to the following procedure, set forth by both Parties, which applies with respect to AAD requests under the CADIVI system in effect at the relevant time. The procedure is largely undisputed save for the relevance of the LOPA and the condition for currency availability to which Respondent invariably refers.

– *First, registration with RUSAD:* Before an international airline could apply for an AAD, it first had to register with the Currency Administration System Users Registry ("RUSAD").[432] To maintain an active status in the RUSAD, the user was required to submit (i) its Tax Information Registration (RIF) and the three most recent income tax, Tax on Corporate Assets, and Value-Added Tax returns; (ii) certificates of good standing from IVSS and the National Institute of Education

---

[428] Exh. C-57, Letter from Air Canada to the Minister of Popular Power, Air and Water Transport, dated 10 July 2014; Memorial, para. 85.

[429] Exh. C-58, Letter from Air Canada to the Minister of Popular Power of Economy, Finance and Public Banks, dated 3 October 2014; Memorial, para. 86.

[430] Exh. C-52, Gobierno venezolano cancela deuda a seis aerolíneas, ULTIMA HORA, 26 May 2014; Exh. C-53, El Gobierno de Venezuela salda deudas con seis aerolíneas internacionales, ABC INTERNACIONAL, 27 May 2014; Exh. C-54, Venezuela Reaches Deals With Six Airlines to Pay Dollar Debt, BLOOMBERG, 26 May 2014; Exh. C-149, Letter from United Airlines to the Minister of Aquatic and Aerial Transportation, 29 July 2014; Exh. C-150, Letter from TAP Portugal to the Minister of Aquatic and Aerial Transportation; Exh. C-151, Letter from Cubana de Aviacion S.A. to CENCOEX, 10 October 2014; Exh. C-152, Letter from the Minister of Aquatic and Aerial Transportation to Lufthansa, 29 May 2014; Exh. C-153, Tiara Air's Clear and Irrevocable Declaration of Will, 4 June 2014; Exh. C-154, TAM Lineas Aereas' Clear and Irrevocable Declaration of Will, 22 July 2014; Exh. C-155, Aeromexico's Clear and Irrevocable Declaration of Will, 26 May 2014; Exh, C-156, Arubaanse, Clear and Irrevocable Declaration of Will, 26 May 2014; Exh. C-157, Insel Air International's Clear and Irrevocable Declaration of Will, 26 May 2014; Exh. C-158, Aerolineas Argentinas' Clear and Irrevocable Declaration of Will, 16 May 2014. See also C-PHB, para. 83.

[431] Exh. C-14 (Notice Letter). See also Exh. C-1 (BIT).

[432] Exh. C-10 (Decree No. 2,302), Article 7. See also, Exh. C-9 / R-11 (Providencia No. 23), Article 3; Counter-Memorial, paras 44-46; C-PHB, para. 166; R-PHB, para. 93.

and Cooperation; and, if applicable, (iii) the most recent tax return.[433] The certificate of good standing from IVSS was only valid for one month. Therefore, each time the airline filed an AAD application, it had to obtain a new certificate from IVSS to reactivate its registration with RUSAD unless the airline filed multiple AAD applications within the same month.[434]

–   *Second, submission of AAD request:* Once registered, the airline received an AAD form from RUSAD, which it was required to "*file with the authorized currency exchange operator* [...] *along with a sworn statement listing the* [airline's] *income, costs, expenses, taxes and the monthly net balance to be remitted to their parent company.*"[435] The airline was required to submit three copies of each AAD request (one for the exchange operator, one for CADIVI, and one for the user), with each page numbered and organized with dividers.[436] The detailed and complete list of the documents required by CADIVI was freely accessible from CADIVI, together with the guidelines regarding the CADIVI procedure and the manner in which the documentation had to be compiled and submitted. CADIVI issued two sets of such guidelines as per Article 3(5) of Decree No. 2,302 ("CADIVI Guidelines").[437]

–   *Third, the transmission of the AAD file by the exchange operator to CADIVI:* The Central Bank of Venezuela authorized banks and certain other entities to act as exchange operators in charge of receiving AAD requests and carrying out purchase and transfer of foreign currency, once approved by CADIVI.[438] The exchange operator, in this case Banco Mercantil, would receive the AAD requests, certify that the airline had submitted original copies of documents or originals when required, and maintain records of all AAD requests received and completed.[439] The exchange operator would then forward the AAD file to CADIVI.[440]

–   *Fourth, assigning an AAD request for review by a CADIVI analyst:* CADIVI would assign the ADD request to an operational analyst for review.[441] According to Respondent, the procedure commenced upon receipt of the request by CADIVI,

---

[433] Exh. C-10 (Decree No. 2,302), Article 7; Exh. C-9 (Providencia No. 23), Article 3.

[434] C-PHB, paras 166-167.

[435] Exh. C-9 / R-11 (Providencia No. 23), Article 6; C-PHB, para. 167; R-PHB, para. 96.

[436] Exh. R-12, Guidelines of the Norms and Procedures for the Submission of Documents Before the Currency Administration Commission (CADIVI) Through the Authorized Exchange Operator dated January 2009 ("January 2009 CADIVI Guidelines"), Section III(2).

[437] Exh. R-12 (January 2009 CADIVI Guidelines); Exh. R-13, Guidelines of the Norms and Procedures for the Submission of Documents Before the Currency Administration Commission (CADIVI) Through the Authorized Exchange Operator dated April 2011 ("April 2011 CADIVI Guidelines"); R-PHB, para. 97.

[438] Exh. C-10 (Decree No. 2,302), Articles 5, 28; C-PHB, para. 168.

[439] Exh. R-12 (January 2009 CADIVI Guidelines), Section III(2); Exh. C-10 (Decree No. 2,302), Article 5; C-PHB, para. 168.

[440] Exh. C-9 / R-11 (Providencia No, 23), Articles 2 and 6; Blanco WS, para. 13; C-PHB, para. 168; R-PHB, paras 94-95.

[441] C-PHB, para. 169; R-PHB, paras 94-95.

pursuant to Article 48 of the LOPA.[442] CADIVI had to open a specific record accessible to the applicant for each single request received, pursuant to Article 51 of the LOPA.[443]

The CADIVI analyst would first conduct a formal verification, i.e., confirm that all required information and documentation was submitted with the AAD request.[444]

If information was missing, the CADIVI analyst would request the information directly from the airline via email, pursuant to Article 10 of Decree No. 2,302.[445] Mr. Blanco testified that this email would include reference to the legal framework and applicable time-limits.[446] As he also explained, "*if the CADIVI analyst did not issue a request, then no further documents or information were required.*"[447] According to Respondent, the applicant had 15 days to file the relevant documents or requested information pursuant to Article 50 of the LOPA.[448]

CADIVI retained electronic and hard copy records of all documentation related to an AAD request, including any communication between CADIVI and the airline.[449] Thus, all requests for information from CADIVI to the airline would be included in CADIVI's master file for each AAD request.[450] If the airline does not provide the requested information, CADIVI would declare the AAD request to suspended.[451] According to Respondent, a suspension of two months resulted in the termination of the file and rejection of the request in accordance with Article 64 of the LOPA.[452]

- *Fifth, the performance of a financial analysis or verification by a CADIVI analyst:* When or if the requested information was complete, the CADIVI analyst would perform a financial analysis or verification.[453] According to Mr. Blanco, the financial analysis included "*a review of the amounts requested and the documents provided by the international airline,*" as well as a review "*that what was included by the international airline in its request was in accordance with the remittable items allowed by* [Providencia] *No. 23*".[454] After conducting the financial review, the CADIVI analyst could request additional documents or information pursuant

---

[442] Exh. RL-54 (LOPA); R-PHB, para. 93.
[443] Exh. RL-54 (LOPA), Articles 51 and 59; R-PHB, para. 93.
[444] Blanco WS, paras 13, 23-25; Tr. Day 2, 122:9-12; C-PHB, para. 169; R-PHB, para. 96.
[445] Exh. C-10 (Decree No. 2, 302); Blanco WS, para. 28; C-PHB, para. 169; R-PHB, para. 98.
[446] Tr. Day 2, 149:10-25; R-PHB, para. 99. According to Respondent this is confirmed by the requests for additional information sent by CADIVI in relation to five of the 15 AAD requests by Air Canada. See Counter-Memorial, paras 75-84; Exhs R-18 to R-22 (Currency Acquisition Requests dated October 2012 to February 2013); R-PHB, para. 99.
[447] Tr. Day 2, 123:1-4; C-PHB, para. 169.
[448] Exh. RL-54 (LOPA); R-PHB, para. 98.
[449] Tr. Day 2, 121:17-20, 122:3-6; C-PHB, para. 169.
[450] C-PHB, para. 169.
[451] Blanco WS, para. 28; C-PHB, para. 169; R-PHB, para. 98.
[452] Exh. RL-54 (LOPA); R-PHB, para. 98.
[453] Blanco WS, para. 26; Tr. Day 2, 123:10-13; C-PHB, para. 170; R-PHB, para. 100.
[454] Blanco WS, paras 26-27; C-PHB, para. 170; R-PHB, para. 100.

to Article 10 of Decree No. 2.302.[455] In case the financial analysis revealed that a request included amounts that should not have been included, the CADIVI analyst would recalculate the eligible amount, without reverting to the applicant.[456]

According to Respondent, the applicant had 15 days to file the relevant documents or submit the information requested, pursuant to Article 50 of the LOPA. Failure to comply with this deadline meant that the procedure was suspended and a suspension of two months resulted in the termination of the file and rejection of the request in accordance with Article 64 of the LOPA.[457]

The time allocated to or dedicated by CADIVI analysts to review an AAD request was not framed by any specific legal provision. In practice, this phase apparently would take a few days.[458]

The CADIVI analyst would then formulate a recommendation to the CADIVI Commission to approve, partially approve or refuse the AAD request based on his or her formal and financial analysis.[459] Once a recommendation was made, the task of the CADIVI analyst was complete and he or she was neither directly involved with the decision-making by the Commission nor specifically informed of the outcome of such process.[460]

  – *Sixth, the CADIVI Commission's decision to grant, deny or suspend the AAD request:* Mr. Blanco stated that the CADIVI Commission would issue a written decision granting, denying, or suspending an AAD request.[461] In practice, the CADIVI Commission would at best case rule within three weeks after receipt of the CADIVI analyst's recommendation.[462] The decision would also be recorded in CADIVI's internal electronic system.[463] Mr. Blanco confirmed that the CADIVI Commission's decision would be "*motivated, or explained and supported, so that an applicant could challenge that decision or, in the case of a suspension, provide additional information.*"[464] If the Commission denied an AAD request, then it would notify the airline by email,[465] unless, according to Respondent, the AAD request was refused by operation of Article 4 of the LOPA.[466] The Commission would also notify the airline if it suspended the

---

[455] Exh. C-10 (Decree No. 2,302); R-PHB, para. 100.
[456] Tr. Day 2, 151:19-152-18; R-PHB, para. 102.
[457] Exh. RL-54 (LOPA); R-PHB, para. 100.
[458] Blanco WS, para. 34; Tr. Day 2, 150:1-13; R-PHB, para. 103.
[459] Blanco WS, para. 29; R-PHB, paras 104-105.
[460] R-PHB, para. 105.
[461] Blanco WS, para. 30; Tr. Day 2, 126:2-10; C-PHB, para. 171; R-PHB, para. 106.
[462] Tr. Day 2, 155:1-8; R-PHB, para. 108.
[463] Tr. Day 2, 125:19-21; C-PHB, para. 171.
[464] Tr. Day 2, 127:22-128:1; C-PHB, para. 171.
[465] Blanco WS, para. 31; C-PHB, para. 171; R-PHB, para. 109.
[466] R-PHB, para. 109.

request so that the airline could submit additional information to support its AAD request.[467]

According to Respondent, the CADIVI Commission had up to four months to rule upon an AAD request as from the date of receipt of the request by the same, pursuant to Article 60 of the LOPA. In case no decision was notified to the applicant within that timeframe the AAD request was considered as rejected pursuant to Article 4 of the LOPA. The LOPA does not contain any requirement of form of the decisions to be rendered by CADIVI nor any communication requirements in this connection.[468] In case of refusal, including by operation of Article 4 of the LOPA, the applicant could contest the decision of the CADIVI Commission pursuant to Articles 94 or 97 of the LOPA within 15 days from the decision. The CADIVI Commission had 15 days to rile on a reconsideration recourse. In case it maintained its initial decision, the applicant could file recourse to the Minister of Finance, pursuant to Article 95 and 96 of the LOPA.[469]

Also, according to Respondent, pursuant to Article 3 of Decree No. 2,302, as amended by Decree No. 2,330, Article 8 of Exchange Agreement No. 1, and Article 8 of Providencia No. 124, the CADIVI Commission could only approve an AAD request subject to currency availability established by the Central Bank of Venezuela and the directives issued by the National Executive.[470]

–   *Seventh, upon approval, CADIVI's authorization to purchase U.S. dollars:* If the Commission granted an AAD request, it would issue an authorization to purchase a specified amount of U.S. dollars.[471]

Once approved, the "AAD request" became an "AAD" and in turn, an "ALD", i.e., authorization to liquidate foreign currency. No applicant could acquire any foreign currency without having obtained an AAD that was converted into an ALD.[472]

The CADIVI Commission would notify the exchange operator, in Air Canada's case Banco Mercantil, of the approval.[473] The applicant would order its exchange operator to proceed with the acquisition of the foreign currency from the Central Bank of Venezuela and authorize the operator to debit the bolivars equivalent to the foreign currency to be acquired from a specified bank account held in

---

[467] Blanco WS, para. 31; C-PHB, para. 171.
[468] Exh. RL-54 (LOPA); Rejoinder, para. 237; R-PHB, para. 108.
[469] Exh. RL-54 (LOPA); R-PHB, para. 110. See also Exh. RL-54 (LOPA), Articles 98 and 99 and R-PHB, para. 111.
[470] Exh. C-10 (Decree No. 2,302); Exh. RL-53, Decree No. 2.330, published in Official Gazette No. 37.644, dated 6 March 2003, Article 3; Exh. C-31 / RL-52 (Exchange Agreement No. 1); Exh. C-9 / R-11 (Providencia No. 23); Exh. C-12 (Providencia No. 124); R-PHB, para. 107.
[471] C-PHB, para. 172.
[472] Blanco WS, para. 32; R-PHB, paras 113-114.
[473] C-PHB, para. 172.

Venezuela by the applicant.[474] As Mr. Blanco explained, the exchange operator "*would block the necessary amount in bolivars in the applicant's funds to acquire the foreign currency approved. After converting them into US dollars, it transferred them to the account indicated by the requesting airline.* Mr. Blanco also explained that "[f]*rom this transfer, a 'swift' receipt would be kept, which had to be submitted in the subsequent AAD requests. The submission of this 'swift' allowed the administration to verify that the applicant had made a lawful use of the currencies*"[475] i.e., that the applicant had actually repatriated the U.S. dollars abroad. This requirement ensured that the U.S. dollars had not remained in Venezuela.[476]

369.    Mr. Blanco considered that the entire CADIVI review process explained above should take only a few weeks, during which time the applicant could track the status of its AAD request.[477] In the case of the 15 AADs at issue, the electronic system indicated that the AADs remained "*under review*" in 2018.[478]

370.    The CADIVI process was allegedly followed in Air Canada's 91 AAD requests for the period from 2004 to 2012.[479] According to Respondent, the same process was followed in Air Canada's 15 AAD requests, but in this case the difference in outcome is explained by the fact that AAD requests were always subject to the availability of foreign currency.[480]

    b.    The assessment

371.    Based on the foregoing facts, the following can be inferred.

    *Possibility for a BIT violation*

372.    *First*, there is no doubt that Respondent rightly had a system in place regarding the exchange and repatriation of locally generated funds and specifically for airlines. This process was governed by Exchange Agreement No. 1, Providencia No. 23 (until it was

---

[474] R-PHB, paras 115-117. Air Canada acquired U.S. dollars from the Central Bank of Venezuela after having been authorized by CADIVI to do so, via Banco Mercantil. See for example, Exhs FTI-7 to FTI-12, Currency Acquisition Requests dated April to September 2012. According to Respondent, the form corresponded to a request from Air Canada to Banco Mercantil to "*proceed with the obtaining, before the* [CADIVI] *and Banco Central de Venezuela, of currency*" corresponding to the amount authorized by CADIVI. In the form, Air Canada had to specify the type of currency which CADIVI had authorized it to acquire. As to the acquisition itself, Air Canada had to request its exchange operator to acquire the foreign currency from the Central bank of Venezuela. Because the exchange operator was not "*bound to finance such transaction*", Air Canada had to expressly authorize its exchange operator to debit from its dedicated bank account in Venezuela the Bolivars equivalent of the foreign currency to be acquired. The transfer of the foreign currency to Air Canada's account outside Venezuela would occur in a further step, once the exchange operator has received the funds in U.S. dollars from the Central Bank of Venezuela.
[475] Blanco WS, para. 33; C-PHB, para. 172. See also R-PHB, paras 117, 131.
[476] C-PHB, para. 172.
[477] Tr. Day 2, 155:1-8.
[478] Exh. C-70, Printout from CENCOEX's website showing Air Canada's AAD requests as pending, 2 March 2018.
[479] R-PHB, para. 119.
[480] R-PHB, para. 120.

replaced by Providencia No. 124), and the CADIVI Guidelines.[481] With respect to the LOPA, on which Respondent relies,[482] there is no doubt that it applies to the administrative process and, therefore, also governs the entire AAD process together with the aforementioned instruments. Apart from that, and as considered above, the Tribunal does not consider that the LOPA defined the timeframe within which an AAD request had to be processed (see *supra* para. 361). Given this regulatory framework and at all relevant times, Claimant was legally obliged to follow the procedure provided in relation to the exchange of its bolivar returns into U.S. dollars for repatriation. This was the system used by Claimant in relation to previous AAD requests in Venezuela, and the system it sought to use in relation to the 15 contested AAD requests.

373.    *Second*, the CADIVI process was apparently a transparent and straightforward process, albeit with delays, but one that worked well, as Claimant acknowledges.[483] It respected an airline investor's right to a free transfer of funds (as provided in the BIT and the ATA) and the State could not interfere with that right at will (see *supra* para. 353). However, the system itself was not absolute in the sense that it did not guarantee approval of AAD requests. Instead, as seen above (see *supra* para. 368), the CADIVI procedure had to be followed, and the CADIVI Commission could take three possible decisions: an approval, a suspension or a denial of an AAD request. Thus, the suspension or denial of an AAD request, cannot, in and of itself, be considered as a violation of the FTF provision in the BIT. Instead, one can consider a possibility for a violation only if:

–    no free transfer of funds was possible in Venezuela (despite the existence of the BIT and ATA), or

–    Respondent acted in such a way to effectively prevent an investor in the airline sector – in this case Air Canada – from exercising its right to freely transfer its funds, contrary to the existing system.

*Respondent's actions in the present case*

374.    In the present case, it is clear and undisputed that the right to a free transfer of funds was available to an investor investing in Venezuela (see *supra* paras 353-369 and 373). In fact, Claimant makes clear that it has never alleged that Respondent's foreign exchange control regime constitutes a violation the BIT, but rather the breach comes from Respondent's refusal to process Claimant's AAD requests in a manner consistent with their past practice and in accordance with that regime.[484] What therefore needs to be clarified is whether Respondent, through CADIVI, deprived Claimant of the right to freely transfer its funds in accordance with the existing system.

---

[481] Exh. C-31 / RL-52 (Exchange Agreement No. 1); Exh. C-9 / R-11 (Providencia No. 23); Exh. R-12 (January 2009 CADIVI Guidelines).
[482] R-PHB, para. 404.
[483] Reply, para. 167.
[484] Reply, para. 105.

375.  *First*, since the inception of Claimant's investment in Venezuela, the Parties had apparently followed the applicable procedure in connection with the repatriation of Claimant's local sales proceeds (see *supra* para. 368).[485] As noted above, Claimant's 91 AAD requests in this context were granted over a period of eight years (see *supra* para. 367).[486] CADIVI has granted each of these requests and authorized Venezuela's Central Bank to convert Claimant's bolivars into U.S. dollars and transfer them to Claimant's bank account in New York.[487] With respect to some of these requests, there is no doubt that there were delays,[488] regardless of the standard by which they are measured: i.e., a few weeks, as mentioned by Mr. Blanco, or otherwise (see *supra* paras 361-362). In any event, there was never a problem in this regard, and requests that exceeded the timeframe of a few weeks – and certainly timeframe of four months allegedly set by the LOPA (see *supra* paras 361 and 372) – were ultimately approved and processed.

376.  *Second*, Claimant's 15 AAD requests were prepared in the same manner as the 91 prior AAD requests CADIVI had previously approved and were submitted between September 2013 and January 2014.[489] With respect to five of those requests, CADIVI requested additional information that Claimant provided, in October and November 2013. Thus, apart from this exchange and the fact that all had remained "*under analysis*" until 2018, there is no document or testimony regarding the conduct of the CADIVI process referred to above with respect to these requests.[490] What is clear is that Claimant pursued the status and settlement of the amounts in respect of these claims with Respondent and that Respondent acknowledged that there was a debt owed to Claimant in this regard, which it held out the prospect of settling. Claimant had suspended its route and again approached Venezuelan authorities in an attempt to obtain payment of the outstanding amounts and to reactivate the route (see *supra* para. 367).

377.  It is undisputed that CADIVI never made a decision to accept, suspend or reject these AADs.[491] Although Respondent submits that "[i]*n practice, unless an AAD request was refused by operation of Article 4 of the LOPA, the Commission generally notified the applicant of its negative decision by e-mail*"[492] meaning that the 15 AAD requests were allegedly automatically rejected, Mr. Blanco stated that the years-long consideration of AADs was a departure from normal procedure and that he had never seen a file that, after three years, is still under review or under analysis.[493] Indeed, under the procedure described by Mr. Blanco or under the LOPA, one had to have a reasoned decision to challenge a denial. Moreover, CADIVI had always made a decision– whether to deny a

---

[485] R-PHB, paras 119-120.
[486] Memorial, para. 47; Pittman WS, paras 23-24; C-PHB, para. 26.
[487] Exhs FTI-7 to FTI-12, Currency Acquisition Requests dated April to September 2012; C-PHB, para. 174; R-PHB, paras 115-117.
[488] Pittman WS, para. 23; Tr. Day 2, 100:24-101:8 (Pittman: "[i]*t was a surprise to Air Canada at the time because we had been able to repatriate our funds from the beginning, from 2004, up until the 2012 timeframe, which the applications were approved by CADIVI and the repatriations occurred; sometimes with delays, but they did happen*."); C-PHB, para. 175.
[489] C-PHB, para. 26; R-PHB, para. 120.
[490] Tr. Day 2, 119:19-121:3.
[491] Counter-Memorial, para. 84; Rejoinder, paras 213, 245.
[492] R-PHB, para. 109; see also Blanco WS, para. 31.
[493] Tr. Day 2, 154:16-20.

request or request additional information – and had not remained silent in order to make the LOPA work (see *supra* paras 361, 372 and 375).[494]

378.     *Third* and in light of the foregoing, the relevant timeframe for assessing Respondent's action (or inaction) with respect to Claimant's 15 AAD requests is that which begins with Claimant's filing of its 15 AAD requests, extends to the suspension of the route and ends with Claimant's notice of dispute. In this connection, the Tribunal considers the following:

–     In view of the practice with respect to the 91 AADs (which took up to seven months to approve), the Tribunal cannot reasonably conclude that Respondent acted in a manner that had the effect of preventing Claimant from recovering its proceeds in U.S. dollars, when no decision had been made by CADIVI in relation to the 15 AAD requests by March 2013. This is because the maximum period between the first of these requests and Claimant's reaction to CADIVI's failure to respond is seven months, between September 2013 and March 2014. This does not mean that Claimant had to wait or that Respondent took all steps in accordance with the applicable procedure to consider Claimant's AAD requests. Nor does it mean that this fact alone can lead the Tribunal to find a breach of Respondent's international obligation under the BIT.

–     However, at the time Claimant suspended the route, it was clear that early examination of the 15 AAD requests was not imminent. This is because Respondent acknowledged that there was a debt in respect of the airlines' funds to be repatriated. At the same time, Claimant's efforts to clarify or settle the situation with the Government were unsuccessful. Indeed, the status of the 15 AAD requests remained "under analysis" in the CADIVI system and Respondent did not respond to several of Claimant's inquiries on the matter (see *supra* para. 367). As a result, Claimant found itself in a position where it could no longer exercise its right to freely transfer its investments or earnings, as the system it knew to be applicable and functioning, was virtually non-existent. And this did not change for some years. Moreover, it is significant that there is nothing in the record of this case to indicate any activity in connection with these requests. The fact that Claimant's domestic bank accounts were not "imprisoned",[495] as Respondent contends, is not relevant to this assessment.

379.     Accordingly, the Tribunal considers that Respondent's inaction in relation to Claimant's 15 AAD requests over the entire period set out above has had the effect of depriving Claimant of the right to freely transfer its funds in accordance with the applicable regime. This being said, the Tribunal will consider whether there were any possible reasons for Respondent's failure to act.

---

[494] Tr. Day 2, 126:22-128:1; Blanco WS, para. 31.
[495] Counter-Memorial, para. 302.

*The possible reasons for Respondent's inaction*

380.    Respondent points to the following reasons in connection with its failure to consider and/or approve Claimant's 15 AAD requests: (i) the lack of sufficient U.S. dollar reserves to process Claimant's requests;[496] (ii) Claimant's failure to meet the requirements of Providencia No. 23 and CADIVI's requests;[497] (iii) its sovereign prerogative to reject such requests;[498] and (iv) the fact that Claimant could have sought alternative means to have its funds converted into U.S. dollars for repatriation.[499] The Tribunal will consider these reasons in turn.

381.    *First, with respect to the sufficiency of U.S. dollar reserves in Venezuela*: Respondent points to the applicable regime and specifically the directives of the National Executive as established in Article 7 of Providencia No. 23 and Exchange Agreement No. 1, which allegedly foresaw that AAD requests would only be approved subject to currency availability.[500] According to Respondent this explains the different conclusion in relation to the 15 AADs.[501] Moreover, Respondent specifically points to a letter dated 11 October 2018 from the Central Bank of Venezuela that purports to provide a historical overview of the availability of foreign currency in Venezuela between 2008 and 2014 and supports its argument that, at that time, U.S. dollar reserves were insufficient to process Claimant's 15 AAD requests.[502] Claimant submits that this letter was prepared solely for the purposes of this arbitration and should be treated with caution. At the same time, it argues that the letter also proves that Respondent actually had more than enough U.S. dollar reserves at the end of 2013 and the beginning of 2014 to process Air Canada's AAD requests, i.e., almost U.S.\$ 34 billion in foreign currency in 2013 and U.S.\$ 27 billion in 2014, in order to *meet the applicable needs of the private sector and the public sector*".[503]

382.    The Tribunal does not question Respondent's presentation of the applicable exchange regime, specifically as it relates to the condition on currency availability which falls within its existing right to regulate its monetary policy. Moreover, it does not question the fact that this regime set forth the possibility to reject AAD requests on this basis.[504] Having said that, it questions whether in this particular case, Respondent's alleged lack of U.S. dollar currency justified its inaction in relation to Claimant's 15 AAD requests. Specifically:

–    The Tribunal gives no weight to a document produced in 2018 – either in favor or against Respondent. While the Tribunal has no reason to doubt Respondent's

---

[496] Rejoinder, paras 172, 314.
[497] Counter-Memorial, paras 62-84.
[498] Counter-Memorial, paras 305-311; Rejoinder, para, 208.
[499] Rejoinder, para. 202.
[500] R-PHB, paras 66-67; Exh. C-9 / R-11 (Providencia No. 23); Exh. C-31 / RL-52 (Exchange Agreement No. 1).
[501] R-PHB, para. 120.
[502] Exh. C-112, Letter from the Central Bank of Venezuela, dated 11 October 2018.
[503] C-PHB, para. 37.
[504] See Respondent's reliance on Articles 2 and 7 of Providencia No. 23, Exh. C-9 / R-11, Providencia No. 124, Exh. C-12 and Exchange Agreement No. 1, Exh. C-31 / RL-52. Having determined that the right to free transfer of funds is not absolute, but in fact subject to the regime in force in Venezuela, the Tribunal does not consider it pertinent to decide the Parties' dispute on the wording of Article 2 of Providencia No. 23.

submission that there was a decline in available foreign currency and that it had to prioritize in this regard, it cannot conclude that Respondent met its burden of proving with contemporaneous documents that there was a shortage of U.S. dollar reserves at the relevant time such that Claimant's requests could not be processed.

– This being said, the Tribunal cannot ignore the fact that at the same time U.S. dollar amounts equivalent to other airlines' AADs were paid to those airlines between May and October 2014.

383. The Tribunal therefore does not consider Venezuela's reliance on the lack of sufficient U.S. dollar reserves as a sufficient reason not to process Claimant's 15 AAD requests.

384. *Second, with respect to the alleged failure of Claimant to meet the requirements of Providencia No. 23 and CADIVI's requests*: Respondent argues that CADIVI did not make a decision on the 15 Air Canada AADs because Claimant had failed to respond to CADIVI's requests for further information and had been unable to secure the IVSS certificates required for the RUSAD, resulting in a delay in the submission of the AADs.[505] The Tribunal finds nothing in the record to support this contention. As seen above, under the applicable procedure, a CADIVI analyst would seek further information if there was a need (see *supra* para. 368). Indeed, this apparently occurred with respect to five of Claimant's 15 AADs (see *supra* para. 367). However, there is nothing in the record to support any such request or follow-up in connection with the information Claimant submitted with respect to the five AADs after CADIVI requested it.[506] Instead, the status of the review of all requests remained "*under review*" until well after the commencement of the present arbitration.[507]

385. With respect to Respondent's reliance on the information requests INAC made to ALAV, the Venezuelan Airlines Association in November 2013 and Air Canada in January 2014,[508] the Tribunal agrees with Claimant that none of these requests has any bearing on CADIVI's review of the 15 AADs of Claimant.[509] Specifically:

– INAC's November 2014 request for information to ALAV was not related Claimant's 15 AAD requests. Instead, the letter requested information on the 26 international airlines operating in Venezuela at that time. Specifically, information was requested to "*help fully identify any Venezuelan or foreign citizens who, via lawful commercial transactions, acquired international air tickets within the territory of the Bolivarian Republic of Venezuela in 2012 and January-October 2013 in accordance with the tax regulations currently in force*".[510]

---

[505] Counter-Memorial, para. 67.
[506] See Babun WS II, para. 8.
[507] Exh. C-70, Printout from CENCOEX's website showing Air Canada's AAD requests as pending, 2 March 2018.
[508] Tr. Day 1, 161:7-20.
[509] Reply, paras 182-185; C-PHB, para. 42. See also Counter-Memorial, paras 380-383.
[510] Exh. C-36, Letter from CADIVI to ALAV, dated 8 November 2013.

–    INAC's request for information to Air Canada, dated 28 January 2014 is not relevant, as it referred to information that CADIVI already had.[511] Moreover, Anira Dinorus Padron Barito, Venezuela's witness and the general manager of aviation at INAC confirmed at the Hearing that INAC has no role in the approval of AAD requests.[512]

386.    With respect to Respondent's argument that Claimant was unable to obtain the IVSS certificates required for the RUSAD in connection with its AAD requests, resulting in a delay in the submission of the AADs,[513] the Tribunal notes that there appears to have been a change in the practice of the Venezuelan authorities in relation to the certificate of good standing that Claimant was required to submit with its AAD requests. Specifically, as of the end of 2012, the IVSS refused to issue a certificate of good standing to Claimant, claiming that it no longer issues such certificates to non-contributing companies, i.e., companies without direct employees that do not actively contribute to the IVSS.[514] It is undisputed that Claimant has had no direct employees in Venezuela since 2004[515] and that it has been able to obtain such a certificate on several occasions. However, with the change in practice, Claimant hired a direct employee.[516]

387.    During the Hearing, Venezuela attempted to demonstrate that Air Canada had employees in Venezuela prior to 2013. However, Mr. Pittman unequivocally stated that Claimant had no employees before prior to mid-2013, when it hired Mr. Serafini, and that the individuals named by Respondent were employees of BASSA, Claimant's GSA.[517] Thus, there does not appear to have been any abuse with respect to Claimant's compliance with this practice regarding employees and in connection with the 15 AAD requests, or that any alleged delay in this regarding is imputed to Claimant.

388.    Therefore, the Tribunal finds no basis for the argument that Claimant's 15 AADs were deficient.

389.    *Third, with respect to Respondent's invocation of its sovereign prerogative under Article VIII(6)*: Respondent submits that it enjoys sovereign prerogatives under international law in order to safeguard its national economy and is therefore entitled to regulate its own currency. This sovereign prerogative is codified in the BIT and Respondent's treatment of the AAD requests was justified therefore "*equitable, non-discriminatory and good faith application of measures relating to maintenance of the safety, soundness, integrity*

---

[511] Exh. C-60, Letter from INAC to Air Canada, dated 27 January 2014; Babun WS, para. 18. See also Exhs R-18 to R-22 (Currency Acquisition Requests dated October 2012 to February 2013).
[512] Tr. Day 2, 162:6-8 ("*INAC doesn't have any role in the approval of CADIVI's AAD requests*").
[513] Counter-Memorial, paras 376-379.
[514] Exh. C-93, Letter from Air Canada to CADIVI, dated 19 February 2013; Pittman WS, paras 25-27.
[515] Pittman WS, para. 26; Babun WS, paras 9-10.
[516] Babun WS, para. 10; Exh. C-99, Certificate of Document Submission to CADIVI, attaching certificate from the IVSS, dated 31 July 2013.
[517] Tr. Day 2, 98:12-99:9.

*or financial responsibility of*" the national economy.[518] The Tribunal refers to Article VIII(6) which provides as follows:[519]

> *Notwithstanding paragraphs 1, 2 and 3 and without limiting the applicability of paragraph 4, a Contracting Party may prevent or limit transfers by a financial institution to, or for the benefit of, an affiliate of or a person related to such institution, through the equitable, non-discriminatory and good faith application of measures relating to maintenance of the safety, soundness, integrity or financial responsibility of financial institutions.*

390.    The Tribunal first recalls its findings above on the requirements of Article VIII and the fact that it also takes due account of a State's right to regulate its monetary policy and that limitations on an investor's FTF can be found in the provision itself, such as in Article VIII(6) (see *supra* para. 353). As such, it considers that a sovereign prerogative exists in this context if it is actually applied *via* the relevant regime and without discrimination.

391.    In particular, with regard to Article VIII(6) in particular, the Tribunal notes that Claimant is neither a financial institution, nor an affiliate of such institution, nor an associated person of such institution.[520] The involvement of Banco Mercantil in the processing of the AAD requests does not make this provision relevant. In any event, any restrictions imposed by a possible application of Article VIII(6), would have to be for the purpose of maintaining the "*safety, soundness, integrity or financial responsibility of financial institutions*" which was not the case with respect to the measures taken by Respondent to safeguard its national economy.

392.    Even if the Tribunal had found otherwise, Article VIII(6) would still not operate as a defense in the present case, since the provision itself requires that any measures taken be "*equitable, non-discriminatory and* [in] *good faith*". In the instant case, Respondent settled other carriers' AAD requests immediately after Claimant announced its decision to suspend its operations and during the time Claimant was still contacting Respondent to reevaluate the situation.

393.    The Tribunal therefore does not consider that Article VIII(6) applies as a defense to Respondent's failure to consider Claimant's 15 AAD requests.

394.    *Fourth, with respect to the claim that there were alternatives to the exchange of bolivars into U.S. dollars*: Respondent insists that Claimant had at all relevant times alternatives to CADIVI to concert its bolivars into foreign currency, not at the attractive preferential subsidized rate offered by the CADIVI regulated market. According to Respondent, Claimant's failure to explore any of these alternatives can only be attributed to its own conduct.[521] The Tribunal need only point to the relevant applicable foreign exchange regime established by Respondent at the time, and that is the relevant one in accordance

---

[518] Counter-Memorial, paras 308-311 quoting also Exh. C-1 (BIT), Article VIII; Rejoinder, para. 209.
[519] Exh. C-1 (BIT).
[520] See Tr. Day 1, 172:14-173:4.
[521] Rejoinder, paras 202-207.

with the BIT and the ATA as comprehensively described by both Parties, i.e., the regime provided by Exchange Agreement No. 1, Providencia No. 23, the CADIVI Guidelines and the LOPA (see *supra* para. 368). It is undisputed that this foreign exchange regime allowed Claimant to access U.S. dollars at a preferential rate, the Tribunal and thus finds, that none of the other mechanisms for exchanging foreign currency constitutes an alternative providing equally beneficial exchange conditions.[522] Claimant was legally entitled to use the CADIVI system provided under Providencia No. 23 to exchange its bolivars for U.S. dollars.

395.    Furthermore, the Tribunal agrees with Claimant's observation that the government would not acknowledge that there was a debt with respect to the airlines' repatriation of funds if such alternatives provided an equivalent source for U.S. dollars.[523] Even if it were otherwise, the Tribunal wonders how the argument that Claimant failed to seek alternatives in Venezuela fits well with the assertion that Respondent could not have fulfilled its obligations with respect to Claimant's 15 AADs in any event, due to the "ebbing" availability of foreign currency at the time.

396.    The Tribunal therefore finds that none of the above considerations justify Respondent's failure to act with respect to Claimant's 15 AAD requests. Venezuela therefore failed to ensure the unimpeded transfer of the proceeds of Air Canada when it failed to process these AADs.

*(iv)    Other considerations*

397.    Having found that Respondent violated Article VIII of the BIT, the Tribunal need not decide whether the provisions of Article III of the BIT entitle Claimant to rely on more favorable FTF provisions in other treaties (as already decided above; see *supra* para. 364), in domestic law and in international law.[524]

*(v)    Conclusion*

398.    In light of the foregoing, ***the Tribunal finds that Respondent violated Article VIII of the BIT***.

399.    Having found that Respondent has violated Article VIII of the BIT, the Tribunal should end its analysis here. Indeed, Claimant itself notes that the Tribunal need go no further. However, for the sake of completeness and in light of the importance of the case and, in particular, the impact on Claimant's claim and/or the assessment of damages, the Tribunal considers it important to briefly assess Claimant's claims for FET and expropriation as well, in light of its considerations above.

---

[522] See Tr. Day 1, 67:1-68:25; see also C-PHB, paras 53.
[523] C-PHB, para. 56.
[524] Memorial, para. 114.

**3.        Article II of the BIT: Fair and Equitable Treatment**

*3.1        The Parties' positions*

   *(i)        Claimant*

400.    Claimant submits that Respondent violated the FET standard in Article II of the BIT, because its treatment of Claimant's investments was (i) inconsistent with Claimant's legitimate expectations that Respondent would respect its obligations under the law, (ii) arbitrary and (iii) lacked transparency.[525]

401.    *First*, Article II of the BIT specifically extends FET to "returns of investors" rather than merely "investments". Respondent's unfair treatment of Claimant's "returns" is the issue in this case.[526]

402.    *Second*, the BIT's FET standard is not synonymous with the international minimum standard. Even if it were, Respondent's contention that the threshold for finding a breach of the FET is "particularly high" is incorrect. Outside the NAFTA context, the international minimum standard has evolved so that it comports generally with the treatment due to investors under the autonomous FET standard.[527]

403.    Tribunals often focus on specific elements of a State's conduct that may relate to a breach of FET. The core elements are generally uniform. Legitimate expectations, arbitrariness, and lack of transparency are particularly relevant in this case.[528] Further, contrary to Respondent's restrictive position, recent awards make it clear that a "*state's conduct need not be outrageous or amount to bad faith to breach the fair and equitable treatment standard*".[529] What is more, Claimant had never argued that it is entitled to a stabilization or a "freezing" of the legal regime under which it invested. Rather, its position is that it was entitled to a predictable, non-arbitrary, non-discriminatory, and transparent application of relevant legal rules and regulations.[530]

   *Concerning legitimate expectations:*

404.    Numerous authorities and tribunals have confirmed that the guarantee of FET for foreign investments encompasses the protection of investors' legitimate expectations regarding their investment.[531] The Parties' dispute regarding legitimate expectations primarily

---

[525] Memorial, para. 133; Reply, para. 126.
[526] Memorial, para. 134.
[527] Reply, paras 130-142.
[528] Memorial, para. 136; Reply, paras 144-145.
[529] Reply, para. 146 quoting Exh. CL-18, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/2, Award, 4 April 2016 ("Crystallex"), para. 543.
[530] Reply, para. 147.
[531] Memorial, paras 137-138; Reply, paras 148-150.

centers on the application of the rules to the facts of this case rather than the scope of the rules.[532]

405.     In deciding to invest in Venezuela, Claimant legitimately expected that Respondent would review and grant its AADs without delay, based on the framework that Respondent had agreed and put in place for the repatriation of investments and returns, and the sale and transfer of foreign currencies: the BIT, the ATA, and *Providencia No. 23* issued by CADIVI. Respondent breached Claimant's legitimate expectations when it failed to abide by the legal rules as written.[533] By executing the ATA and the BIT, as well as by enabling the conversion and repatriation of Claimant's revenues for a decade, Respondent created legitimate expectations it subsequently violated.[534] Claimant would never have invested in Venezuela had it known that it would be prevented from repatriating the returns from its ticket sales in Venezuela.[535]

406.     Further, nothing in Venezuela's domestic legislation existing at the time Claimant invested or subsequently could invalidate or permit Respondent to breach its free transfer of funds obligations to Claimant in the BIT or the legitimate expectations created by those obligations in the BIT and the ATA. Nor could it invalidate Claimant's legitimate expectations based on the BIT. Article 2 of Providencia No. 23 expressly provides that airlines are entitled to acquire foreign currency to transfer their returns out of Venezuela. Neither *Providencia No. 23* nor Exchange Agreement No. 1 restrict Air Canada's free transfer rights.[536]

407.     Moreover, to date, Respondent has not produced any contemporaneous documents evidencing a shortage of hard currency to satisfy Claimant's requests. The evidence instead shows that it did have sufficient hard currency available.[537]

408.     Thus, Respondent had no justification for violating Claimant's legitimate expectations that the former would comply with its international and domestic legal obligations and approve Claimant's AADs.[538]

*Concerning arbitrariness:*

409.     Respondent also breached the Treaty's FET provision by treating Air Canada's returns in an arbitrary and inconsistent manner.[539]

---

[532] Reply, para. 151.
[533] Reply, paras 152-157 referring to Exh. C-5 (ATA), Exh. C-1 (BIT) and Exh. C-9 / R-11 (Providencia No. 23).
[534] Memorial, paras 139-140.
[535] Reply, paras 157-158.
[536] Reply, paras 159-163 referring to and quoting Exh. C-9 / R-11 (Providencia No. 23) Article 2 and Exh. C-31 / RL-52 (Exchange Agreement No. 1), Article 10.
[537] Reply, paras 164-165.
[538] Reply, para. 166.
[539] Reply, para. 167.

410.    Arbitrariness can present itself in many forms, including when a State acts with bias, preferential treatment, or concealment. In order for a State's acts to be considered legitimate and reasonable, they need not only be related to a rational policy but must actually be appropriately tailored to that end.[540]

411.    Respondent's conduct in this case was arbitrary, in violation of the BIT's FET standard. Respondent chose not to process Claimant's properly submitted AADs, thereby preventing the conversion of Claimant's revenues into U.S. dollars and their repatriation. Its refusal to act was attributed to the need for senseless "authorizations" that had never been demanded before. Thereafter, Respondent "went silent" on the subject and ignored Claimant's requests for action or dialogue. Its decision to neglect Claimant's AADs, far from being supported by clear and articulable legal or policy principles or reached in accordance with due process principles, was undertaken in a black box. Furthermore, its failure to approve such AADs was inconsistent with the actions and statements from high-ranking Venezuelan officials who were assuring Claimant and airlines in general that payment would be forthcoming. Moreover, it was manifestly inconsistent, because it had approved 91 AADs submitted by Claimant over the previous eight years.[541] To this day, Respondent has failed to furnish Claimant with an answer as to why its 15 AADs have been neglected for five years, let alone a well-reasoned, meritorious explanation for why Respondent has decided to not abide by its obligations. CADIVI has simply never acted upon Claimant's requests and to this date, the 15 AADs remain "under analysis". This itself suffices to demonstrate arbitrariness.[542]

412.    In relation to Respondent's arguments, Claimant notes the following:

   –   Respondent did not content that it failed to approve Air Canada's AADs because of Claimant's alleged delays and there is no contemporaneous evidence to support such a contention. Claimant's delay in presenting ten of its 15 AAD requests resulted from the bureaucracy of the CADIVI system and of the IVSS.[543]

   –   Claimant promptly submitted its AADs and responded CADIVI's requests for information. If it had not done so, CADIVI would have denied the requests or at minimum there would be contemporaneous evidence of information shortfalls.[544]

   –   Claimant was not required to exhaust local remedies and in any event it would have been futile.[545]

---

[540] Memorial, paras 141-142.
[541] Reply, para. 168.
[542] Memorial, paras 143-144; Reply, para. 168.
[543] Reply, paras 172-177.
[544] Reply, paras 178-186.
[545] Reply, paras 187-194.

413.    Thus, CADIVI's refusal to take a decision on Air Canada's AAD requests was arbitrary as well as inconsistent with CADIVI's past practice of approving Air Canada's AAD requests.[546]

*Concerning lack of transparency:*

414.    It is also well-established that the FET standard requires a host state to act transparently toward investors and their investments. In this connection, a State's legal and regulatory framework must be "*readily apparent and that any decisions of the host state affecting the investor can be traced to that legal framework*".[547] The facts giving rise to a lack of transparency need not be complicated; mere absence of notice or communication is sufficient.[548] Further, transparency is not limited to the publishing of laws and decrees. It also comprises executive and administrative transparency in the application of its own laws and decrees.[549]

415.    Respondent's lack of transparency toward Claimant in relation to the processing of the 15 AADs is evident. Respondent never took any decisions in relation to the AADs or at least none were communicated to Claimant. Respondent had never explained its actions, provided a rationale, or engaged in any process to address the consequences of its actions. Moreover, it chose to approve AADs submitted by other airlines and entered into payment agreements with several others, while completely excluding Claimant from negotiations and failing to explain the basis for this policy of picking and choosing which airline would get paid.[550] Respondent concedes that it singled out Claimant for discriminatory treatment because it suspended its service in March 2014. But Respondent had ceased approving Claimant's AADs long before it suspended its Toronto-Caracas-Toronto route.[551]

416.    Therefore, Respondent's violation of Claimant's legitimate expectations, its arbitrariness, and its lack of transparency in relation to the processing of Claimant's AADs are each independent grounds for the Tribunal to conclude that Respondent breached the BIT's FET standard. Taken together, there can be no doubt Respondent is liable to Air Canada for violating the FET requirement.[552]

*(ii)    Respondent*

417.    Respondent submits that it has treated Claimant at all times in a fair and equitable manner.[553]

---

[546] Reply, para. 195.
[547] Memorial, para. 145; Reply, paras 197-198 quoting Exh. CL-30, *Frontier Petroleum Services Ltd. v. Czech Republic*, Final Award, 12 November 2010 ("Frontier"), para. 285.
[548] Memorial, para. 149.
[549] Reply, para. 203.
[550] Memorial, para. 150; Reply, paras 196, 203, 207.
[551] Reply, paras 204-205 referring to Counter-Memorial, para. 394.
[552] Memorial, para. 151.
[553] Counter-Memorial, paras 322-324; Rejoinder, para. 215.

418.    *First*, Claimant misrepresented the appropriate standard for the assessment of FET. Under Article II(2) of the BIT, the threshold for finding that there had been a breach of the FET standard is high. Even when applying an objective standard, the Tribunal must take into account Respondent's public policy reasons and assess the reasonability and proportionality of its conduct, to determine whether, in the particular circumstances of the case, it had afforded FET to Claimant's alleged investment.[554]

419.    Article II(2) includes an express reference to "*the principles of international*" law. As such, Claimant's submission that the FET should be looked at through a "modern eye", meaning without regard to customary international law, must be rejected. This is all the more so because the applicable law, according to Article XII(7) of the BIT, expressly provides for this Tribunal to decide the dispute in accordance with the "*applicable rules of international law*".[555]

420.    NAFTA arbitral tribunals have also adopted the more restrictive approach required by international law, in particular since the issuance of the NAFTA interpretation in July 2011. The understanding of the minimum standard of treatment under the NAFTA is central to the interpretation of the FET under the BIT. The BIT in this particular case is closely linked to the NAFTA. In fact, the conclusion of the NAFTA had a direct impact on the final version of the BIT.[556] In this context, a proper interpretation of the "*plain meaning of the terms*" of the BIT, in accordance with the VCLT, must necessarily take into account that the Parties established limitations to Article II(2) of the BIT on the basis of the NAFTA.[557]

421.    Arbitral tribunals outside the NAFTA universe have followed a similar approach when interpreting the FET standard. They have consistently interpreted similar language to that of Article II(2) of the BIT to mean that the FET standard is inexorably linked to the minimum standard under customary international law. As such, violations to the FET standard need to rise to the level of acts of "*willful neglect of duty, and insufficiency of action falling far below international standards, or even subjective bad faith*".[558]

422.    Thus, the threshold for a finding of a breach of the FET standard under the BIT is particularly high.[559]

423.    In addition, Article II(2) does not guarantee Claimant a stable legal framework. The BIT, in the current case, plainly lacks such language and there are no other elements that would point to any intention of Parties in this respect. States have a sovereign prerogative to amend their legal framework as they see fit.[560]

---

[554] Counter-Memorial, para. 324; Rejoinder, paras 216-220.
[555] Counter-Memorial, paras 325-326 quoting Exh. C-1 (BIT), Article XII(7).
[556] Counter-Memorial, paras 329-332 referring to Exh. RL-81, Notes of Interpretation of Certain Chapter 11 Provisions (NAFTA Free Trade Commission), dated 31 July 2011; Rejoinder, paras 216-218.
[557] Rejoinder, para. 219.
[558] Counter-Memorial, paras 327-336 quoting Exh. RL-84, *Alex Genin et al. v. The Republic of Estonia*, ICSID Case No. ARB/99/2, Award, dated 25 June 2001 ("Alex Genin"), para. 367.
[559] Counter-Memorial, para. 337; Rejoinder, para. 216.
[560] Counter-Memorial, paras 338-342; Rejoinder, paras 221-222.

424.    In the instant case, Respondent put into place a foreign exchange control regime with an official fixed exchange rate that changed from time to time.[561] At the same time, private individuals and companies operating in Venezuela had the possibility to acquire foreign currency through the CADIVI regulated market at the CADIVI official rate. Both features of this regime, the fixed official exchange rate that evolves over time and the acquisition of foreign currency subject to availability, have been in place and remained unchanged since the inception of the regime in 2003, long before Claimant started operating its route. While these features have remained unchanged, they hinge on two variables which themselves have evolved over time: the official exchange rate and the availability of currency. Such evolution is in no way proscribed by the BIT.[562]

425.    *Second*, and in any event, Respondent did not frustrate any legitimate expectations of Claimant.[563]

426.    While certain tribunals have recognized a trend towards protecting investors' legitimate expectations, that trend finds no basis in the text of the BIT. In this context, Claimant's reliance on "legitimate expectations" as the "key element" in defining the FET standard of treatment should be viewed with caution. The only legitimate expectations that may be considered by the Tribunal are those that are reasonable and arise at the time of making the investment; or in the instant case, at the time Claimant started operating the Toronto-Caracas-Toronto route, in the absence of an investment. Furthermore, they must be assessed *in concreto*, with regard to all circumstances, including whether the State made any specific promises to Claimant, which in this case it did not.[564]

427.    Further, Claimant could not have had any legitimate expectations to an unlimited availability of currency nor to a stable exchange rate. Close examination of the laws and regulations in place when it started the Toronto-Caracas-Toronto route belies Claimant's position. In addition, there is no legal basis provided for Claimant's conclusion that a repeated practice – approval of AAD requests – generated a right, or the expectation of a right, on its part. Requesting an authorization to acquire foreign currency remained a possibility, under the terms of Article 2 of Providencia No. 23 subject to the availability of such foreign currency, in accordance with the provisions of Article 7 of Providencia No. 23 and those of the Exchange Agreement No. 1. In the instant case, Respondent chose to exercise such sovereignty by putting into place the foreign exchange control regime, one of its main features of which is that availability is determinative for the processing of AAD requests, from international airlines and others. Respondent never represented that there were any guarantees of unlimited availability. In fact, the Preamble to the Exchange Agreement No. 1 already hints at a decrease in foreign currency, which explains the adoption of the foreign exchange control regime in 2003.[565] Further, there cannot be any

---

[561] Counter-Memorial, para. 343 quoting Flores Report, paras 27-28.
[562] Counter-Memorial, paras 344-346.
[563] Rejoinder, para. 223.
[564] Counter-Memorial, paras 347-356; Rejoinder, para. 224.
[565] Counter-Memorial, paras 257-367 referring to Exh. C-9 / R-11 (Providencia No. 23) and Exh. C-31 / RL-52 (Exchange Agreement No. 1).

"reinforced" expectations on account of the fact that Claimant may have also looked at the ATA or at the BIT.[566]

428.    Respondent did not rely on Article 27 VCLT and did not contend that Providencia No. 23, Exchange Agreement No. 1 and the entire Forex regime prevail over its international obligations or that they justified any failure to perform such obligations. Rather, it had submitted that its Forex regime was adopted in exercise of its sovereign powers and in full conformity with its international obligations, including those arising out of the BIT. And, in 2004 or at any other time, Claimant could not have legitimately expected that its AAD requests would automatically or necessarily be approved. It is impossible that Claimant did not conduct a due diligence of the Forex regulations that were in place at the time it decided to start operating the route in 2004.[567]

429.    Therefore, having due regard to the legal framework in place when Claimant started operating the Toronto-Caracas-Toronto route, Claimant could not have legitimately nor reasonably expected an unlimited availability of currency nor an unchanged exchange rate for the duration of their stay in Venezuela.[568]

430.    *Third*, there was no arbitrariness in the treatment of Claimant. The standard proposed by Claimant is overbroad. Arbitrariness is often defined by reference to the ruling of the International Court of Justice ("ICJ") in *ELSI v. Italy*, which found that "[a]*rbitrariness is not so much something opposed to a rule of law, as something opposed to the rule of law*" and that an arbitrary act is "*a willful disregard of due process of law, an act which shocks, or at least surprises, a sense of judicial propriety*." In the context of bilateral investment treaties, "arbitrary" is used interchangeably with "unjustified" and "unreasonable". As confirmed by the *AES* tribunal, a state measure will be sustained as reasonable if it flows from a rational policy and is reasonably related to that policy. In this sense, *ELSI* sets a standard that is narrow and entails a high threshold, while *AES* expressly provides that the existence of public policy explanations for the State's actions is incompatible with a finding that they have been arbitrary.[569]

431.    Further, Claimant did not provide any legal authority for its claim that the FET standard includes a separate obligation of consistency and the contexts and limitations of such an obligation, were it to exist.[570]

432.    In the instant case, Respondent's application of its foreign exchange regulations had not been arbitrary. The two "measures" of which Claimant complains – their difficulties in obtaining the IVSS certificates and their failure to respond to legitimate information requests from the Venezuelan authorities – cannot be characterized as arbitrary, even by

---

[566] Rejoinder, paras 226-227.
[567] Rejoinder, paras 228-231.
[568] Counter-Memorial, paras 368-369.
[569] Counter-Memorial, para. 370 quoting Exh. RL-97, *Case concerning Elettronica Sicula S.p.A. (ELSI) (United States of America v. Italy)*, Judgment, ICJ Rep., dated 20 July 1989 ("ELSI"), para. 128 and citing Exh. CL-40, *AES Summit Generation Limited, et al. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, dated 23 September 2010, para. 460; Rejoinder, para. 235.
[570] Rejoinder, para. 235.

Claimant's overbroad standard. Both were expressly foreseen in Venezuelan legislation, in force before it started its operations, and any complications that may have arisen were in part of Claimant's own doing.[571] In fact, they constituted the normal exercise of Respondent's regulatory powers as provided for in the applicable legal regime.

433.    In addition, there is no legal basis to claim that "past practice" could somehow be taken into account when processing a given AAD request. Past approval of AAD requests, even repeated approval, does not create any rights as to future approval for the requesting entity. The main criteria for approval were compliance with the requirements, the availability of currency and the directives of the National Executive, each of which were examined *de novo* for each request.[572]

434.    By the time Claimant presented its last 15 AAD requests, the availability of currency in the Republic had significantly ebbed. At the same time, Respondent was struggling with the potential abuses committed possibly both by private individuals and commercial airlines to take advantage of the CADIVI currency acquisition system. CADIVI's mission had always been to administer the available currency per the guidelines of the Executive Branch and the availability determined by the Venezuelan Central Bank. As a regulatory body, its actions and conduct were subject to the LOPA. Article 4 of the LOPA provides a solution when requests go unanswered, so as to not leave the requesting party vulnerable in the exercise of its rights. At the very least, Claimant had the possibility of filing a reconsideration recourse, provided for in Article 94 of the LOPA. Jurisdictional remedies were also available, such as the *contencioso-administrativo* action and those of a constitutional character. None of these available remedies were undertaken by Claimant. Claimant chose to disengage with Respondent when it decided to abandon the Toronto-Caracas-Toronto route.[573] The Tribunal should therefore dismiss Claimant's allegations on arbitrariness.[574]

435.    *Fourth*, there was no lack of transparency in the treatment of Claimant. The standard proposed by Claimant is overbroad. The principles of international law, which are to be considered as part of the FET assessment, require neither transparency nor the involvement of the investor in the decision-making process. In any event, the definition and scope of any duty of transparency must be placed in its proper context. Having said that, it is good administrative practice to render the legal framework for the investor's operations readily apparent and give the investor the opportunity to trace decisions affecting its investments to that legal framework. Respondent did not deny this as it acted in conformity with this good administrative practice. All the main relevant foreign exchange control regulations were adopted in norms ranked as *Providencia* or higher, and duly published in the official journal *Gaceta Oficial*.[575]

436.    In the present case, although Claimant alleges to have been excluded from negotiations, it has not presented any evidence, other than the testimony of its official, on any such

---

[571] Counter-Memorial, paras, 371-375.
[572] Rejoinder, para. 236.
[573] Counter-Memorial, paras 376-387; Rejoinder, paras 237-240 referring to Exh. RL-54 (LOPA).
[574] Counter-Memorial, paras 388-389.
[575] Counter-Memorial, para. 392; Rejoinder, para. 242.

exclusions. In fact, the basis for its policy is clearly stated in the law. In circumstances in which it was becoming increasingly difficult for CADIVI to administer the ebbing available currency, the government established clear priorities. The "public service" nature of the air transportation of passengers explains that payments of pending AAD requests were made to other airlines that were still operating in the country. Its "public service" is undeniable as a matter of Venezuelan law and justified any payments that may have been made to other airlines in order to ensure the continuity of the service.[576]

437.    Further, Respondent, through CADIVI, put into place an electronic platform for the processing of the AAD requests submitted by users, including Claimant. CADIVI did not issue any document informing users of AAD requests or their status because such information was handled electronically. In addition, Claimant's AAD requests were rejected by operation of the administration's negative silence, under the LOPA. By definition, the administration's negative silence is not notified and it is instead incumbent upon the interested party to know the applicable legal framework in force in the Republic and which regulates the relevant requests and their processing.[577]

438.    Claimant's ignorance can only be described as willful or gross negligence. Indeed, the fact that the AAD requests submitted under *Providencia No. 23*, and later *Providencia No. 124*, would be processed according to the availability of foreign currency as determined by the Central Bank of Venezuela and the National Executive is an essential feature of the CADIVI mechanism and was in place well before Claimant submitted its first AAD request, and even before Air Canada started operating its route.[578]

439.    Therefore, Claimant's FET case fails both as a matter of law and as a matter of fact.[579]

### 3.2    The Tribunal's analysis

#### (i)    The issue

440.    The *issue* is whether Respondent acted in a manner contrary to its FET obligations under the BIT in connection with Claimant's investments or its returns (see *supra* paras 400 and 417).

441.    To determine this issue, the Tribunal will proceed as follows:

–    *First*, it will set out the requirements of Article II(2) of BIT (Section (ii)).

–    *Second*, it will address the question of whether Respondent violated Article II(2) of the BIT (Section (iii)).

–    *Third*, it will conclude (Section (iv)).

---

[576] Counter-Memorial, paras 393-394; Rejoinder, paras 247-248.
[577] Rejoinder, paras 244-245 referring to Exh. RL-54 (LOPA).
[578] Rejoinder, para. 246 referring to Exh. C-9 / R-11 (Providencia No. 23) and to Exh. C-12 (Providencia No. 124).
[579] Rejoinder, para. 249.

*(ii)*      *Article II(2) of the BIT*

442.    Article II(2) provides as follows:

> *Each Contracting Party shall, in accordance with the principles of international law, accord investments or returns of investors of the other Contracting Party fair and equitable treatment and full protection and security.*[580]

443.    Article II(2) corresponds to the so-called "Fair and Equitable Treatment" or FET clause, an important protection that requires states to treat investors and their investments fairly and equitably.

444.    *First*, in the context of its scope, Article II(2) refers, like Article VIII, to "*investments or returns of investors*". In this regard, the Tribunal refers to its reasoning regarding the phrase "*transfer of investments and returns*" found in the FTF cause (see *supra* paras 355-356) and notes that Article II(2) also covers Claimant's claims relating to currency exchange and repatriation of funds from ticket sales in Venezuela.

445.    *Second*, the Parties disagree as to the standard to be applied in the context of this clause. The disagreement arises from the use of the phrase "*in accordance with the principles of international law*" in the clause. Respondent contends that the reference to "principles of international law" in Article II(2) clearly indicates that the FET, to which Canadian investors are entitled under the BIT, is "*inexorably linked to the minimum standard under customary international law*". On this basis, "*violations to the fair and equitable treatment standard need to rise to the level of acts of 'willful neglect of duty, and insufficiency of action failing far below international standards, or even subjective bad faith'*".[581] Moreover, according to Respondent, the BIT in this case is closely linked to the NAFTA and a proper interpretation must necessarily take into account that the Parties established limitations to Article II(2) on the basis of the NAFTA.[582] However, Claimant submits that Respondent seeks to apply an overly restrictive interpretation of international law.[583] According to Claimant, this is wrong because the FET standard of the BIT is not synonymous with the century-old international minimum standard, and even if Respondent were right, the argument that the threshold for finding of a breach of the FET standard under the BIT is particularly high would be incorrect. This is because, outside of the NAFTA content, the international minimum standard has evolved so that it comports generally with the treatment due to investors under the autonomous FET standard.[584]

---

[580] Exh. C-1 (BIT).
[581] Counter-Memorial, paras 334-335.
[582] Rejoinder, paras 216-220.
[583] Reply, paras 128-147; C-PHB, para. 58.
[584] Reply, paras 130-131.

446.    The Tribunal does not ignore the fact that such standards have been interpreted both ways, i.e.,:

– one that follows the NAFTA direction of the customary international law minimum standard, which requires a high threshold to find a violation,[585] and

– one that follows a more liberal, low-threshold direction that embraces various elements of what is fair and equitable as developed not only in investment law but, international law generally.[586]

447.    The Tribunal's starting point in determining the relevant threshold for FET in the present case is the BIT itself (not any other instrument) and international law as set out in the applicable provision namely Article XII(7) of the BIT (see *supra* paras 145-146).

---

[585] See, for example, Exh. RL-84 (Alex Genin), para. 367 ("*Article II(3)(a) of the BIT requires the signatory governments to treat foreign investment in a 'fair and equitable' way. Under international law, this requirement is generally understood to 'provide a basic and general standard which is detached from the host State's domestic law.' While the exact content of this standard is not clear, the Tribunal understands it to require an 'international minimum standard' that is separate from domestic law, but that is, indeed, a minimum standard. Acts that would violate this minimum standard would include acts showing a wilful neglect of duty, an insufficiency of action falling far below international standards, or even subjective bad faith. Under the present circumstances—where ample grounds existed for the action taken by the Bank of Estonia—Respondent cannot be held to have violated Article II(3)(a) of the BIT.*"); Exh. RL-87, *Occidental Exploration and Production Company v. The Republic of Ecuador*, LCIA Case No. UN3467, Final Award, 1 July 2004, paras 188-190 ("*188. There is still one aspect that the Tribunal needs to address in respect of this Article and the arguments of the parties related thereto. The Article provides that in no case shall the investment be accorded treatment less favorable than that required by international law. This means that at a minimum fair and equitable treatment must be equated with the treatment required under international law. 189. The issue that arises is whether the fair and equitable treatment mandated by the Treaty is a more demanding standard than that prescribed by customary international law. 190. The Tribunal is of the opinion that in the instant case the Treaty standard is not different from that required under international law concerning both the stability and predictability of the legal and business framework of the investment. To this extent the Treaty standard can be equated with that under international law as evidenced by the opinions of the various tribunals cited above. It is also quite evident that the Respondent's treatment of the investment falls below such standards.*").

[586] See, for example: Exh. CL-18 (Crystallex), para. 530 ("*The Tribunal starts its analysis of FET by elucidating the content of the standard. In this respect, the Tribunal begins with the examination of the formulation 'in accordance with the principles of international law', which is found in Article II(2) o the Treaty, quoted above. The Tribunal is of the opinion that the FET standard embodied in the Treaty cannot – by virtue of that formulation or otherwise – be equated to the 'international minimum standard of treatment' under customary international law, but rather constitutes an autonomous treaty standard. Unlike treaties such as NAFTA, which expressly incorporate the minimum standard of treatment, the Canada-Venezuela BIT nowhere refers to such minimum standard.*"); Exh. CL-4, *Compañia de Aguas de Aconquija S.A. and Vivendi Universal v. Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007 ("Vivendi"), para. 7.4.7 ("*The Tribunal sees no basis for equating principles of international minimum standard of treatment. First, the reference to principles of international law supports a broader reading that invites consideration of a wider range of international law principles than the minimum standard alone. Second, the wording of Article 3 requires that the fair and equitable treatment conform to the principles of international law, but the requirement for conformity can just as readily set a floor as a ceiling on the Treaty's fair and equitable treatment standard. Third, the language of the provision suggests that one should also look to contemporary principles of international law, not only to principles from almost a century ago.*"); Exh. CL-15, *Valores Mundiales, S.L. and Consorcio Andino S.L. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/13/11, Award, 25 July 2017 ("Valores"), para. 530.

In this regard, the Tribunal takes the following view:

– The Tribunal reads this provision as a stand-alone norm. It is clearly not synonymous with the standard of protection in the NAFTA context. The fact that Article II(2) refers to "principles of international law" does not imply that these "principles" are synonymous with customary international law or to the "international minimum standard".

– Rather, international law requires this Tribunal to interpret the concept of fair and equitable treatment in a manner consistent with the context of investor-State arbitration and the purpose of the BIT itself, namely investment protection. In this regard, the more liberal approach, which focuses on the broadly consistent elements of "fair and equitable", is appropriate.

– These elements are the respect for an investor's "legitimate expectations", the obligation not to act in an arbitrary, inconsistent or discriminatory manner, and the existence of transparency.[587]

---

[587] Exh, CL-72, *S Rumeli Telekom A.S. and Telsim Mobil v. Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008, para. 609 ("*The parties rightly agree that the fair and equitable treatment standard encompasses inter alia the following concrete principles: - the State must act in a transparent manner; - the State is obliged to act in good faith; - the State's conduct cannot be arbitrary, grossly unfair, unjust, idiosyncratic, discriminatory, or lacking in due process; - the State must respect procedural propriety and due process. The case law also confirms that to comply with the standard, the State must respect the investor's reasonable and legitimate expectations.*"; Exh. CL-117, *Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, 14 January 2010 ("Lemire"), paras 284-285 ("*The FET standard defined in the BIT is an autonomous treaty standard, whose precise meaning must be established on a case-by-case basis. It requires an action or omission by the State which violates a certain threshold of propriety, causing harm to the investor, and with a causal link between action or omission and harm. The threshold must be defined by the Tribunal, on the basis of the wording of Article II.3 of the BIT, and bearing in mind a number of factors, including among others the following: - whether the State has failed to offer a stable and predictable legal framework; - whether the State made specific representations to the investor; - whether due process has been denied to the investor; - whether there is an absence of transparency in the legal procedure or in the actions of the State; - whether there has been harassment, coercion, abuse of power or other bad faith conduct by the host State; - whether any of the actions of the State can be labeled as arbitrary, discriminatory or inconsistent. 285. The evaluation of the State's action cannot be performed in the abstract and only with a view of protecting the investor's rights. The Tribunal must also balance other legally relevant interests, and take into consideration a number of countervailing factors, before it can establish that a violation of the FET standard, which merits compensation, has actually occurred: - the State's sovereign right to pass legislation and to adopt decisions for the protection of its public interests, especially if they do not provoke a disproportionate impact on foreign investors; - the legitimate expectations of the investor, at the time he made his investment; - the investor's duty to perform an investigation before effecting the investment; - the investor's conduct in the host country.*"); Exh. CL-12 (Rusoro), paras 523-525 ("*Art.II.2 of the BIT simply states that each Contracting Party shall accord protected investments or returns 'fair and equitable treatment'. 523. Although the Treaty does not provide further guidance, it is generally accepted that this undefined legal concept requires States to adopt a minimum standard of conduct vis-à-vis aliens. A State breaches such minimum standard if actions (or in certain circumstances omissions) occur, for which the State must assume responsibility, and which violate certain thresholds of propriety or contravene basic requirements of the rule of law, causing harm to the investor. The obligation to provide FET binds all branches of government, and can be disavowed - by administrative acts, adopted by the government or its agencies, targeting the investor or its investment directly, - by judicial decisions, approved by the State's judicial system, which are directed directly against the investor or the investment personally and which amount to a denial of justice, - or finally by legislation, approved by the legislative power, or regulation,*

448.    Invoking such elements by adopting a liberal FET approach does not lower the threshold for finding a violation. Indeed, as established by arbitral tribunals, "*the decision of what is fair and equitable shall depend on the facts of each specific case*". Moreover, these elements are also to be measured against a State's interest, such as regulating to protect its public interest.[588] Accordingly, the Tribunal considers that an investor must positively prove an act of the State which:

–    Contradicts reasonable *legitimate expectations* of the investor regarding the protection of its interests and its rights at the time of the investment.[589] This does not require the expectation of stabilization of the legal environment if such stabilization is not expressly provided for in the BIT.[590] Expectations must be assessed in light of all the circumstances of the case.[591]

–    Fails to provide a *transparent environment* in which to make and operate one's investment, in the sense that the procedures that must be followed are clear and

---

*adopted by government (or by another authority with regulatory powers), affecting citizens in general, and the protected investor and investment in particular. 524. The required threshold of propriety must be defined by the tribunal after a careful analysis of facts and circumstances, and taking into consideration a number of factors, including among others the following: - whether there has been harassment, coercion, abuse of power or other bad faith conduct by the host State; - whether the State had made specific representations to the investor, prior to the investment; - whether the State's actions or omissions can be labelled as arbitrary, discriminatory or inconsistent; - whether the State has respected the principles of due process and transparency when adopting the offending measures; - whether the State has failed to offer a stable and predictable legal framework, breaching the investor's legitimate expectations. 525. In evaluating the State's conduct, the Tribunal must balance the investor's right to be protected against improper State conduct, with other legally relevant interests and countervailing factors. First among these factors is the principle that legislation and regulation are dynamic, and that States enjoy a sovereign right to amend legislation and to adopt new regulation in the furtherance of public interest. The right to regulate, however, does not authorize States to act in an arbitrary or discriminatory manner, or to disguise measures targeted against a protected investor under the cloak of general legislation. Other countervailing factors affect the investor: it is the investor's duty to perform an appropriate pre-investment due diligence review and to show a proper conduct both before and during the investment."); Exh, CL-18 (Crystallex), paras 539- 542 ("Arbitral tribunals have on numerous occasions attempted to capture the somewhat elusive essence of FET and, with a view to ascertaining the ordinary meaning of the phrase 'fair and equitable treatment', have extracted a number of elements which they considered inherent components of the standard. The Tribunal considers the findings of these tribunals in this respect to be instructive as they evidence what is nowadays considered to be the core of the 'fair and equitable treatment' standard. […].");* Exh. CL-15, (Valores), para. 539 ("*From the construction and application that different arbitral tribunals have given to the obligation to grant fiar and equitable treatment, some elements commonly accepted as part of the standard arise. These components include, inter alia, the obligation not to act in an arbitrary or discriminatory manner, abide by due process and to act in a consistent and transparent manner. It has also been understood that 'the guarantee of fair and equitable treatment […] is an expression and constitutive part of the principle of good faith recognized by international law' and must therefore be construed in light of such principle. In any case as established by the tribunal of Modev. v. USA, the decision of what is fair and equitable shall depend on the facts of each specific case.*"); Exh. CL-25, *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/09/1, Award, 22 September 2014 ("Gold Reserve"), paras 569-574; See also Reply, paras 143-147.

[588] Exh. CL-117 (Lemire), para. 285; Exh. CL-12 (Rusoro), para. 525.

[589] Counter-Memorial, para. 356; Reply, para. 151; Exh. RL-93, *El Paso Energy International Company v. The Argentine republic,* ICSID Case No. ARB/03/15, Award, 31 October 2011, para. 348.

[590] Rejoinder, para. 221.

[591] Counter-Memorial, para. 356; Reply, para. 151; Rejoinder, para. 224.

obvious and are in fact followed.[592] This does not mean that the investor has to be involved in the decision-making process, but only that the legal framework for the investor's operation is readily apparent and allows the investor to trace decisions affecting its investments back to that legal framework.[593]

− Treats an investor's investment in a manner that is not arbitrary, inconsistent or discriminatory as compared to the investments of other investors.[594] Indeed, this must be measured against a State's right to regulate in the public interest.[595]

449.    Accordingly, the Tribunal will assess whether Respondent's treatment of Claimant's investments complies with the BIT's FET standard by considering the following elements: (i) legitimate expectations, (ii) transparency and (iii) arbitrariness, inconsistency or discrimination.

*(iii)    Did Respondent violate Article II(2) of the BIT?*

450.    The Parties disagree as to whether Respondent treated Claimant's investments and returns in violation of Claimant's legitimate expectations and in an arbitrary and non-transparent manner.[596]

---

[592] Reply, paras 197-200; Exh. CL-30, (Frontier), para. 285 ("*The protection of the investor's legitimate expectations is closely related to the concepts of transparency and stability. Transparency means that the legal framework for the investor's operations is readily apparent and that any decisions of the host state affecting the investor can be traced to that legal framework. Stability means that the investor's legitimate expectations based on this legal framework and on any undertakings and representations made explicitly or implicitly by the host state will be protected. The investor may rely on that legal framework as well as on representations and undertakings made by the host state including those in legislation, treaties, decrees, licenses, and contracts. Consequently, an arbitrary reversal of such undertakings will constitute a violation of fair and equitable treatment. While the host state is entitled to determine its legal and economic order, the investor also has a legitimate expectation in the system's stability to facilitate rational planning and decision making.*"); Exh. CL-12 (Rusoro), para. 525. While Respondent is sceptic that an obligation of transparency, including an investment or the investor in the decision-making process, should be read into Article II(2), it submits that its application could not go to the lengths presented by Claimant, According to it, although transparency is not required as a condition it is good administrative practice to render the legal framework for the investor's operation readily apparent and give the investor to trace decision affecting its investments to that legal framework. See Counter-Memorial, paras 390-392; Rejoinder, para. 242. Respondent's reliance on Exh. RL-99, *Cargill, Incorporated v. United Mexican States*, ICSID Case No. ARB(AF)/05/2, Award, 18 September 2009, para. 294 is inapt, as that case excludes transparency as an element for the customary international minimum standard: "*The Tribunal holds that Claimant has not established that a general duty of transparency is included in the customary international law minimum standard of treatment owed to foreign investors per Article 1105's requirement to afford fair and equitable treatment. The principal authority relied on by the Claimant-Tecmed- involved the interpretation of a treaty-based autonomous standard for fair and equitable treatment and treated transparency as an element of the 'basic expectations' of an investor rather than as an independent duty under customary international law.*"). Here, the Tribunal is instead confronted with an autonomous standard.

[593] Counter-Memorial, paras 390-392; Rejoinder, para. 242.

[594] Reply, paras 148-150; Exh. CL-18 (Crystallex), para. 578 ("*a measure is for instance arbitrary if it is not based on legal standards but on excess of discretion, prejudice or personal preference, and taken for reasons that are different from those put forward by the decision maker.*")

[595] Counter-Memorial para. 370; Rejoinder, para. 323; Exh. RL-97 (ELSI), para. 128 ("*Arbitrariness is not so much something opposed to a rule of law, as something opposed to the rule of law. [...] It is a wilful disregard of due process of law, an act which shocks, or at least surprises, a sense of juridical propriety.*").

[596] Claimant (Reply, para. 126); Respondent (Rejoinder, para. 215).

To decide, *the Tribunal* will first point to the relevant facts and then assess whether Respondent is liable based on its considerations of the interpretation of Article II(I).

a. <u>Facts</u>

451.  The Tribunal has already set out the relevant facts above in relation to Claimant's FTF claim (see *supra* para. 367). There is no need to repeat them here. However, the Tribunal will set out in more detail the facts which it considers to be more relevant to the present claim. Specifically, it will be recalled that:

–  <u>On 17 March 2014</u>, Air Canada submitted the Suspension Notice to INAC.[597]

–  <u>In late March 2014</u>, Venezuela announced that it would allow airlines to repatriate their revenues.[598]

–  <u>On 28 April 2014</u>, Air Canada wrote to the President of INAC requesting a meeting to clarify the Suspension Notice and the repatriation of its funds.[599]

–  <u>On 28 May 2014</u>, Air Canada wrote to the Venezuelan Vice President to discuss the suspension of its operations in Venezuela and to clarify any misunderstandings in relation to the Suspension Notice.[600]

–  <u>On 13 June 2014</u>, IATA's Director General and CEO sent a letter to the President of Venezuela "*on behalf of the airline members of the* [IATA] *that operate flights to Venezuela*", concerning the members' "*blocked monies from airline ticket sales in Venezuela*" and "*a number of serious concerns*" expressed from them in this respect.

–  <u>On 10 July 2014,</u> Air Canada wrote to the Minister for Popular Power, Air and Water Transport, in relation to its suspension of operations in Venezuela. Air Canada noted that it had contacted the Vice President directly but had not received a response.[601]

–  <u>On 3 October 2014,</u> Air Canada wrote to the Minister for Popular Power of Economic, Finance and Public Banks, reiterating what it had already written to the Minister for Popular Power, Air and Water Transport and noting its willingness to meet and resolve the issue of repatriating Air Canada's funds.[602]

---

[597] Exh. C-49, Letter from Air Canada to the President of INAC, dated 17 March 2014; RfA, para. 29; Memorial, para. 67.
[598] Memorial, para. 78.
[599] Exh. C-91, Letter from Air Canada to the President of INAC, dated 28 April 2014; Memorial, para. 83.
[600] Exh. C-56, Letter from Air Canada to the Vice-President of Venezuela, dated 28 May 2014; Memorial, para. 84.
[601] Exh. C-57, Letter from Air Canada to the Minister of Popular Power, Air and Water Transport, dated 10 July 2014; Memorial, para. 85.
[602] Exh. C-58, Letter from Air Canada to the Minister of Popular Power of Economy, Finance and Public Banks, dated 3 October 2014; Memorial, para. 86.

– <u>Between May and October 2014</u>, Venezuela entered into agreements with other international airlines and negotiated settlements regarding their outstanding AADs. Under these agreements, Venezuela had approved their AAD requests for U.S. dollars corresponding to ticket sales in the country in 2012 and 2013, using the exchange rate of 6.3 bolivars. Specifically, Venezuela approved several requests submitted by Lufthansa, Aeromexico, Insel Air, Tame Ecuador, Aruba Airlines, Avianca, and LACSA-TACA in 2012 and 2013.[603]

For example, <u>on 30 May 2014</u>, the Minister of People's Power for Air and Water Transportation wrote to Lufthansa informing it that CENCOEX (formerly CADIVI) "*authorized the Currency Acquisition Requests made by* [Lufthansa . . .] *which will be implemented as follows* [. . .] *The currency acquisition requests* [. . .] *scheduled for fiscal year 2013 will be considered under an Exchange Rate of six bolivars and thirty cents (VEF 6.30) per US dollar (US$ 1).*"[604]

– <u>On 15 June 2016</u>, Air Canada provided Venezuela with a written notice of dispute pursuant to Article X(II) of the Canada-Venezuela BIT.[605]

b. <u>Assessment</u>

*Legitimate expectations*

452. The Parties dispute whether Respondent breached Claimant's legitimate expectations when it allegedly prevented it from repatriating the proceeds of its ticket sales in Venezuela. In particular, Claimant argues that it never expected Respondent's foreign reserves to be unlimited or Respondent to freeze the Bolivar – U.S. dollar exchange rate or the relevant legal regulatory framework. It legitimately expected that Respondent would review and grant its AADs without delay, based on the framework that Respondent had agreed and established for repatriation of investments and returns and the same and transfer of foreign currency, namely the BIT, the ATA and Providencia No. 23.[606] Respondent argues that Claimant could never legitimately expect that all of its AAD requests would be approved, as it began operations in in 2004, after the Venezuelan foreign exchange regulations (and, in particular, Providencia No. 23 and Exchange

---

[603] Exh. C-52, Gobierno venezolano cancela deuda a seis aerolíneas, ULTIMA HORA, 26 May 2014; Exh. C-53, El Gobierno de Venezuela salda deudas con seis aerolíneas internacionales, ABC INTERNACIONAL, 27 May 2014; Exh. C-54, Venezuela Reaches Deals With Six Airlines to Pay Dollar Debt, BLOOMBERG, 26 May 2014; Exh. C-149, Letter from United Airlines to the Minister of Aquatic and Aerial Transportation, 29 July 2014; Exh. C-150, Letter from TAP Portugal to the Minister of Aquatic and Aerial Transportation; Exh. C-151, Letter from Cubana de Aviacion S.A. to CENCOEX, 10 October 2014; Exh. C-152, Letter from the Minister of Aquatic and Aerial Transportation to Lufthansa, 29 May 2014; Exh. C-153, Tiara Air's Clear and Irrevocable Declaration of Will, 4 June 2014; Exh. C-154, TAM Lineas Aereas' Clear and Irrevocable Declaration of Will, 22 July 2014; Exh. C-155, Aeromexico's Clear and Irrevocable Declaration of Will, 26 May 2014; Exh, C-156, Arubaanse, Clear and Irrevocable Declaration of Will, 26 May 2014; Exh. C-157, Insel Air International's Clear and Irrevocable Declaration of Will, 26 May 2014; Exh. C-158, Aerolineas Argentinas' Clear and Irrevocable Declaration of Will, 16 May 2014. See also C-PHB, para. 83.

[604] Exh. C-152, Letter from the Minister of Aquatic and Aerial Transportation to Lufthansa, 29 May 2014.

[605] Exh. C-14 (Notice Letter). See also Exh. C-1 (BIT).

[606] Reply, paras 152-165.

Agreement No. 1). These regulations make the processing of AAD requests subject to the availability of foreign currency and the directives of the National Executive, thus providing for the possibility that any given AAD request may be rejected.[607]

453.    The Tribunal considers the following.

454.    *First*, as noted above, the right to a free transfer of funds, as codified in Article VIII of the BIT, but also in the ATA, is an imperative right for an investor who decides to invest in a country (see *supra* para. 351). For an airline such as Air Canada, this right becomes particularly important the moment it decides to establish its local business there, which includes setting up the Toronto-Caracas-Toronto route and an office in Venezuela for the purpose of selling tickets locally. Therefore, the Tribunal considers that Claimant did in fact acquire, as it claimed, legitimate expectations that it would be granted the right to exchange and repatriate the proceeds of its ticket sales in the country when it decided to invest in and establish the route, in accordance with the relevant legal and regulatory framework. These expectations were based on the international treaties that Canada had signed with Venezuela, as well as the Venezuelan legal framework, i.e., *inter alia*, the BIT, the ATA and Providencia No. 23 (for the domestic legal framework see *supra* para. 368).[608] Indeed, the repatriation of funds sought not only by Claimant, but by many international airlines operating in Venezuela, was essential to ensure the viability of their business, for which they devoted aircraft, personnel and capital; in the case of Claimant, approximately 80% of route's revenue came from sales in Venezuela and was generated in Bolivars, so repatriation was indispensable to ensure the viability of its route.[609]

455.    Thus, Claimant's expectation was not only fundamental and legitimate, but reasonable. Indeed, this is what happened during the time Claimant operated its route. Between July 2004 and November 2012, Claimant filed, and CADIVI approved, 91 AAD requests that allowed Air Canada to repatriate approximately U.S.$ 91 million worth of returns generated in Venezuela from ticket sales on the route. In reliance on this, and until the route was discontinued, Claimant had continued to invest in Venezuela.[610]

456.    *Second*, the Tribunal must reiterate that Claimant's right to exchange and repatriate funds was mandatory under the BIT and the ATA and not a possibility, as Respondent contends.[611] At the same time, it was not absolute, but subject to the limitations imposed by the relevant foreign exchange regime, which had to be applied at all times in a non-capricious and non-discriminatory manner, regardless of whether the exchange of currency was conditional on the availability of currency (see *supra* paras 352-353). Thus, the Tribunal's conclusion in this regard is not based on an interpretation of Article 2

---

[607] Rejoinder, para. 225.
[608] Pittman WS II, para. 21.
[609] Pittman WS, para. 19; See also Exh. C-19, IATA Urges Governments to Address Airline Blocked Funds, IATA Press Release, 2 June 2016 (quoting Tony Tyler, IATA's Director General and CEO: "*The airline industry is a competitive business operating on thin margins. So the efficient repatriation of revenues is critical for airlines to be able to play their role as a catalyst for economic activity. It is not reasonable to expect airlines to invest and operate in nations where they cannot efficiently collect payment for their services.*")
[610] Pittman WS, para. 23.
[611] Rejoinder, para. 225.

Providencia No. 23 (on which the Parties disagree) or on the pertinence of Article 7 of Providencia No. 23 and Article 7 of Exchange Agreement No. 1,[612] but on its overall assessment of the relevant regimes (the BIT, the ATA and the regime relevant to the CADIVI in processing the AAD requests in the present case; see *supra* paras 352-353, 368).

457.   In the present case, it is undisputed that there is no evidence that Respondent dealt with or processed Claimant's 15 AAD requests pursuant to the CADIVI process set out above (see *supra* para. 368), let alone that it informed Claimant of any CADIVI decision in this regard. Mr. Blanco testified that he did not know whether any operational analyst had ever reviewed the 15 AAD requests or whether any of the operational analysts had made any recommendations with respect to those requests. Mr. Blanco also testified that he had not seen any CADIVI Commission decision on those requests. There is in fact no document in the record reflecting any decision-making in this regard.[613]

458.   With respect to the application of the LOPA and the argument that the absence of a response to an AAD request after four months is automatically considered a rejection,[614] the Tribunal reiterates its reasoning above regarding the impact on Claimant's AADs (see *supra* paras 361, 372, 375 and 377). It specifically refers to Mr. Blanco's testimony that having AADs "*under analysis*" for years is a departure from normal procedure and he has never seen a file that, after three years, is still under review or under analysis.[615] Under

---

[612] The Parties dispute the interpretation of the word "may" in the English version or "*podrán*" in the Spanish version of Article 2 of Providencia No. 23 and, in particular, whether that provision means that Claimant enjoyed a possibility that it would be permitted to repatriate its proceeds using Respondent's exchange mechanisms subject to the availability of foreign currency. Article 2 in its English version reads specifically as follows: "*Foreign international air transportation providers duly authorized by the National Institute for Civil Aviation (INAC) may, acting through authorized currency exchange operators, acquire the foreign currency necessary for them to remit to their home offices, in their home office, the net balance of their revenue from ticket sales, cargo and mail freight at each sales point minus all costs, expenses and taxes payable by them in Venezuela for the adequate and safe operation.*" See Exh. C-9 / R-11. Article 7 of Providencia No. 23 on the fact that AADs are subject to currency availability provides, in its English version, as follows: "*The authorizations by international air transportation companies to acquire foreign currency will be subject to currency availability as established by the Central Bank of Venezuela (BVC) and the directives issued by the National Executive in the corresponding norm*". See Exh. C-9 / R-11. Similarly, in its English version Article 7 of Exchange Agreement No. 1 provides as follows: "*The Central Bank of Venezuela, in application of its own mechanisms and using the information that the National Executive and Public Entities shall submit to it, will set the currency availability that will be administered in accordance with the provisions of this Agreement and will inform the National Executive and the Foreign Currency Administration Commission (CADIVI). This availability will be adjusted and/or revised by the Central Bank of Venezuela, every time the conditions of the reserves and cash flow in the foreign currency of said Issuing Entity so determines, of which it will inform to the Foreign Currency Administration Commission (CADIVI). For the purposes of determining currency availability, the Central Bank of Venezuela shall take into account the monetary, credit and exchange conditions related to monetary stability and to the orderly development of the economy, as well as the levels of international reserves.*" In turn, Article 8 provides: "*The Central Bank of Venezuela will only see foreign currency in accordance with the currency availability determined by said Institution and in accordance with the provisions of Article 7 of this Exchange Agreement.*" See Exh. C-31 / RL-52. See also the Tribunal's consideration *supra* fn 504. The Tribunal need not assess whether Respondent's international commitments take precedence over the terms of Exchange Agreement No. 1 in light of its findings above (see *supra* para. 456). For the Parties' positions in this context see Claimant (Reply, paras 156-163) and Respondent (Counter-Memorial, paras 357-358; Rejoinder, para. 225, 228).

[613] Tr. 11.03.2020, 114:2-3, 124:13-15, 128:14-17.

[614] Counter-Memorial, para. 385; Rejoinder, para. 245.

[615] Tr. 11.03.2020, 154:16-20.

the procedure described by Mr. Blanco or the application of the LOPA, one had to have a reasoned decision to challenge a rejection or provide more information in the case of a suspension. In fact, CADIVI has always made a decision – whether to deny an application or request additional information – and has not remained silent for the LOPA to work.[616]

459.    It is significant that despite the fact that Respondent acknowledges that Claimant could only legitimately expect the CADIVI process to be respected, Respondent never responded to Claimant's efforts to reach out to officials to pursue the status and settle the outstanding amounts in respect of the 15 AAD requests (see *supra* paras 367 and 451). Regardless of the reason behind Respondent's inaction, Respondent should have at least responded to Claimant's inquiries and requests.

460.    Therefore, the Tribunal finds that Respondent's failure to address or process Claimant's 15 AAD requests in accordance with the applicable rules violates Claimant's legitimate expectations.

*Transparency*

461.    The Tribunal will also briefly assess whether CADIVI's failure to process the AADs as described above constitutes an independent breach of Respondent's obligation to act transparently in relation to Claimant's investments.[617]

462.    As noted above, if CADIVI had processed Claimant's AADs, then all sorts of evidence reflecting such processing would be available (see *supra* para. 457). The operation of the LOPA and in particular the operation of an adverse silent decision of which Claimant should have allegedly been aware,[618] does not relieve Respondent of its transparency obligations under the BIT's FET provision. Nor does the fact that Venezuelan law informed Claimant that AADs would be processed subject to the availability of currency as were determined by the Venezuelan Central Bank and the National Executive.[619] This is because Claimant had the right to be informed of the status of its AAD requests, as well as the reasons why these were not approved by Respondent, particularly in light of its repeated appeals for information and settlement in this context. All the more so because Mr. Blanco testified that the CADIVI Commission's decision would be reasoned so that the applicant could appeal the decision to the appropriate body or, if a decision was made to suspend consideration of the AAD, submit additional information in support of the AAD request.[620] For this reason, Respondent's invocation of its right to regulate in the public interest and therefore to have priority in the handling of its currency (which the Tribunal does not dispute)[621] plays no role in its obligation to act transparently with respect to Claimant's 15 AADs and to afford Claimant a minimum level of due process

---

[616] Tr. 11.03.2020, 126:22-128:1.
[617] Claimant (Memorial, paras 145-151; Reply, paras 196-207); Respondent (Counter-Memorial, paras 385-394; Rejoinder, pars 242-248).
[618] Counter-Memorial, para. 385; Rejoinder, para. 245; Exh. RL-54 (LOPA), Articles 4 and 60.
[619] Rejoinder, para. 246; Exh. C-9 / R-11 (Providencia No 23), Article 7; Exh. C-12 (Providencia No. 124); Exh. C-31 / RL-52 (Exchange Agreement No. 1), Article 7.
[620] Tr. 11.03.2020, 126:23-128:1.
[621] Rejoinder, para. 248.

from the time they were filed. As such, the fact that Claimant has suspended its operations also plays no role.[622]

463.    Thus, in the present case, the Tribunal finds no evidence of how such requests were handled, if at all. Therefore, Respondent's treatment of Claimant's investment in this regard was not transparent.

*Arbitrariness, Inconsistency or Discrimination*

464.    The Tribunal will further briefly consider whether Respondent discriminated against Claimant and treated it inconsistently or arbitrarily compared to other international airlines with similar AADs.

465.    As seen above, between May and October 2014, Venezuela entered into at least ten agreements with other international airlines. Pursuant to such agreements, it approved hundreds of millions of dollars' worth of AADs from those airlines (see *supra* paras 367 and 451). By contrast, it is undisputed that Venezuela failed to do so in connection with Air Canada's 15 AAD requests. This was despite Claimant's requests, which resulted in Claimant suspending its operations.

466.    Respondent relies on its right to regulate in the public interest, and therefore to prioritize the allocation of its currency, as a justification behind its disparate treatment of Claimant's AAD requests (see also *supra* para. 264).[623] In this context, it argues as follows:

> *When Claimant decided to "jump ship" and abandon the route it had been operating without undue interference from the Republic for almost a decade, other companies understood the social and public interest dimension of the service they were providing and continued to operate. In circumstances in which it was becoming increasingly difficult for CADIVI to administer the ebbing available currency, the government established clear priorities. In this context it was only reasonable and proportionate for the Republic to give preference to those airlines who were still operating, thus ensuring the public service of air transportation of passengers.*[624]

467.    The Tribunal does not follow Respondent's argument that it favored other airlines after Claimant discontinued its route. Indeed, both before and after Claimant suspended the Toronto-Caracas-Toronto route, it had made efforts to clarify and/or resolve the situation with respect to its 15 AADs. Respondent had not responded to those efforts, let alone in a manner that would reassure Air Canada by suggesting that a settlement might be forthcoming. Even more, while settlements with other carriers were taking place, Claimant was still evaluating its options in connection with its unanswered AADs. In fact, in its letter of 17 March, Claimant communicated its intention to reevaluate the resumption of the route. Thus, Respondent's failure to include Claimant in these discussions and to keep the status of Air Canada's requests "under review" long thereafter

---

[622] Counter-Memorial, para. 394.
[623] Rejoinder, para. 248.
[624] Counter-Memorial, para. 394.

demonstrates that Respondent did not intend to continue its dealings with Claimant as an investor in the aviation sector. If Respondent had not intended to discriminate against Claimant, it would have approached Claimant (or at least responded to its inquiries) in the same manner it did with other airlines.

468. Moreover, the Tribunal has already rejected all possible reasons for Respondent's failure to deal with Claimant's AADs (see *supra* paras 380-396 including, in particular, Respondent's allegation that Claimant delayed to submit its AADs while it sought to obtain the IVSS Certificates or that Claimant had failed to respond to CADIVI's requests for information, or that I had failed to pursue alternatives) that could have served as a defense to its treatment towards Claimant. With respect to the argument that the airlines abused the CADIVI system, the Tribunal refers to its findings above that Respondent had established the CADIVI system as the only available legal system by which the airlines could clearly exercise their right to repatriate their funds. As regards the argument that legal resources, administrative and judicial, were available to Claimant but that it did not avail itself of them,[625] the Tribunal refers to the procedure set out above in connection with AAD requests (see *supra* para. 368) and to the fact that, in view of Respondent's inaction in particular, Claimant did not have such means at its disposal.

469. Therefore, the Tribunal finds that Respondent discriminated against Claimant and treated it inconsistently, if not arbitrarily, compared to other international airlines with similar pending AAD requests during the same period.

470. In light of the foregoing, the Tribunal finds that the combined violation of Claimant's legitimate expectations, as well as Respondent's failure to treat Claimant in a transparent and non-discriminatory manner, results in a breach of Respondent's obligation to treat Claimant in a fair and equitable manner pursuant to Article II(2) of the BIT.

*(iv)    Conclusion*

471. In view of the foregoing, the Tribunal finds that ***Respondent breached Article II(2) of the BIT***.

## 4.    Article VII of the BIT: Expropriation

### 4.1    The Parties' positions

*(i)    Claimant*

472. Claimant submits that Respondent unlawfully expropriated Claimant's investments and returns.

---

[625] Rejoinder, paras 238-240.

473. Article VII of the BIT provides Claimant with broad rights against expropriation.[626] It prohibits Respondent from expropriating protected investments or returns unless it meets stringent requirements. As in the case of the FTF and FET provisions, Article VII specifically refers to "returns of investors" as well as "investments".[627]

474. Although the BIT does not define "expropriation" or "nationalization," the concepts are well-defined under international law. The BIT's wording uses "nationalization" and "expropriation" interchangeably and also includes "*measures having an effect equivalent to nationalization or expropriation*", commonly referred to as "indirect expropriation".[628] Expropriation can take many names and forms. Here, regardless of semantics, Respondent's acts and omissions clearly violate Article VII of the BIT.[629] Specifically, while Claimant maintains that Respondent directly expropriated Claimant's investments and returns, the distinction between direct and indirect expropriation is ultimately academic in this case. There is no serious dispute that at minimum Respondent is liable to Claimant for "indirect" expropriation.[630] Such expropriations were also unlawful and not excusable as proper exercise of Respondent's sovereign powers.[631]

475. *First*, Respondent directly expropriated Claimant's investments and returns.

476. Direct expropriation "*involves the investor being deprived of property and a corresponding appropriation by the state, or state-mandated beneficiary, of specific property rights*".[632] The most common form of direct expropriation is state acquisition to pursue national economic policies.[633]

477. The BIT provides only limited situations in which a Contracting Party may prevent an investor from transferring its returns in a convertible currency and none of those situations apply in the present case. Neither *Providencia No. 23* nor Exchange Agreement No. 1 restrict Claimant's free transfer rights to a mere "possibility" or otherwise justify Respondent's actions.[634]

478. Here, Respondent dispossessed Claimant of its returns and its "investments" defined as money and/or claims to money. It "took" Claimant's right to U.S. dollars, representing Claimant's in-country revenues that could be repatriated. The taking effectively transferred those U.S. dollars to Respondent to use for other purposes for which it needed scarce hard currency. The taking directly resulted from CADIVI's refusal to act upon

---

[626] Reply, para. 209.
[627] Memorial, paras 152-153; Reply, para. 210.
[628] Memorial, para. 154.
[629] Memorial, para. 155.
[630] Reply, paras 211- 212.
[631] Reply, para. 213.
[632] Memorial, para. 156 quoting Exh. CL-34 A. Newcombe & L. Paradell, *Law and Practice of Investment Treaties: Standards of Treatment* (Kluwer Law International Jan 2009) ("Newcombe & Paradell"), p. 340; Reply, para. 214.
[633] Memorial, para. 156.
[634] Reply, para. 215 referring to Exh. C-9 / R-11 (Providencia No. 23) and Exh. C-31 / RL-52 (Exchange Agreement No. 1).

Claimant's 15 properly submitted AADs. Respondent's acts and omissions amounted to an outright taking of Claimant's money or, at a minimum, Claimant's claims to money.[635]

479.   *Second*, and in any event, Respondent indirectly expropriated Claimant's investments and returns.[636]

480.   In the event that the Tribunal finds that Respondent's acts and omissions do not constitute a direct expropriation, then doubtlessly they constitute an "indirect expropriation" or, in the words of the BIT, "*measures having an effect equivalent to nationalization or expropriation*". Investment tribunals recognize that a state's interference with an investor's rights may constitute an indirect expropriation. The *Tecmed* tribunal's analysis of indirect expropriation is particularly instructive.[637]

481.   In the instant case, all of the elements the *Tecmed* tribunal considered relevant to a finding of indirect expropriation are present.

– Claimant has been deprived of the economical use and enjoyment of its returns and investments. Respondent's refusal to allow Claimant to convert and expatriate its revenues stripped away any "*real substance*" or value from those revenues. It forced Claimant to retain its revenues in Bolivars – a currency that was quickly plunging in value and useless outside of Venezuela – and forego any meaningful use of the relevant ticket sales proceeds, which should have been promptly expatriated as valuable U.S. dollars. Thus, Respondent stripped away the economic value of Claimant's returns.

– Respondent's conduct amounts to a *de facto* expropriation. It had the severe effect of depriving Claimant of its ability to freely use and enjoy its investments and returns. Respondent prevented Claimant from exercising its basic right to use the property (here, the revenues) it generated. Although Claimant was technically allowed to generate revenues, it was forced to maintain those revenues in country and in Bolivars, which were depreciating at a rapid pace. Therefore, it could not use its revenues or investments in Venezuela as it wished. Furthermore, Claimant's 15 AAD requests have been pending since 2013. Thus, the interference with its rights to its revenues has been permanent and constitutes an expropriation.

– Claimant should be compensated for Respondent's conduct. The BIT is clear in that Respondent is liable for measures having an effect equivalent to expropriation. Claimant provided a service to its customers, for which it was paid, and is entitled to the value of those payments absent Venezuelan interference.

---

[635] Memorial, para. 157; Reply, para. 216.
[636] Reply, para. 217.
[637] Memorial, paras. 158-160 quoting Exh. C-1 (BIT), Article VII and referring to Exh. CL-7, *Técnicas Medioambientales Tecmed, S.A. v. United Mexican States*, ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003 ("Tecmed"), para. 116.

Respondent's conduct not only deprived Claimant of the value of its revenues, but it also blocked the repatriation of its revenues completely.[638]

482.  The only benefit to Claimant from operating in Venezuela was the U.S. dollar value of the income derived from ticket sales in-country, which accounted for approximately 80% of its sales for the Toronto-Caracas-Toronto route. Respondent's measures, effectively deprived Claimant of 80% of its total returns from the route, and 100% of its returns from ticket sales in Venezuela, thus rendering worthless the entirety of its investments and activities in Venezuela.[639]

483.  The fact that Claimant has retained possession and been able to dispose of its Bolivars in Venezuela is irrelevant. Legally, what is at issue is Respondent's expropriation of Air Canada's "investments" and "returns," as defined by the BIT.[640]

484.  The fact that Claimant ultimately spent the bulk of its Bolivars in Venezuela has no bearing on Respondent's liability for the earlier expropriation of Claimant's investments. But for Respondent's unlawful acts and omissions, Claimant would never have incurred the extraordinary in-country expenses that it ultimately had to pay with the Bolivars that were still on its account in Venezuela i.e., for ticket refunds and wind-down costs following Claimant's forced withdrawal from Venezuela. These amounts are additional costs to Claimant that do not excuse Respondent's unlawful acts.[641]

485.  *Third*, Respondent's acts and omissions constitute an unlawful expropriation.

486.  The BIT sets forth the requirements for a lawful expropriation: the actions or measures must be: (i) for a public purpose; (ii) under due process of law; (iii) in a nondiscriminatory manner; and (iv) against prompt, adequate, and effective compensation. Respondent must comply with these requirements cumulatively in order for an expropriation to be lawful.[642]

487.  Here, Respondent did not comply with any of the requirements for a lawful expropriation. Its taking was of money, and it never provided any compensation in any form. There was no public purpose to Respondent's acts and omissions; no purpose was ever articulated. There was no due process, as all of Claimant's attempts to engage Venezuelan authorities fell upon deaf ears. Furthermore, there was obvious discrimination against Claimant in terms of the treatment some other similarly situated airlines received.[643]

488.  Further, Respondent's expropriations are not excused as a proper exercise of its sovereign powers. This is not an actual defense to any of the claims in this case nor is it based on any language of the BIT. In any event, Respondent did not discharge its burden of proof in this respect. It has not established that hard currency shortages prevented it from

---

[638] Memorial, paras 161-165; Reply, paras 220-221.
[639] Reply, para. 222.
[640] Reply, para. 223.
[641] Reply, para. 224.
[642] Memorial, para. 166; Reply 225.
[643] Memorial, para. 167; Reply, paras 226-232.

approving Claimant's long-pending AADs. It has also failed to establish that Claimant's withdrawal from the Venezuelan market in March 2014, after months of it receiving no response to its AADs, somehow excuses Respondent's earlier inaction in approving those AADs and its breach of the free transfer obligations contained in the BIT and the ATA.[644]

489.    For all of the foregoing reasons, Respondent unlawfully expropriated Claimant's investments and returns in violation of Article VII of the Treaty.[645]

*(ii)    Respondent*

490.    Respondent submits that there was no expropriation.[646]

491.    At the outset, under public international law, the power to expropriate is a sovereign prerogative, which may be exercised under certain conditions, such as those found in Article VII of the BIT. There is no such thing as "*broad rights*" against expropriation.[647]

492.    *First*, Claimant did not have a "right" to U.S. dollars susceptible of being expropriated. The starting point for any expropriation analysis is necessarily the identification of the "asset" that is susceptible of being expropriated. The first question to be addressed is that of the existence of an "interest" that is protected. Article VII of the BIT defines such interests as "*investments or returns of investors*".[648]

493.    Claimant did not have an absolute right to U.S. dollars under Venezuelan law susceptible of being expropriated. Under *Providencia No. 23* and Exchange Agreement No. 1, Claimant, like the other international airlines operating in Venezuela, had the possibility of applying for the acquisition of foreign currency at the official, preferential rate, subject to the availability of foreign currency as determined by the Central Bank of Venezuela. This possibility was never an absolute right, and the passage of time and repeated approvals of Claimant's AAD requests over the years do not transform it into one. Adding to this, foreign currency acquisition through CADIVI was in fact not the only possibility for Claimant and the other airlines and economic actors in the country. Individuals, companies and others wishing to have access to foreign currency were able to do so through the alternatives that existed and evolved over time in the Republic. There was no "right" and thus no taking.[649]

494.    *Second*, and in any event, Claimant had retained possession and control of its funds and had actually been able to freely dispose of them as it had seen fit.[650]

495.    The difference between a direct expropriation and an indirect one turns on whether the legal title of the owner is affected by the disputed measure. In a direct expropriation the

---

[644] Reply, paras 233-238.
[645] Memorial, para. 167; Reply, para. 239.
[646] Counter-Memorial, para. 395.
[647] Rejoinder, para. 258 quoting Reply, para. 209.
[648] Counter-Memorial, paras 396-398 referring to Exh. C-1 (BIT), Article VII; Rejoinder, paras 253-257.
[649] Counter-Memorial, paras 399-401 referring to Exh. C-9 / R-11 (Providencia No. 23) and Exh. C-31 / RL-52 (Exchange Agreement No. 1); Rejoinder, paras 270-271, 275, 277.
[650] Counter-Memorial, para. 402.

title is taken. For its part, in an indirect expropriation, there is no interference with the title but there is a deprivation of the possibility to use and enjoy the "asset" or "interest" in a meaningful way.[651] Thus, the distinction is far from academic.[652]

496.    There are two cumulative requirements for there to be a direct expropriation: "[d]*irect expropriation involves the investor being deprived of property and a corresponding appropriation by the state, or state-mandated beneficiary, of specific property rights.*"[653] Claimant did not prove there had been either (i) a deprivation of property or (ii) a corresponding appropriation by Respondent for each of its claim for expropriation of its alleged right to transfer money and its claim for expropriation of its alleged entitlement to U.S. dollars.[654] Claimant did not have an absolute right to U.S. dollars under Venezuelan law susceptible of being expropriated.[655] Further, there was no such thing as "*returns in U.S. dollars*", or at least none that were or could have been affected by Respondent's sovereign monetary policy, including its Forex regime.[656] In addition, Claimant did not show that the CADIVI's refusal of the AAD requests would have prevented it from acquiring U.S. dollars by other means.[657] What is more, Claimant itself conceded that it still holds the Bolivars resulting from the sale of its airline tickets. And the evidence shows that Claimant had actually been able to dispose of its funds as it has seen fit. For the purpose of assessing any impact on Claimant's title, it is clear that there had been none.[658] Thus, Claimant's case on direct expropriation fails.[659]

497.    Claimant's case on indirect expropriation also fails.[660] Claimant has not seen the value of such funds impacted, let alone destroyed, by any government measure.[661] Impact on the economic value of an "interest" or "asset" is the relevant consideration for a finding of expropriation when there has been in fact no taking of the title, as in the instant case. In what is a mostly pacific interpretation, an indirect expropriation implies such an interference with property that it destroys its value.[662] Indeed, Claimant must demonstrate that its allegedly protected assets have suffered from an important degree of deprivation and that said degree of deprivation is caused by a measure with permanent effects taken by the State.[663]

498.    In the instant case, there was no indirect expropriation because Claimant not only retained possession and control of its assets, but it was able to freely dispose of them as it has seen fit. A claimant, such as Air Canada, which not only retains full possession and control (or

---

[651] Counter-Memorial, para. 403.
[652] Rejoinder, para. 260.
[653] Rejoinder, paras 260-266 quoting Exh. CL-34 (Newcombe & Paradell), p. 339.
[654] Rejoinder, paras 260-269.
[655] Rejoinder, para. 275.
[656] Rejoinder, para. 277.
[657] Rejoinder, para. 278.
[658] Counter-Memorial, paras 404-405.
[659] Rejoinder, para. 279.
[660] Rejoinder, para. 279.
[661] Counter-Memorial, para. 406.
[662] Counter-Memorial, paras 407-410.
[663] Rejoinder, paras 282-291.

title) of its "interest" but is also able to freely dispose of it, cannot be said to have been substantially deprived of its interest.[664]

499.    On the other hand, in order to prove that there has been a compensable expropriation due to a substantial deprivation, a causal link is required between the disputed measure and the substantial deprivation.[665]

500.    In the present case, Claimant's business setbacks and its decision to abandon the Toronto-Caracas-Toronto route is not linked to the situation of its AAD requests nor can it be traced back to any alleged expropriatory conduct by Respondent. In any event, there is simply no evidence that Claimant was "*forced to suspend its Caracas flights*". The business decision to leave cannot in any way be attributed to Respondent or its conducts.[666] Further, Claimant failed to take into account that CADIVI was the most advantageous component of the Forex regime implemented by the Republic in 2003 because of its subsidized exchange rate but by no means the only one. It likewise failed to factor in the legal recourses available under Venezuelan law, which Air Canada chose not to exercise. Following the legal standard regarding indirect expropriation, Claimant had not demonstrated that CADIVI's negative silence regarding Claimant's AAD requests had been "*irreversible and permanent*" since it could have had to have recourse to legal action before Venezuelan courts and/or CADIVI to challenge the refusal of its AAD requests. Claimant also failed to demonstrate that its allegedly protected investments had "disappeared", or that their economic values have been "*neutralized or destroyed*" nor that this would have been due to the refusal by operation of the law of the 15 AAD requests.[667]

501.    Even if the only benefit to Claimant from operating the Toronto-Caracas-Toronto route in Venezuela were the U.S. dollar value of the income derived from ticket sales in-country, Claimant was not deprived of the same because of CADIVI's silence regarding the 15 AAD Requests. Indeed, had Claimant wished to convert its money in U.S. dollars, it simply could have done so through any of the regulated and unregulated alternatives it had at its disposal at the time. The fact that Claimant decided not to do so cannot suffice to establish a causal link between their alleged damage and the refusal of the 15 AAD requests by operation of Articles 4 and 60 of the LOPA.[668]

502.    In addition, Claimant had not established either that there was a loss of economic value or that if there was one, CADIVI's silence was its cause. In any case, the alleged loss in economic value would in any case be due to its negligence in seeking both (i) domestic remedy for CADIVI's silence regarding its AADs and (ii) its inertia in seeking for alternative ways of converting its Bolivar-earned profits into foreign currency.[669]

---

[664] Counter-Memorial, para. 411.
[665] Counter-Memorial, paras 412-413.
[666] Counter-Memorial, para. 414 quoting Memorial, p. 30, Section "D".
[667] Rejoinder, paras 292-294 quoting Reply, para. 221.
[668] Rejoinder, para. 297 referring to Exh. RL-54 (LOPA).
[669] Rejoinder, para. 299.

503.    As such, it is clear that there has been no "taking" nor the "*deprivation of any economic value*".[670]

504.    *Third*, even on Claimant's own case, Respondent is not liable for the payment of any compensation to Claimant, as the situation in which Claimant finds itself is nothing more than a case of the exercise of sovereign regulatory powers.[671]

505.    Tribunals have held that precisely the criteria to distinguish between a compensable expropriation and a non-compensable regulation is whether the measure is within the recognized police powers of the host State, as is indeed the case of public policy decisions with regard to currency and monetary policy.[672]

506.    In the instant case, CADIVI rejected Claimant's 15 AAD requests in light of the ebbing availability of foreign currency at the time, as expressly provided for in both *Providencia No. 23* and Exchange Agreement No. 1. This is part and parcel of Respondent's prerogative regarding its monetary policies.[673] Pursuant to Article 4 of the LOPA, with the passage of time Claimant's pending AAD requests were considered to be resolved in the negative. This came at a time when the Republic was dealing with ebbing currency availability, which had an impact on CADIVI's currency administration functions. Claimant had furthermore abandoned the operation of the Toronto-Caracas-Toronto route, thereby interrupting the "public service" of air transportation of passengers.[674] Further, the hypothesis of "complete" restriction on the use of property must be set aside in the instant case, given that Claimant retained control over its funds.[675] Finally, Air Canada never even attempted to find a remedy to challenge CADIVI's negative silence despite the passage of time and the availability of domestic remedies under the LOPA nor did it seek other alternatives to convert its Bolivars into foreign currency.[676]

507.    Therefore, Respondent's conduct, even if characterized as having had an effect on Claimant's funds or "interests", was nothing more than non-compensable regulation. The Republic is thus not liable for the payment of any compensation to Claimant.[677]

508.    In light of the above, Respondent has not breached in any manner Article VII of the BIT.[678]

---

[670] Counter-Memorial, para. 415.
[671] Counter-Memorial, para. 416; Rejoinder, para. 300.
[672] Counter-Memorial, paras 417-418; Rejoinder, paras 301-305.
[673] Rejoinder, para. 314 referring to Exh. C-9 / R-11 (Providencia No. 23) and Exh. C-31 / RL-52 (Exchange Agreement No. 1).
[674] Counter-Memorial, para. 419 referring to Exh. RL-54 (LOPA); Rejoinder, para. 314.
[675] Rejoinder, paras 304-306 referring to Exh. R-42, Claimant's Bank Statements (Banco Mercantil) for January 2014 and April 2018.
[676] Rejoinder, para. 314.
[677] Counter-Memorial, para. 420; Rejoinder, paras 307-313, 315.
[678] Rejoinder, para. 316.

*4.2*       ***The Tribunal's analysis***

*(i)*       *The issue*

509.    The *issue* is whether Respondent expropriated or effectively expropriated Claimant's investments and returns by precluding Claimant from exercising its legal rights to exchange and repatriate its money and by expropriating or effectively expropriating Claimant's claims to U.S. dollars, therefore violating Article VII of the BIT (see *supra* paras 472 and 490).

510.    In order to decide this question, the Tribunal will proceed as follows:

–    *First*, it will set out the scope and requirements of Article VII of BIT on expropriation (Section (ii)).

–    *Second*, it will address the question of whether Respondent breached Article VII of the BIT (Section (iii)).

–    *Third*, it will conclude (Section (iv)).

*(ii)*      *Article VII of the BIT*

511.    Article VII on "Expropriation" provides the following:

> *1. Investments or returns of investors of either Contracting Party shall not be nationalized, expropriated or subjected to measures having effect equivalent to nationalization or expropriation (hereinafter referred to as "expropriation") in the territory of the other Contracting Party, except for a public purpose, under due process of law, in a non-discriminatory manner and against prompt, adequate and effective compensation. Such compensation shall be based on the genuine value of the investment or returns expropriated immediately before the expropriation or at the time the proposed expropriation became public knowledge, whichever is the earlier shall be payable from the date of expropriation or at the time the proposed expropriation became public knowledge, whichever is the earlier, shall be payable from the date of expropriation with interest at a normal commercial rate, shall be paid without delay and shall be effectively realizable and freely transferable.*

> *2. The investor affected shall have a right, under the law of the Contracting Party making the expropriation, to prompt review, by a judicial or other independent authority of that Party, of its case and of the valuation of its investment or returns in accordance with the principles set out in this Article.*

512.    Article VII includes the protection against expropriation of investments or returns of investors which does not meet certain legal requirements.

513.   *First*, in the context of its scope, Article VII, similar to Articles II(2) and VIII, refers to "*investments or returns of investors*". In this regard, the Tribunal refers to its considerations above (see *supra* paras 355-356 and 444) and notes that generally Article VII also covers Claimant's claims relating to currency exchange and repatriation of funds from ticket sales in Venezuela.

514.   *Second*, Article VII itself describes (but does not define) expropriation (i.e., "*referred to 'expropriation'*") as the "*nationaliz*[ation]*, expropriat*[ion] *or subject*[ion] *to measures having effect equivalent to nationalization or expropriation*" of an investor's returns or investments in the territory of the other Contracting Party. It prohibits such expropriation unless certain elements are met. From this description, the Tribunal can infer the following:

  –   The terms "nationalization" and "expropriation" are used interchangeably, and although they are not explicitly defined, they are presumed to refer to direct expropriation.

  –   The reference to "*measures having effect equivalent to nationalization or expropriation*" implies that Article VII also covers indirect expropriation.

  –   Article VII prohibits direct or indirect expropriation "*except for a public purpose, under due process of law, in a non-discriminatory manner and against prompt, adequate and effective compensation*". This means that such expropriations are *unlawful expropriations* unless these four elements are present and/or satisfied in a particular case.

515.   The Parties disagree on the proper legal standard for both direct and indirect expropriation in this case. While Claimant contends that the distinction between the two is largely academic,[679] Respondent disagrees.[680] Notwithstanding the distinction, which the Tribunal does not ignore, the difference between the Parties appears to be limited to the existence of a requirement of transfer of specific property rights and the degree of deprivation of the protected property rights.[681]

516.   The Tribunal notes that investment law jurisprudence is rich when it comes to definitions of direct and indirect expropriation. Indeed, there is a plethora of formulations from which tribunals can select and apply in a given case.

---

[679] Reply, para. 212

[680] Rejoinder, para. 260 referring to Exh. CL-34 (Newcombe & Paradell), p. 322 ("*The primary distinction in customary international law is between: (i) direct forms of expropriation in which the state openly and deliberately seizes property, and/or transfers title to private property to itself or a state-mandated third party; and (ii) indirect forms of expropriation in which a government measure, although not on its face effecting a transfer of property, results in the foreign investor being deprived of its property or its benefits.*"; Exh. CL-37, R. Dolzer & C. Schreuer, Principles of International Investment Law (Oxford University Press) ("Dolzer & Schreuer"), p. 92.

[681] Claimant (Reply, paras 214, 217-219); Respondent (Rejoinder, paras 264-266, 281-290).

517.    For example, *direct expropriation:*

  –  Is where "*the state openly and deliberately seizes property, and/or transfers title to private property to itself or a state-mandated third party*".[682]

  –  "[A]*rises where there is a forced transfer of property from the investor to the state, or a state-mandated beneficiary*"; "*involves the investor being deprived of property and a corresponding appropriation by the state, or state-mandated beneficiary, of specific property rights*"; and has as its "*most common form* […] [the] *state acquisition of property for public infrastructure or to pursue national economic policies*".[683]

  –  Is "*understood as the forcible appropriation by the State of the tangible or intangible property of individuals by means of administrative or legislative action*"; "*In considering the severity of the economic impact, the analysis focuses on whether the economic impact unleashed by the measure adopted by the host State was sufficiently severe as to generate the need for compensation due to expropriation. In many arbitral decisions, the compensation has been denied when it has not affected all or almost all the investment's economic value. Interference with the investment's ability to carry on its business is not satisfied where the investment continues to operate, even if profits are diminished. The impact must be substantial in order that compensation may be claimed for the expropriation.*"[684]

  –  "[M]*eans a forcible taking by the Government of tangible or intangible property owned by private persons by means of administrative or legislative action to that effect*" but "*also covers a number of situations defined as de facto expropriation, where such actions or laws transfer assets to third parties different from the expropriating State or where such laws or actions deprive persons of their ownership of such assets, without allocating such assets to third parties or to the Government.*"[685]

  –  Requires "*at least some essential component of property rights has not been transferred to a different beneficiary, in particular the State.*"[686]

---

[682] Exh, CL-34 (Newcombe & Paradell), p. 322.
[683] Exh, CL-34 (Newcombe & Paradell), p. 340.
[684] Exh. CL-28, *LG&E Energy Corp., LG&E Capital Corp., and LG&E International Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006 ("LG&E"), paras 187, 191. See also Exh. RL-142, *Metalpar S.A. and Buen Aire S.A. v. Argentine Republic*, ICSID Case No. ARB/03/5, Award on the Merits, 6 June 2008 ("Metalpar"), paras 172-174.
[685] Exh. CL-7 (Tecmed), para. 113
[686] Exh. CL-35, *Enron Corporation, Ponderosa Assets, L.P., v. Argentine Republic*, ICSID Case No ARB/01.3, Award, 22 May 2007, para. 243.

518.    In turn, *indirect expropriation*:

– Is where "*a State may expropriate property, where it interferes with it, even though the State expressly disclaims any such intention, and* […] *even though a State may not purport to interfere with rights to property, it may, by its actions, render those rights so useless that it will be deemed to have expropriated them.*"[687]

– "[I]*nvolves total or near-total deprivation of an investment but without a formal transfer of title or outright seizure.*"[688]

– Exists where claimant "*was radically deprived of the economical use and enjoyment of its investments, as if the rights related thereto* […] *had ceased to exist*"; it is distinct from a "*a regulatory measure, which is an ordinary expression of the exercise of the state's police power that entails a decrease in assets or rights*"ˆ; it is "*a de facto expropriation that deprives those assets and rights of any real substance* […] *the effects of the actions or behavior under analysis are not irrelevant to determine whether the action or behavior is an expropriation*"; "*it is understood that the measures adopted by a State, whether regulatory or not, are an indirect de facto expropriation if they are irreversible and permanent and if the assets or rights subject to such measure have been affected in such a way that '…any form of exploitation thereof…' has disappeared; i.e. the economic value of the use, enjoyment or disposition of the assets or rights affected by the administrative action or decision have been neutralized or destroyed. Under international law, the owner is also deprived of property where the use or enjoyment of benefits related thereto is exacted or interfered with to a similar extent, even where legal ownership over the assets in question is not affected, and so long as the deprivation is not temporary. The government's intention is less important than the effects of the measures on the owner of the assets or on the benefits arising from such assets affected by the measures; and the form of the deprivation measure is less important than its actual effects. To determine whether such an expropriation has taken place, the Arbitral Tribunal should not* […] *restrict itself to evaluating whether a formal dispossession or expropriation took place, but should look beyond mere appearances and establish the real situation behind the situation that was denounced.*"[689]

– Exists where "*a government measure, although not on its face effecting a transfer of property, results in the foreign investor being deprived of its property or its benefits*".[690]

– Exists where "*measures taken by a state can interfere with property rights to such an extent that the rights are rendered so useless that they must be deemed to have been expropriated, even though the state does not purport to have expropriated*

[687] Exh. CL-126, W. M. Reisman & R. D. Sloane, Indirect Expropriation and its Valuation in the BIT Generation, 2004 Faculty Scholarship Series (2004), para. 120 (quoting G.C Christie in 1962).
[688] Exh. CL-125, UNCTAD Series on Issues in International Investment Agreements II (2012), p. 7.
[689] Exh. CL-7 (Tecmed), paras 115-116.
[690] Exh. CL-34 (Newcombe & Paradell), p. 323.

> *them and the legal title to the property formally remains with the original owner*".[691]

- It must be considered that "[w]*hile the assumption of control over property by a government does not automatically and immediately justify a conclusion that the property has been taken by the government, thus requiring compensation under international law, such a conclusion is warranted whenever events demonstrate that the owner was deprived of fundamental ownership and it appears that this deprivation is not merely ephemeral.*"[692]

- "[R]*equires a certain level of sacrifice of private property in order to be found. Minor losses that are an incidental consequence to a general regulation of the economy adopted in the public interest are not considered to be expropriation giving rise to indemnification.*"[693]

- *Indirect expropriation* is generally an unreasonable interference with the use, enjoyment or disposition of one's property.

519.  The Tribunal does not find one formulation more fitting than the other. Rather, all are appropriate and founded on law. If the Tribunal were to distinguish some important elements, they would be:

- Appropriation or taking of property rights *for a direct expropriation*, and

- An interference with property to such an extent as to give rise to a right to compensation for *an indirect expropriation*. While this does not necessarily require the transfer of property rights, it does require some degree "*of sacrifice of private property*".[694]

520.  In either case, an appropriate assessment in this context would look at the circumstances of the case, and in particular "*the severity of the economic impact*" focusing "*on whether the economic impact unleashed by the measure adopted by the host State was sufficiently severe as to generate the need of compensation due to expropriation*".[695]

521.  Accordingly, the Tribunal will assess whether Respondent's treatment of Claimant's investments was in violation of the BIT's standard on expropriation.

*(iii)    Did Respondent violate Article VII of the BIT?*

522.  The Parties disagree as to whether Respondent treated Claimant's investments and returns in violation of the BIT's provision on protection against expropriation. To decide this

---

[691] Exh. CL-125, *Starrett Housing Corp. v. Islamic Republic of Iran*, 4 Iran-United States Claims Tribunal (1983) 122, 154.
[692] Exh. CL-36, *Tippetts, Abbett, McCarthy, Stratton v. TAMS-AFFA Consulting Engineers of Iran*, Award No. 141-7-2, reprinted in 6 IRAN-U.S. C.T.R. 219, dated 29 June 1984, p. 5.
[693] Exh, CL-8 (Continental Casualty), para. 284.
[694] Exh, CL-8 (Continental Casualty), para. 284.
[695] Exh. CL-28 (LG&E) para. 191; Exh. RL-142, (Metalpar), paras 172-174.

question, the Tribunal will first refer to the relevant facts and then assesses whether Respondent is liable based on its reasoning on the interpretation of Article VII (see *supra* paras 514-520).

a.  Facts

523.  The Tribunal need not repeat the facts relevant to the treatment of Claimant's claim under Article VII of the BIT. Instead, it shall refer to the same facts set out in detail in the discussion of Claimant's FTF and FET claims (see *supra* paras 367 and 451).

b.  Assessment

524.  The Tribunal considers the following.

525.  *First*, *with respect to direct expropriation*, it is recalled that Claimant's alleged expropriated rights concern its legal right to a free transfer of funds under the BIT, the ATA and Providencia No. 23, its money and/or claims to money and its returns in U.S. dollars in that connection.[696]

526.  The Tribunal has already held that Claimant's right to a free transfer of funds, though not absolute, was imperative and mandatory. It was not a mere possibility, as interpreted by Respondent, but a right which had to be respected by Respondent in accordance with a non-discriminatory and transparent application of the relevant foreign exchange regime (see *supra* paras 352-353, 456). On this basis, and after an assessment of the relevant facts (most of which also come into play almost identically in the context of Claimant's expropriation claims), the Tribunal found Respondent liable for breach of this right under both the FTF and FET provisions (see *supra* paras 398 and 471). However, the Tribunal's conclusion in this regard (based on an independent application of the requirements of those provisions concerning) cannot convert a free transfer of funds right into a property right that it itself is subject to direct expropriation. While Claimant's claims relating to currency exchange and repatriation of funds from ticket sales in Venezuela fall within the scope of Article VII of the BIT, the same is not true as to the right to free transfer of funds itself under the BIT, the ATA and Providencia No. 23. To hold otherwise would require this Tribunal to significantly stretch any formulation of direct expropriation and to find breach based on elements of other BIT provisions.

527.  Although the situation may initially appear somewhat different when it comes to Claimant's alleged expropriation of its money and/or claims to money and its returns in U.S. dollars in connection with Claimant's right to a free transfer of funds, the Tribunal is again of the view that it would be going too far to conclude that Respondent appropriated these U.S. dollars or claims to U.S. dollars in such a way that it would necessarily be obliged to pay compensation on the basis of a direct taking. This is all the more so because the 15 AAD requests had not been dealt with at all under the relevant procedure, let alone approved, so that ownership of the bolivar amount would pass on from Claimant to Respondent and ownership of the U.S. dollar amount would pass on from Respondent to Claimant. The fact that Claimant had a legitimate claim to have its bolívares converted

---

[696] Reply, para. 216.

into U.S. dollars and that Respondent was found liable for the breach of its international obligations in that respect, does not mean that an equal breach can be presumed in the context of direct expropriation.

528. *Second, with respect to indirect expropriation*, it is recalled that Claimant points to the fact that Respondent's failure to approve the 15 AADs effectively deprived Claimant of the use and economic benefit of its legal rights to U.S. dollars, its money and/or its claims to those U.S. dollars, and its returns. Specifically, Claimant contends that it was deprived of 80% of its total returns from the Toronto-Caracas-Toronto route (the only benefit to it from operating in Venezuela), and 100% of its ticket sales revenues in Venezuela, rendering the entirety of its investments and operations in Venezuela worthless. According to it, the fact that Claimant retained ownership of its bolivars in Venezuela and could dispose them, as it did, is irrelevant.[697]

529. As noted above, the Tribunal has concluded that Claimant's right to freely transfer funds, was imperative and mandatory (see *supra* paras 352-353, 456), and held Respondent liable for breach of the FTF and FET provisions of the BIT (see *supra* paras 398 and 471). In this regard, and although the Tribunal has not reached the point of deciding the claim for damages, it does not deny that this breach very likely had an impact on Claimant's investment in Venezuela, and that this impact is not insignificant. In particular, the Tribunal does not ignore the fact that Claimant had to suspend its operations as a result of Respondent's treatment of Claimant's 15 AAD requests.

530. What the Tribunal fails to see, however, is that Respondent's failure to treat the 15 AAD requests in accordance with the applicable regime and in the same manner as it did with other carriers caused a serious impact on Claimant's investment that warrants compensation on the basis of indirect expropriation. This is all the more true since Claimant itself reiterated its intention to return to Venezuela and to resume the Toronto-Caracas-Toronto route after reassessing the situation. Moreover, Claimant continued to carry out activities on the ground, even if these were limited to small activities such as refunding ticket and paying various expenses. In addition, Claimant did not lose its personal property in connection with its investment in Venezuela. Thus, although Respondent's acts or omissions had serious effects on Claimant's business, it did not occur to an extent that would justify a finding of indirect expropriation.

531. Therefore, the Tribunal does not find evidence of indirect expropriation of Claimant's investments or returns in this case.

532. *Third, with respect to the lawfulness of expropriation*, in light of the Tribunal's findings above on direct and indirect expropriation, the argument that any expropriation was unlawful because it did not meet the requirements of public purpose, due process, non-discrimination, and compensation is moot. Therefore, it is not necessary to address Respondent's argument that it is not liable for compensation because this was a case of non-compensable sovereign regulatory power or police power.[698]

---

[697] Reply, paras 221-224.
[698] Rejoinder, paras 300-315.

*(iv)*      *Conclusion*

533.    Therefore, the Tribunal finds that ***Respondent did not breach its obligations under Article VII of the BIT***.

**5.      Conclusion**

534.    In light of the foregoing, the Tribunal finds that Respondent breached its obligations under ***Articles VIII and II(1) of the BIT.***

## V.      Damages

**1.      The issue**

535.    Having found that Respondent has breached its obligations under Articles VIII and II(1) of the BIT, the Tribunal shall proceed to determine the damages, if any, arising from such breaches.

536.    ***Claimant*** requests that the Tribunal award to it

> *an order that Venezuela pay compensation to Air Canada for all damages suffered, plus pre-award compound interest up to February 29, 2020, in the amount of US$ 213,140,023 or, alternatively, in the amount of US$ 72,118,369;* [Claim. 3];
>
> *an order that Venezuela additionally pay Air Canada pre-award compound interest calculated from March 1, 2020 until the date of the Tribunal's award using Venezuela's cost of borrowing or, alternatively, Air Canada's cost of debt;"* [Claim. 4]; and
>
> *an order that Venezuela additionally pay Air Canada post-award compound interest calculated using Venezuela's cost of borrowing or, alternatively, Air Canada's cost of debt until the date of Venezuela's final satisfaction of the award;* [Claim. 6].

537.    ***Respondent*** requests that the Tribunal

> *Dismiss Air Canada's claim for compensation, as well as its claim for interest, or alternatively, reduce any amounts ordered as compensation on account of Air Canada's contributory fault, its unwise conduct or its improper actions;*[699] [Resp. 3]; and

---

[699] In its Counter-Memorial, Respondent requests the Tribunal to:

> *e. Declare:*

> *Order Air Canada to pay interest as the Arbitral Tribunal may consider appropriate on the amounts owed to the Republic as from the date of the award on costs and complete payment;* [Resp. 5].

538.    **The Tribunal** will address the damages of this case as follows:

– *First*, it will address the issues of entitlement to and quantification of damages (Section V.2).

– *Second*, it will address the issue of interest (Section V.3).

– *Third*, it will conclude (Section V.4).

## 2.    Entitlement to and quantification of damages

### 2.1    The Parties' positions

*(i)    Claimant*

<u>Entitlement to damages</u>

539.    Claimant submits that Respondent's conduct violated the BIT and international law and caused significant damage to Claimant. Therefore, it is entitled to full compensation as a result.[700]

540.    To determine compensation, the Tribunal should in the first instance look to any *lex specialis* in the BIT. The only *lex specialis* standard of compensation is found in Article VII of the BIT, which sets out the conditions that Respondent must satisfy for lawful expropriation.[701] The BIT does not expressly provide a standard of compensation for an unlawful expropriation or for other violations of the BIT, and thus the customary international law principle of full compensation fills the *lacuna* and provides the governing rules of compensation. Customary international law calls for the payment of full compensation. The principle of full reparation was first established by the Permanent Court of International Justice in the seminal 1928 case of *Chorzów Factory* between Germany and Poland[702] and has more recently been codified in the ILC Articles.[703]

---

*i. That Claimant is not entitled to any compensation; or in the alternative*
*ii. That Claimant has failed to quantify its damages; or in a further alternative*
*iii. That Claimant's entitlement to any compensation shall be reduced by 75% due to Claimant's contributory fault; or by 50% due to Claimant's unwise conduct; or, at the very least by 25% due to its improper actions.*
*f. Declare, if any damages are awarded to Air Canada, that Claimant is not entitled to any interest neither simple nor compound;*
*g. Dismiss all of Claimant's claims;*

[700] Memorial, para. 168.
[701] Memorial, para. 169; Reply, para. 244
[702] Memorial, paras 170-176 referring to and quoting Exh. CL-59, *Case Concerning the Factory at Chorzów*, PCIJ Ser. A, No. 17, Judgment No. 13, Merits, 47, 13 September 1928 ("*Chorzów*"); Reply, paras 244-245.
[703] Reply, paras 246-247 referring to Article 31 of the ILC Articles, Exh. CL-6.

541.    Claimant is entitled to full compensation for Respondent's violations of the BIT. Although Respondent breached each of those BIT standards, a violation of any one of them would entitle Claimant to full compensation.[704] In the instant case, each of Respondent's various breaches of the BIT led to exactly the same loss, namely the loss of the U.S.$ 50,618,073.89 that Claimant would have received in late 2013 and early 2014 if Respondent had allowed Claimant to exchange the 318,893,865.58 BSF worth of returns that Claimant held in its Venezuelan bank account for U.S. dollars at the then applicable rate, for onwards repatriation. Accordingly, the Tribunal need not distinguish between Venezuela's measures when determining the amount of compensation due to Claimant in these proceedings.[705]

542.    There is an unbroken and obvious causal link between Respondent's actions and Claimant's damages: Respondent prevented Claimant from converting and repatriating its revenues in U.S. dollars.[706]

543.    The revenues that Venezuela prevented Air Canada from repatriating should be undisputed. Air Canada submitted 15 ADDs to CADIVI through the official foreign exchange agent, Banco Mercantil. The foreign exchange agent received each of these ADDs and sent them to CADIVI. To date, the 15 ADDs appear within CADIVI's system, now CENCOEX, as pending "*under analysis*".[707]

544.    Further, Claimant did not cause or fail to mitigate its losses.

–    The fact that by February 2014, Respondent had refused to authorize more than $ 3.5 billion worth of AADs submitted by many different international airlines demonstrates the fallacy of the argument that Claimant was responsible for its losses. Venezuela's allegation regarding Claimant's supposed failure to explain the increase in its revenues does not absolve Respondent of responsibility. Respondent also cannot avoid liability by arguing that Claimant never sought administrative or judicial review of CADIVI's refusal to authorize the 15 AADs. Further, Respondent has not identified any alternatives to the CADIVI regulated market that were available to Claimant in 2013 and 2014. Respondent's allegation that Claimant contributed to its own losses by waiting to file this arbitration is spurious and without any legal basis. Finally, Respondent does not explain how Claimant's use of its Bolivars after March 2017 could possibly have contributed to the injury that it suffered in late 2013 and early 2014.[708] Concerning Respondent's reliance on Article 39 of the ILC Articles, such provision makes clear that not every action or omission by a claimant that contributes to the damage suffered is relevant to determining the amount of compensation. Here, Respondent has not proven that Claimant played any role whatsoever, much less that it acted "willfully" or "negligently" in connection with Respondent's arbitrary denial of

---

[704] Memorial, para. 177.
[705] Reply, para. 250.
[706] Memorial, para. 178; Reply, paras 253-255.
[707] Memorial, para. 179 referring to Exh. C-70, Printout from CENCOEX's website showing Air Canada's AAD requests as pending, dated 2 March 2018.
[708] Reply, paras 256-262.

Claimant's AADs.[709] The Tribunal should thus reject Respondent's attempts to invoke contributory negligence to reduce Claimant's compensation.[710]

– Concerning mitigation, for the same reasons that Respondent's arguments do not establish that Claimant caused its own damages, they do not establish that Claimant failed to mitigate its damages. The Tribunal should therefore reject this argument.[711]

*Quantification of damages*

545. Claimant's damages expert in this arbitration, Mr. Howard Rosen of FTI Consulting, reviewed and verified the 15 ADDs. As summarized by Mr. Rosen, Claimant should have been able to repatriate U.S.$ 50,618,073.90.[712]

546. Further, Respondent's criticisms of Mr. Rosen's reports are unfounded. Specifically:

– Claimant's claim is limited to the value of the unapproved AADs, calculated at the applicable exchange rate, plus interest. Mr. Rosen's determination of this amount does not require any "quantification model".[713]

– Respondent's criticisms of Mr. Rosen's independence are likewise without merit. Mr. Rosen is not a legal expert qualified to interpret Article VIII of the BIT and his acceptance of a legal assumption upon instruction was transparent and entirely appropriate.[714]

– Respondent wrongly argues that Mr. Rosen's opinion is based on unreliable information.[715]

– Further, Respondent's contention that Claimant "may have" inflated the price of its tickets in Bolivars in Venezuela, thereby overstating the amounts to be repatriated in its AADs is misplaced.[716]

547. Respondent's arguments and those of its expert are thus meritless.[717]

---

[709] Reply, paras 263-267 referring to Exh. RL-116, Article 39 of the ILC Articles.
[710] Reply, para. 268.
[711] Reply, paras 269-270.
[712] Memorial, paras 180-181; Reply, para. 242.
[713] Reply, para. 272.
[714] Reply, para. 273.
[715] Reply, para. 274.
[716] Reply, paras 275-276.
[717] Reply, para. 276.

*(ii)     Respondent*

<u>Entitlement to damages</u>

548.    Respondent submits that Claimant is not entitled to damages.[718]

549.    *First*, Claimant failed to meet its burden to prove the existence of an actual and concrete loss caused by the Respondent. This is enough in and of itself to dismiss Claimant's case on damages.[719]

550.    Claimant's case on damages consists on a multiplication of unsubstantiated claims rather than on an assessment of its alleged harm, its nature, its cause and extent, irrespective of whether its claims are brought for expropriatory or non-expropriatory damages.[720] In cases of claims for non-expropriatory damages, the doctrine and arbitral tribunals tend to treat differently cases depending on whether or not the alleged breach of a treaty involves a total or a partial loss of an asset.[721] The case is different in relation to the claims for alleged expropriatory damages.[722] Claimant recognizes the various breaches it invokes did not have the same impact nor caused the same harms, if any.[723]

551.    In any event, Claimant failed to prove it was deprived of its alleged investment, whichever it may be, or of any returns. Either Claimant was deprived of its Bolívar-denominated funds and could not have spent them, or it had not been dispossessed of said funds and was able to freely spend them, which it did. These contradictory statements defy all logic and do not assist Claimant in meeting its burden of proving its case on damages.[724]

552.    In these circumstances, any amount of money accorded to Claimant would amount to unjustified enrichment, not to compensation for damages.[725] Respondent therefore requests that the Tribunal reject Claimant's claims for compensation.[726]

553.    *Second*, Claimant failed to prove that the alleged damages were caused by Respondent.[727]

554.    Failure to establish a causal link between the alleged damages and the alleged actions of the Republic would also be sufficient, in and of itself, to entirely dismiss Claimant's claim for damages. This would be valid even in cases where States are found responsible of an international wrongful act.[728]

---

[718] Counter-Memorial, paras 423-424; Rejoinder, paras 317-318, 321.
[719] Counter-Memorial, paras 425-426; Rejoinder, para. 324.
[720] Counter-Memorial, paras 427-429; Rejoinder, para. 323.
[721] Counter-Memorial, para. 430.
[722] Counter-Memorial, paras 432-433.
[723] Rejoinder, para. 325.
[724] Rejoinder, para. 326.
[725] Counter-Memorial, para. 434.
[726] Rejoinder, para. 327.
[727] Counter-Memorial, para. 439.
[728] Counter-Memorial, paras 440-442; Rejoinder, para. 329.

555.    In the present circumstances, it is complicated – if not impossible – for Respondent to address the issue of causation.[729] Specifically, Claimant failed to point to any specific action attributable to Respondent that would have caused the damages for which it seeks compensation. Its entire case on causation relies on the unsubstantiated and cursory statement according to which "*Air Canada claims the U.S. dollar amounts that Venezuela prevented Air Canada from converting and repatriating*". This statement does not suffice to evidence any causation, in that there is neither any explanation nor any evidence as to how Respondent would have "prevented" Claimant from repatriating its funds.[730]

556.    Claimant has the burden to particularize its case on causation. It is not Respondent to try to guess what Claimant's case on causation is. Claimant failed to put forward a case on causation or, in any event, to meet its burden of proof. It failed to explain why or how the alleged violations of the BIT by Respondent could have caused Claimant any loss. This is true for both the non-expropriatory and expropriatory claims.[731]

557.    If, nevertheless, the Tribunal were to determine that the AAD requests were properly submitted and that CADIVI's refusal was wrongful in some meaningful way, Claimant would still be lacking a sufficient causal link between the alleged breach and the alleged loss. The proper submission of AAD requests is not a guarantee, in accordance with Article 7 of Providencia 23 and Article 9 of Providencia 124, the conversion into U.S. dollars is subject to the availability of U.S. dollars and the directives of the National Executive Branch.[732]

558.    Respondent therefore requests that the Tribunal dismiss Claimant's claims for damages in the absence of any evidence that Respondent has caused any such damages.[733]

559.    *Third*, and in any event, Claimant materially contributed to its own alleged injury. Indeed, Claimant refused to provide CADIVI with all the documents that had been requested in order to assess the accuracy of the 15 AAD Requests. Without this, CADIVI was not in a position to understand the abnormal increase of Air Canada's revenues and to assess whether the prices fixed by Air Canada, as required under the ATA, were reasonable. Furthermore, it failed to act as a "wise investor", because it did not attempt to acquire U.S. dollars through one of the alternatives to the CADIVI regulated market. Similarly, it contributed to its own injury by not even attempting to challenge CADIVI's negative silence before CADIVI itself or before the competent courts of Respondent and rather awaiting more than three years to lodge its claims.[734] It also disposed of its revenues in Bolivars and concealed this fact to the Tribunal. Therefore, the Tribunal could only

---

[729] Counter-Memorial, paras 443-445.
[730] Rejoinder, para. 328 quoting Reply, para. 251.
[731] Counter-Memorial, paras 446-447.
[732] Counter-Memorial, para. 448.
[733] Rejoinder, para. 330.
[734] Rejoinder, para. 331 quoting Exh. CL-43, *MRD Chile MTD Equity Sdn. Bhd. And MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/07, Award, 25 May 2004, para. 242.

attribute such loss to Claimant's own conduct and declare that Respondent's wrongful conduct does not amount to a sufficient nor to a direct cause of Claimant's loss.[735]

560.    At the very least, its suggestion that it was unaware of the existence of alternatives that would have allowed it to mitigate its alleged damages shows Claimant had been grossly negligent. Claimant's contributory fault should at least lead to a 75% reduction of any award on damages and that, in any event, such reduction should not be less than 25%.[736]

561.    *Fourth*, and in the alternative, the Tribunal should nevertheless take into consideration the fact that Claimant failed to mitigate its alleged loss[737] and reduce any award on damages.[738] It is undisputed that the principle of mitigation of damages is applicable in the instant case as a general principle of international law recognized by numerous arbitral tribunals.[739]

562.    Claimant could have challenged CADIVI's decision through various administrative and judicial recourses, the existence of which is undisputed. It did not, in breach of its obligation to mitigate its damages. Additionally, it failed to mitigate its alleged damages when choosing not to acquire U.S. dollars through the alternatives to the CADIVI regulated market. Claimant never had an unconditional right to obtain a favorable decision from CADIVI, nor did it ever have any right or any legitimate exceptions to have access to the CADIVI subsidized exchange rate of 6.3 Bolivars per U.S. dollar.[740] The Tribunal should therefore reject Claimant's claims for damages entirely and on this sole basis.[741]

563.    Even if the Tribunal were to consider that Claimant was entitled to benefit from CADIVI's preferential rate at all times, Claimant should have mitigated its damages and acquired U.S. dollars through one of the alternatives to CADIVI.[742]

564.    Finally, and in any event, Claimant has failed to mitigate its damages by initiating these proceedings in December 2016. By its negligence, it contributed to the aggravation of the damages it claims to have suffered due to the time value of money, which it estimates to be between U.S.$ 16,769,433 and U.S.$ 113,630,857 as of 30 November 2018. Thus, the Tribunal should also reject Claimant's claim for pre-award interests.[743]

565.    Based on the foregoing, the Tribunal should deny Claimant's claims for damages or reject its claims for pre-award interest.[744]

---

[735] Counter-Memorial, paras 449-450.
[736] Rejoinder, para. 332. See also Counter-Memorial, paras 449-457, for Respondent's proposed redactions on account of alleged contributory fault on the part of Claimant.
[737] Rejoinder, para. 333.
[738] Counter-Memorial, paras 435-438.
[739] Counter-Memorial, para. 437; Rejoinder, para. 334.
[740] Counter-Memorial, paras 435-438; Rejoinder, paras 335-337.
[741] Rejoinder, para. 338.
[742] Rejoinder, para. 339.
[743] Rejoinder, para. 340 referring to FTI Report II, para. 3.72, Figure 19.
[744] Rejoinder, para. 342.

*Quantification of damages*

566.   Respondent submits that Claimant's quantification of damages is fundamentally flawed. Mr. Rosen does not offer any relevant economic expert opinion but his report consists instead of factual and legal submissions.[745]

567.   *First*, neither Claimant nor Mr. Rosen have attempted to perform any damages quantification exercise.[746] The two-step methodology adopted by Mr. Rosen, namely to first verify six approved AAD requests and then verify the 15 AAD Requests, is not a quantification of damages but a mere matching exercise. The results obtained therefrom are not sufficient for the Tribunal to assess Claimant's damages, if any.[747]

568.   The claims as presented by Claimant have nothing to do with a claim for unpaid invoices, as Claimant would have the Tribunal believe. The 15 AAD Requests are not invoices and neither CADIVI nor Respondent have any debt towards Claimant. In any event, even a claim for an unpaid invoice would have required a more detailed analysis than the matching exercise performed by Mr. Rosen.[748]

569.   Mr. Rosen's so-called verification of the six previously approved AADs lead him to understand (i) that Claimant had repatriated funds at the official Bs./US dollar exchange rate through CADIVI, which is uncontroverted and inapposite for the present case and (ii) "*how unprocessed AADs would have been accounted for*", which is even more inapposite to quantify damages.[749]

570.   Therefore, Mr. Rosen has performed nothing more than a matching exercise. Thus, the Tribunal should disregard Mr. Rosen's methodology and discard his findings for the purpose of quantifying damages. If the Tribunal were to decide that Mr. Rosen might have applied the appropriate methodology to quantify damages, it should nevertheless find that the underlying documentation to Mr. Rosen's report is unreliable.[750]

571.   The documents on which Mr. Rosen's matching exercise was performed do not take into consideration various inconsistencies found in other documents related to Claimant's operations.[751] Specifically:

   –   Claimant's final tax declaration for 2013 appears irreconcilable with the monthly tax declarations that Claimant submitted to CADIVI in support of its 12 AAD requests for that year. It would have been easy for Mr. Rosen to identify those discrepancies. Thus, the declarations contained in the monthly income statements "verified" by Mr. Rosen cannot be relied upon to assess damages.[752]

---

[745] Counter-Memorial, paras 458-460; Rejoinder, pars 343-344.
[746] Counter-Memorial, paras 461-464.
[747] Rejoinder, para. 345.
[748] Rejoinder, paras 348-349.
[749] Counter-Memorial, paras 468 and 472 quoting FTI Report paras 3.10-3.11.
[750] Counter-Memorial, para. 474; Rejoinder, paras 345, 357.
[751] Counter-Memorial, para. 476.
[752] Counter-Memorial, paras 477-479.

– The documents on which Mr. Rosen relied contain various indicators that Air Canada may have inflated the prices of its ticket sold in Bolivars in Venezuela. If confirmed, this would necessarily lead to the conclusion that the amounts Claimant sought to repatriate through the 15 AAD Requests, or any amounts repatriated in the past, are overstated. Mr. Rosen does not discuss those obvious indicators.[753]

572. Mr. Rosen has not verified that the amounts reported by Claimant in its AAD requests actually correspond to the difference between the revenue Claimant collected on ticket sales in the Republic and its in-country expenses, including taxes. The only verification performed was circular and based on documents that cannot lead to any conclusive evidence that the amounts reported are accurate. Mr. Rosen's assessment exclusively relies on Claimant's own representations rather than on his independent analysis of contemporaneous documents.[754] Only the relevant audited and complete financial books of Claimant, as well as samples of their underlying documentation could have permitted Mr. Rosen to assess, in an independent manner, Claimant's net proceeds of ticket sales in the Republic.[755]

573. The results of Mr. Rosen's "analysis" is that the amounts authorized for repatriation by CADIVI were invariably lower than those sought by Claimant. In practice, Mr. Rosen's conclusion should have been that Claimant did not historically repatriate the amounts and therefore cannot, in the present arbitration, seek to repatriate $ 50.6 million.[756]

574. Therefore, Mr. Rosen's verifications are incomplete both in terms of underlying documents and in terms of methodology. Mr. Rosen did not have sufficient documents to properly quantify Claimant's damages, which he did not. Mr. Rosen simply performed a matching and cross-referencing exercise based on Claimant's own circular declarations, with no consideration of any economic reality. As stated by Dr. Flores, such an exercise "*does not come anywhere close to quantifying the economic losses allegedly suffered by Claimant*".[757]

575. *Second*, and in the alternative, Claimant's claims for damages are overstated. Claimant fails to take into account six factors that severely affect its quantification of damages, in spite of the findings in this respect of its own expert, Dr. Flores and Respondent. A consideration of these factors reduces Claimant's alleged damages by more than 50%, to U.S.$ 21,334,156.51.[758] Specifically:

576. *In relation to the SOTI tickets:* It is undisputed that Claimant had to limit the sale and issuing of tickets sold outside the Republic for trips originating from the Republic (the "SOTI Tickets" or "Sold Outside Ticketed In") to a maximum of 10% of its general sales volume. Dr. Flores and Mr. Rosen concur that the 15 AAD Requests include requests for

---

[753] Counter-Memorial, paras 480-481.
[754] Rejoinder, paras 351-352.
[755] Rejoinder, paras 351-353, 356
[756] Counter-Memorial, para. 465.
[757] Counter-Memorial, para. 491quoting Econ One Report, para. 13.
[758] Rejoinder, paras 358-359.

VEF 7,787,081.79 in excess of that limit. This amount must be deducted from Claimant's quantification of its alleged damages.[759] This is because, even in the "but for" scenario, Claimant would not have been authorized to acquire foreign currency for the net proceeds of its SOTI sales that were in excess of the agreed 10% limit.[760]

577.    Therefore, in order to avoid overcompensating Claimant, an amount of VEF 7,787,081.79 should be deducted from the amount Claimant claims it could have used in the "but for" scenario to acquire U.S. dollars. Dr. Flores has performed this calculation and Mr. Rosen agrees with the same. Once the correction is made, the amount in Bolivars that Air Canada would allegedly have been authorized to use to acquire U.S. dollars corresponds to VEF 310,563,655.03.[761]

578.    *In relation to the interest revenue:* Dr. Flores and Mr. Rosen concur that the 15 AAD Requests include an amount of VEF 739,672 corresponding to accrued interest revenue on funds deposited in Claimant's bank accounts in the Republic. This amount should be deducted. Under *Providencia No. 23*, and *Providencia No. 124*, as from 20 January 2014, Claimant was only authorized to submit requests for the acquisition of foreign currency equivalent to the net proceeds of its ticket sales, i.e., the difference between Claimant's proceeds from ticket sales and the costs due by it in the Republic. Interest revenue do not qualify as proceeds from ticket sales.[762] In the "but for" scenario, Claimant would not have been authorized to transfer such interest revenue outside of the Republic through AAD requests. The six "Approved AADs" analyzed by Mr. Rosen prove so.[763]

579.    Therefore, in order to reinstate Claimant in the situation in which it would have been but for the alleged breaches, it is necessary to further deduct an amount of VEF 739,672 from its quantification of the amount it would have allegedly been authorized to convert in foreign currency in the "but for" scenario. Dr. Flores has performed this calculation and Mr. Rosen agrees with the same. Once this adjustment is made, this amount corresponds to VEF 310,367,311.82.[764]

580.    *In relation to the applicable exchange rate:* Claimant should have used the rate applicable at the dates on which it would have been able to acquire the U.S. dollars it claims in this arbitration. In the instant case, it is appropriate to refer to the BIT in order to determine how many U.S. dollars Claimant would have been authorized to acquire in the "but for" scenario, which provides that the appropriate rate is the one "*applicable on the date of transfer*". Those dates need to be retroactively determined because no transfer occurred.[765] If the Tribunal were to reach the quantum aspect of the case, the "*without*

---

[759] Rejoinder, paras 360-361. See also Counter-Memorial, paras 468-471.
[760] Rejoinder, para. 363.
[761] Rejoinder, para. 365 referring to Exh. EO-2, Table 4.
[762] Rejoinder, paras 366-368. See also Counter-Memorial, paras 466-467.
[763] Rejoinder, paras 371-372.
[764] Rejoinder, para. 373 referring to Exh. EO-2, Table 4.
[765] Rejoinder, paras 374-377 quoting Exh. C-1 (BIT), Article VIII(2).

*delay*" expression of the BIT should be construed in light of the LOPA, to which both the 15 AAD Requests and CADIVI were subject.[766]

581.    Claimant would have allegedly been able to acquire in the "but for" scenario VEF 310,367,111.82 which corresponds to U.S.$ 27,321,048.51. Indeed, as Mr. Flores and Mr. Rosen agree, the applicable exchange rate went from 6.3 Bolivars per U.S. dollar to 11.36 Bolivars per U.S. dollar as from 24 January 2014.[767] Claimant was fully aware that the exchange rate of 6.3 Bolivars per U.S. dollar would never have been applied in the "but for' scenario to any of the 15 AAD Requests.[768] Claimant would, at best have been able to acquire U.S.$ 27,321,048.51 in the "but for" scenario with VEF 310,367,111.82.[769]

582.    Claimant's assessment based on the dates of submission of the AAD requests to CADIVI is incorrect. The exchange rate of 11.36 Bolivars per U.S. dollar should be applied at the very least in relation to the AAD request, corresponding to the month of December 2013. In such circumstances, i.e., if an exchange rate of 6.3 Bolivars per U.S. dollar is applied to the first 14 Controverted AAD Requests and a rate of 11.36 Bolivars per U.S. dollar is applied for the 15th AAD request, Claimant would allegedly have been authorized to acquire U.S.$ 47,664,214.53 with VEF 310,367,111.82.[770]

583.    *In relation to the free spending by Claimant of its Bolivars since 2014:* Claimant misrepresented that, as of 28 June 2018, it still held the Bolivars that it needed in order to acquire U.S. dollars through CADIVI in 2014 and has since then been forced to confess that it has freely spent those Bolivars. Beyond the fact that this affects its credibility, this has an impact on its case on damages.[771]

584.    In the instant case, Claimant claims for the U.S. dollars it says it should have acquired through CADIVI with VEF 310,563,655.03 but for the alleged breaches. At best, this would have corresponded to U.S.$ 27,321,048.51. However, Claimant fails to consider the fact that in order to acquire those U.S. dollars, it would have had to provide the Bolivar equivalent of the U.S. dollars it wanted to acquire, which at the time amounted to VEF 310,367,111.82. Even upon approval, an AAD request does not qualify as a debt towards Claimant.[772] It is thus necessary to assess the value of the Bolivars that Claimant spent since 2014 and deduct it from the U.S. dollars it would allegedly have been able to acquire in the "but for" scenario, i.e., $ 27,321,048.51.[773]

585.    Mr. Rosen concludes that between the end of March 2014 and the end of July 2018, Air Canada freely spent VEF 305,464,316. This corresponds to more than 98% of the funds Claimant should have had to provide in order to acquire the U.S. dollars it claims. According to Mr. Rosen, this corresponds, at the maximum, to U.S.$ 5,986,892. Since,

---

[766] Rejoinder, para. 379 quoting Exh. C-1 (BIT), Article VIII(2) and referring to Exh. RL-54 (LOPA).
[767] Rejoinder, para. 381.
[768] Rejoinder, para. 382 referring to Exh. R-76 (Air Canada's internal communication, e-mail from Daniela Mauro to Yves Dufrense et al. Subject: Conversation with Ben – VE, dated 4 March 2014).
[769] Rejoinder, para. 383.
[770] Rejoinder, paras 374, 384-387.
[771] Rejoinder, para. 389.
[772] Rejoinder, para. 390.
[773] Rejoinder, para. 393.

for reasons beyond its control Respondent avers not having been able to file a reply expert report, Respondent was left with no other choice than to rely, under strict reserves, on Mr. Rosen's quantification.[774] Thus, the amount of U.S.$ 5,986,892 must be deducted from Claimant's alleged damages, if any.[775] Thus, any compensation to Claimant, could not exceed U.S$ 21,334,156.5, corresponding to a cap rather than an accurate assessment because as of today, Respondent cannot confirm whether Claimant had spent the Bolivars that it still had on its Venezuelan bank accounts in July 2018. This deduction must be applied on any amount that the Tribunal will determine as corresponding to the U.S. dollars that Claimant would have been able to acquire through CADIVI in the "but for" scenario.[776]

586. Claimant's contention that this amount corresponds to "*additional, exceptional costs that Air Canada suffered as a result of Venezuela's measures*" is unsubstantiated and inapt.[777] In any event, a superficial review of the documents related Bolivars freely spent by Claimant between March 2014 and July 2018, reveals that the use of its funds is not remotely connected to the alleged breaches. The Tribunal should draw adverse inferences and conclude that none of the expenditures incurred by Claimant since March 2014 were caused by the alleged breaches.[778]

587. Further, Claimant does not make any specific claim in this proceeding for damages related to the alleged "additional costs" deriving from the alleged breaches on top of the value of the 15 AAD Requests. Claimant's disguised claim for damages for U.S.$ 5,986,892 for "additional costs" allegedly caused by the alleged breaches should therefore fail.[779]

588. *In relation to the fact that Claimant would have had to provide Bolivars to acquired* U.S. dollars*:* In order to make Claimant whole and not overcompensate it, the Tribunal will have to direct it to provide Respondent with the Bolivars equivalent of any damages awarded to it with respect to the 15 AAD Requests as per the exchange rate applicable in the Republic as at the date of the Award. As per Article VIII of the BIT, the relevant rate is the rate applicable at the date of transfer. In order to avoid overcompensation, the relevant rate to be considered cannot be the one that was applicable at the dates at which a transfer would have occurred for each AAD request in the "but for" scenario. In the instant case, Claimant has spent all of the Bolivars it held in the Republic. If it is ordered to provide Bolivars in exchange of the U.S. dollars that may be awarded to it, as would have been the case in the "but for" scenario, Claimant would have to acquire the Bolivars it no longer has. The equivalent U.S. dollars to the Bolivars would be U.S.$ 27,321,048.51. Any award should not compensate Claimant over U.S.$ 21,334,156.51 (i.e., the U.S dollar equivalent of the Bolivars of the 15 AAD

---

[774] Rejoinder, para. 394 referring to FTI Report II, Figure 12.
[775] Rejoinder, paras 395, 409.
[776] Rejoinder, paras 396, 409.
[777] Rejoinder, paras 397-398 quoting Reply, para. 262.
[778] Rejoinder, paras 400-407.
[779] Rejoinder, para. 408.

Requests minus the Bolivars spent thereafter).[780] In this connection, two scenarios may be compared:

- In the first scenario, the rate applicable to determine the amount in Bolivars that Claimant will have to provide in exchange of the U.S. dollars it may acquire through the award is the rate applicable at the date each of the transfer should have taken place.

- In the second scenario, the rate considered is the one applicable on the date of the Award.

589.    The first scenario leads to an unwarranted substantial enrichment for Claimant whereas the second comes as closely as possible to making Air Canada whole.[781] Thus, in order to make it whole, if need be, the Tribunal should order it to provide Respondent with the Bolivars equivalent of any U.S. dollars it found that Air Canada could have acquired through the 15 AAD Requests but for the alleged breaches. This equivalent should be determined pursuant to the average Bolivar per U.S. dollar exchange rate, as published by the BCV as at the date of the Award.[782]

590.    Based on the foregoing, the Tribunal should deny Claimant's claims for damages as being unsubstantiated.[783]

### 2.2    The Tribunal's analysis

### (i)    The issue

591.    The issue is whether Claimant is entitled to damages as a result of Respondent's breaches of Articles VIII and Article II(2) of the BIT and if so, how those damages should be quantified (see *supra* paras 537, 543, 546 and 564).

592.    To address this issue, the Tribunal will *first* consider the question of entitlement to damages (Section V.2), and *second*, if necessary, proceed to the question of quantification (Section V.2.2)(iii)).

### (ii)    Entitlement to damages

#### a.    The law

593.    The Tribunal has already found Venezuela in violation of Article VIII and Article II(2) of the BIT (see *supra* para. 534). The question is whether Claimant has suffered loss as a result of this violation that entitles it to damages.

---

[780] Rejoinder, para. 395.
[781] Rejoinder, para. 418.
[782] Rejoinder, para. 423.
[783] Counter-Memorial, para. 492.

594.    *First*, the Tribunal should look to the BIT to determine the requirements for damages or, in other words, compensation for the breach of the BIT itself. The only reference to compensation in the BIT itself is in the context of protection against expropriation in Article VII, the violation of which the Tribunal did not find (see *supra* para. 533). There is no other reference or guidance to this effect, particularly in relation to the violation of non-expropriatory norms. Accordingly, the Tribunal resorts to the provision of applicable law, namely Article XII(7) of the BIT, which requires it to decide issues in dispute, including the question of damages, in accordance with the BIT and the "*applicable rules of international law*".

595.    Although fundamentally a principle of customary international law, the Tribunal considers that the principle of "full reparation", developed in the PCIJ Judgment of *Chorzow Factory* and codified in the ILC Draft Articles, is a relevant international rule – particularly in investment arbitration – to be applied when considering questions of damages. In the *Chorzow Factory* judgment, the PCIJ held the following:

> *The essential principle contained in the actual notion of an illegal act – a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals – is that reparation must, so far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committee. Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for loss sustained which would not be covered restitution in kind or payment in place of it – such are the principles which should serve to determine the amount of compensation due for an act contrary to international law.*[784]

596.    In the present case, this would require the remedying of the consequences suffered by Claimant as a result of Respondent's violation of Article VIII and Article II(2) of the BIT.[785]

---

[784] Exh. CL-59, *Case Concerning Factory at Chorzów (Germany v. Poland)*, Judgment 13, PCIJ, 13 September 1928 (1928 PCIJ, Series A. No. 17) ("*Chorzów*"), p. 47; Exh. CL-132, *Flughafen Zürich A.G. v. Venezuela*, ICSID Case No. ARB/10/19, Award, 18 November 2014, para. 749; Exh. CL-25 (Gold Reserve), paras 675-679. See also, Exh. CL-6, International Law Commission Draft Articles on Responsibility of States for Internationally Wrongful Acts, 53th Sess., November 2001 ("ILC Draft Articles"), Articles 31, 34 and 36. Article 31 on "Reparation" provides as follows: "*1. The responsible State is under an obligation to make full reparation for the injury caused by the internationally wrongful act. 2. Injury includes any damages whether material or moral, caused by the internationally wrongful act of a State*". Article 34 on "Forms of reparation" provides as follows: "*Full reparation for the injury caused by the internationally wrongful act shall take the form of restitution, compensation and satisfaction, either singly or in combination, in accordance with the provisions of this chapter.*" Article 36 on "Compensation" provides as follows: "*1. The State responsible for an internationally wrongful act is under an obligation to compensate for the damage caused thereby, insofar as such damage is not made good by restitution. 2. The compensation shall cover any financially assessable damage including loss of profits insofar as it is established.*". See also Reply, paras 244-248.

[785] Exh. Cl-4 (Vivendi), para. 8.2.7 ("*Based on these principles, and absent limiting terms in the relevant treaty, it is generally accepted today that, regardless of the type of investment, and regardless of the nature of the illegitimate measure, the level of damages awarded in international investment arbitration is supposed to be sufficient to compensate the affected party fully and to eliminate the consequences of the state's action.*".

597.    *Second*, the Tribunal considers that the burden of proving the damage is on Claimant. Indeed, as Respondent submits, Claimant must prove actual and concrete loss.[786] In this case, it means that Claimant must concretize and prove the losses it has suffered as a result of Respondent's violation of Article VIII and Article II(2) of the BIT.

598.    *Third*, and importantly, the Tribunal also agrees with Respondent that it is crucial that there is a sufficient causal link between the breach and the damage caused.[787] Causation is not only a prerequisite for the claim for damages, but also has an impact on the amount or scope of the damages to be compensated. If only partial causation is proved, this may lead to a substantial reduction in damages.

599.    In the present case, this requires Claimant to prove a sufficient causal link between Respondent's act, found to be in breach of Article VIII and Article II(2) of the BIT, and the damage that Claimant seeks, which must be substantiated and proven.

600.    *Fourth*, there are certain cases in which the right to damages may be affected as follows:

   –    When there is a duty to mitigate damages on the part of the non-breaching party, and that party has failed to do so; and

   –    Where the non-breaching party is at fault in some way and that fault contributes to the loss suffered, known as "contributory fault".

601.    These principles, although not set out in the BIT, are among the applicable rules of international law and, to the extent they are invoked in the present case, the Tribunal must take them into account.

602.    In light of the above principles, the Tribunal will proceed to determine whether Claimant is entitled to its claimed losses arising from Respondent's breach of Article VIII and Article II(2) of the BIT.

   b.    The assessment

603.    It is recalled that Claimant seeks, as damages for Respondent's breach of all and/or any of the provisions of the BIT, the amount in U.S. dollars which it was unable to repatriate in respect of the 15 AAD requests which it submitted to CADIVI and that were never

---

[786] Rejoinder, para. 322.
[787] Rejoinder, paras 321, 329; Exh. RL-112, *Cargill, Incorporated v. Republic of Poland*, ICSID Case No. ARB(AF)/04/2, Award, 29 February 2008, para. 632 ("*Having said that, the Tribunal wishes to emphasize that compensation will only be awarded if there is sufficient causal link between the breach of the BIT and the loss sustained by the Claimant.* [...]."; Exh. RL-114, *Archer Daniels Midland Company and Tate & Lyle Ingredients Americas, Inc. v. The United Mexican States*, ICSID Case No. ARB (AF)/04/5, Award, 21 November 2007, para. 282 ("*Any determination of damages under principles of international law require a sufficiently clear direct link. between the wrongful act and the alleged injury, in order to trigger the obligation to compensate for such injury. A breach may be found to exist, but determination of the existence of the injury is necessary and then a calculation of the injury measured as monetary damages. This Tribunal is required to ensure that the relief sought, i.e., damages claimed, is appropriate as a direct consequence of the wrongful act and to determine the scope of the damage, measured in an amount of money.*").

processed.[788] Respondent objects, arguing that Claimant has failed to prove its alleged damages, as it has not specified its damages for the non-expropriatory damages in a concrete and precise manner, and has not established the required causal link between the act/omission and the damages.[789] In this regard, the Tribunal considers the following.

604.   *First*, the Tribunal found that:

–    Although Claimant was not absolutely entitled to the approval of its AAD requests, Respondent violated Article VIII of the BIT by failing to treat these requests in accordance with the applicable foreign exchange regime, thereby depriving Claimant of the opportunity to have its right to repatriation properly considered under the law (see *supra* paras 371-398).

–    In any event, Respondent has violated Article II(2) of the BIT by treating Claimant, and its AAD requests in particular, in an unfair and inequitable manner, contrary to the legitimate expectations of Claimant when it decided to invest in Venezuela, and in a non-transparent and discriminatory manner (see *supra* paras 452-471).

605.   In connection with all of its BIT claims, Claimant seeks as damages the same U.S. dollar amount that it would have received had Respondent approved its 15 AAD requests. The Tribunal considers that, based on its findings above, there is no reason why Claimant's 15 AAD requests would not have been approved. Indeed, they were properly submitted in accordance with the applicable procedure and there were no deficiencies on Claimant's part (see in particular the Tribunal's consideration of the possible reasons for Respondent's inaction *supra* paras 380-396). Moreover, while it is true that, as Respondent argues, the AADs would still be subject to the available currency in U.S. dollars (see *supra* para. 382), the Tribunal does not consider that there was something that prevented Respondent from settling the amount with Claimant, as it has done with other carriers with similar AAD requests (see *supra* para. 467).

606.   Were it not for Respondent's inaction (whether intentional or not), Claimant would have been able to exchange and repatriate U.S. dollars equivalent to approximately VEF 319 million (corresponding to the 15 AADs) as returns of late 2013 and early 2014 at the exchange rate set by the Government at that time or enter into a settlement in this regard. Moreover, and as a result, Claimant would most likely still operate and profit from its route in Venezuela. However, as a result of Respondent's breaches of the BIT, Claimant has lost the opportunity to earn its revenues in U.S. dollars, and furthermore, the opportunity to profit from that amount.[790] Thus, there is a sufficient nexus between Respondent's actions and the harm suffered by Claimant.

607.   What must be therefore remedied, is the harm suffered by Claimant, whether assessed under the FTF violation or the FET violation.

---

[788] Reply, para. 250.
[789] Rejoinder, para. 321.
[790] Tr. 12.03.2020, 10:17-11:11; Rosen Presentation, p. 9; C-PHB, para. 67.

167

608.  *Second, and with respect to mitigation*, the Tribunal does not find that Claimant failed to mitigate its claimed losses. Specifically:

–   Claimant was under no obligation to challenge CADIVI's decision through administrative and judicial channels, because there was no decision in this connection, let alone a reasoned decision, to challenge. Indeed, the AAD requests remained under review on CADIVI's website well into 2018 (see *supra* paras 361, 372, 375 and 377 and 458).

–   Claimant had no equal legal alternatives to acquire U.S. dollars in connection to its 15 AAD requests (see *supra* paras 394-395).

–   Claimant attempted to mitigate the consequences by contacting Venezuelan officials at the time (see *supra* para. 367).

–   Claimant brought its claims against Venezuela within the time limit provided for in Article XII(2) of the BIT (see *supra* para. 265).[791]

–   Claimant's suspension of its operations in Venezuela in March 2014 was justified in light of the circumstances (see *supra* para. 378).

609.  *Third, with respect to contributory fault*, the Tribunal reiterates its above reasoning on the challenge to CADIVI's decisions, the lack of equal alternatives, Claimant's suspension of the route, and the timely commencement of the arbitration, and holds that there is no contributory fault. With respect to Respondent's argument that Claimant failed to establish an alleged irregular increase in revenues or the fact that Claimant had disposed of its revenues in Bolivars, the Tribunal considers that this is an issue that must be taken into account in determining the amount of Claimant's compensation.

610.  Having therefore found that there is a sufficient connection between Respondent's breach and Claimant's claimed loss, and that Claimant did not fail to mitigate and did not contribute to this loss, the Tribunal finds that Claimant is entitled to damages.

611.  The Tribunal must now determine whether the damages claimed by Claimant are appropriate or whether it must adjust them to remedy the consequences caused by Respondent's breach of Article VIII and Article II(2) of the BIT.

*(iii)*     *Quantification of damages*

612.  It will be recalled that Claimant claims U.S.$ 50,618,073.90, an amount equal to the 15 AADs that it could have repatriated, as reviewed and verified by Claimant's expert,

---

[791] See also Exh. C-56, Letter from Air Canada to Vice-President of Venezuela, dated 28 March 2014; Exh. C-57, Letter from Air Canada to the Minister of Popular Power, Air and Water Transport, dated 10 July 2014; Exh. C-58, Letter from Air Canada to the Minister of Popular Power of Economy, Finance and Public Banks, dated 3 October 2014.

Mr. Rosen.[792] Respondent, on the other hand, disputes this amount, and argues that Claimant's quantification of damages is fundamentally flawed.[793]

613.    The Tribunal must determine whether the amount claimed is proper compensation for the damage caused by Respondent's breaches of the FTF and FET clauses. Although there is no indication in the BIT of what is proper compensation for such breaches, the Tribunal notes that the purpose of the compensation must be to reinstate Claimant in the same financial position it would have been in had there been no BIT breach.

614.    Further, Article 36 of the ILC Draft Articles states that "*compensation shall cover any financially assessable damage including loss of profits insofar as it is established*"[794]. The Tribunal will therefore proceed with these principles in mind when determining the amount of compensation, also taking into account that it has a wide margin of discretion in this respect.

615.    In the present case, there is no question that absent Respondent's breaches of the BIT, Claimant would have received the U.S. dollar amount associated with the 15 AADs, either in the event that Respondent had properly applied its foreign exchange regulations or in the event that it had approached Claimant to consider the possibility of a settlement, as it has done with other airlines. Accordingly, it is necessary to determine whether, on the basis of the Parties' submissions and, in particular Respondent's defenses in this regard, Claimant's claimed U.S. dollar amount is appropriate and whether it is also affected by what, if anything, Claimant currently owns in this context.

616.    *First*, the Parties disagree as to whether Claimant's expert, Mr. Rosen, properly assessed the damages in this case.[795]

617.    It should be recalled at this point that Respondent's expert, Mr. Flores, was unable to provide a second expert rebuttal report to Mr. Rosen's second report (see *supra* paras 70-73) and to be present at the Hearing (see *supra* paras 100-105) because of the alleged impact of the U.S. sanctions. While Respondent consistently contended that this situation and the Tribunal's refusal to stay the proceedings on this basis hindered its right to defend itself, the Tribunal granted Respondent several opportunities in the form of extensions of time and an opportunity to find a replacement expert. Respondent did not do so, and in its PO No. 8, the Tribunal admitted Mr. Flores' report into the record, but decided that it would take into account that Mr. Flores would not corroborate its contents and would not be subject to cross-examination by Claimant (see *supra* para. 105).[796]

---

[792] Memorial, paras 180-181; Reply, para. 242; Reply C-PHB, para. 100.

[793] Counter-Memorial, paras 458-460; Rejoinder, pars 343-344.

[794] Ex. CL-6 (ILC Draft Articles).

[795] Rejoinder, paras 345-357; Reply, para. 272.

[796] See also Tr. 10.03.2020, 87:35-88:18 (Claimant: "[I]*t's very important to recognize and consider how Dr Flores's opinion in this case should be treated. The Tribunal has elected to admit the report into evidence despite the fact he is not here to testify. But he has prepared only one report in support of Venezuela's first submission; he never responded to Mr Rosen's second report and the rebuttal of his first report. He is not present here to testify, ostensibly because of US regulations and restrictions, but none of which have ever been really confirmed. Most importantly,*

618.    Thus, insofar as the assessment of the quantum and Respondent's criticism of Mr. Rosen's methodology and reports are concerned, the Tribunal will not ignore Mr. Flores' report – which remains in the record – but will take into account that its contents were not ratified or subject to cross-examination.

619.    In this regard, the Tribunal considers Mr. Rosen's methodology, as detailed in his First Report and during his oral testimony, to be reasonable, independent and objective.

620.    In particular, Mr. Rosen first reviewed the documents related to six previously approved AADs in relation to domestic ticket sales between April 2012 to September 2012, i.e., the approved AADs, to understand the documents that supported Claimant's AADs that were approved by Respondent and the documents related to the transfer of funds upon approval.[797] Mr. Rosen then reviewed the following documents in relation to the 15 AADs: (i) the 15 AADs for the period from October 2012 to December 2013; (ii) Claimant's Ticket Sales Sub-Ledger of ticket sales in the country in bolivars in relation to the 15 AADs; (iii) Claimant's monthly income statements evidencing the amounts of revenues and specific costs in Venezuela that Claimant submitted in the AADs; and (iv) Claimant's monthly VAT tax returns.[798]

621.    On the basis of these documents, Mr. Rosen stated that he verified the amounts of the approved AADs by: (i) reviewing the application forms to check that the revenues, costs and VAT payments listed in each equaled to the net amount to be repatriated; (ii) verifying that the total ticket sales listed in the application forms matched with the Ticket Sales Sub-Ledger for each month; (iii) comparing the VAT credits and debits listed in each Application Form to the VAT Tax Returns; (iv) reviewing the monthly income statements to verify that the specific revenue line items and cost line items included in the application forms matched with those recorded in the monthly income statements; (v) verifying that the BS/U.S. dollar exchange rate used in the application forms matched with the official rated being used in Venezuela at the time; (vi) reviewing the wire transfer receipts showing the transfers of U.S. dollars form Banco Mercantil to Claimant's bank account out of country (Citibank, New York) and comparing the amounts transferred to the amounts recorded in the application forms; and (vii) reconciling any differences between the amounts stated in the application forms and the information stated in the VAT Tax Returns, Income Statement, Wire Transfer Receipts and Ticket Sales Sub-Ledger.[799] This review and verification along with the supporting documents established his

---

*Venezuela has not replaced him. They had a year to replace him, they had a year to come before you with an expert who could testify, and could explain and defend his opinion, and they chose not to. Air Canada submits that in these circumstances, while the report has certainly been admitted by the Tribunal, it should be given no weight. And that's particularly the case given Mr Rosen's detailed and reasoned rebuttal of that report in his second report.*"); Tr. 10.03.2020, 87:35-88:18 (Respondent: "*And this is the main impacting factor and the main reason why we believe Air Canada has not engaged into a proper damages assessment, which we had to conduct ourselves, facing the impossibility to have a second report by Dr Flores or any other expert in this case due to the political situation that we are all aware of. That's the final parameter.*").

[797] FTI Report, paras 3.2-3.3.

[798] FTI Report, para. 3.4.

[799] FTI Report, para. 3.5.

understanding on how the unprocessed AADs would have been accounted for and supports his verification of the amounts that Claimant has not been able to repatriate.[800]

622. The Tribunal finds the foregoing analysis employed by Mr. Rosen to be appropriate to this case. In particular, it does not see, and neither Respondent nor Mr. Flores offer any explanation as to which or how any other economic analysis would be more appropriate in this case. More specifically, it does not find that Claimant has relied on any improper or non-contemporaneous documents, as Respondent contends. Nor does it see how any alleged inconsistencies with other documents would render Mr. Rosen's approach inappropriate.[801]

623. *Second*, and more specifically, the Tribunal considers the following in connection with Respondent's argument that Claimant's damages are overstated in any event and that certain factors should reduce those damages by more than 50% to U.S.$ 21,334,156.51.[802]

### Concerning Claimant's higher revenues in 2013

624. Respondent argues that the documents on which Mr. Rosen relied contain various indicators that Claimant may have inflated the prices of its ticket sold in Bolivars in Venezuela. If confirmed, this would necessarily lead to the conclusion that the amounts Claimant sought to repatriate through the 15 AAD Requests, or any amounts repatriated in the past, are overstated. According to Respondent, Mr. Rosen does not discuss those obvious indicators.[803] Claimant disputes this by arguing that it generated higher revenue in 2013 compared to previous years due to (i) a large increase in the number of tickets sold and (ii) a relatively smaller increase in the U.S. dollar price of its tickets.[804] According to Claimant, the revenues reported by Air Canada in its AADs can be reconciled to the amounts reported in its 2013 tax return.[805]

625. The Tribunal agrees with Claimant. Indeed, as Mr. Rosen explained, the increased ticket sales are independently confirmed by IATA's records. The increased revenue reflects more ticket purchases at higher prices.[806] Moreover, comparing the last 15 months of operations to the previous eight years cannot be an appropriate comparison.[807]

---

[800] FTI Report, paras 3.10-3.11.
[801] Counter-Memorial, paras 474-481; Rejoinder, paras 345-356.
[802] Rejoinder, para. 359.
[803] Counter-Memorial, paras 480-481.
[804] FTI Report II, paras 3.35-3.54; Tr. 12.03.2020, 19:8-22:24, 49:11-50:22; C-PHB, para. 88.
[805] Reply, para. 276; FTI Report II, paras 3.55-3.64; Tr. 12.03.2020, 22:25-23:23 C-PHB, para. 88.
[806] Tr. 12.03.2020, 19:8-22:24. See also C-PHB, paras 89-90.
[807] Tr. 11.03.2020, 54:2-55:8 ("*Originally when the route began, in 2004, the load factor on the flight was low because it was a brand new route. And after a two-year period of operating three frequencies per week on the Toronto-Caracas route, we changed the route to operate through Port of Spain Trinidad. So the flight operated Toronto-Port of Spain Caracas-Toronto. Effectively we split the capacity of the route in half with Trinidad, with half of the capacity of the aircraft being sold in Trinidad, and leaving the other half to be sold in Venezuela. So that resulted in obviously, a significant reduction in capacity Subsequent to that, we eliminated Trinidad and began operating the route directly to Caracas. And after that date, as the route performed better, we increased frequencies from the three per week up to four/five per week. And the market was growing, and so we were having higher load factors and at the same time*

626.    Accordingly, Claimant's revenues between October 2012 and December 2013 were properly determined and included in Claimant's net returns for purposes of the 15 AADs.[808]

*Concerning the inclusion of revenues from the SOTI ticket sales to calculate Claimant's damages*

627.    Respondent submits that Claimant had to limit the sale and issuing of tickets sold outside Venezuela for trips originating from Venezuela (i.e., SOTI ticket sales) to a maximum of 10% of its general sales volume. Mr. Flores and Mr. Rosen concur that the 15 AAD Requests include requests for VEF 7,787,081.79 in excess of that limit. According to Respondent, therefore, this amount must be deducted from Claimant's alleged damages.[809] Claimant on the other hand contends that its revenues earned from SOTI ticket sales form part of its "returns" in relation to its investments as defined in the BIT. The fact that Respondent has attempted to limit these amounts through domestic practices and regulations does not limit the rights of Claimant under the BIT.[810]

628.    It is true that revenues from the sale of SOTI tickets could very well be part of the definition of "returns" of the BIT, and in particular the returns related to investments as defined in Articles VIII and II(2), which Respondent has violated (see *supra* 355, 356, 365, 444 and 471). This being said, the Tribunal recalls it specifically held Respondent liable for failing to deal with Claimant's 15 AADs in accordance with the relevant foreign exchange regime at the time (see *supra* paras 374-396). The Tribunal also considered that any claim to damages should reinstate Claimant in a financial situation it would have been in had there been no BIT breach (see *supra* para. 613). If, according to the relevant foreign exchange regime, revenues from the sale of SOTI tickets were subject to a limit, that limit would have applied regardless of the ultimate BIT breach. Accordingly, the Tribunal finds that these revenues were not properly included in the amounts that Claimant was entitled to exchange and repatriate and should therefore be deducted from Claimant's total claim.[811]

629.    Consequently, of the VEF 318,893,865.58 totaling Claimant's AADs[812], VEF 7,787,081.79 were unduly included. The net amount is, thus, VEF 311,106,783.79.

---

*higher yielding fares. [F]rom a period from roughly 2010, approximately, going forward, the load factors increased significantly on this route*."). See also C-PHB, para. 91.
[808] C-PHB, para. 92.
[809] Rejoinder, paras 360-361.
[810] Reply, paras 47, 273; C-PHB, para. 75.
[811] Mr. Rosen admits that the inclusion of this amount is a legal issue to be determined by the Tribunal and agrees with the calculated amount by Dr. Flores, should the Tribunal decide that this element should be excluded from Mr. Rosen's calculation: "*2.4 I disagree with Dr. Flores that my inclusion of SOTI ticket sales in the Claimant's net revenue is an overstatement of the funds to be repatriated since this represents a legal issue to be determined by the Tribunal. 2.5 If the proceeds from SOTI ticket sales in excess of CADIVI's limit were to be excluded from my calculation, it would reduce Air Canada's claim by bs. 7,787,082, or US $ 1,236,045 (using an exchange rate of Bs. 6.3 per US $.*" See FTI Report II, paras 2.4-2.5.
[812] Rosen Presentation, p. 8.

*Concerning interest on Claimant's revenue to calculate Claimant's damages*

630.    Respondent argues that, in a "but for" scenario, Claimant would not have been authorized to transfer interest revenue (at an amount of VEF 739,672.00) outside of Venezuela through AAD requests submitted under Providencia No. 23 and Providencia No. 234, as proven also by the approved AADs analyzed by Mr. Rosen. This is because, under this regime, Claimant was only authorized to submit requests for the acquisition of foreign currency equivalent to the net proceeds of its ticket sales, i.e., the difference between Claimant's proceeds from ticket sales and the costs due by Claimant in Venezuela.[813] Claimant contends that interest on revenue that qualifies as "returns" related to investments falls squarely within Article I(i) of the BIT, which expressly defines "returns" as "interest". As such, the inclusion of such interest in Mr. Rosen's calculation was appropriate.[814]

631.    Similar to the considerations above in relation to the sale of SOTI tickets (see *supra* para. 627), had there been no breach, Claimant would have received the relevant U.S. dollar amount in relation to its 15 AAD requests under the relevant foreign exchange regime. The fact that "returns" under Article I(i) includes interest does not alter this conclusion. Indeed, as Mr. Blanco testified, interest was not included in the remittable items allowed under Providencia No. 23 or Providencia No. 124.[815] Accordingly, the inclusion of interest revenue in the amount claimed should be deducted from Claimant's claim.

632.    Interest revenue undisputedly amounts to VEF 739,672[816]. This figure needs to be deducted from the amount in bolivars that Claimant was entitled to exchange: VEF 311,106,783.79 – VEF 739,672 is VEF 310,367,111.79.

*Concerning the application of the 6.3 bolivar per U.S. dollar exchange rate to calculate Claimant's damages*

633.    Respondent notes the BIT's reference to a rate "*applicable on the date of the transfer*" in order to determine how many U.S. dollars Claimant would have been authorized to

---

[813] Rejoinder, paras 369-371.
[814] C-PHB, para. 76.
[815] Blanco WS, para. 27; R-PHB, para. 101. Indeed Mr. Rosen states as follows: "3.7 [...] [T]*he Income Statements show higher amounts than the Application Forms. However, it is my understanding that most of the differences arise form the fact that the Income Statements include the interest revenue before taxes, while the Application Forms reflect the after-tax amount. Other than this small difference, the amounts in the Approved AADs Supporting Documents matched with the amounts stated in the Application Forms. 3.8 It is my understanding that Air Canada included interest revenue in the Application Forms for the purpose of matching these amounts with the submitted supported documents. While I understand that Venezuela did not accept the repatriation of interest revenue at the time, I have been advised by Counsel that Air Canada's claim is based on Article VIII of the BIT which guarantees the unrestricted transfer of investments and returns. As such I have been requested by Counsel to assume that for the Unprocessed AADs, the amounts to be repatriated would include interest revenue.*". See FTI Report, paras 3.7-3.8. See also FTI Report II, paras 2.8-2.9 ("2.8 I disagree with Dr. Flores that my inclusion of after-tax interest revenue in the Claimant's net revenue is an overstatement of the funds to be repatriated since this represents a legal issue to be determined by the Tribunal. 2.9 If after-tax interest revenue were to be excluded from my calculation, it would reduce Air Canada's claim by Bs. 739,672, or US $117,408 (using an exchange rate of Bs. 6.3 per US $1)."
[816] Rejoinder, para. 366.

acquire in the "but for" scenario.[817] According to Respondent, pursuant to Article 60 of the LOPA, an AAD request was to be considered as having been rejected after four months. Considering these deadlines for Claimant's 15 AAD requests and factoring in the applicable rate of 11.36 Bolivars per U.S. dollar from 24 January 2014 (as agreed by Mr. Rosen and Mr. Flores), the amount in U.S. dollars that Claimant would have been able to acquire in the "but for" scenario with VEF 310,367,111.82 corresponds to U.S.$ 27,321,048.51.[818] Alternatively, Respondent argues that if the Tribunal were to adopt the rate applicable at the date of submission to CADIVI, Claimant is still not entitled to the amount it claims, as the AAD request for December 2013 was submitted by Claimant to its exchange agent on 30 January 2014, i.e., after the implementation of Providencia No. 124, subjecting it therefore to the rate of 11.36 bolivars per U.S. dollar. This would mean that Claimant would be entitled to acquired U.S.$ 47,664,214.53.[819]

634.    Claimant disagrees with Respondent's position arguing first that there is no basis for applying the LOPA's 4-month administrative deadline to its AADs. In specific, Article VIII(1) and (2) of the BIT required Venezuela to guarantee the unrestricted transfer "without delay" and four months does not constitute "without delay". Moreover, CADIVI never actually approved Claimant's AADs or transferred the U.S. dollars making the use of the date of submission to CADIVI as a relevant date instead. Further, Respondent prevented Claimant from submitting its AAD requests for almost ten months due to the change in practice in relation to the IVSS certificates. In addition, the bolivar returns that Claimant sought to exchange and repatriate were generated using the 6.3 bolivar exchange rate. Lastly, Claimant submits that Respondent discriminated against Claimant when it entered into at least 10 agreements with other international airlines in May and October 2014 and approved their pre-2014 returns at the more favorable 6.3 bolivar rate. Accordingly, Claimant contends that Mr. Rosen's application of an exchange rate of 6.3 bolivars per U.S. dollar to calculate the U.S. dollar amount that Claimant should have received for the VEF 319 million it intended to exchange through its 15 AADs is appropriate.[820]

635.    The Tribunal recalls the following:

    –    Claimant's AAD requests were subject to the system established by Respondent for the exchange and repatriation of locally generated funds and, in particular, to the CADIVI process (see *supra* paras 368 and 372). This meant that the relevant exchange rate was that established by that process and not any other purported alternative, let alone that of a "parallel" or "unregulated" market (see *supra* paras 368 and 394-396).[821]

---

[817] Counter-Memorial, paras 13, 18; Rejoinder, para. 376; R-PHB, para. 147.

[818] Rejoinder, para. 381; Econ One Report, para. 29.

[819] Rejoinder, paras 384-385.

[820] C-PHB, paras 77-84.

[821] See also Econ One Report, para. 26: "*Venezuela has a regulated currency exchange regime, meaning that currency cannot be freely exchanged. Rather, it must be exchanged according to the procedures set forth by Venezuela's currency authorities. The Venezuelan bolivar has been subject to a fixed exchange regime since 2003. CADIVI*

– LOPA did not define the time frame within which an AAD request had to be processed (see *supra* paras 361, 372, 375 and 377).

– CADIVI never made a decision to accept, suspend or reject Claimant's 15 AAD requests (see *supra* para. 377).

– Following Claimant's suspension of its route, Respondent settled other airlines AAD requests at the rate 6.3 bolivar per U.S. dollar (see *supra* paras 375, 451 and 465).

636.    In view of the foregoing, the Tribunal considers that the application of a rate at the date of transfer, as required by the BIT itself, is inappropriate. There is no such date in the present case. To place Claimant in a financial position it would have been in the absence of Respondent's breach, it is more appropriate to use the exchange rate applied when Respondent settled other airlines' AADs for their 2012 and 2013 returns in bolivars, i.e., the 6.3 bolivars per U.S. dollar, which should also be the exchange rate applicable to the 15 AADs (covering the period between October 2012 and December 2013 and submitted to CADIVI between 20 September 2013 and 22 January 2014).[822] The fact that the last of Claimant's 15 AAD requests was filed with the exchange agent once Providencia No. 124 (and the higher exchange rate) was in force, is therefore not relevant to the Tribunal's consideration on this point: the relevant issue here is that other airlines saw their December 2013 returns converted at the lower rate and, thus, Claimant should be entitled to the same treatment.

637.    In these circumstances, the Tribunal considers Mr. Rosen's use of the exchange rate of 6.3 bolivars per U.S. dollars to calculate Claimant's damages to be appropriate.

638.    The VEF amount mentioned in the 15 AADs, net of SOTI tickets and interest revenue is VEF 310,367,111.79. Once the 6.3 bolivars per U.S. dollars is applied, it results in U.S.$ 49,264,621.

*Concerning the equivalent bolivar amount kept by Claimant*

639.    Respondent argues that, in the "but for" scenario, Claimant would have had to provide Bolivars in exchange for the U.S. dollars. Therefore, to avoid overcompensating Claimant, the Tribunal should direct Claimant to provide Respondent with the bolivars equivalent of any damages awarded to it with respect to the 15 AAD Requests as per the exchange rate applicable in Venezuela as of the date of the Award, i.e., as per the date of the transfer in accordance with Article VIII of the BIT (not the dates at which a transfer would have occurred for each AAD request in the "but for" which would lead to overcompensation).[823]

---

administered foreign currency exchange in accordance with the fixed exchange regime determined by the Central Bank of Venezuela."
[822] Exhs C-75 to C-89 (corresponding to the 15 AAD requests).
[823] Rejoinder, paras 413-418; R-PHB, paras 148-150.

640.    Claimant submits that Respondent's claim in this regard is "*illogical and specious*". If the Tribunal were to follow Respondent's logic and credit Respondent the equivalent in bolivars of any U.S. dollar awarded, then Claimant would be ordered to provide Respondent more than VEF 2.4 trillion, as calculated issuing the official exchange rate on 30 December 2019 (almost 7,700 times what Respondent would have received in early 2014) contrary to the purpose of the but-for scenario and the *Chorzow* principle. But for Respondent's unlawful acts in early 2014, Claimant would have received U.S.$ 50.6 million in exchange for VEF 319 million. Thus, according to Claimant, if the Tribunal awards Claimant U.S.$ 50.6 million, then it should offset the present-day U.S. dollar value of VEF 319 million against that amount, effectively providing Respondent with the VEF 319 million that it would have received in early 2014. This means that the Tribunal would reduce Claimant's compensation by a few thousand dollars, depending on the exchange rate the Tribunal applies.[824]

641.    The Tribunal recalls that the purpose of compensation is to remedy the consequences suffered by Claimant as a result of Respondent's violation of Article VIII and Article II(2) of the BIT (see *supra* para. 594) and to place Claimant in the situation it would have been in the absence of such BIT breaches (see *supra* para. 611). In this regard, the Tribunal enjoys a wide margin of discretion (see *supra* para. 614).

642.    Both Parties seem to accept that Claimant needs to provide Respondent with an amount in bolivars equivalent to the U.S. dollars Claimant was entitled to receive. However:

    –    Claimant recalls it was owed U.S.$ 50.6 million in exchange for VEF 319 million; thus, Claimant should now provide Respondent with VEF 319 million at current exchange rates, which would be equivalent to a few thousand U.S. dollars.

    –    Respondent, on the other hand, disregards that the historically owed U.S.$ 50.6 million were the equivalent of VEF 319 million and focuses on the amount in U.S. dollars it will be ordered to pay in this Award; it is this amount which needs to be converted into VEF as of the date of the Award.

643.    The Tribunal finds that both Parties are partially correct and partially wrong: Claimant is correct in fixing at VEF 319 million the amount that needs to be deducted from the compensation owed to it; it would make no sense to award Respondent the current equivalent of U.S.$ 50.6 million because in the absence of a BIT breach, Claimant would have transferred U.S.$ 50.6 million in exchange for VEF 319 million in 2014. For the same reasons, Claimant cannot simply convert VEF 319 million at a current exchange rate, because that would unduly harm Respondent for the devaluation of the VEF, when in fact it had the right to obtain VEF 319 million at their value in March 2014.

644.    In deciding the equivalent U.S. dollar amount of VEF 319 million in March 2014, the Tribunal decides to resort to Mr. Rosen's expert report. Mr. Rosen avers that in March 2014 two official supplementary foreign currency exchange rates existed:[825] SICAD 1

---

[824] Reply C-PHB, para. 107.
[825] FTI Report II, p. 20.

and SICAD 2. The first provided for an exchange rate of 10.9 and the second one of 51.[826] Respondent has not offered an alternative exchange rate, in fact, it agrees "*under strict reserves*" with converted amounts applying the SICAD 1 exchange rate.[827] The Tribunal will, thus, apply the 10.9 exchange rate as it appears to represent a common ground among the Parties.

645.   The total of VEF shown in the AADs minus the amount for SOTI tickets and interest revenue, i.e., VEF 310,367,111.79 (see *supra* para. 632), converted into U.S. dollars at an exchange rate of 10.9, results in U.S.$ 28,474,047.

646.   The above amount needs to be set-off against U.S.$ 49,264,620.92 that Claimant was entitled to freely transfer. The resulting net figure is, thus, U.S.**$ 20,790,574**.

*Concerning the spending of the bolivars post suspension of Claimant's route*

647.   Respondent avers that Claimant actually kept VEF 319,535,316 in his Venezuelan bank accounts and freely spent thereof VEF 305,464,316. This amount equals, as per Mr. Rosen's quantifications, U.S.$ 5,986,892 – a figure which Respondent, albeit under strict reserves, accepts[828] (see *supra* para. 644). According to Respondent, this amount should be deducted from any quantification of Claimant's alleged damages.[829]

648.   Claimant submits that none of the payments it made in respect to post-suspension expenses bore any relation to the amounts that it requested to exchange via its 15 AAD requests and that it claims as damages in this arbitration. Any and all expenses incurred in relation to those 15 AAD requests were incurred and paid during the month for which the relevant AAD request was issued, i.e., well before Claimant suspended operations. Any expenses incurred and paid using its bolivars following its suspension of operations are not properly deductible from Claimant's damages.[830]

649.   Respondent counters that the bolivars spent by Claimant were used to pay taxes[831], the subscription to ALAV and other memberships[832], BASSA's services[833], accountant's services[834], the reimbursement of travel expenses of a certain Mr. Villegas[835], etc.; none of these expenditures would bear any link to the alleged breaches.[836]

650.   The Tribunal has already determined that, absent the breach of the BIT, Claimant's damages are its entitlement of the U.S. dollar amount at the favorable exchange rate minus the amount that Respondent was entitled to receive in Bolivars in March 2014. Whether

---

[826] FTI Report II, p. 19.
[827] Rejoinder, para. 394.
[828] Rejoinder, para. 394.
[829] Rejoinder, paras 389-395.
[830] C-PHB, paras 207-212; Reply C-PHB, paras 104-105.
[831] Rejoinder, para. 402.
[832] Rejoinder, para. 403.
[833] Rejoinder, para. 404.
[834] Rejoinder, para. 405.
[835] Rejoinder, para. 406.
[836] Rejoinder, para. 406.

Claimant spent the latter amount and for which purpose is therefore no longer relevant to the calculation of Claimant's damages.[837]

### 2.3    Conclusion

651.    In light of the foregoing, the net amount which results is U.S.$ 20,790,574. The Tribunal finds that Claimant shall be awarded U.S.**$ 20,790,574**.

## 3.    Interest

### 3.1    The Parties' positions

### (i)    Claimant

652.    Claimant requests that the Tribunal award pre- and post-award interest at the highest lawful rate until the date Respondent pays the Award in full. Interest is an integral component of full reparation under customary international law[838] as set forth in Article 38 of the ILC Draft Articles and it is not awarded in addition to reparation.[839] Here, full reparation will only be achieved if Claimant is awarded compound interest, running from three months after Claimant submitted its AADs, at either of the rates proposed by Claimant and its expert.[840]

653.    *First, concerning the timing of pre-award interest:* Interest should be awarded and run from three months after Claimant submitted the AADs. Article VIII(2) of the BIT requires that transfers "*be effected without delay*". Three months is a reasonable time limit. Respondent does not dispute that a state's duty to pay interest arises immediately after its unlawful act or omission causes harm. Indeed, Respondent had an existing debt to Claimant under the applicable legal framework, not simply "*requests for acquisition of foreign currency*".[841]

654.    Further, Respondent's argument for the date of the Request for Arbitration being an alternative start date for the accrual of pre-award interest has no merit.[842]

---

[837] Indeed as Claimant submits: "*Putting aside the fact that the parties disagree on how that credit should be calculated […], it cannot be the case that Venezuela is entitled to a credit and to an additional deduction of the U.S. dollar value of the expenditures (exceptional or otherwise) that Air Canada paid after suspending operations using the bolivars on its account. That would plainly amount to double-dipping, because it would effectively deduct the VEF 319 million from Air Canada's damages twice. This highlights once again why Air Canada's post-suspension use of the bolivars in its account is irrelevant, both for the purposes of determining Venezuela's liability and for determining the quantum of Air Canada's damages.*" See Reply C-PHB, para. 106.
[838] Memorial, paras 182-184.
[839] Reply, paras 277-278.
[840] Reply, para. 279 referring to Exh. RL-116 ("ILC Draft Articles Commentary") Article 38.
[841] Reply, paras 280-282 quoting Exh. C-1 (BIT), Article VIII(2) and Counter-Memorial, para. 502.
[842] Reply, paras 283-284 quoting Exh. RL-120, *Vestey Group Ltd v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/06/4, Award, 15 April 2016 ("Vestey"), para. 438.

655.    Moreover, Respondent's request for a 90-day grace period because Claimant has supposedly delayed in bringing its claims to arbitration should be denied.[843]

656.    *Second, concerning the applicable interest rate:* The appropriate rate of interest is a matter within the discretion of the Tribunal, subject to the requirement that damages should provide full compensation to the injured claimant. To guide the Tribunal, Mr. Rosen identified two suitable interest rates that the Tribunal might apply.[844]

657.    The <u>first</u> alternative is the rate of return that Claimant would have collected or the interest it would have avoided, if it would have used the funds it could not repatriate to pay down existing debt or borrow less debt. In 2013, Claimant completed private offerings of senior secured notes and a senior secured credit facility at a weighted average interest rate of 7.12%.[845]

658.    The <u>second</u> alternative would be for the Tribunal to apply Respondent's cost of borrowing which is 11.75%. By failing to authorize Claimant's AADs, Venezuela was able to have free access to approximately U.S.$ 50 million and use those funds for other purposes. To calculate Respondent's cost of borrowing, Mr. Rosen reviewed sovereign debt issuances from Venezuela during the relevant period.[846]

659.    Claimant effectively has been forced to lend money to Respondent for almost five years. The market views this as a higher risk "transaction" and applying Respondent's borrowing rate or Claimant's cost of debt to Claimant's damages would recognize the involuntary nature of the transaction in which Respondent forced Claimant and would make Claimant whole. It is indeed common for tribunals to apply interest rates that account for a risk premium.[847]

660.    An interest rate based on U.S. Treasury bill rate does not qualify as a "*normal commercial rate*", provided for by the BIT, because commercial parties cannot borrow funds at the Treasury bill rate, which is only available to the U.S. government.[848]

661.    Based on the foregoing and Mr. Rosen's analysis, the Tribunal should employ a pre-award interest rate of 7.12% or 11.75%. As a result, Claimant's damages to date would total U.S.$ 67,545,647 or U.S.$ 126,096,700.[849]

---

[843] Reply, para. 285.
[844] Memorial, para. 185.
[845] Memorial, para. 186.
[846] Memorial, paras 187-188.
[847] Reply, paras 286-287.
[848] Reply, para. 288 referring to FTI Report II, para. 3.68.
[849] Memorial, para. 189 referring to FTI Report, Figure 9.

662.    Finally, for both pre-award and post-award interest, the opportunity cost for delay in payment is the same. Consequently, Claimant requests post-award interest at one of the above rates until the date of Respondent's full payment of the Tribunal's award.[850]

663.    *Third, concerning compound interest:* Claimant further requests that any award of interest granted by this Tribunal be compounded. The recent practice of international investment tribunals confirms that awarding compound interest is the most widely accepted and appropriate method of making a claimant whole.[851]

664.    Awarding Claimant compound interest is also appropriate because it prevents Respondent from unjustly enriching itself from its wrongdoing. Respondent's withholding of Claimant's revenues essentially constitutes a coerced loan from which Respondent has been unjustly enriched.[852]

665.    The role of interest is to compensate a claimant fully for the delay between the date of harm suffered and the award of damages. In this regard, interest awarded on a compound basis more accurately reflects what the claimant would have been able to "*earn on the sums owed if they had been paid in a timely manner*".[853]

666.    In addition, Claimant is not required to prove that it has incurred compound interest as damages. It is sufficient to assume that Claimant could have earned compound interest on the money that Respondent has refused to pay.[854]

667.    Further, it is irrelevant whether compound interest is permitted under Venezuelan law. Claimant basis its claim for interest on the BIT and customary law. Indeed, tribunals in at least two cases issued awards in 2016 that rejected Respondent's argument that compound interest should not be awarded because it is prohibited under Venezuelan law.[855]

*(ii)    Respondent*

668.    Respondent submits that Claimant's claims for interest are ill-founded. Claimant fails to make reference to the commentary to the ILC Articles, which clarifies that interest is not an autonomous form of reparation but is rather subsidiary to the principal "sum" and only necessary when needed to make reparation "full". Claimant does not point out in any concrete or particularized way to the circumstances of the case that would support the

---

[850] Memorial, para. 190; Reply, para. 299 quoting Exh. CL-133, *Saint-Gobain Performance Plastics Europe v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/12/13, Decision on Liability and the Principles of Quantum, 30 December 2016 ("Saint-Gobain"), para. 886.
[851] Memorial, paras 191-196.
[852] Memorial, para. 197.
[853] Memorial, para. 198 quoting Exh. CL-55, J. Y. Gotanda, *A Study of Interest*, 83 VIillanova University School of Law Working Paper Series 4 (2007), p. 31. See also Memorial, paras 199-201.
[854] Reply, paras 296-298 quoting Exh. CL-68, *Wena Hotels Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Award, 8 December 2000, para. 12, Exh. CL-68 (Wena Hotels), para. 129, and Exh. RL-120 (Vestey), para. 447.
[855] Reply, paras 290-295 referring to and quoting Exh. CL-133 (Saint-Gobain), para. 890 and Exh. RL-120 (Vestey), para. 447.

interest start date and rate it claims, let alone whether such interest should be simple of compounded. There is likewise no discussion from Claimant on why procedurally it should be entitled to any post-award interest.[856]

669.    *First*, Claimant applies an inappropriate start date for interest (*dies a quo*).

670.    In the instant case, any obligation to make any payment to Claimant would only arise with a potential unfavorable award to Respondent. Indeed, today, there is no debt to Claimant, only requests for the acquisition of foreign currency, which were subject to the availability of such foreign currency. Were the Tribunal to determine that there is any compensation for damages due, it would need to engage in the exercise of determining the quantum of such compensation taking into account the particularities of AAD requests under Venezuelan law, deducing the amounts requested but not susceptible of being repatriated and especially it would have to direct Claimant to provide the necessary Bolivars to acquire the U.S. dollars it wants to buy (after establishing the appropriate exchange rate).[857]

671.    Indeed, Claimant was never dispossessed of its funds. The *dies a quo* cannot correspond to the dates at which Claimant may have allegedly started to suffer a damage and cannot therefore serve as a basis for any interest calculation. In the absence of an alternative date proposed by Claimant, interest should not run earlier than the date of the Award.[858]

672.    If the Tribunal were to follow Claimant's position, it should take into consideration the fact that Claimant retained control over its bolivars and freely spent them, and consider that the amount of U.S.\$ 5,986,892 was available to it as from the first date on which the Republic allegedly defaulted and somehow balanced the consequences of the alleged breaches that Claimant claims to have suffered.[859]

673.    In the alternative, the start date for the accrual of interest should be no earlier than the date of the Claimant's Request for Arbitration, i.e., 16 December 2016.[860]

674.    In any event, Respondent should be provided with an opportunity to make any required payment and therefore that a 90-day grace period be applied, at the very least regarding the application of post-award interest.[861]

675.    *Second*, Claimant suggests inappropriate interest rates.

676.    Claimant's proposed interest rates, namely Claimant's cost of debt and Respondent's borrowing rate, lead to overcompensation.[862]

---

[856] Counter-Memorial, paras 493-499; Rejoinder, para. 425.
[857] Counter-Memorial, paras 500-502; Rejoinder, paras 426-428.
[858] Rejoinder, paras 429-430.
[859] Rejoinder, paras 431-432 referring to FTI Report II, para. 3.23 Figure 8.
[860] Counter-Memorial, para. 503; Rejoinder, para. 427.
[861] Counter-Memorial, para. 504.
[862] Counter-Memorial, para. 515.

677.     Claimant's proposition of an interest rate with a premium risk is inapposite. Neither Claimant nor Mr. Rosen provided evidence that Claimant was forced to issue loans or senior notes.[863] The use of the borrowing rates of Claimant would only be appropriate if Claimant had been forced to take out a loan to bridge the period from the date of the breach until the date of award. A review by Dr. Flores of Claimant's 2013 Annual Report does not indicate that this was the case. Dr. Flores draws the same conclusion from the analysis of Claimant's 2014 through 2017 Annual Reports which show that the company's liquidity target was never breached. According to Dr. Flores, had Claimant repatriated the funds, they would not have been used to pay off an existing debt.[864]

678.     Claimant's proposition for a rate of 11.75% based on sovereign debts issuance from Venezuela during the relevant period is likewise inapposite.[865] Claimant's "unjust enrichment" argument in support of choosing an interest rate that corresponds to Respondent's borrowing costs defies economic logic.[866] Indeed, full compensation aims to compensating aggrieved parties and any assessment of damages must therefore be performed form the perspective of those parties rather than form the perspective of the party having allegedly caused the damage. Thus, the Tribunal should not consider Respondent's cost of borrowing. Even more so as in the "but for" scenario, Claimant would have transferred the U.S. dollars equivalent of its Bolivars outside of the Republic and would not have reinvested them in the Republic.[867]

679.     Respondent refers to Article XII(9) of the BIT and submits that only a short-term risk free interest rate should be considered as being the "applicable interest" rate in the instant case and in order to make Claimant whole and avoid overcompensation. This is in line with investment arbitration precedent.[868]

680.     Thus, the Tribunal should apply the yield of six-month or one-year U.S. Treasury bills. Concerning Claimant's reliance on Article VII of the BIT's reference to "normal commercial rate" in relation to lawful expropriation, and its argument that the U.S. Treasury bill rate is not a commercial rate because it would only be available to the U.S. government, Respondent points to the fact that Claimant's case rests on an alleged unlawful expropriation and alleged breaches of the BIT's FET and FTF provisions. These claims fall outside the scope of Article VII. Thus, the standard under Article VII is irrelevant.[869]

681.     In any event, the Treasury bill rate is undoubtedly a "commercial rate".[870]

---

[863] Counter-Memorial, paras 506-508.
[864] Counter-Memorial, para. 511; Rejoinder, para. 443.
[865] Counter-Memorial, para. 512; Rejoinder, para. 444.
[866] Counter-Memorial, paras 513-514.
[867] Rejoinder, paras 445-448 referring to and quoting Exh. CL-134, *Tidewater Investment SRL, et al. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Award, 13 March 2015, para. 205 and Exh. RL-120 (Vestey), para. 440.
[868] Counter-Memorial, paras 516-518; Rejoinder, paras 434-435 quoting Exh. RL-120 (Vestey), para. 440.
[869] Rejoinder, paras 436-438.
[870] Rejoinder, para. 439.

682.    Thus, a short-term risk-free rate interest using the six-month or one-year U.S. Treasury Bill rates should be applied.[871]

683.    If the Tribunal were to apply a rate with a premium, then it should apply a rate of 1.39% corresponding to interest related to cash, cash equivalent and short-term investment earned by Claimant as per its 2013 Annual Reports.[872]

684.    In a further alternative, if the Tribunal were to consider that neither of the above rates is appropriate in the instance case, the Tribunal should use a rate corresponding to the average six-month U.S. dollar London Interbank Offered Rate (LIBOR) plus 1% or 2%. Even though either of these two rates will undoubtedly lead to overcompensation, arbitral tribunals frequently apply them as "*normal commercial rates*", "*reasonable rates*" or the "*widely recognized conservative measure*" in the absence of clear evidence of the claimant's cost of borrowing.[873]

685.    *Third*, Claimant inappropriately claims compound interest.[874]

686.    Specifically, the granting of compound interest is not appropriate since, under Venezuelan law, the granting of compound interest requires an express agreement between the parties, and there are no contentions that there has been one in the instant case. Indeed, Venezuelan law applies to the determination of the type of interest. Arbitral tribunals have found host State provisions relevant when international law is silent on the fixation of interest rate.[875]

687.    Claimant's claim is anyhow incompatible with the BIT. Article XII(9) of the BIT refers to "applicable interest" and nothing indicates that the Venezuela and Canada have consented that "compound interest" could be applied and qualify as "applicable interest" In 1996, the year of signature of the BIT, both the laws of Venezuela and Canada prohibited compound interest. Pursuant to Article 530 of the Venezuelan Commercial Code, compound interest is indeed prohibited unless agreed otherwise. Moreover, until recently, compound interest was only available under Canadian law where courts exercised their equitable jurisdiction. Thus, Article XII of the BIT does not grant jurisdiction to the Tribunal to award compound interest.[876]

688.    In any event, in order for compound interest to be awarded, it must also be proven by the Claimant as having been actually suffered as damages.[877] Unless Claimant proves that in the "but for" scenario it would have earned monthly compounded interest or that it bore compound interest because of the alleged breaches, Claimant is not entitled to compensation. Such evidence is all the more necessary because interest may be compounded on so many distinct ways that without concrete evidence of the situation Air

---

[871] Counter-Memorial, paras 519, 530.; Rejoinder, para. 440.
[872] Counter-Memorial, para. 515; Rejoinder, paras 441-442, 449, 451.
[873] Rejoinder, paras 450-451 quoting and referring to decisions of various tribunals in fns 55 and 556.
[874] Counter-Memorial, para. 520.
[875] Counter-Memorial, paras 521-526.
[876] Rejoinder, paras 456-457 referring to Exh. RL-165, Commercial Code (Código de Comercio), published in Extraordinary Official Gazette No. 475, dated 21 December 1955, Article 530.
[877] Counter-Memorial, para. 527.

Canada would have faced in the "but for" scenario, any assessment by the Tribunal of Claimant's alleged damages will be purely speculative.[878]

689.  In the instant case, Claimant failed to provide any evidence establishing the charges it may have faced or would have faced in the "but for" scenario.[879] Claimant has made no effort to show that it failed to earn compound interest or that it was required to borrow money at compound interest rates as a result of the Republic's conduct. In fact, Dr. Flores analysis of Claimant's Annual Report show the contrary. Thus, the award of compound interest has not been borne out. In such circumstances, awarding compound interest would over-compensate Claimant.[880]

690.  If the Tribunal awards compound interest, such interest should be compounded yearly rather than monthly and should only apply to post-award interest. Claimant has not established that it would have earned monthly compounded interest in the "but for" scenario and fails to demonstrate that the constant practice it relies on concerns monthly interest.[881]

## 3.2    *The Tribunal's analysis*

691.  Having held Respondent liable for the breach of the BIT and the resulting damages, and having assessed those damages, the *question* before the Tribunal at this point is the award of interest.

692.  It will be recalled that the Parties disagree on three points in relation to interest: (i) the timing of interest; (ii) the applicable rate of interest and (iii) whether interest should be compounded (see *supra* paras 653-667. On each of these points, and on interest in general, the Tribunal proceeds as follows.

693.  *First*, under Article XII(9)(a) of the BIT, the Tribunal "*may award, separately or in combination, only: (a) monetary damages and any applicable interest*". Applicable interest is not defined in the BIT except in the context of a lawful expropriation. Specifically, Article VII(1) states that "[s]*uch compensation shall be based on the genuine value of the investment or returns expropriated immediately before the expropriation or at the time the proposed expropriation became public knowledge, whichever is earlier, shall be payable from the date of expropriation with interest at a normal commercial rate, shall be paid without delay and shall be effectively realizable and freely transferable*". The BIT gives no indication of "applicable interest" in the context of its other provisions, such as those for which the Tribunal has found a violation.

---

[878] Rejoinder, para. 454.
[879] Rejoinder, para. 455.
[880] Counter-Memorial, paras 528-529.
[881] Rejoinder, para. 459.

694.    The Tribunal finds that a normal commercial rate is an appropriate interest rate on the amounts, for two reasons:

  –    The parties to the Treaty agreed that the normal commercial rate is an adequate interest rate applicable to a compensation, equaling the value of the investment, in a context of expropriation; in this case, the compensation also equals the value of the investment, there is thus no good reason for applying a different interest rate.

  –    The Parties in this arbitration accept the application of a normal commercial rate: Claimant suggests that the normal commercial rate is an appropriate standard in this case[882]; Respondent's position is twofold: at first, it avers that the normal commercial rate should only be applied in cases of expropriation, but then Respondent asks the Tribunal to apply purportedly normal commercial interest rates[883].

695.    *Second and, therefore, in relation to the timing of interest:* It will be recalled that Claimant is claiming both pre- and post- award interest, the former commencing three months after the filing of Claimant's AADs.[884] Respondent, on the other hand, argues that any interest should not run before the date of the Award, or in the alternative, the date of the Request for Arbitration.[885]

696.    The Tribunal recalls that it found that Respondent breached its obligations under Articles VIII and II(1) of the BIT with respect to the 15 AAD requests because it failed to consider those requests in accordance with the relevant foreign exchange regime. The Tribunal has not identified a specific "*time when the international wrongful act*" arose, but notes that, on 26 May 2014 the press released the news that Venezuela had settled the debt with respect to other airlines' AAD requests for 2012 and 2013 returns[886]. The Tribunal considers that the award of pre-award interest on the principal amount should start running from the date in which other airlines obtained the U.S. dollars they were owed (i.e., 26 May 2014) to properly compensate Claimant.

697.    *Third and with respect to the applicable rate of interest:* The Tribunal has already determined that Claimant's compensation should accrue interest at a normal commercial rate. This implies that Respondent compensate Claimant for the lack of use in time of the amount awarded to it, at a rate at which Claimant could reasonably have made use of the money at market conditions.

---

[882] FTI Report, p. 22: "*I am advised by Counsel that this* [normal commercial rate] *is the appropriate standard to apply to pre-award interest in this matter.*"
[883] R-PHB, p. 116.
[884] Reply, paras 280-282.
[885] Counter-Memorial, paras 500-504; Rejoinder, paras 429-432.
[886] Exhibit C-52.

698.    The Parties have proposed a total of five alternative interest rates:

–    The first, based on Venezuela's cost of borrowing because Respondent's failure to permit the repatriation of U.S. dollars effectively amounted to a forced loan to Respondent; the Tribunal, however, finds this rate is inapposite for a compensation due in U.S. dollars.

–    The second, based on a short-term risk-free rate, such as the U.S. Treasury bill rate; the Tribunal is of the opinion that such a rate would not be appropriate because a normal commercial rate would reflect a premium on top of a risk-free rate.

–    The third, based on Claimant's cost of debt: according to Mr. Rosen, pursuant to the information contained in Air Canada's Annual Report, Air Canada's weighted average cost of debt was 7.22%; the Tribunal notes that the purported interest rate is actually higher than that reflected in the Annual Report,[887] but that no adequate explanation for this discrepancy has been provided. In any event, as will be explained below (see *infra* para. 700), the Tribunal will choose Canada's effective interest rate for business as a proper benchmark for a normal commercial rate – a rate which was at all relevant times significantly lower than the interest rates purported by Mr. Rosen, this seems to suggest that Claimant's cost of debt did not reflect normal commercial rates.

–    The fourth, at 1.39%, based on the interest rate on cash, cash equivalents and short-term investments earned by Claimant according to its 2013 Annual Report; the Tribunal notes that this interest rate is calculated *ex post* by Respondent's expert, taking the amount of interest earned as well as the cash, cash equivalents and short term investments figures – it is, thus, an approximate, backwards looking method, unsuitable to quantify interest due at the moment of full payment.

–    The fifth, equal to the six-month U.S. dollar London Interbank Offered Rate (LIBOR) plus 1% or 2%: LIBOR is a benchmark interest rate at which global banks lend to another and thus represents a commercial rate; banks borrow without any mark-up, Air Canada would have to pay a margin. However, the Tribunal considers that due to market and regulatory changes such rate is not appropriate.

699.    In view of the above, the Tribunal finds that only a rate that compensates the aggrieved party within reasonable market conditions is appropriate. Accordingly, the Tribunal considers that such rate can be found in "Canada's effective interest rate for businesses", which is a business borrowing interest rate published by the Bank of Canada that represents a weighted-average borrowing rate for new lending to non-financial businesses, estimated as a function of bank and market interest rates. Canada's effective

---

[887] FTI-5, p 110.

interest rate for businesses, seems to adequately reflect a normal commercial rate for a Canada-based business such as Air Canada.

700.    *Fourth, on the question of whether interest should be compounded*, it is recalled that Claimant submits that compound interest is appropriate to make it whole and also to prevent Respondent from being unjustly enriched.[888] Respondent objects, stating that this is impermissible under Venezuelan law and that, in any event, Claimant must prove that it actually arose as damages.[889]

701.    The Tribunal does not consider that this is a case where compound interest should be awarded to Claimant to put it back in a position it would have been in had the breach of the BIT not occurred. While it is true that compound interest is particularly appropriate in cases where the aggrieved party could have used its principal by depositing it and earning interest on it,[890] such compounding as an element of full redress must be particularly justified.[891] The Tribunal does not find that the present case provides such justification and therefore dismisses Claimant's compound interest claim.

702.    Finally, having determined that Claimant's claims are not time-barred (see *supra* para. 265), the Tribunal rejects Respondent's 90-day grace period concerning the payment of interest.

703.    In light of the foregoing, the Tribunal decides that interest should accrue on the amount awarded at Canada's effective interest rate for businesses, simple, from 26 May 2014 until payment in full.

### 3.3    Conclusion

704.    In light of the foregoing, the Tribunal decides that ***interest shall accrue on the amount awarded at Canada's effective interest rate for businesses, simple, from 26 May 2014 until payment in full.***

## 4.    Conclusion

705.    In light of the foregoing, the Tribunal finds that ***Claimant shall be awarded U.S.\$ 20,790,574, with simple interest accruing on the amount awarded at Canada's effective interest rate for businesses from 26 May 2014 until payment in full.***

---

[888] C-PHB, para. 97; Reply C-PHB, para. 109.
[889] Counter-Memorial, paras 520-529; Rejoinder, paras 456-457.
[890] Exh. RL-120 (Vestey), para. 447; see also Reply, para. 297.
[891] See Exh. RL-116 (ILC Draft Articles Commentary), pp 108-109.

# VI.    Arbitration costs

## 1.    The issue

706.    The question at *issue* is the apportionment and quantification of arbitration costs.

707.    ***Claimant*** requests the Tribunal to award Claimant

> "*all costs of this proceeding, including (but not limited to) Claimant's attorney's fees, experts, and all costs associated with the tribunal and the conduct of the proceeding*" [Claim. 4]

and

> "*pre- and post-award compound interest at a 7.12% or 11.75% rate until the date of Venezuela's final satisfaction of the award*" [Claim. 5].

708.    ***Respondent*** requests the Tribunal to

> "[o]*rder Claimant to pay all costs incurred by the Republic in connection with this arbitration, including all of the Arbitral Tribunal's and ICSID's fees and expenses, and all legal fees and expenses incurred by the Republic (including but not limited to lawyer's fees and expenses)*" [Resp. 8]

and to

> "[o]*rder Claimant to pay interest as the Arbitral Tribunal may consider appropriate on the amounts owed to the Republic as from the date of the award on costs and complete payment*" [Resp. 9].

## 2.    The Parties' positions

### 2.1    Claimant

709.    Claimant submits that the BIT and the AF Arbitration Rules grant the Tribunal wide discretion to allocate costs between the Parties.[892]

710.    Tribunals typically allocate costs between the parties based on a number of factors, including, but not limited to, the extent to which a party has succeeded on its various claims and arguments, and the reasonableness of the costs.[893]

711.    For the reasons set out in its prior written and oral submissions, Claimant should prevail in the arbitration. As the prevailing party, Claimant should be awarded all of its costs

---

[892] C-Costs, para. 3 referring to Exh. C-1 (BIT), Article XII(9) and Exh. CL-95, ICSID Additional Facilities Rules, Article 58(1).
[893] C-Costs, para. 4 referring to various tribunals' decisions in fns 5 to 9.

because (i) Respondent caused serious harm to Claimant's investments and forced Claimant to bring this case to obtain compensation for the damages it has suffered; and (ii) Claimant will not obtain full compensation unless it is awarded the costs and fees related to the bringing of the case. Those arbitration costs are reasonable considering the complexity and length of the case, and are the natural, normal and predictable consequence of Respondent's actions. Further, Respondent's conduct in this arbitration warrants an award of costs in Claimant's favor. Respondent filed an unwarranted request to bifurcate the proceedings; it raised multiple unfounded objections to the Tribunal's jurisdiction; it failed to produce documents in the arbitration despite the Tribunal's order; and it repeatedly refused to advance its share of the arbitration costs. Accordingly, to wipe out as far as possible the consequences of Respondent's illegal acts, the Tribunal should award Claimant its costs and expenses in the present arbitration, in the amounts set forth in its Costs Submission[894] totaling U.S.$ 6,445,505.85.

## 2.2    *Respondent*

712.    Respondent submits costs generally follow the event and the Republic respectfully requests that costs be allocated in the spirit of this commonly applied rule.[895]

713.    Respondent should recover all of its costs because Claimant abusively introduced these proceedings, for all the reasons provided in the Respondent's pleadings, including at the March 2020 Hearing. In particular, because the Tribunal lacks jurisdiction; those claims are in any event ill founded; and Claimant fell short of establishing that it had suffered any damage caused by the Republic. Further, Respondent offers the following specific illustrations of Air Canada's unhelpful and wasteful approach to these proceedings in terms of efficiency, which should also be taken into consideration in the allocation of costs.[896]

714.    *First*, Claimant objected to each of the Respondent's attempts to safeguard its due process rights in the vain hope that it could reap the benefits from the illegitimate economic and political pressure imposed on the Respondent by certain countries. Claimant went as far as to request the exclusion from the record of the sole expert report that Respondent had been able to produce in circumstances where Dr. Flores was prevented from acting as an economic expert for the Republic under Executive Order No. 13884 of the President of the United States of America. Respondent maintains in this regard that its right to defend itself from Claimant's claims was hindered and respectfully considers that this should be reflected in the Tribunal's decision on costs.[897]

715.    *Second*, although Respondent objected to the jurisdiction of the Tribunal due to the application of the ATA for the first time in its Application for Bifurcation of 15 June 2018, Claimant waited until its June 2020 Post-Hearing Brief to address the Respondent's objection. Claimant's improper conduct went so far as to seek, at the very last minute, the

---

[894] C-Costs, para. 5.
[895] R-Costs, para. 1.
[896] R-Costs, para. 2.
[897] R-Costs, para. 3.

Tribunal's leave to produce new authorities, in breach of the rules governing the post-hearing phase of this arbitration. Had Claimant fully briefed its position in due time, the scope of the parties' post-hearing pleadings regarding this issue could have and would have been narrowed down, thereby reducing representation costs.[898]

716. *Third*, Claimant attempted to mislead the Tribunal on several occasions. For example, as explained in the Application for Bifurcation, Claimant misleadingly suggested in its Request for Arbitration that the relevant date under Article XII(3)(d) of the BIT is the date of the Notice of Dispute rather than the date of the Request for Arbitration. It did so in order to conceal that its claims were in fact time barred. Another illustration of Claimant's improper conduct lies in the presentation of its already doomed case on expropriation. Claimant misleadingly represented in its Response to the Application for Bifurcation that the funds that it improperly sought to convert into U.S. dollars through this arbitration – thereby bypassing the applicable Venezuelan regulations – were sitting in a bank account in Venezuela; where in fact Respondent demonstrated not only that Claimant had retained control over its funds but, more importantly, that it had freely spent over 99% of those funds prior to the commencement of these proceedings. Had Claimant not misrepresented key aspects of the case, the scope of the Parties' pleadings could have and would have been narrower, thereby reducing representation costs. For these reasons, Respondent respectfully considers that given its conduct, under no circumstances should Claimant be awarded costs.[899]

717. *Fourth*, the Hearing took place in Paris between 10 and 12 March 2020, only a few days before the President of France announced a general lockdown in France due to the COVID-19 pandemic. Given the seriousness of the situation in Paris days before the Hearing, Respondent requested that public health concerns be taken into consideration and that the Hearing be reconvened by videoconference at a later date. Not only would have such a way forward allowed to avoid imposing contact in a confined environment on people having had to travel but it would also have undoubtedly saved costs. Opportunistically refuting the gravity of the situation in France, Claimant strongly opposed such a solution. But for Claimant's defiant stance in this regard, the Hearing could have and would have been held in safer conditions, and important travel expenses would have been saved. Therefore, Respondent respectfully considers that Claimant should bear, in any event, all costs and expenses associated with the Hearing.[900]

718. In light of the above, Respondent respectfully requests that the Tribunal:

– Order Claimant to pay an amount of U.S.$ 7,678,000.80 in reimbursement of the Respondent's representation costs to date;

– Declare that the amount awarded to Respondent shall bear interest as the Tribunal may consider appropriate, as from the date of the Award and until complete payment; and

---

[898] R-Costs, para. 4.
[899] R-Costs, para. 5.
[900] R-Costs, para. 6.

– Order any additional measure it may deem appropriate.[901]

## 3. The costs of the proceeding

719. The costs of the proceeding, including the Tribunal's fees and expenses, ICSID's administrative fees, and direct expenses, are as follows: [902]

Tribunal's fees and expenses

|  |  |
|---|---|
| Prof. Pierre Tercier | U.S.$ 440,392.12 |
| Dr. Charles Poncet | U.S.$  79,060.20 |
| Ms. Deva Villanúa | U.S.$ 121,746.99 |
| Tribunal Assistant's Hearing Expenses | U.S$    2,620.70 |
| ICSID's administrative costs | U.S.$ 200,000.00 |
| Direct expenses | U.S.$  81,235.44 |
| **Total** | **U.S.$ 925,055.45** |

## 4. The Tribunal's analysis

720. Both Parties request an award of all costs associated with the arbitration, including the legal fees and expenses incurred in connection with this proceeding.

– Claimant's legal fees and expenses amount to U.S.$ 6,445,505.85 and

– Respondent's legal fees and expenses amount to U.S.$ 7,678,000.80.

721. The fees and expenses of the Tribunal and ICSID amount to U.S.$ 925,055.45.

722. *First*, the Tribunal will make no adjustments with respect to the amounts claimed by each Party as legal fees and expenses. The Tribunal finds these amounts to be reasonable in light of the circumstances of this case, particularly each Party's right to defend its case as it deems appropriate, the complexity of the case, and the number of arguments presented. It therefore affirms these amounts.

723. *Second*, the Tribunal notes that neither the BIT nor the AF Arbitration Rules provide any guidelines for the allocation of costs. The Tribunal therefore has discretion to allocate the costs of the arbitration. The Tribunal considers that an allocation of costs should be made

---

[901] R-Costs, para. 8.
[902] ICSID will provide a detailed final statement of the case account to the Parties. The remaining balance will be reimbursed to the Parties in proportion to the payments that they advanced to ICSID.

in accordance with the principle that "costs follow the event"[903] and in light of the overall assessment of the case. In particular, the Tribunal notes the following:

– Both Parties have acted properly;

– While Respondent lost all of its jurisdictional objections, those objections were not without merit;

– Claimant was successful on the majority of its claims on the merits; and

– Claimant was awarded a portion of the damages claimed.

724.    In light of the above, the Tribunal concludes that a 75% / 25% allocation in favor of Claimant is appropriate. Accordingly:

– Respondent shall bear 75% of the costs of the proceeding (i.e., U.S.$ 693,791.59), while Claimant shall bear 25% of such costs (i.e., U.S.$ 231,263.86); and

– Respondent shall bear its own legal fees and expenses, and Claimant shall be awarded 75% of its legal fees and expenses (i.e., U.S.$ 4,834,129.39).

**5.      Conclusion**

725.    ***In view of the foregoing, the Tribunal decides that Respondent shall bear U.S.$ 693,791.59 and Claimant shall bear U.S.$ 231,263.86 of the costs of the proceeding. Respondent shall bear its own legal fees and expenses and Claimant shall be awarded U.S.$ 4,834,129.39 of its legal fees and expenses.***

---

[903] The Gold Reserve tribunal noted that tribunals "*have awarded costs on a 'loser pays' basis,*" before stating that: "[c]*ompensating Claimant for the cost of bringing this proceeding is required to wipe out the consequences of Respondent's breach of the BIT and is particularly appropriate in the current case given the serious and egregious nature of the breach.*" The Rusoro tribunal also "*look*[ed] *favourably upon the criterion, often used in investment arbitration, that the losing party should make a significant contribution to the payment of the arbitration fees and the costs and expenses incurred by the prevailing party*". *Rusoro Mining Ltd. v. The Bolivarian Republic of Venezuela* – a case decided under the same BIT at issue in this case – noted that "[n]*either the Arbitration AF Rules nor the BIT contain any guidelines for the apportionment of costs. Therefore, the Tribunal has ample discretion to decide on how the costs of this proceeding will be apportioned.*"

# C.   AWARD

For the reasons set forth above, the Tribunal decides the following:

1. *The present dispute is within the Tribunal's jurisdiction and is admissible.*

2. *Respondent breached its obligations under Articles VIII and II(2) of the BIT.*

3. *Claimant shall be awarded U.S.\$ 20,790,574 with simple interest accruing at the rate reflecting Claimant's cost of debt from 17 March 2014 until payment in full.*

4. *Respondent shall bear 75% (i.e., U.S.\$ 693,791.59) and Claimant shall bear 25% (i.e., U.S.\$ 231,263.86) of ICSID's and the Tribunal's fees and costs. Respondent shall bear its own legal fees and expenses and Claimant shall be awarded 75% of its legal fees and expenses (i.e., U.S.\$ 4,834,129.39).*

5. *All other requests are rejected.*

Made in Paris, France

_____
Dr. Charles Poncet
Arbitrator
Date: 9 September 2021

_____
Ms. Deva Villanúa
Arbitrator

_____
Prof. Pierre Tercier
President of the Tribunal

Made in Paris, France

_____
Dr. Charles Poncet
Arbitrator

_____
Ms. Deva Villanúa
Arbitrator
Date: 9 September 2021

_____
Prof. Pierre Tercier
President of the Tribunal

195

Made in Paris, France

_____                    _____
Dr. Charles Poncet                              Ms. Deva Villanúa
Arbitrator                                        Arbitrator

Prof. Pierre Tercier
President of the Tribunal
Date: 9 September 2021